# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SCOTT REHBERG, WILLARD ALLEN RILEY, and MARIO RONCHETTI, individually and on behalf of all similarly situated individuals,<br><br>                  Plaintiffs,<br><br>-v-<br><br>FLOWERS FOODS, INC. and FLOWERS BAKING CO. OF JAMESTOWN, LLC,<br><br>                  Defendants. | Court File No. 12-cv-00596-MOC-DSC<br><br><br>**NOTICE OF CLASS ACTION** |

**NOTICE OF YOUR RIGHTS IN CONNECTION WITH A
FAIR LABOR STANDARDS ACT LAWSUIT AGAINST FLOWERS FOODS, INC. AND
FLOWERS BAKING CO. OF JAMESTOWN, LLC FOR OWED OVERTIME WAGES**

*A Court authorized this notice. This is not a solicitation from a lawyer.*

| **You Must Take Action by [DATE]** |
|---|

**PLEASE READ THIS NOTICE CAREFULLY.
IT MAY AFFECT YOUR LEGAL RIGHTS.**

➢ Current distributors who signed Independent Contractor Agreements with Flowers Foods, Inc. and Flowers Baking Co. of Jamestown, LLC (collectively referred to as "Flowers") have sued the company alleging that they were actually employees and should have been paid overtime premium wages for all hours worked over 40 each week.

➢ The Court has certified an opt-in class. **To participate in this class, you must mail the CONSENT TO JOIN FLSA CLASS form so it is postmarked by [day], [date], [year].**

➢ The Court has not decided whether Flowers did anything wrong. There is no money available now, and no guarantee there will be. However, your legal rights are affected and you have choices to make now that are explained in this Notice.

**1. Basic Information**

This Notice is to inform you about a lawsuit in which you may make a claim for unpaid overtime wages, to advise you of how your rights may be affected by this suit, and to describe how you can participate in these proceedings.

1

Three current distributors (Plaintiffs) have sued Flowers on behalf of themselves and other similarly situated distributors who were classified as independent contractors. Your rights may be affected if you worked for Flowers at any time from **[date]** to the present and were characterized as an independent contractor.

### 2. Summary of the Case

This lawsuit was filed against Flowers on September 12, 2012. The Plaintiffs allege that Flowers deprived them of overtime wages by misclassifying them as independent contractors instead of employees. The lawsuit is filed in the U.S. District Court for the Western District of North Carolina. Judge Max O. Cogburn, Jr. is assigned to the case.

Flowers denies any wrongdoing in this action.

### 3. The Court Has Certified a "Class" In Which You May Participate

If you worked for Flowers as a distributor and were characterized as an independent contractor at any time during the last three years, you may wish to participate in the FLSA Class.

To participate in the FLSA Class, **you must complete, sign and mail the yellow CONSENT TO JOIN FLSA CLASS form** enclosed with this notice **so that it is postmarked on or before [day], [date], [year].**

Because the liability period for your claim depends on the filing of your Consent to join FLSA CLASS form, you are encouraged to return it as soon as possible if you intend to participate. If you do not return the form so that it is postmarked by [day], [date], [year], you will not be able to seek FLSA wage damages in this lawsuit.

This class will seek to prove that distributors were employees rather than independent contractors and are therefore entitled to unpaid overtime wages under the federal Fair Labor Standards Act.

If you participate in the FLSA Class, you will receive an award of damages only if the Court determines that Flowers violated your rights under the law.

If you do not wish to seek overtime wages damages by participating in the FLSA Class, you do not need to take any action. Choosing not to participate in the FLSA Class will not eliminate your right to pursue a possible claim on an individual basis.

### 4. Flowers is Prohibited from Retaliating Against You

Federal law prohibits Flowers from terminating your position with the company or in any other manner discriminating against you because you have exercised your legal right to opt in to the FLSA Class or because you have otherwise exercised your rights under the Fair Labor Standards Act.

### 5. The Legal Effect of Joining this Lawsuit

Your ability to recover money may differ depending on what choices you make. If you choose to participate in the FLSA Class by submitting the enclosed **CONSENT TO JOIN FLSA CLASS** form, you will be bound by the judgment on your federal FLSA claim whether favorable or unfavorable, and by any settlement of the FLSA claims that may later be approved by the Court as fair and reasonable. While the suit is proceeding, you may be required to provide information, appear for a deposition, or testify in court.

2

**6. The Legal Effects of Not Joining This Lawsuit**

If you choose not to participate in the FLSA Class, the statute of limitations for any claim of unpaid compensation that you may have will continue to run and your claim could expire forever. If you do not participate in the class, you will not be bound by any ruling, judgment, award, or settlement, entered in this case, favorable or unfavorable.

**7. Legal Representation If You Join the Lawsuit**

The attorneys for Plaintiffs and the FLSA Class are:

Shawn J. Wanta
BAILLON THOME JOZWIAK
& WANTA LLP
222 South Ninth Street
Suite 2955
Minneapolis, MN 55402
Telephone: (612) 252-3570
Facsimile: (612) 252-3571
www.baillonthome.com

Ann Groninger
COPELEY JOHNSON GRONINGER PLLC
225 East Worthington Avenue
Charlotte, NC 28203
Telephone: (704) 200-2009
Facsimile: (888) 412-0421
www.cjglawfirm.com

Plaintiffs' counsel are being paid on a contingency fee and/or statutory basis, which means that if there is no recovery, there will be no attorneys' fees. If there is a class-wide recovery, the attorneys will apply to the court to receive a part of any settlement obtained or money judgment entered.

**8. Additional Information**

The information in this Notice is only a summary of the litigation.  For further information about this lawsuit, you may visit the website [www.URL.com] or contact Plaintiffs' Counsel using the information provided above.

**Although the Court has authorized the sending of this Notice, the Court expresses no opinion regarding the merits of Plaintiffs' claims or Flowers's liability, if any.**

---

### DEADLINE:

### IF YOU WISH TO SUBMIT A
### CONSENT TO JOIN FLSA CLASS FORM,
### IT MUST BE POSTMARKED BY [DAY], [DATE], [YEAR]

---

3

*Rehberg, et al. v. Flowers Foods, Inc., et al.*, No. 12-cv-00596 (W.D. NC)

## CONSENT TO JOIN FLSA CLASS

I hereby **consent** to make a claim under the Fair Labor Standards Act, 29 U.S.C. §201, *et seq.* to recover overtime wages owed to me as a distributor for Flowers Foods, Inc. and Flowers Baking Co. of Jamestown, LLC. ("Flowers") in the lawsuit *Rehberg, et. al. v. Flowers Foods, Inc., et al.*, No. 12-cv-00596 (W.D. NC).  I worked for Flowers as a distributor within the last three years and was characterized as an independent contractor.

For purposes of prosecuting my claims under the FLSA, I hereby give my consent to be represented by counsel for the Plaintiffs as identified in the Notice sent by this Court.

If this case does not proceed collectively, I also consent to join any subsequent action to assert claims against Flowers for overtime wages. I understand that I may withdraw my consent to proceed with my claims at any time by notifying the attorneys handling the matter.

Dated: _____, [year]        _____
                                       Signature

                                       _____
                                       Printed Name

---

**No information included below will be filed with the Court.**

PLEASE PRINT OR TYPE THE FOLLOWING INFORMATION:

Name: _____
              (First)                    (Middle)                    (Last)

Street Address: _____

City, State, Zip: _____

Home Phone:_____ Cell: _____ Work:_____

Email: _____ Date of Birth: _____ Social Security #: _____

Return this form **SO IT IS POSTMARKED BY [DAY[, [DATE], [YEAR]**

Return to:        Baillon Thome Jozwiak & Wanta LLP
                  Attn:  Shawn J. Wanta
                  222 South Ninth Street
                  Suite 2955
                  Minneapolis, MN 55402

4

Baillon Thome Jozwiak & Wanta LLP
222 South Ninth Street
Suite 2955
Minneapolis, MN 55402

Postage

**PLEASE READ**

IMPORTANT CLASS ACTION
INFORMATION

[Address Block]

---

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
*Rehberg, et al. v. Flowers Foods, Inc., et al.*, **No. 12-cv-00596 (W.D. NC)**

Please be advised that on [date] a Notice of Class Action was mailed to you in connection with the *Rehberg, et al. v. Flowers Foods, Inc., et al.* class action litigation. The claim deadline for taking action is **[date]**. As of today's date, we have not received a response from you.

**IN ORDER TO PARTICIPATE IN THE FLSA PORTION OF THE LAWSUIT, YOU MUST SUBMIT A COMPLETED CONSENT FORM BY [DATE].**

 If you did not receive a Notice of Class Action or the necessary forms, please contact us at (612) 252-3570 to check your eligibility and request that the forms be mailed to you. You may also download the forms on-line at [www.URL.com].

Case 3:12-cv-00596-MOC-DSC   Document 28-2   Filed 11/20/12   Page 6 of 29

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SCOTT REHBERG, WILLARD ALLEN RILEY, and MARIO RONCHETTI, individually and on behalf of all similarly situated individuals,<br><br>Plaintiffs,<br><br>-v-<br><br>FLOWERS FOODS, INC. and FLOWERS BAKING CO. OF JAMESTOWN, LLC,<br><br>Defendants. | Civil Action No. 3:12-cv-00596-MOC-DSC<br><br><br>**DECLARATION OF SCOTT REHBERG** |

1.     I am a Plaintiff in this action against Defendant Flowers Foods, Inc. and

Flowers Baking Co. of Jamestown, LLC (collectively referred to as "Flowers").  I am

over the age of 18 and competent to testify about the matters set forth in this Declaration.

I submit this Declaration in support of Plaintiffs' Motion for Conditional Class

Certification.

2.     I have been employed as a Distributor with Flowers since approximately

November of 2004.  My area of distribution is in North Carolina.

3.     As a Distributor, I have a contract with Flowers that outlines my

compensation and job performance expectations.  I am paid a "piece rate" based upon the

amount of bakery products that Flowers' customers sell.  Flowers subsidizes me to take

up to two weeks of vacation each year, and they provide a substitute driver if I take time

off.

4.     I am required to pay for my own delivery vehicles and equipment.

5.     My main job duty as a Distributor is to deliver Flowers' products to their

customers.  I typically arrive at Flowers' warehouse early in the morning to load my truck

with Flowers products. After loading my truck, I drive to Flowers' various customers on a pre-determined route, stock the customers' shelves with the product, and remove stale product from the stores. I am required to maintain my market seven days a week.

6. I am required to use Flowers' handheld computer system. This computer system tells me the price of the products, the quantity to deliver, historical sales, and similar information. The information is maintained in a central computer system controlled by Flowers. I also use the handheld computer system to place orders for products from Flowers, but Flowers have changed orders that I have placed—even if I disagree with the reason for the change. I am required to deliver and stock any product that Flowers demand.

7. Flowers retain the authority to decide prices and make other product-related decisions. Flowers negotiate directly with their customers to determine the price of products, the products that will be sold in each store, the shelf space that will be allocated to the products, any sale or promotional prices, and the terms of payment.

8. I am held to the same performance standards as all other Distributors. We are required to follow the same protocol when delivering to Flowers' customers. Flowers can monitor my deliveries and orders using the handheld computer system. Flowers can terminate my contract if I do not meet the company's performance expectations.

9. As a Distributor, I routinely work over 40 hours per week. I do not receive any overtime compensation for any of those hours.

10. I believe that other Flowers Distributors also regularly work over 40 hours per week. I understand that these Distributors do not receive any overtime compensation for any of those hours.

11.     I understand that Flowers has a company-wide policy of not paying

Distributors overtime compensation because we are classified as "exempt" employees.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true
and correct.


Dated this __13__ day of November 2012.

_____
Scott Rehberg

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SCOTT REHBERG, WILLARD ALLEN RILEY, and MARIO RONCHETTI, individually and on behalf of all similarly situated individuals,<br><br>Plaintiffs,<br><br>-v-<br><br>FLOWERS FOODS, INC. and FLOWERS BAKING CO. OF JAMESTOWN, LLC,<br><br>Defendants. | Civil Action No. 3:12-cv-00596-MOC-DSC<br><br><br>**DECLARATION OF WILLARD ALLEN RILEY** |

1.      I am a Plaintiff in this action against Defendants Flowers Foods, Inc. and

Flowers Baking Co. of Jamestown, LLC (collectively referred to as "Flowers").  I am

over the age of 18 and competent to testify about the matters set forth in this Declaration.

I submit this Declaration in support of Plaintiffs' Motion for Conditional Class

Certification.

2.      I have been employed with Flowers since 1989 and working as a

Distributor since approximately 1994.  My area of distribution is in York County, South

Carolina.

3.      As a Distributor, I have a contract with Flowers that outlines my

compensation and job performance expectations.  I am paid a "piece rate" based upon the

amount of bakery products that Flowers' customers sell.  Flowers subsidizes me to take

up to two weeks of vacation each year, and they provide a substitute driver if I take time

off.

4.      I am required to pay for my own delivery vehicles and equipment.

5.      My main job duty as a Distributor is to deliver Flowers' products to their customers.  I typically arrive at Flowers' warehouse early in the morning to load my truck with Flowers products.  After loading my truck, I drive to Flowers' various customers on a pre-determined route, stock the customers' shelves with the product, and remove stale product from the stores. I am required to maintain my market seven days a week.

6.      I am required to use Flowers' handheld computer system.  This computer system tells me the price of the products, the quantity to deliver, historical sales, and similar information.  The information is maintained in a central computer system controlled by Flowers.  I also use the handheld computer system to place orders for products from Flowers, but Flowers have changed orders that I have placed—even if I disagree with the reason for the change.  I am required to deliver and stock any product that Flowers demand.

7.      Flowers retain the authority to decide prices and make other product-related decisions.  Flowers negotiate directly with their customers to determine the price of products, the products that will be sold in each store, the shelf space that will be allocated to the products, any sale or promotional prices, and the terms of payment.

8.      I am held to the same performance standards as all other Distributors.  We are required to follow the same protocol when delivering to Flowers' customers. Flowers can monitor my deliveries and orders using the handheld computer system.  Flowers can terminate my contract if I do not meet the company's performance expectations.

9.      As a Distributor, I routinely work over 40 hours per week.  I do not receive any overtime compensation for any of those hours.

10.     I believe that other Flowers Distributors also regularly work over 40 hours per week.  I understand that these Distributors do not receive any overtime compensation for any of those hours.

11.     I understand that Flowers has a company-wide policy of not paying Distributors overtime compensation because we are classified as "exempt" employees.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 8 day of November 2012.

Willard Allen Riley

| | |
|---|---|
| SCOTT REHBERG, WILLARD ALLEN RILEY, and MARIO RONCHETTI, individually and on behalf of all similarly situated individuals,<br><br>Plaintiffs,<br><br>-v-<br><br>FLOWERS FOODS, INC. and FLOWERS BAKING CO. OF JAMESTOWN, LLC,<br><br>Defendants. | Civil Action No. 3:12-cv-00596-MOC-DSC<br><br><br>**DECLARATION OF MARIO RONCHETTI** |

1.      I am a Plaintiff in this action against Defendants Flowers Foods, Inc. and Flowers Baking Co. of Jamestown, LLC (collectively referred to as "Flowers").  I am over the age of 18 and competent to testify about the matters set forth in this Declaration. I submit this Declaration in support of Plaintiffs' Motion for Conditional Class Certification.

2.      I have been employed as a Distributor with Flowers since approximately May 16, 2004.  My area of distribution includes Charlotte and Harrisburg, North Carolina.

3.      As a Distributor, I have a contract with Flowers that outlines my compensation and job performance expectations.  I am paid a "piece rate" based upon the amount of bakery products that Flowers' customers sell.  Flowers subsidizes me to take up to two weeks of vacation each year, and they provide a substitute driver if I take time off.

4.      I am required to pay for my own delivery vehicles and equipment.

5.      My main job duty as a Distributor is to deliver Flowers' products to their customers.  I typically arrive at Flowers' warehouse early in the morning to load my truck with Flowers products.  After loading my truck, I drive to Flowers' various customers on a pre-determined route, stock the customers' shelves with the product, and remove stale product from the stores. I am required to maintain my market seven days a week.

6.      I am required to use Flowers' handheld computer system.  This computer system tells me the price of the products, the quantity to deliver, historical sales, and similar information.  The information is maintained in a central computer system controlled by Flowers.  I also use the handheld computer system to place orders for products from Flowers, but Flowers have changed orders that I have placed—even if I disagree with the reason for the change.  I am required to deliver and stock any product that Flowers demand.

7.      Flowers retain the authority to decide prices and make other product-related decisions.  Flowers negotiate directly with their customers to determine the price of products, the products that will be sold in each store, the shelf space that will be allocated to the products, any sale or promotional prices, and the terms of payment.

8.      I am held to the same performance standards as all other Distributors.  We are required to follow the same protocol when delivering to Flowers' customers. Flowers can monitor my deliveries and orders using the handheld computer system.  Flowers can terminate my contract if I do not meet the company's performance expectations.

9.      As a Distributor, I routinely work over 40 hours per week.  I do not receive any overtime compensation for any of those hours.

10. I believe that other Flowers Distributors also regularly work over 40 hours per week. I understand that these Distributors do not receive any overtime compensation for any of those hours.

11. I understand that Flowers has a company-wide policy of not paying Distributors overtime compensation because we are classified as "exempt" employees.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this _14_ day of November 2012.

Mario Ronchetti

# EXHIBIT 3

## DISTRIBUTOR AGREEMENT

AGREEMENT made this _____ day of _____, by and between _____(COMPANY),

and _____ (DISTRIBUTOR).

### WITNESSETH:

COMPANY has developed or acquired a license or franchise for the use of formulae, recipes, trademarks and trade names through which it manufactures and/or markets bread, rolls, and other fresh-baked products, as defined herein, throughout a geographic area which constitutes the Territory designated in Exhibit A (Territory), attached hereto and made a part hereof; and

Whereas, COMPANY, through the expenditure of time and effort and through its continuing research and marketing programs, has over the years developed a reputation for excellence in quality, value, and superior service which has created strong consumer recognition, approval, and demand for its products; and

Whereas, COMPANY has determined that the division of a portion of its market area into distribution territories, and the sale of its products to Independent Distributors for distribution and ultimate retail sale in said territories, will result in a superior distribution system; and

Whereas, _____ is an independent contractor with the resources, expertise and capability to act as a distributor of COMPANY'S products in the Territory; and

Whereas, the parties desire to create a right in DISTRIBUTOR, under which DISTRIBUTOR will be authorized to sell certain defined products within a specified geographic area.

Now, therefore, in consideration of these premises, and of the covenants and conditions contained in this Agreement, and for other good and valuable consideration given and received, the receipt and the sufficiency of which are hereby specifically agreed to and acknowledged, the parties mutually agree as follows:

### I. WARRANTY

1.1     The foregoing preambles shall constitute warranties, representations, agreements and undertakings by the parties.

### II. DEFINITIONS

2.1     **Outlets**: Shall mean all retail stores (except thrift stores) selling food to the general public and all restaurant, fast food, military and institutional accounts except those exempt from this Agreement as set forth in Article VII, below.

2.2     **Products**: Shall mean fresh baked goods, as specifically described in Exhibit B, attached hereto and made a part hereof, which are currently produced and/or distributed by COMPANY, provided, however, that the Distribution Rights granted herein shall survive only so long as COMPANY has the license or franchise rights for such goods and COMPANY produces and/or sells such goods. Products shall not include products other than those specifically described in Exhibit B nor products intended to be sold as frozen or refrigerated.

**2.3** **Authorized Products**:  Shall mean fresh baked goods, as specifically described in Exhibit C, attached hereto and made a part hereof, which are currently produced and/or distributed by COMPANY, provided, however, that DISTRIBUTOR does not acquire any proprietary or ownership rights to such Authorized Products, exclusive or non-exclusive, and that COMPANY may cease selling such Authorized Products to DISTRIBUTOR upon written notice, with or without cause.  COMPANY may also add Authorized Products to Exhibit C upon written notice to DISTRIBUTOR.

**2.4** **Distribution Rights**:  Except as expressly limited by this Agreement, Distribution Rights shall mean the right to sell and distribute Products as set forth in Exhibit B to Outlets in the Territory, which right has been purchased by DISTRIBUTOR from COMPANY as evidenced by a Bill of Sale executed by the parties, the form of which is attached hereto as Exhibit D, and made a part hereof.

**2.5** **Territory**:  Shall mean that geographic area as more specifically described in Exhibit A within which DISTRIBUTOR owns the Distribution Rights.

**2.6** **Good Industry Practice**:  Shall mean the standards that have developed and are generally accepted and followed in the baking industry, including, but not limited to, maintaining an adequate and fresh supply of Products and Authorized Products in all Outlets requesting service, actively soliciting all Outlets not being serviced, properly rotating all Products and Authorized Products, promptly removing all stale Products and Authorized Products, maintaining proper service and delivery to all Outlets requesting service, maintaining all equipment in a sanitary condition and in good safe working order, and operating the Distributorship in compliance with all applicable federal, state and local laws, rules and regulations.

**2.7** **Chain**:  Shall mean a person or business entity that operates more than one Outlet and/or which makes centralized decisions regarding the purchase of Products and/or Authorized Products for more than one Outlet.

## III. RELATIONSHIP

**3.1** **Extent and Duration**:  COMPANY hereby recognizes DISTRIBUTOR'S ownership of the Distribution Rights, said ownership to continue until:

(a)     transferred, assigned or sold by DISTRIBUTOR or anyone acting on behalf of DISTRIBUTOR (this includes a sale by COMPANY for the account of DISTRIBUTOR in the event of a termination of this Agreement upon the terms defined below), or

(b)     COMPANY, for legitimate business reasons, ceases to use distributors to distribute Products in the _____ market area.  In such event, COMPANY will repurchase the Territory and Distribution Rights from DISTRIBUTOR at ten (10) times the average weekly sales volume of Products (not Authorized Products) in the Territory calculated over the six (6) month period preceding the repurchase, or

(c)     either party exercise their rights to terminate pursuant to Section 15.1.  In such event, COMPANY will repurchase the Territory and Distribution Rights from DISTRIBUTOR at fair market value.

**3.2** **Nature of Rights**: The parties agree that the Distribution Rights sold to DISTRIBUTOR pursuant to the Bill of Sale can be exercised only pursuant to the terms of this Agreement and that any termination of this

Agreement other than in accordance with Section 3.1 (b) or (c) requires DISTRIBUTOR, or anyone acting on behalf of DISTRIBUTOR, to sell such Distribution Rights subject to the terms of this Agreement.

## IV. SALE OF PRODUCTS

4.1     Products and Authorized Products will be sold to DISTRIBUTOR at such terms and prices as established by COMPANY from time to time.

## V. BEST EFFORTS/DISTRIBUTOR

5.1     **Obligations of DISTRIBUTOR**:  DISTRIBUTOR agrees and covenants to use DISTRIBUTOR'S best efforts to develop and maximize the sale of Products to Outlets within the Territory and service the Territory in accordance with good industry practice as defined above.

DISTRIBUTOR further agrees and covenants to use DISTRIBUTOR'S best efforts to maximize the sale of Authorized Products to those Outlets in the Territory for which such Authorized Products have been produced and to distribute such Authorized Products to such Outlets in accordance with good industry practice as defined above, including full rack service if required by the Outlet.

DISTRIBUTOR shall cooperate with COMPANY on its marketing and sales efforts and maintain a clean and neat personal appearance consistent with the professional image customers and the public associate with COMPANY.  DISTRIBUTOR may not carry outside merchandise which is competitive with the Products or Authorized Products.  DISTRIBUTOR may carry noncompetitive products, as long as this does not interfere with the distribution of the Products or Authorized Products.

5.2     **Non-Compliance**:  Failure to comply with Section 5.1 above and/or any of the terms, conditions and obligations elsewhere in this Agreement shall be considered a material breach of this Agreement and shall be governed by the provisions of this Agreement dealing with termination.

## VI. BEST EFFORTS/COMPANY

6.1     **Obligations of Company**:  COMPANY shall use its best efforts to manufacture and deliver to DISTRIBUTOR sufficient quantities of Products and Authorized Products to supply Outlets requesting service in the Territory, preserve and develop the quality and marketability of the Products, and cooperate with DISTRIBUTOR in DISTRIBUTOR'S sales efforts.

In order to assist DISTRIBUTOR with product sales to Chains, which may require COMPANY involvement to obtain authorization to sell Products or Authorized Products, DISTRIBUTOR hereby designates COMPANY and COMPANY agrees to act as DISTRIBUTOR'S agent to obtain such authorization.

Nothing herein shall obligate COMPANY to seek authorization or otherwise pursue business opportunities with any specific Chain or other account, such decisions being within the exclusive province of COMPANY.

3

## VII. ACCOUNTS AND/OR TRADEMARKS EXEMPT FROM DISTRIBUTORSHIP

**7.1**  **Accounts Exempt From Agreement**: COMPANY reserves the right to solicit and service drop delivery accounts, in whole or in part, in DISTRIBUTOR'S Territory, so long as it is done for legitimate business reasons and not for the purpose of undermining DISTRIBUTOR'S business.

**7.2**  **Thrift Stores**: COMPANY reserves the right to continue to sell Products and Authorized Products through its retail thrift store operation, COMPANY-owned and/or independently owned.

**7.3**  **Other Trademarks**: The parties hereto stipulate that COMPANY and COMPANY affiliates produce a variety of products marketed under a variety of trademarks distributed through multiple channels of distribution. This Agreement does not restrict any other distribution of products by COMPANY and COMPANY affiliates marketed under trademarks not listed on Exhibit B.

## VIII. PAYMENT FOR PRODUCTS

**8.1**  **Settlement of Account**: On or before Friday of each week, DISTRIBUTOR will provide to COMPANY a full settlement of all Products and Authorized Products sold to DISTRIBUTOR in, and a statement of operating expenses for, the preceding week.

**8.2**  **Maintenance of Records**: DISTRIBUTOR will maintain current and accurate financial records for the operation of the Distributorship during the term of the Agreement. DISTRIBUTOR will provide the COMPANY with complete and accurate quarterly and annual financial reports and operating statements in the form as described in Exhibit E attached hereto and as amended from time to time, within thirty (30) days after each quarter and year end. To insure the adequacy and accuracy of such reports and otherwise insure compliance with the obligations referenced herein, COMPANY, at its expense, shall be entitled to inspect, copy and audit DISTRIBUTOR'S records and books kept in accordance with this Agreement upon request.

    **8.2.1**  COMPANY, for a period of _____ (__) year(s) following the date of this Agreement, agrees to reimburse DISTRIBUTOR the expenses of a certified public accountant, to a maximum of ___ dollars ($ ) per year, who will assist DISTRIBUTOR in the maintenance of these records. Upon request, DISTRIBUTOR shall provide COMPANY evidence of payment to the certified public accountant.

**8.3**  **Cash Sales**: DISTRIBUTOR is responsible for the collection of all cash sales in the Territory.

**8.4**  **Non-Cash Sales**: In cases where Products and/or Authorized Products are sold and distributed to Outlets which have been authorized by COMPANY for credit, COMPANY, at the request and for the convenience of DISTRIBUTOR, may establish an account receivable for Products and/or Authorized Products with the Outlet and will promptly credit DISTRIBUTOR for all such accounts. DISTRIBUTOR is wholly responsible for collection of accounts receivable not authorized by COMPANY.

**8.5**  **Chain Accounts**: COMPANY reserves the right to continue carrying the accounts receivable for all Chain and other major accounts and to promptly credit DISTRIBUTOR for all such accounts. The accounts covered by this section are listed in Exhibit F, attached hereto and made a part hereof. In the

4

event a Chain account implements pay by scan technology, DISTRIBUTOR agrees to comply with COMPANY pay by scan policies as established by COMPANY from time to time.

**8.6**     **Security Interest:** To secure the payment of any indebtedness or liability of DISTRIBUTOR to COMPANY now or hereafter arising, DISTRIBUTOR hereby grants and conveys to COMPANY a security interest in the Distribution Rights, all other rights under this Agreement and all Products and Authorized Products in DISTRIBUTOR'S possession, and grants to COMPANY the rights of a secured party under the Uniform Commercial Code.

## IX. EQUIPMENT AND PROPRIETARY SERVICES

**9.1**     DISTRIBUTOR is responsible for obtaining DISTRIBUTOR'S own delivery truck(s) and purchasing adequate insurance thereon, in such amounts as may from time to time be reasonably required by COMPANY, which as of the date of the execution of this Agreement will include combined single limit coverage of at least $1,000,000. DISTRIBUTOR'S insurance purchased pursuant to this section shall be endorsed to name COMPANY as an additional named insured and be primary and not contributory to any other coverage available to COMPANY under similar policies. DISTRIBUTOR will provide COMPANY evidence of insurance and the endorsement described in this section. DISTRIBUTOR shall provide evidence of the primary and non-contributory coverage by providing an additional insured endorsement which specifically states that the insurance is primary and not contributory.

**9.2**     DISTRIBUTOR is responsible for truck sanitation. Consistent with good industry practice, the delivery truck(s) should be kept clean at all times and maintained in such condition as to provide safe, prompt, and regular service to all customers.

**9.3**     DISTRIBUTOR is responsible for maintenance of DISTRIBUTOR'S delivery truck(s).

**9.4**     COMPANY will assist DISTRIBUTOR in securing a spare delivery truck, when needed, at a specified location which DISTRIBUTOR may use in case of an emergency. DISTRIBUTOR will be responsible for any charges resulting from any use of such vehicle. On any such vehicle, DISTRIBUTOR is responsible for obtaining automobile liability insurance coverage with limits of at least $1,000,000, with COMPANY named as additional insured. On any vehicle DISTRIBUTOR rents, borrows or leases from COMPANY, DISTRIBUTOR agrees that DISTRIBUTOR'S automobile liability insurance shall be primary and not contributory to any other coverage available to the COMPANY under similar policies.

**9.5**     COMPANY shall make available, and DISTRIBUTOR shall use, certain proprietary administrative services in order to assist DISTRIBUTOR in the conduct of DISTRIBUTOR'S business for the following purposes: (i) collection of sales data, (ii) preparation of sales tickets, (iii) accumulation of sales histories, (iv) preparation of daily and weekly settlements, (v) preparation of automated "adds" to and "cuts" from DISTRIBUTOR'S daily order of Products and Authorized Products, and (vi) direct communication to COMPANY for the purpose of DISTRIBUTOR'S ordering of product and receipt of daily load information.

5

Further, COMPANY shall make available, and DISTRIBUTOR shall use, certain proprietary administrative services in order to assist DISTRIBUTOR in the conduct of DISTRIBUTOR'S business for the following purposes: (i) to provide automated route book information, (ii) to provide automated product movement information, (iii) to provide individual customer sales profiles, and (iv) to provide suggested orders for each customer.

**9.5.1**  COMPANY shall charge, and DISTRIBUTOR shall pay, a fair market, reasonable administrative fee for these services, which shall be established from time to time by COMPANY.

**9.5.2**  DISTRIBUTOR agrees to maintain and hold in confidence any and all information obtained from or derived about COMPANY'S proprietary administrative services.

**9.5.3**  DISTRIBUTOR acknowledges that DISTRIBUTOR cannot and shall not acquire any proprietary rights in COMPANY'S proprietary administrative services and no rights shall accrue to DISTRIBUTOR by virtue of the use of the proprietary administrative services.

**9.5.4**  This provision shall remain in effect for as long as this Agreement is in effect. However, in the event this Agreement is terminated for any reason, so shall DISTRIBUTOR'S right to use the proprietary administrative services. The right to use these administrative services shall not be assigned by DISTRIBUTOR without the express written consent of COMPANY.

**9.5.5**  Compliance with these provisions is a material part of the performance standards of this Agreement and any violation shall be a material breach of this Agreement.

**9.5.6**  COMPANY may, in its sole discretion, alter, amend or terminate the proprietary administrative services herein made available by the giving of fourteen (14) calendar days notice to DISTRIBUTOR.

## X. PRODUCT DELIVERY

**10.1**  COMPANY shall deliver Products and Authorized Products to DISTRIBUTOR at a location specified by COMPANY, provided that any location chosen will be of suitable size with the necessary loading dock heights to allow for use by DISTRIBUTOR. DISTRIBUTOR will be charged a fee for warehouse use.

## XI. PRODUCT CODE

**11.1**  Maintaining a fresh market is a fundamental tenet of the baking industry. Accordingly, out of code Products or Authorized Products on the market is a material breach of this Agreement. Repeated violations will be grounds for termination of this Agreement.

**11.2**  To assist DISTRIBUTOR in maintaining a fresh market, COMPANY will repurchase a certain percentage of DISTRIBUTOR'S stale Products or Authorized Products, at a price equal to DISTRIBUTOR'S cost of such product, in accordance with COMPANY'S stale allowance policy as established by COMPANY from time to time.

**11.3**  DISTRIBUTOR may not sell any Products or Authorized Products over code or not in a saleable condition for distribution to the general public, but may otherwise sell such products to purchasers who are not competitors of COMPANY.

6

## XII.  ADVERTISING AND PROMOTIONS

**12.1**  COMPANY will provide all COMPANY initiated advertising material at no cost to DISTRIBUTOR, including, but not limited to, point of sale material and COMPANY scheduled media advertising.  Subject to COMPANY'S prior approval, which approval will not be unreasonably withheld, DISTRIBUTOR may use other advertising materials.

**12.2**  DISTRIBUTOR will adhere to all promotions and feature pricing with respect to the major and Chain accounts in the Territory.  Such promotions and feature pricing are optional with respect to local accounts. When DISTRIBUTOR follows promotions or feature pricing, DISTRIBUTOR will receive a reduction in the purchase price accounting for such promotion or feature pricing.

## XIII.  SERVICE REQUIREMENTS

**13.1**  DISTRIBUTOR is responsible for providing service of the Territory during periods of sickness, vacation, temporary disability and other similar circumstances.

**13.2**  In the case of an emergency during which DISTRIBUTOR cannot provide a substitute to service the Territory, COMPANY reserves the right to service such Territory and charge DISTRIBUTOR a daily fee plus operating expenses.

## XIV.  TRANSFER OR SALE OF RIGHTS

**14.1**  **Conditions:**  The Distribution Rights are owned by the DISTRIBUTOR and may be assigned, transferred or sold, in whole or in part, by DISTRIBUTOR, or anyone acting on behalf of DISTRIBUTOR, subject in either case to the prior written approval of the assignees', transferees' or purchasers' qualifications by COMPANY, which approval will not be unreasonably withheld.  However, any sale, whether made by DISTRIBUTOR, or by anyone acting on behalf of DISTRIBUTOR, shall be subject to a first right of refusal on the part of COMPANY at the same terms and conditions offered to DISTRIBUTOR, or anyone acting on behalf of DISTRIBUTOR, by a qualified and bona fide purchaser, which right shall expire if not exercised with ten (10) business days after the later of:  (a) receipt by COMPANY of written notice of intent to sell to a named purchaser on terms and conditions fully set forth in such notice, and (b) an evaluation by COMPANY of the proposed purchaser.  DISTRIBUTOR agrees to execute and deliver to COMPANY a release of all of DISTRIBUTOR'S interests and claims to and in the Distribution Rights and all of DISTRIBUTOR'S interests under or arising out of this Agreement, together with a general release of claims, in the event of any sale, conveyance or assignment, including any sale, conveyance or assignment to COMPANY.  COMPANY will concurrently execute a general release of claims as to DISTRIBUTOR, except for any claim for monies due and owing COMPANY.

**14.2**  **Settlement of Account:**  No transfer or sale of DISTRIBUTOR'S rights under this Agreement is to be made unless and until DISTRIBUTOR has settled with COMPANY all outstanding accounts and settled all other outstanding liens and debts related to the Distributorship; provided, however, that COMPANY

7

may waive this requirement depending on the circumstances of the particular transaction, including if it is satisfied that under the terms of the sale, the purchaser assumes all such liabilities and is financially capable of such assumption.

**14.3    Transfer Fee**:   In the event of a sale by DISTRIBUTOR, or by anyone acting on behalf of DISTRIBUTOR (including a sale by COMPANY for the account of DISTRIBUTOR), of DISTRIBUTOR'S Distribution Rights, DISTRIBUTOR shall pay a transfer fee to COMPANY in an amount equal to five (5%) of such gross sales price, in consideration of the administrative activities undertaken by COMPANY in connection with such sale.

## XV.  INDEPENDENT BUSINESS

**15.1    Essential Term**:   The status of DISTRIBUTOR pursuant to this Agreement is that of common law independent contractor and the parties hereby signify their express intention to this effect. DISTRIBUTOR shall not be controlled by COMPANY as to the specific details or manner of DISTRIBUTOR'S business, it being understood that the primary interest of COMPANY is the results achieved by DISTRIBUTOR. DISTRIBUTOR'S business is separate and apart from that of COMPANY and it is of the essence of this Agreement that DISTRIBUTOR is an independent business. Any final judicial determination that DISTRIBUTOR is not a common law independent contractor shall entitle either party to cancel this Agreement. Neither DISTRIBUTOR nor any of DISTRIBUTOR'S employees, agents, or servants shall be considered or deemed in any way to be employees, agents or servants of COMPANY and neither party has the right or power, express or implied, to do any act or thing that would bind the other, except as herein specifically provided. The parties do not intend to act as joint employers, parent/subsidiary, joint venturers, or any other legal capacity other than separate and distinct businesses acting pursuant to the terms of this Agreement. Furthermore, none of the benefits provided by COMPANY to its employees are available from COMPANY to DISTRIBUTOR or to DISTRIBUTOR'S employees, agents, or servants. In the event DISTRIBUTOR and/or DISTRIBUTOR'S employees, agents or servants hereafter become eligible to participate in any such benefits, DISTRIBUTOR, on behalf of DISTRIBUTOR and DISTRIBUTOR'S employees, agents and servants, hereby waives any right to participate in such benefits. Such waiver is not dependent upon DISTRIBUTOR'S status as an independent contractor. DISTRIBUTOR will be solely and entirely responsible for DISTRIBUTOR'S acts and for the acts of DISTRIBUTOR'S employees, agents, and servants during the performance of this Agreement, and will save and hold COMPANY harmless from any and all damages which may arise therefrom, including attorneys' fees. As a part of this obligation, DISTRIBUTOR agrees to obtain a combined single limit insurance policy against any such liability as to COMPANY with limits of at least $1,000,000, naming COMPANY as an additional named insured therein. Such coverage shall be primary and not contributory. DISTRIBUTOR must provide COMPANY with a written certificate of said insurance. Notwithstanding the fact the DISTRIBUTOR is an independent contractor, COMPANY and DISTRIBUTOR agree that, until further written notice from COMPANY to DISTRIBUTOR,

8

COMPANY shall treat DISTRIBUTOR as a "statutory employee" as defined in Section 3121 of the Internal Revenue Code, and shall withhold and/or remit the appropriate amounts on DISTRIBUTOR'S behalf pursuant to the Federal Insurance Contributions Act and/or Section 3306 of the Federal Unemployment Tax Act. Any such written notice shall be effective as of the date specified therein which shall be no sooner than thirty (30) calendar days from the date of delivery thereof.

15.2 **Non-Personal Service**: This Agreement does not require that DISTRIBUTOR'S obligations hereunder be conducted personally, or by any specific individual in DISTRIBUTOR'S organization. DISTRIBUTOR shall be free to engage such persons as DISTRIBUTOR deems appropriate to assist in discharging DISTRIBUTOR'S responsibilities hereunder. Any breach of this Agreement by any person engaged by DISTRIBUTOR shall be deemed to be a breach by DISTRIBUTOR.

## XVI. TERMINATION BY COMPANY

16.1 **Performance**: Except as set forth in Sections 3.1 (b) and (c) and 15.1 above, or this Article, COMPANY shall not terminate or cancel this Agreement, provided DISTRIBUTOR faithfully carries out the terms hereof. In the event DISTRIBUTOR fails to perform DISTRIBUTOR'S obligations under this Agreement, COMPANY may terminate this Agreement as set forth below.

16.2 **Non-Curable Breach**: COMPANY may terminate upon twenty-four (24) hours' written notice and DISTRIBUTOR shall have no right to cure if DISTRIBUTOR'S failure of performance involves criminal activity, threatens public health or safety, or threatens to do substantial harm to COMPANY'S business, including, but not limited to, any action or inaction on DISTRIBUTOR'S part that results in DISTRIBUTOR'S inability to service any Chain account.

16.3 **Curable Breach**: In any event of failure of performance by DISTRIBUTOR, COMPANY must give DISTRIBUTOR ten (10) business days written notice within which DISTRIBUTOR may cure DISTRIBUTOR'S failure of performance. If DISTRIBUTOR does not cure such failure of performance within this ten (10) day period, COMPANY may thereafter terminate this Agreement and DISTRIBUTOR shall have no further right to cure. Furthermore, the parties agree that repeated violations constitute a chronic failure of performance and threaten substantial harm to COMPANY'S business, and in such event COMPANY shall be entitled to terminate this Agreement and DISTRIBUTOR shall have no further right to cure.

16.4 **Actions Following Termination**: If this Agreement is terminated under either Section 16.2 or 16.3, COMPANY, within the limits of its ability to do so, will operate the business for the account of DISTRIBUTOR, deducting its reasonable expenses in connection with the operation thereof, and sell DISTRIBUTOR'S Distribution Rights to a qualified purchaser at the best price which can reasonably be obtained after proper notice and advertisement. Such sale shall be for the account of the terminated DISTRIBUTOR, and the proceeds of such sale, after deducting therefrom any monies owed by DISTRIBUTOR to COMPANY, the amount of any outstanding liens, any other known liabilities of the Distributorship and the reasonable costs incurred in effecting the sale, shall be turned over to

9

DISTRIBUTOR in exchange for the release of DISTRIBUTOR'S Distribution Rights and interests under this Agreement, together with a general release of claims. COMPANY will concurrently execute a general release of claims as to DISTRIBUTOR, except for any claim for monies due and owing COMPANY.

**16.5** **Payment Upon Termination and Sole Remedy:** DISTRIBUTOR and COMPANY acknowledge that the rights and obligations in this Article, and Sections 3.1(b) and (e) and 15.1 if applicable, shall be DISTRIBUTOR'S and COMPANY'S sole and exclusive remedy upon any termination pursuant to this Agreement notwithstanding any law, regulation or court decision to the contrary. COMPANY shall not be liable for any loss of profit by DISTRIBUTOR or any part of DISTRIBUTOR'S advertising, sales, promotion, organization, capital or business investment. DISTRIBUTOR hereby releases COMPANY from any and all such liability. COMPANY hereby releases DISTRIBUTOR from any such liability.

## XVII. DISPUTE RESOLUTION

**17.1** **Negotiations And Mediation:**

(a) DISTRIBUTOR and COMPANY shall attempt in good faith and employ their best efforts to resolve and terminate any controversy, claim or dispute arising out of or relating to this Agreement promptly by negotiations. Such negotiations shall take place between representatives of COMPANY and DISTRIBUTOR who have the authority to settle and resolve the dispute. Such negotiations shall begin upon written notice from one party to the other describing any dispute or claim which has not been resolved in the ordinary course of business and suggesting a location for a meeting between the parties to conduct such negotiations within ten (10) business days after delivery of such notice. Representatives of DISTRIBUTOR and COMPANY shall meet at a mutually acceptable time and place within ten (10) calendar days after delivery of such notice and thereafter as often as they reasonably deem necessary, to exchange relevant information and to attempt to resolve the dispute. Any such meeting may be attended by one or more representatives of each party. No such meeting shall be attended by an attorney representing either party unless such party shall have first given the other party at least three (3) calendar days' notice that it will be accompanied by an attorney at the next scheduled meeting, and at such meeting the other party may also be accompanied by an attorney.

(b) If the dispute has not been resolved within thirty (30) calendar days of the initial notice, or if the party receiving such notice has failed to meet within fifteen (15) calendar days, either party may initiate mediation by a request therefor in writing to the other party. Upon receipt of such notice, DISTRIBUTOR or COMPANY shall be obligated to engage in mediation in accordance with the then-current Mediation Procedure published by the Center for Public Resources, and if the parties fail to agree within fifteen (15) calendar days of the date of such request for mediation on the selection of a mediator, then the Center for Public Resources shall appoint a mediator in accordance with its Mediation Procedure and the parties shall continue efforts through mediation to resolve the controversy and dispute between them until mediation is terminated by the occurrence of any of the following events:

10

(i) A written resolution in settlement of the dispute is reached, or

(ii) The mediator informs the parties in writing that further efforts would not be productive or useful, or

(iii) The parties agree in writing that further efforts would not be productive, or

(iv) Sixty (60) calendar days elapse from the commencement of the mediation without resolution.

Neither COMPANY nor DISTRIBUTOR may withdraw from mediation before such a termination of the process.

(c) If the dispute has not been resolved in accordance with the foregoing within ninety (90) calendar days of the commencement of the negotiation procedure, either party may initiate litigation upon ten (10) calendar days written notice to the other party; provided, however, that if any party has failed to voluntarily participate in the requirements of the foregoing Paragraphs, the other party may initiate litigation before expiration of the ninety (90) day period.

(d) All negotiations and mediations pursuant to this Paragraph of the Agreement are confidential and shall be treated as compromise and settlement negotiations for purpose of the Federal Rules of Evidence and any similar state rules of evidence.

(e) All applicable statutes of limitation and defenses based upon the passage of time shall be tolled during the procedures specified in this Paragraph, including those specified in Section 20.3 hereof. All deadlines specified by this Paragraph may be extended by mutual agreement of the parties.

(f) Each party shall be required to continue the performance obligation under this Agreement pending final resolution of any dispute arising out of or related to this Agreement.

(g) The procedures specified by this Paragraph shall be the sole and exclusive procedures for the resolution of disputes between COMPANY and DISTRIBUTOR arising out of or relating to this Agreement.

## XVIII. CONSENT TO INCORPORATION

18.1 If DISTRIBUTOR desires to conduct business in a corporate or other legal capacity, other than as a sole proprietorship, COMPANY will consent to the assignment of this Agreement to such legal entity provided:

(a) If a corporation, DISTRIBUTOR at all times retains at least 51% of the outstanding stock and meets the other conditions set forth in this Article; the books and records of the corporation reflect that the issuance and transfer of shares of stock are restricted and that all stock certificates shall bear a legend giving notice of such restriction and referring the reader to the terms of this Agreement; DISTRIBUTOR acts as such corporation's principal officer and continues to guarantee the obligations imposed hereunder; and DISTRIBUTOR executes any other consents or documents reasonably required by COMPANY in connection with such approval.

11

**(b)**     If any other legal business enterprise is established, DISTRIBUTOR shall have all other individuals involved in the enterprise as an entrepreneur personally execute this Agreement, and DISTRIBUTOR'S interest in the enterprise shall at all times represent at least 51%.

## XIX. TRADEMARKS AND TRADE NAMES

**19.1**   **Permission for Use**: DISTRIBUTOR shall make no use of COMPANY'S trademarks or trade names subject to this Agreement, nor engage in any program or activity which makes use of or contains any reference to COMPANY, its products, trademarks or trade names, other than as specifically provided herein, except with the prior written consent of COMPANY.

**19.2**   **Return Upon Termination**: Upon termination of this Agreement, DISTRIBUTOR shall cease use of COMPANY'S trademarks and shall deliver to COMPANY any advertising, promotional or merchandising material.

## XX. MISCELLANEOUS

**20.1**   **Notice**: Any notice required or permitted under this Agreement shall be deemed properly given when personally received, or seventy-two (72) hours after deposit in the U.S. mail, return receipt requested, first class postage prepaid, addressed to the below designated parties at the below-designated addresses or at such other address as either party may designate by written notice duly given in accordance with this Section 20.1:

As to DISTRIBUTOR,

As to COMPANY,

**20.2**   **Company Breach**: If DISTRIBUTOR maintains COMPANY is in breach of this Agreement, DISTRIBUTOR must notify COMPANY President in writing, by certified mail, return receipt requested, within ten (10) calendar days of the occurrence of the alleged breach or, if it is an alleged continuing breach, within thirty (30) calendar days of the first occurrence of the alleged breach.   Such written notice must include the specific section of this Agreement DISTRIBUTOR maintains has been breached and sufficient facts to provide reasonable notice to COMPANY of the action or failure to act which DISTRIBUTOR maintains is a breach of this Agreement.   DISTRIBUTOR'S failure to comply with the requirements of this section shall constitute a waiver of such breach or continuing breach.

Upon receipt of the DISTRIBUTOR'S notice of breach, COMPANY shall have a reasonable period of time to investigate and cure any breach.

**20.3**   **Statute of Limitations**: COMPANY and DISTRIBUTOR agree that no legal or equitable claim of any sort shall be commenced or maintained by either party to enforce any liability or obligation of the other party, whether arising from this Agreement or otherwise, unless brought before one (1) year after the date of the first act or omission giving rise to such alleged liability or obligation.

**20.4**   **Survival**: This agreement shall be binding upon the heirs, personal representatives, successors or assigns of the parties to this Agreement.   Notwithstanding any termination of this Agreement, all provisions hereof

12