that, by their terms or reasonable interpretation thereof, set forth obligations that extend beyond the termination of this Agreement, shall survive and remain in full force and effect.

**20.5** **Incorporation of Bill of Sale:** This Agreement is subject to and affected by a Bill of Sale simultaneously executed by the parties, such Bill of Sale being fully incorporated in this Agreement by reference.

**20.6** **Entire Agreement:** This Agreement, together with Exhibits A, B, C, D, ,E and F, sets forth the entire agreement between the parties and supersedes all prior agreements, discussions, negotiations, understandings, representations, conditions, warranties and covenants between them with respect to this subject matter. Unless set forth in this Agreement, no party shall be liable for any representation made to any other. This Agreement may be amended or modified only by a writing signed by all parties.

**20.7** **Indemnification:** DISTRIBUTOR agrees to indemnify and hold harmless COMPANY from and against any and all claims, actions, liabilities, expenses, losses or demands, including reasonable attorneys' fees, growing out of or based upon this Agreement or any acts of DISTRIBUTOR arising in the normal course of the conduct of business by DISTRIBUTOR pursuant to this Agreement. DISTRIBUTOR shall also indemnify COMPANY against all liability and loss in connection with, and shall assume full responsibility for, payment of all federal, state and local taxes and/or contributions imposed or required under unemployment insurance, workers' compensation insurance, and income tax laws, except as otherwise provided by Paragraph 15.1 herein, with respect to DISTRIBUTOR or DISTRIBUTOR'S employees engaged in performance of this Agreement. Should any such indemnification obligation accrue prior to or during the first six (6) months after DISTRIBUTOR acquires the Distribution Rights, DISTRIBUTOR shall not be obligated to make any such payment to COMPANY until after the expiration of said six (6) month period, at which point any such payment shall immediately be made to COMPANY.

**20.8** **Covenant Not To Compete:** DISTRIBUTOR agrees that if this Agreement is terminated, DISTRIBUTOR will not, for a period of one (1) year thereafter, sell or attempt to sell any product competitive with the Products as defined in Section 2.2 of this Agreement to any of the customers to whom DISTRIBUTOR made one or more sales during DISTRIBUTOR'S last year as COMPANY'S DISTRIBUTOR. The geographical territory applicable to this paragraph is the Territory as defined in Section 2.5 of this Agreement. DISTRIBUTOR agrees that the promise herein made to refrain from selling or attempting to sell means that DISTRIBUTOR will not, directly or indirectly, either as an individual on DISTRIBUTOR'S own account or as a partner, employee, distributor, agent or salesperson of or for any person, firm, association or corporation, engage in selling or attempting to sell any of said competitive products to any of the customers hereinabove designated.

**20.9** **Trade Secrets/Confidential Business Information:** DISTRIBUTOR recognizes and acknowledges that COMPANY and its related entities have, through the expenditure of substantial time, effort and money, developed and acquired certain trade secrets and confidential business information which are of great value to COMPANY. DISTRIBUTOR further acknowledges and understands that through the distributor relationship with COMPANY, DISTRIBUTOR will have access to trade secrets and

13

Case 3:12-cv-00596-MOC-DSC   Document 28-3   Filed 11/20/12   Page 1 of 31

confidential business information of COMPANY and its related entities. Accordingly, DISTRIBUTOR covenants that DISTRIBUTOR will make no disclosure, or any use, in any manner whatsoever, of any of the trade secrets and/or confidential information of COMPANY and/or any of its related entities while this Agreement is in effect and for a period of five (5) years after the termination of this Agreement, except as specifically authorized by COMPANY. Upon termination of this Agreement, DISTRIBUTOR shall return to COMPANY all embodiments of such trade secrets and/or confidential information that are in DISTRIBUTOR'S possession, custody or control. As used herein the terms "trade secrets" and/or "confidential information" include sales data, financial statements and information, marketing arrangements and plans, pricing information and strategies, business development plans, and any other business methods, processes and techniques of COMPANY and/or its related entities to the extent all of which are not generally known to the trade or industry. DISTRIBUTOR'S obligations in this paragraph shall be in addition to, and not in lieu of, any and all obligations imposed upon DISTRIBUTOR by applicable law.

**20.10** **Savings Provision/Non-Waiver**: Should any portion, word, clause, sentence or paragraph of this Agreement be declared void or unenforceable, such portions shall be modified or deleted in such a manner as to make this Agreement as modified legal and enforceable to the fullest extent permitted under applicable law. Except as expressly provided herein, no waiver by either party of any default in the performance of any part of this Agreement by the other party shall be deemed a waiver of any other default hereunder.

**20.11** **Damages**: Neither party shall be liable to the other for, and each party expressly waives, any consequential, incidental, special, exemplary or punitive damages.

**20.12** **Governing Law**: This Agreement and the construction thereof shall be governed by the laws of the State of _____.

IN WITNESS WHEREOF, COMPANY and DISTRIBUTOR have executed this Agreement on the day and year first above written.

WITNESSES                                                    DISTRIBUTOR

_____                    _____

_____


ATTEST:                                                      COMPANY

                                                             _____
_____                    By: _____
                                                             Its: _____

Case 3:12-cv-00596-MOC-DSC   Document 26-3   Filed 11/20/12   Page 2 of 31

**EXHIBIT "A"**

**Territory**

15

## EXHIBIT "B"

Except as expressly limited by the Distributor Agreement, DISTRIBUTOR shall have the exclusive right to sell and distribute the following Products in the Territory specifically described in Exhibit A.

## EXHIBIT "C"

Except as expressly limited by the Distributor Agreement, DISTRIBUTOR is authorized to distribute the following products; provided, however, that DISTRIBUTOR does not acquire any proprietary or ownership rights to such Authorized Products, exclusive or non-exclusive, and that COMPANY may cease selling such Authorized Products to DISTRIBUTOR upon written notice, with or without cause. COMPANY may also add Authorized Products to this Exhibit upon written notice to DISTRIBUTOR.

## EXHIBIT "D"

## BILL OF SALE

_____, ("COMPANY"), subject to the consideration set for the below, hereby conveys, sells, transfers and delivers to _____, ("DISTRIBUTOR"), the Distribution Rights specifically described in the Distributor Agreement executed simultaneously with this Bill of Sale. Both the Distributor Agreement and all appendices (exhibits) thereto are specifically incorporated into and made a part of this Bill of Sale.

The terms of this sale are as follows:

Purchase price shall be $_____ _____.

DISTRIBUTOR shall own all Distribution Rights in the Territory in himself/herself/itself and in DISTRIBUTOR'S executors, administrators and assigns, consistent with the terms and conditions contained in the Distributor Agreement.

COMPANY has lawful title to the Distribution Rights in the Territory free from all encumbrances. COMPANY warrants and will defend the rights conveyed herein against the lawful claims and demands of all persons.

IN WITNESS WHEREOF, COMPANY and DISTRIBUTOR execute this Bill of Sale at _____day of _____.

WITNESSES                                          DISTRIBUTOR

_____                        _____

_____


ATTEST:                                            _____
                                                   COMPANY

_____                        By: _____
                                                   Its: _____

## EXHIBIT "E"

Quarterly and Annual Financial Reports, consisting of:

1.      Compiled Statement of Revenues and Expenses

2.      Compiled Statement of Cash Flow

        These statements may be prepared on a cash basis and issued without disclosure as required by generally accepted accounting principles. Further, these statements must be compiled by a certified public accountant in accordance with the standards established by the American Institute of Certified Public Accountants.

3.      Statement of Revenues, expenses other than transportation expense, and fair rental value of vehicles used in the business.

        Company will supply actual format, if necessary.

19

**EXHIBIT "F"**

**Authorized Charge Accounts (see Paragraph 8.5)**

## ADDENDUM

The following agreement is entered into as a supplement to the Distributor Agreement between (DISTRIBUTOR) and _____ (COMPANY). Notwithstanding any other provision contained in the Distributor Agreement, the parties hereby agree as follows:

(1)    At any time within six (6) months and one (1) day of the effective date of the Distributor Agreement, should DISTRIBUTOR decide he/she no longer desires to be an independent businessperson, then, if DISTRIBUTOR provides thirty (30) calendar days written notice, COMPANY will buy back the Distribution Rights from DISTRIBUTOR. DISTRIBUTOR'S obligations under the Distributor Agreement shall continue until the Distribution Rights are repurchased.

(2)    In the event DISTRIBUTOR exercises this option, the purchase price of the Distribution Rights will be an amount equal to the amount DISTRIBUTOR paid COMPANY for such Distribution Rights.

(3)    Provided the vehicle is in usable condition, COMPANY also agrees to purchase the truck purchased by DISTRIBUTOR from COMPANY at the lesser of DISTRIBUTOR'S purchase price or an amount determined by an independent appraiser. In the event DISTRIBUTOR has leased a vehicle for use in connection with the Distributor Agreement and has done so under commercially reasonable circumstances, then COMPANY will assume, and relieve DISTRIBUTOR of, any obligation under said lease.

(4)    Except as provided in this Addendum, the parties retain any and all rights set forth in the Distributor Agreement.

WITNESSES

DISTRIBUTOR

_____

_____

_____

ATTEST:

COMPANY

By: _____

_____

Its: _____

**Distributorship Financial Guidelines**

_____ ("Company") is under no obligation to repurchase and/or finance the repurchase of your distributorship (except, of course, during the period of the initial six-month buy-back guarantee). We are willing, however, to consider repurchasing and/or financing the repurchase of your distributorship under the following guidelines. These guidelines are subject to change at any time in the sole discretion of the Company without notice to you. The decision to repurchase and/or finance the repurchase of a distributorship is an individualized decision made after a review of the particular circumstances of a distributor.

A. If a distributor has owned the distributorship for a period of more than six (6) months but less than five (5) years, the Company will consider repurchasing and/or financing the repurchase at ten (10) times weekly branded sales, but in no event will the repurchase price exceed the original purchase price.

B. After the distributorship has been owned by the distributor for five (5) years or more, the Company will consider repurchasing and/or financing the repurchase of the distributorship at ten (10) times weekly branded sales. The history of ownership for more than five (5) years is indicative of a more valuable distributorship business, generally supported by a stable customer base and excellent customer relations.

Please understand the guidelines set forth herein are subject to change at any time in the sole discretion of the Company without notice to you. If you have any questions concerning these guidelines, please contact the Company's Distributor Coordinator or Controller.

I acknowledge receipt of:

_____
Signature                          Date

_____
Print Name and Address

_____

_____

22

# **TERRITORY DESCRIPTION**

Distributor shall have the rights to distribute products as specified by the Distributor Agreement within the following geographic territory.

## **EXCLUSIVE RIGHTS**

Except as expressly limited by the Distributor Agreement, Distributor shall have the exclusive right to sell and distribute the following products in the Territory. These Distribution Rights shall survive only so long as the Company has the license or franchise rights for such products and the Company produces and/or sells such products.

      1.    See Attached

## **AUTHORIZED PRODUCTS**

Except as expressly limited by the Distributor Agreement, Distributor shall be authorized to distribute the following products in the Territory. Distributor does not obtain any proprietary or ownership rights in these products/labels. The Company may cease selling and/or may add authorized products upon written notice to Distributor.

      1.   <u>See Attached</u>

**EXHIBIT "B"**

Except as expressly limited by the Distributor Agreement, DISTRIBUTOR shall have the exclusive right to sell and distribute the following Products in the Territory specifically described in Exhibit A.

1. Bunny
2. Natures Own
3. Cobblestone Mill
4. Bluebird
5. Breads International

## 6. EXHIBIT "C"

Except as expressly limited by the Distributor Agreement, DISTRIBUTOR is authorized to distribute the following products; provided, however, that DISTRIBUTOR does not acquire any proprietary or ownership rights to such Authorized Products, exclusive or non-exclusive, and that COMPANY may cease selling such Authorized Products to DISTRIBUTOR upon written notice, with or without cause. COMPANY may also add Authorized Products to this Exhibit upon written notice to DISTRIBUTOR.

1- **HT Premeire**

2- **Burger King**

3- **Arby's**

4- **Dixie Darling**

31

## <u>ACCOUNT LISTING</u>

This is only a list of accounts currently being served in the territory. It does not restrict Distributor's sale/distribution of products to other accounts within the territory. Under the Distributor Agreement, Distributor is obligated to use Distributor's best efforts to maximize the sale of both Exclusive and Authorized products.

# Account List
## 6745

| Account Number | Account Name |
|---|---|
| 40150196 | Winn Dixie #2014 |
| 40151556 | Winn Dixie #2108 |
| 40152814 | Burger King #12456 |
| 40153595 | Arby's #6875 |
| 40153949 | Burger King #7489 |
| 40158082 | Food Lion #532 |
| 40159360 | Harris Teeter #147 |
| 40163788 | Weddington BP |
| 40189546 | Goodwill #15 |
| 40194830 | Amoco Convenience Store |
| 40203865 | Dollar General |
| 40204547 | Harris Teeter #249 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

## AUTHORIZED CHARGE ACCOUNTS

This is a list of accounts within the territory that currently have been approved by the Company for credit. These accounts remit payment to the Company, and the Company applies credit to Distributor's account with the Company for sales to these accounts.

| ACCOUNT NAME | ACCOUNT NUMBER | ACCOUNT NAME | ACCOUNT NUMBER |
|---|---|---|---|

## SCAN BASED TRADING

Scan based trading, also called Pay-By-Scan (PBS), is a method of conducting business whereby a customer pays their vendors/suppliers only for products that are sold through their registers/scanners. If you have a PBS account, the Company PBS policies and your PBS responsibilities will be thoroughly explained to you. Should you have any questions about our policies or your responsibilities, do not hesitate to ask the Sales Manager or Distributor Coordinator for assistance.

## STALE REPURCHASE AND RETURN POLICY

Freshness is an important attribute of bakery products. Freshness also helps to assure each independent distributor's next sale in every one of his/her distribution outlets.

The amount of time various products remain sufficiently fresh on customer's shelves has been established. A copy of the current Freshness Codes should be posted on the bulletin boards at all times. If it is not, or if you have questions about the Freshness Codes, please consult the Sales Manager at your location.

In order to assist you in your sales efforts, the Company will repurchase stale product from you as provided by the current stale allowance policy. Such stale allowance policy may be amended from time to time and at the discretion of the Company. To receive stale credit, product must be returned to the designated location and in a sellable condition. Except under certain circumstances and only as authorized by the Sales Manager, there will be no repurchase of - and no credit given for - any product that is returned in a non-saleable condition (including out-of-code).

## TEMPORARY DEVELOPMENT ALLOWANCE

The Company reserves the right to _temporarily_ increase the product purchase discount in order to assist you in the development of your territory. This additional discount may be shown on the Proforma sheet.

Any additional discount is to be reviewed by the President and Vice President of Sales at their discretion. The Distributor will be advised of any changes prior to the effective date.

## Reference Guide to Distributor Weekly Statement
### (Including Pay By Scan Information)

1. Total Product Charged: This represents the purchases for the specified week at whole sale cost.

2. Relay Adjustment, Load Adjustment, Damaged/Crippled, Short Code: represents any adjustments made to the load in the hand held.

3. Product Transfers: All transfers for the week excluding the current Saturday's transfers, and including the previous week's Saturday transfers.

4. Cust Price Allwncs/Overrides: Monday through Saturday Price Allowances and Overrides at wholesale cost for non Pay By Scan customers, plus allowances from the previous week for PBS customers based on the actual scan data. *(current wk Pos)*

5. Stales: Monday through Saturday stales at wholesale cost.

6. Standard Discount: Distributor discount/profit margin on product received during the week.

7. Additional Discount: If a distributor is set up for Additional Discount, the amount that was calculated for the week would appear here.

8. Contest Earnings: Any contest earnings are shown here

9. Other Earnings: Any additional money paid to the Distributor for the week. This can include pull up credits, warehouse maintenance, on call, etc.

10. Authorized Charges: Monday through Saturday validated authorized charge tickets plus any prior missing tickets that were validated day 6 of the previous week through day 5 of current week, minus any pay by scan tickets. (Note: Any missing tickets that are validated on Day 6, will be given credit in the following week)

11. AR Ticket Chargebacks: Any chargebacks on AR invoices

12. Point of Sale Data: Previous week scan data by Pay By Scan Customers

13. Revaluation Variance: Prior week shrink variance due to revaluing the inventory based on Saturday's physical count. Figure will also include any Internal Price Variance and Ending Inventory fluctuations due to price changes; however, variance is mostly composed of shrink units.

14. Shrink Charges: amount of shrink being charged to the distributor for the quarter

15. Subtotal of charges under the Accountability Column: Total charges that the distributor is responsible for before discount.

16. Subtotal of Discounts/Earnings: Total of Standard Discount, Additional Discount and Other Earnings for the week.

17. New Distributor Balance: Accountability minus Discounts/Earnings. Represents the net amount distributor owes for product. A negative amount represents amount owed to the distributor.

18. Business Expenses: Detail of expenses collected through the weekly statement (some on behalf of distributor for remitting to appropriate payee)

19. Total Business Expense: Total of expenses collected through weekly statement.

20. Total Distributor Balance: Beginning Balance Owed (number 26), plus Funds Paid to Distributor, Minus Funds Received From Distributor, plus/minus New Distributor Balance (number 17), plus Total Business Expense (number 19).

21. Less Prior Week Pay By Scan Inventory: The actual physical inventory count from the end of the prior week (valued at the authorized price at the end of the prior week), plus Saturday's deliveries minus Saturday's scan data as of Midnight Saturday night.

22. Less Current Week PBS Delivery Tickets: The sum of the daily delivery tickets (sales invoices) for the current week LESS the sum of the daily return tickets (stale invoices) for the current week.

23. Adjust for PBS Deliveries (Allowance Discount): Price allowances taken for PBS invoices minus the distributor discount on that product.

24. Weekly Distributor Balance: net amount distributor owes or we owe distributor after giving credit for prior week PBS inventory and current week PBS deliveries.

25. To be paid via Direct Deposit to bank account on record this Friday: Indicates that distributor is enrolled in direct deposit and any money owed to him will be sent via direct deposit.

26. Beginning Balance Owed: Total Distributor Balance from previous week (number 20).

ALLEN VICTOR
TERRITORY #1343

# FLOWERS BAKING COMPANY

# OF JAMESTOWN

**DISTRIBUTORSHIP PROGRAM**

Case 3:12-cv-00596-MOC-DSC   Document 28-3   Filed 11/20/12   Page 21 of 31

## DISTRIBUTOR'S AGREEMENT

AGREEMENT made this 25th day of October, 1994, by and between FLOWERS BAKING COMPANY OF JAMESTOWN, INC. (COMPANY), and Allen Victor (DISTRIBUTOR).

### W I T N E S S E T H:

COMPANY has developed or acquired a license of franchise for the use of formulae, recipes, trademarks and tradenames through which it manufactures and/or markets bread, rolls, and other fresh-baked products, as defined herein, throughout a geographic area which constitutes the Territory designated in Exhibit A (Territory), attached hereto and made a part hereof; and

Whereas, COMPANY, through the expenditure of time and effort and through its continuing research and marketing programs, has over the years developed a reputation for excellence in quality, value, and superior service which has created strong consumer recognition, approval, and demand for its products; and

Whereas, COMPANY has determined that the division of a portion of its market area into distribution territories, and the sale of its products to Independent Distributors for distribution and ultimate retail sale in said territories, will result in a superior distribution system; and

Whereas, Allen Victor is an independent contractor with the resources, expertise and capability to act as a distributor of COMPANY'S products in the Territory; and

1-da

Case 3:12-cv-00596-MOC-DSC   Document 28-3   Filed 11/20/12   Page 22 of 31

Whereas, the parties desire to create a right in DISTRIBUTOR, under which DISTRIBUTOR will be authorized to sell certain defined products within a specified geographic area.

Now, therefore, in consideration of these premises, and of the covenants and conditions contained in this Agreement, and for other good and valuable consideration given and received, the receipt and the sufficiency of which is hereby specifically agreed to and acknowledged, the parties mutually agree as follows:

## I. WARRANTY

1.1   The foregoing preambles shall constitute warranties, representations, agreements and undertakings by the parties.

## II. DEFINITIONS

2.1   Outlets: Shall mean all retail stores (except thrift stores) selling to the general public and all restaurant and institutional accounts except those exempt from this Agreement as set forth in Article VII, below.

2.2   Products: Shall mean fresh baked goods, as specifically described in Exhibit B, attached hereto and made a part hereof, which are currently produced and/or distributed by COMPANY, provided, however, that the Distribution Rights granted herein shall survive only so long as COMPANY has the license or franchise rights for such goods and COMPANY produces and/or sells such goods.

2.3   Distribution Rights: Except as expressly limited by this Agreement, Distribution Rights shall mean the right to sell and distribute Products as set forth in Exhibit

B to Outlets in the Territory, which right has been purchased by DISTRIBUTOR from COMPANY as evidenced by a Bill of Sale executed by the parties, the form of which is attached hereto as Exhibit C, and made a part hereof.

2.4 Territory: Shall mean that geographic area as more specifically described in Exhibit A within which DISTRIBUTOR owns the Distribution Rights.

2.5 Good Industry Practice: Shall mean the standards that have developed and are universally accepted and followed in the baking industry, including, but not limited to, maintaining an adequate and fresh supply of Products in all Outlets, properly rotating all Products, promptly removing all stale Products, maintaining proper service and delivery to all Outlets requesting service except those proven consistently to be unprofitable, and maintaining all equipment in a sanitary condition and in good safe working order.

### III. RELATIONSHIP

3.1 Extent and Duration: COMPANY hereby recognizes DISTRIBUTOR'S ownership of the Distribution Rights, said ownership to continue until:

(a) transferred, assigned or sold by DISTRIBUTOR or anyone acting on behalf of DISTRIBUTOR (this includes a sale by COMPANY for the account of DISTRIBUTOR in the event of a termination of this Agreement upon the terms defined below), or

(b) COMPANY, for legitimate business reasons, ceases to use distributors to distribute its products in the North Carolina market area. In such event, COMPANY will repurchase the territory and distribution rights

1-de

- 3 -

from DISTRIBUTOR at the greater of the first original purchase price or ten (10) times the average weekly sales volume of name brand Products in the Territory calculated over the six month period preceding the repurchase, or

(c)     either party exercise their rights to terminate pursuant to Section 15.1.

3.2     Nature of Rights: The parties agree that the Distribution Rights sold to DISTRIBUTOR pursuant to the Bill of Sale can be exercised only pursuant to the terms of this Agreement and that any termination of this Agreement other than in accordance with Section 3.1 (b) or (c) requires DISTRIBUTOR, or anyone acting on behalf of DISTRIBUTOR, to sell such Distribution Rights subject to the terms of this Agreement.

## IV.  SALE OF PRODUCTS

4.1     Products will be sold to DISTRIBUTOR at such terms and prices as established by COMPANY from time to time.  COMPANY will also furnish to DISTRIBUTOR suggested resale prices.  Bid prices will be jointly established by COMPANY and DISTRIBUTOR.

## V.  BEST EFFORTS/DISTRIBUTOR

5.1     Obligations of DISTRIBUTOR:  DISTRIBUTOR agrees and covenants to use his/her best efforts to develop and maximize the sale of COMPANY'S Products to Outlets within his/her Territory and service his/her Territory in accordance with good industry practice as defined above.

DISTRIBUTOR shall cooperate with COMPANY on its marketing program and

Case 3:12-cv-00596-MOC-DSC   Document 28-3   Filed 11/20/12   Page 25 of 31

maintain a clean and neat personal appearance consistent with the professional image customers and the public associate with COMPANY. DISTRIBUTOR may not carry outside merchandise which is competitive with COMPANY'S products. DISTRIBUTOR may carry noncompetitive products, as long as this does not interfere with the distribution of COMPANY'S Products.

5.2    Non-Compliance: Failure to comply with Section 5.1 above shall be considered a material breach of this Agreement and shall be governed by the provisions of this Agreement dealing with termination.

## VI. BEST EFFORTS/MANUFACTURING

6.1    Obligations of Company: COMPANY shall use its best efforts to manufacture and deliver to DISTRIBUTOR sufficient quantities of Products to supply Outlets requesting service in his/her Territory, preserve and develop the quality and marketability of the Products, and cooperate with DISTRIBUTOR in his/her sales efforts.

## VII. ACCOUNTS AND/OR TRADEMARKS EXEMPT FROM DISTRIBUTORSHIP

7.1    Accounts Exempt From Agreement: COMPANY reserves the right to solicit and service drop delivery accounts in DISTRIBUTOR'S Territory, so long as it is done for legitimate business reasons and not for the purpose of undermining DISTRIBUTOR'S business.

7.2    Thrift Stores: COMPANY reserves the right to continue to sell Products through its retail thrift store operation, Company-owned and/or independently owned.

7.3    Other Trademarks: The parties hereto stipulate that the COMPANY produces

1-da                                                                                         - 5 -

a variety of products marketed under a variety of trademarks distributed through multiple channels of distribution. This Agreement applies only to the trademarks set forth on Exhibit B and does not restrict any other distribution of products by the COMPANY marketed under trademarks not listed on Exhibit B.

## VIII. PAYMENT FOR PRODUCTS

8.1 Settlement of Account: On or before Friday of each week, DISTRIBUTOR will provide to COMPANY a full settlement of all Products sold to DISTRIBUTOR in, and a statement of operating expenses for, the preceding week.

8.2 Maintenance of Records: DISTRIBUTOR will maintain current and accurate financial records for the operation of the Distributorship during the term of the Agreement. DISTRIBUTOR will provide the COMPANY with complete and accurate quarterly and annual financial reports and operating statements in the form as described in Exhibit E attached hereto and as amended from time to time, within thirty (30) days after each quarter and year end. To insure the adequacy and accuracy of such reports and otherwise insure compliance with the obligations referenced herein, COMPANY, at its expense, shall be entitled to inspect, copy and audit DISTRIBUTOR'S records and books kept in accordance with this Agreement upon request.

8.2.1 COMPANY, for a period of ONE ( 1 ) year following the date of this agreement, agrees to reimburse the DISTRIBUTOR the expenses of a certified public accountant, to a maximum of FIVE HUNDRED dollars ($ 500 ) per year, who will assist the DISTRIBUTOR in the maintenance of these records. Upon

1-de

- 6 -

request, DISTRIBUTOR shall provide COMPANY evidence of payment to the
certified public accountant.

8.3 Cash Sales: DISTRIBUTOR is responsible for the collection of all cash sales in
his/her Territory.

8.4 Non-Cash Sales: In cases where Products are sold and distributed to Outlets
which have been authorized by COMPANY for credit, COMPANY, at the request
and for the convenience of DISTRIBUTOR, may establish an account receivable
for COMPANY'S Products with the Outlet and will promptly credit
DISTRIBUTOR for all such accounts. DISTRIBUTOR is wholly responsible for
collection of accounts receivable not authorized by COMPANY.

8.5 Chain Accounts: COMPANY reserves the right to continue carrying the
accounts receivable for all chain and other major accounts and to promptly
credit DISTRIBUTOR for all such accounts. The accounts covered by this
section are listed in Exhibit D, attached hereto and made a part hereof.

8.6 Security Interest: To secure the payment of any indebtedness or liability of
DISTRIBUTOR to COMPANY now or hereafter arising, DISTRIBUTOR hereby
grants and conveys to COMPANY a security interest in his/her Distribution
Rights, all other rights under this Agreement and all Products in DISTRIBUTOR'S
possession, and grants to COMPANY the rights of a secured party under the
Uniform Commercial Code.

8.7 Security Deposit: DISTRIBUTOR shall furnish COMPANY with a security
deposit in the amount of One Thousand Dollars ($1,000.00). This money shall

$RH$ $\mathcal{AU}$

Case 3:12-cv-00596-MOC-DSC   Document 28-3   Filed 11/20/12   Page 28 of 31

be deposited into an interest bearing account for the benefit of DISTRIBUTOR and shall be returned to DISTRIBUTOR upon termination of this Agreement after DISTRIBUTOR has satisfied all requirements under this Agreement.

## IX. EQUIPMENT AND MAINTENANCE

9.1 DISTRIBUTOR is responsible for obtaining his/her own delivery truck and purchasing adequate insurance thereon, which will include combined single limit coverage of at least $1,000,000.00. DISTRIBUTOR'S insurance purchased pursuant to this section shall include COMPANY as an additional named insured. DISTRIBUTOR must provide COMPANY with a written certificate of such insurance.

9.2 DISTRIBUTOR is responsible for truck sanitation. Consistent with good industry practice, the delivery truck should be kept clean at all times and maintained in such condition as to provide safe, prompt, and regular service to all customers.

9.3 DISTRIBUTOR is responsible for maintenance of his/her delivery truck.

9.4 COMPANY will make available a spare delivery truck at a specified location which DISTRIBUTOR may use in case of an emergency. DISTRIBUTOR will be charged a daily rental fee for any use of such vehicle.

9.5 COMPANY shall make available, and DISTRIBUTOR shall use, certain proprietary administrative services in order to assist the DISTRIBUTOR in the conduct of his/her business for the following purposes: (i) collection of sales data, (ii) preparation of sales tickets, (iii) accumulation of sales histories, (iv) preparation of daily and weekly settlements, (v) preparation of automated "adds" to and

1-da

- 8 -

"cuts" from DISTRIBUTOR's daily order of the COMPANY's products, and (vi) direct communication to company for the purpose of DISTRIBUTOR's ordering of product and receipt of daily load information.

Further, the COMPANY shall make available, and DISTRIBUTOR shall use, certain proprietary administrative services in order to assist the DISTRIBUTOR in the conduct of his/her business for the following purposes: (i) to provide automated route book information, (ii) to provide automated product movement information, (iii) to provide individual customer sales profiles, and (iv) to provide suggested orders for each customer.

9.5.1 COMPANY shall charge, and DISTRIBUTOR shall pay, a fair market, reasonable administrative fee for these services, which shall be established from time to time by the COMPANY.

9.5.2 DISTRIBUTOR agrees to maintain and hold in confidence any and all information obtained from or derived about the COMPANY's proprietary administrative services.

9.5.3 DISTRIBUTOR acknowledges that he/she cannot and shall not acquire any proprietary rights in the COMPANY's proprietary administrative services and no rights shall accrue to DISTRIBUTOR by virtue of the use of the proprietary administrative services.

9.5.4 This provision shall remain in effect for as long as the DISTRIBUTOR's Agreement is in effect. However, in the event the DISTRIBUTOR's Agreement

is terminated for any reason, so shall DISTRIBUTOR's right to use the proprietary administrative services. The right to use these administrative services shall not be assigned by DISTRIBUTOR without the express written consent of COMPANY.

9.5.5 Compliance with these provisions is a material part of the performance standards of the DISTRIBUTOR's Agreement and any violation shall be a material breach of the DISTRIBUTOR's Agreement.

9.5.6 The COMPANY may, in its sole discretion, alter, amend or terminate the proprietary administrative services herein made available by the giving of 14 days notice to the DISTRIBUTOR.

## X. PRODUCT DELIVERY

10.1 COMPANY shall deliver Products to DISTRIBUTOR at <u>Rock Hill, SC</u> _____. COMPANY reserves the right to change such location provided that any location chosen will be of suitable size with the necessary loading dock heights to allow for use by DISTRIBUTOR. DISTRIBUTOR will be charged a fee for warehouse use.

## XI. PRODUCT CODE

11.1 Maintaining a fresh market is a fundamental tenet of the baking industry. Accordingly, out of code product on the market is a material breach of this Agreement. Repeated violations will be grounds for termination of this Agreement.

11.2 To assist DISTRIBUTOR in maintaining a fresh market, COMPANY will

1-da

- 10 -