IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SCOTT REHBERG, WILLARD ALLEN RILEY, and MARIO RONCHETTI, individually and behalf of all similarly situated individuals,<br><br>        Plaintiffs,<br><br>    v.<br><br>FLOWERS FOODS, INC. and FLOWERS BAKING CO. OF JAMESTOWN, LLC,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 3:12-cv-00596-MOC-DSC

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION AND JUDICIAL NOTICE[1]

### I.    INTRODUCTION

Plaintiffs are three current independent contractor distributors with Flowers Baking Co. of Jamestown, LLC ("Flowers/Jamestown") who have ever operated only out of 3 of Flowers/Jamestown's 24 warehouses.[2] They seek, however, FLSA conditional certification of—and notice to—a class of close to 230 current and former independent contractor distributors who, among other things, work at all 24 warehouses throughout North Carolina and portions of South Carolina, Virginia and West Virginia, with some 25 *different* managers who exercised *different* levels of oversight, for *different* customers with *different* customer-service requirements, who took advantage of *different* entrepreneurial opportunities. Alleging they are misclassified as independent contractors under federal and state law, Plaintiffs ultimately seek an order declaring them and other Jamestown distributors to be employees.  Yet admittedly they do not all seek this same relief: while one definitively testified that he wants to be an employee,

---

[1] Defendants' Response to Plaintiffs' Motion for Judicial Notice and Objections to Proposed Notice, filed concurrently herewith.
[2] Likewise, the 6 other individuals who have filed opt-in consents to join this action also ever worked only out of these same 3 warehouses.

another did not.  And, *just 1 day* before Plaintiffs filed their Motion, another acted independently by entering into a purchase agreement to sell what he advertised as his "independent distributor business" to an outside buyer for $150,000.

Plaintiffs' request for notice is based entirely on their contention that all Jamestown distributors are misclassified as independent contractors, which is insufficient, as a matter of law, to support their request. As discussed below, Plaintiffs fail to provide *any factual evidence* of a *common unlawful policy* applicable to all Jamestown distributors in all 24 warehouses. In fact, they uniformly testified at deposition that they know of no such common policies. What is more, they all admit they have no personal knowledge about how other Jamestown distributors—in their own or in the other 21 warehouses—operate their distributorships, how often they interact with management, or what each manager's individual practices are with respect to distributors.

While these admissions alone are fatal to Plaintiffs' Motion, even under the "lenient standard" typically applied at this stage, the individualized nature of their claims is an *independent basis* upon which to deny their motion. To adjudicate Plaintiffs' claims, the Court must first analyze, *for each Plaintiff and opt-in*, whether, to what extent, and over what time period each Jamestown distributor[3]: (1) was subject to control by his *individual* manager(s); (2) took advantage of the various entrepreneurial opportunities available in different accounts (*i.e.* utilizing helpers or assistants, buying or selling distribution rights, incorporating, etc.); (3) realized the opportunity for profit or loss through individualized sales efforts, accounts opening or closing in his defined territory, and the like; and (4) worked elsewhere, operated additional businesses, or sold non-competitive products, among others—all of which Plaintiffs admit can, and do, vary by distributor, geographic area, account composition, and over time. Even if all these inquiries, on balance, did support employee status (they do not), the Court would then need

---

[3] The masculine form will be used throughout in the interests of clarity.

to determine whether *each individual* is exempt under the outside sales and/or motor carrier exemptions, both of which require substantial individualized inquiries and proof down to such details as the specific weight of the vehicle driven and products ordered each day. And, as Plaintiffs' own testimony establishes, both factors can—and do—vary from distributor to distributor and from day to day.

In short, Plaintiffs ask this Court to conditionally certify and send notice to all current and former Jamestown distributors over a three-year period based on nothing more than their own conclusory assertions, which are admittedly not based on any personal knowledge whatsoever and do not even point to—let alone establish—a common unlawful policy. Plaintiffs' purported "evidence" fails to meet their burden. This Court should deny their Motion accordingly.

## II.   STATEMENT OF FACTS

### A.   The Parties and Putative Opt-ins.

Headquartered in Thomasville, Georgia, Flowers Foods, Inc. ("Flowers Foods") is the parent holding company of numerous operating subsidiaries throughout the country, each of which is organized as a separate legal entity and is responsible for its own day-to-day operations. Flowers/Jamestown is one such subsidiary. (Affidavit of Chuck Rich ¶ 2[4]; Affidavit of Paul Holshouser ¶ 1[5].) Flowers/Jamestown contracts with independent contractor distributors[6] who purchase distribution rights to sell and distribute different branded products to customers in a defined geographic territory. (Holshouser Aff. ¶¶ 6-8.) From 2009 to the present, Flowers/Jamestown had contracted with—at one time or another—some 230 different distributors. (Holshouser Aff. ¶ 13.) Flowers/Jamestown has a bakery in Jamestown, N.C.,

---

[4] The Affidavit of Chuck Rich is attached hereto as Exhibit A.
[5] The Affidavit of Paul Holshouser is attached hereto as Exhibit B.
[6] As Plaintiffs themselves acknowledged, Flowers Foods is not a party to any of these contracts. (*See, e.g.,* Riley Dep. 64:4-10; Rehberg Dep. 90:24-91:8; Glavey Dep. 149:22-150:11; Ronchetti Dep. 29:14-30:16.)

where it produces several bread and bun products and also operates 24 different warehouses throughout North Carolina and portions of South Carolina, Virginia and West Virginia from which distributors pick up products for ultimate sale and distribution to end customers. (Id. ¶ 3.) Each warehouse has its own sales manager(s), who serves as the primary point-of-contact with distributors. (Riley Dep. 47:16-18[7]; Holshouser Aff. ¶ 3.)   During the past three years, Flowers/Jamestown has employed over 25 different sales managers and 7 additional Directors of Sales, who typically only get involved in distributor-related issues from time to time. (Holshouser Aff. ¶¶ 3-5.)

Plaintiff Rehberg has been a distributor since November 22, 2004, and has only ever operated out of the Monroe/Indian Trail, N.C. warehouse.  (Rehberg Dep. 10:11-24 & Ex. 5.) Rehberg purchased his distributorship to build equity in a business and has been successful in doing so. (Rehberg Dep. 15:2-9.) He recently advertised his distributorship for sale on "Routesforsale.com," describing it as an "independent" and "successful business" with "good growth opportunity." (Id. at 17:18-23, 22:7-24:18 & Ex. 1.) Just one day before Plaintiffs' filed their Motion, Rehberg independently entered into a purchase agreement with a prospective buyer to sell his distributorship for $150,000. (Rehberg Dep. 15:19-16:15, 29:12-23 & Ex. 2.) Plaintiff Riley has been a distributor since October 25, 1994 and has only ever operated out of the Rock Hill, S.C. warehouse.  (Riley Dep. 12:15-17 & Ex. 2.)  Riley joined this lawsuit because he is interested in becoming an employee. (Riley Dep. 145:1-3.)  Plaintiff Ronchetti has been a distributor since December 12, 2005 and has only ever operated out of the Concord, N.C. warehouse. (Ronchetti Dep. 26:5-15 & Ex. 2.)  Ronchetti, conversely, does not want to become an employee. (Id. 79:20-80:2.)  *See also* Holshouser Aff. ¶ 6 (noting contract dates).

---

[7] The deposition excerpts and deposition exhibits referenced herein and on Exhibits D and E are attached hereto as Exhibit C.  Excerpts for Scott Rehberg are attached as C-1, Willard Riley as C-2, Mario Ronchetti as C-3, Paul English as C-4, and Cliff Glavey as C-5.

The opt-in Plaintiffs, including Bobby Shillinglaw, Donald Keistler, Cliff Glavey, Paul English, Johnny Easley, and Ken Kirk, have also ever operated only out of these same three warehouses for different periods of time. All but one—namely Shillinglaw—are current distributors. (Holshouser Aff. ¶ 6.) The two opt-ins who were deposed[8] do not seek the same relief Plaintiffs have requested in the Complaint. *See, e.g.,* English Dep. 97:19-98:2 (does not want to be an employee); Glavey Dep. 183:19-184:2 (seeking to have the contract to "allow us to be independent distributors").

    B.    The Distributorship Model Contains Numerous Individualized Indicia of Independent Contractor Status.

Jamestown distributors ("distributors") purchase different products from the bakery at a specified discount, which they sell and market to customers and potential customers in their respective territories. (Holshouser Aff. ¶ 9). Contrary to Plaintiffs' assertions, distributors determine what products to order for their customers based on their customers' individual needs by making adjustments to the suggested order in their handheld computers.[9] (Riley Dep. 124:14-125:4, 126:23-127:8.) Distributors can—and often do—make significant adjustments to the suggested orders based on various individualized factors such as weather, holidays, competition pricing, and the like. (Riley Dep. 128:12-129:22 (regularly adjusts suggested orders based on different factors which change over time); Ronchetti Dep. 91:8-15 (responsible for ordering products) & 105: 17-109:5 (adjusts orders based on experience.); Rehberg Dep. 119:5-120:16 & Ex. 8 (makes adjustments to orders).) Products are then produced in response to these specific

---

[8] Defendants were permitted to take the depositions of three opt-in Plaintiffs prior to filing their response: namely, Cliff Glavey and Paul English. The third opt-in who was scheduled to be deposed, Donald Keistler, had a family emergency. (Ct. Doc. No. 31.)

[9] The type of products sold also varies by distributor, over time, and by region. (Riley Dep. 124:3-17; Rehberg Dep. 93:16-94:1; English Dep. 29:17-33:1 (discussing products he sold over time and changes thereto, including TastyKake, which he just started selling over past year); 125:12-24 (discussing how some products, like TastyKake, sell much better in more affluent areas); Riley Dep. 66:9-17 (focuses on selling all products equally); and Glavey Dep. 151:5-7 (focuses on selling branded products).)

orders and are shipped to the warehouse for ultimate pick-up, distribution, and sale by distributors to end customers for whom such products were ordered. (Holshouser Aff. ¶ 9.) Many of these products, including all TastyKake and Blue Bird products, are produced by bakeries out of state. (Id.) Distributors order these products in varying amounts and at different times based on their customers' needs. *See, e.g.,* Riley Dep. 124:7-17 (ordering TastyKake some but not all months) and 124:7-25 (ordering BlueBird regularly); Rehberg Dep. 97:9-10, 97:24-98:2 (sells TastyKake and BlueBird). Distributors determine the hours they operate based on their customers' individualized needs and do not receive a set schedule from Flowers/Jamestown. (Rehberg Dep. 77:6-21; 78:24-79:24; English Dep. 73:1-19; Glavey Dep. 138:25-141:10.) The hours worked vary from distributor to distributor. (Riley Dep. 40:21-23; 42:8-10.)

The distributor business model used by Flowers/Jamestown has been repeatedly upheld as an independent-contractor relationship. It is premised on the belief that independent distributors who own their own distribution rights will have more entrepreneurial incentive to develop business and generate additional sales, based on their own individual efforts and individualized sales strategies. (Rich Aff. ¶ 7.)[10] Thus, the Distributor Agreement Jamestown distributors sign contains numerous indicia of independent-contractor status, including responsibility for all business-related expenses; purchase of a defined proprietary interest; and the right, among others, to hire helpers, to advertise, to incorporate, to own outside businesses, to perform work elsewhere, and to buy and sell distribution rights—in whole or in part. (Ex. 3 to

---

[10] As Plaintiffs correctly point out, Flowers/Jamestown treats its distributors as "statutory employees" under the Internal Revenue Code. However, Plaintiffs' understanding "statutory employee" is incorrect. The term "statutory employee" is specifically defined in a section of the Internal Revenue Code under which certain categories of **common law independent contractors**, including bakery distributors, are treated as employees for Federal Insurance Contribution Act (FICA) purposes only, and the appropriateness of this treatment as been confirmed by the I.R.S. (Rich Aff. ¶¶ 3-6.) **Contrary to Plaintiffs' assertions and misguided understanding, statutory employee treatment, <u>by definition</u>, confirms—rather than undermines—independent contractor status.**

6

Pls. Brief (Ct. Doc. No. 28-3).)  As discussed below and as Plaintiffs freely admit, the extent to which these opportunities are taken advantage of varies from distributor to distributor.

      C.    <u>Plaintiffs Uniformly Admit the Individualized Nature of Their Claims</u>.

At deposition, Plaintiffs uniformly admit the individualized nature of their claims.  First, the composition of their customer base creates individualized differences in how they operate their distributorships and how they have done so over time.  Plaintiffs and other Jamestown distributors service both cash and authorized charge accounts, like Wal-Mart, Food Lion, and other chain accounts, the composition and profitability of which varies from distributor to distributor. *E.g.,* Rehberg Dep. 93:16-94:1 ("[S]ome guys have a lot of [cash accounts] some— some don't."); 95:18-22, 104:7-9; Riley Dep. 84:22-25 (admitting number of cash and charge accounts varies among distributors); Glavey Dep. 115:9-116:11, 130:9-11 (discussing Gail's, a non-chain account that is his most profitable and constitutes 45% of his total sales).  The composition of cash versus charge accounts also varies over time.  *E.g.* Rehberg Dep. 94:16-95:11 (had one cash account until recently when two were added); 99:17-100:6 (Bi-Lo and Harris Teeter opened in territory over time); Glavey Dep. 128:10-19, 129:13-130:8, 137:9-138:5 (discussing increase in national accounts over time).

The different authorized charge accounts have different customer-service requirements, which impacts how and when such accounts are serviced. (Riley Dep. 85:16-87:1; Rehberg Dep. 100:7-25; Glavey Dep. 105:17-106:7.)  In cash accounts, distributors can extend credit, determine days and times of service, and may have more discretion on marketing, product mix, displays, and the like. (Riley Dep. 81:4-16; Ronchetti Dep. 52:14-53:10; Rehberg Dep. 94:19-95:17, 96:10-18; Glavey Dep. 144:4-9, 157:6-158:14.)  Conversely, charge accounts may have different marketing programs and promotions, hours of service requirements, and other service procedures, which vary from account to account and over time. (Glavey Dep. 105:17-106:7;

112:15-114:12, 128:10-19, 129:13-130:8, 137:9-138:14 (discussing changes over time and onslaught of charge accounts following closure of Hostess); English Dep. 71:23-72:25, 73:20-24; Rehberg Dep. 79:14-80:4.)

Further, the extent to which Plaintiffs and other distributors take advantage of various entrepreneurial opportunities afforded by the independent-contractor distributor model varies. *See, e.g.,* Ronchetti Dep. 34:25-35:14 (we all "do our own thing."). For example, some Plaintiffs solicit new accounts for new business, ask for displays, and engage in other individualized activities to build their sales. *See, e.g.,* Ronchetti Dep. 58:18-60:13 (has picked up some new accounts on his own and asks for displays from time to time), 69:3-70:11; Glavey Dep. 181:10-182:2 (gives holiday gift cards to customers to build business). Others do not. *See, e.g.,* Riley Dep. 82:12-83:3 (hasn't tried to pick up new accounts in the past 3 years because has been "too maxed out"); English Dep. 44:19-45:2 (same); Rehberg Dep. 81:16-24 (same). Some Plaintiffs and distributors have purchased and sold off portions of their distribution rights for various reasons in the past three years, and others have not. *Compare* Ronchetti Dep. 72:5-73:10 (sold rights to Food Lion), Rehberg 46:19-47:3, 102:25-103:7 (sold portions "multiple times"), Glavey Dep. 92:1-94:13 & Ex. 2 (arranging sale of distribution rights to store with other distributor) *with* English Dep. 27:14-21 (hasn't sold any portions in past three years).[11] This, too, varies from distributor to distributor and depending on the economy and other factors. (Rehberg Dep. 50:9-12; Glavey Dep. 95:6-25.) Some Plaintiffs regularly hire helpers to assist with servicing territories, even on a full-time basis, and others do not. *Compare* English Dep. 50:3-7, 12-21 (admitting he uses helpers "all but maybe ten" days a year, including on full-time basis) *with* Glavey Dep. 47:7-49:2 (use of helpers less frequent). Hiring and using helpers varies from

---

[11] In fact, some Plaintiffs are currently trying to sell their territories—in whole or in part—to outside buyers. (Glavey Dep. 99:7-101:10; Rehberg Dep. 17:18-23, 22:7-24:18 & Ex. 1.)

distributor to distributor—"its all different." (Rehberg Dep. 39:2-8.) Some Plaintiffs and distributors have changed the price on products sold to customers, and others have not. *Compare* Ronchetti Dep. 109:16-110:1 (changed price on products sold to one account to keep account) *with* Rehberg Dep. 95:23-96:3 (never changes price).

As the examples below illustrate, which are far from exhaustive, management policies and practices also vary by warehouse, manager, from distributor to distributor, and over time:

- **different practices for group meetings**- *compare* English Dep. 63:13-19, 64:13-21 (management in Concord never has group meetings with distributors) *with* Riley Dep. 38:6-14 (management in Rock Hill has group meetings with distributors whenever there are new product promotions, among others);

- **different local management practices at different times regarding oversight of distributors-***see, e.g.,* Glavey Dep. 126:17-128:9 (describing two different Concord sales managers with "definitely" different management styles—one who had several rules and the other who treated him like more of an independent distributor); Ronchetti Dep. 108:1-7 (management may help newer distributors more with ordering);

- **different practices for approval of hiring helpers**- *compare* Ronchetti Dep. 12:16-13:19 (management approval of helpers is required) *with* Glavey Dep. 50:8-11 (no such approval is required);

- **different practices for management changes to orders**- *compare* Ronchetti Dep. 97:1-19 (management in Concord has not made any changes to his orders in the past year but before that, they did make changes to his orders from time to time) *with* Riley Dep. 130:5-16 (management in Rock Hill makes changes to his orders "quite a few times"—or "maybe 30, 40 times a year.") and Rehberg Dep. 122:13-123:1 (Indian Trail management changes orders "numerous times");[12]

- **different consequences for cutting orders added by management -***compare* Ronchetti Dep. 62:13-65:10 (can cut orders management adds) *with* English Dep. 95:20-96:17 (cannot cut added orders because you will be "threatened" and charged $200);

- **different protocol for handling stale products**- *compare* Ronchetti Dep. 49:24-51:19 (discussing that he sells stale product to Dollar Tree to make some money on it) *with* Riley Dep. 58:14-59:15 (discussing policy in Rock Hill that he bring stale back to warehouse and separate it into predetermined categories);

---

[12] Riley Dep. 131:4-24, 132:3-133:12 (acknowledging that management's practices regarding distributors cutting product that has been added "changes by manager.")

- **different practices regarding stale caps**- *see* Rehberg Dep. 87:18-88:25 (testifying that some distributors in Monroe/Indian Trail are on "stale caps" to control stale products, others are not.);

- **different practices about procuring vehicles**- *compare* English Dep. 75:21-76:5 and Ronchetti Dep. 74:22-75:19 (only able to lease vehicle through company program) *with* Riley Dep. 97:6-99:6 (has multiple vehicles and was not prohibited from getting vehicles from outside source) and Glavey Dep. 163:15-165:17 (same).

All such factors are relevant to whether Plaintiffs and the distributors are—or are not—truly independent contractors under the FLSA. *See Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 304-05 (4th Cir. 2006) (factors necessary to determination of independent contractor status include: "(1) the degree of control that the putative employer has over the manner in which the work is performed; (2) the worker's opportunities for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business.") And, this limited deposition testimony establishes just how highly-individualized this inquiry is, *even within these three warehouses alone*.

D.  <u>Plaintiffs Uniformly Admit They Have No Personal Knowledge Of Any Common Jamestown Policies or Procedures</u>.

Plaintiffs argue that Defendants "dictate every aspect of [their'] jobs" through various unidentified policies and procedures. (Pls.' Mem. in Support of Mot. for Cond. Cert. and Judicial Notice (Ct. Doc. No. 28-1) ("Pls.' Brief") Intro.)  At deposition, however, Plaintiffs uniformly admit they are not aware of any common policy applicable to all Jamestown distributors (other than the Distributor Agreement itself, which by its terms establishes an independent-contractor relationship and miscellaneous pricing information). *See* Riley Dep. 36:18-22 (admitting he has no personal knowledge of any policies or procedures applicable to other Jamestown distributors);

and Exhibit D (attached) for Plaintiffs Rehberg, Riley, and Ronchetti and opt-in Plaintiffs Glavey and English's testimony supporting the following chart:

| | Topic | Common Jamestown Policy? | | Topic | Common Jamestown Policy? |
|---|---|---|---|---|---|
| 1. | Family members assisting with distributorship | No. | 14. | Hours worked | No. |
| 2. | Recordkeeping | No. | 15. | Breaks during the day | No. |
| 3. | Use of helpers | No. | 16. | Scripts or protocols when servicing customers | No. |
| 4. | Management of helpers | No. | 17. | Unloading vehicles | No. |
| 5. | Type of vehicle for distributorship | No. | 18. | Loading vehicles | No. |
| 6. | Use of vehicle for outside business | No. | 19. | "Performance Evaluations" | No. |
| 7. | Outside employment or side businesses | No. | 20. | Number of cash accounts and charge accounts distributors must have | No. |
| 8. | Advertising | No. | 21. | Price charged to cash accounts | No. |
| 9. | Mandatory group meetings | No. | 22. | Territory sales | No. |
| 10. | Timing or substance of communications with distributors | No. | 23. | Incorporation | No. |
| 11. | Sales techniques | No. | 24. | Displays | No. |
| 12. | Management Visits | No. | 25. | How to order products/adjustments | No. |
| 13. | Scheduling | No. | 26. | Other policies or procedures that dictate how to run the distributorship | No. |

E.     Plaintiffs Uniformly Admit They Have No Personal Knowledge of How Other Jamestown Distributors Run Their Distributorships.

Further, at deposition Plaintiffs uniformly admit they lack any personal knowledge whatsoever about how other Jamestown distributors, current and former, both inside and outside

of their warehouses, operate their distributorships. *See* Exhibit E (attaching summary of testimony establishing lack of personal knowledge). As Plaintiff Ronchetti acknowledged, "Everybody has their own style. We just—do our own thing." (Ronchetti Dep. 34:25-35:14; *accord,* Riley Dep. 120:10-16 (no knowledge of sales efforts by other distributors); Rehberg Dep. 83:8-84:1 (same); Glavey 55:23-56:3, 122:2-123:2 ("I really don't have much contact with—with any of them" [i.e. other distributors at other Jamestown warehouses]).) Indeed, Plaintiffs and the deposed opt-ins all testified they have never seen any other Jamestown distributors servicing their customers in the field and their visits to other warehouses, if at all, were for the sole purpose of picking up product. *See, e.g.,* Rehberg Dep. 61:6-62:2 (sole purpose of visiting limited number of other warehouses was for picking up product and never saw any other distributors servicing territory); Ronchetti Dep. 33:16-34:2 (never personally observed other distributors servicing territories and never visited other warehouses); English Dep. 19:25-20:18 (sole purpose of visiting limited number of other warehouses was picking up product); Id. 43:21-44:18 (never witnessed other distributors in warehouse service their customers); Glavey Dep. 118:17-120:12 (same); Riley Dep. 30:21-24 (never saw any postings in other warehouses).

Most importantly, despite the alleged "understanding" and "belief" set forth in their cookie-cutter declarations, Plaintiffs uniformly admit they have no idea how many hours other distributors—in their own and other warehouses—operate per week and, with limited exception, have not seen their compensation records. *See, e.g.,* Ronchetti Dep. 57:3-57:13 (no personal knowledge of hours worked by other Jamestown distributors in Concord or other warehouses); Riley Dep. 30:6-20, 39:25-40:2, 55:13-15 (same); Rehberg Dep. 43:5-44:13 (same).

In addition, Plaintiffs uniformly admit that they have no personal knowledge regarding management practices at other Jamestown warehouses or for other distributors at their own warehouses. As opt-in English testified, "I know nothing about really what goes on at other warehouses." (English Dep. 80:11-14; *accord,* Rehberg Dep. 62:3-65:13, 71:9-15, 73:10-14 (no personal knowledge of management's interaction with Indian Trail distributors or management practices or interaction/communication with distributors in other warehouses); Ronchetti Dep. 35:15-37:6 (no knowledge of discussions between other distributors and management); Riley Dep. 30:25-31:4, 34:20-35:3 (no knowledge of management meetings with other Jamestown distributors), 51:8-17 (no knowledge of how often management speaks with or visits other distributors); Rehberg Dep. 64:23-65:14, 71:9-15, 73:10-14 (same).)

## III. ARGUMENT

Section 216(b) of the Fair Labor Standards Act (FLSA) allows employees to seek damages for alleged overtime and other wage/hour violations on behalf of themselves and others "similarly situated." 29 U.S.C. § 216(b). The decision whether to conditionally certify a § 216(b) collective action under the FLSA lies within the sound discretion of the trial court. *See Purdham v. Fairfax Cnty. Pub. Sch.,* 629 F. Supp. 2d 544, 548 (E.D. Va. 2009). Contrary to what Plaintiffs imply in their Motion, conditional certification or notice is not automatic or perfunctory. Rather, the court cannot facilitate notice unless "[t]he facts and the circumstances of the case illustrate" that a class of aggrieved individuals who are actually "similarly situated" does exist. *Id.* at 547 (citing *Hoffman-LaRoche, Inc. v. Sperling,* 493 U.S. 165, 170 (1989)). And, the power to authorize notice must be used "only in appropriate cases." *Haynes v. Singer Co.,* 696 F.2d 884, 886 (11th Cir. 1983) (quoting *Hoffman-LaRoche,* 493 U.S. at 170).

13

Plaintiffs bear the burden of establishing a "reasonable basis" for their claim that other individuals are in fact similarly situated to them. *MacGregor v. Farmers Ins. Exch.,* 2012 WL 2974679, at *2 (D.S.C. Jul. 20, 2012); *Haynes,* 696 F.2d at 887 (plaintiffs must establish a "reasonable basis for crediting their assertions that aggrieved individuals exist in the broad class that they proposed."). To meet this burden, Plaintiffs must come forward with sufficient *factual evidence* of a "common policy or plan *that violated the law*." *Ruffin v. Entm't of the E. Panhandle*, 2012 WL 761659, at *4 (N.D. W.Va. Mar. 7, 2012) (quoting *Choimbol v. Fairfield Resorts, Inc.,* 475 F. Supp. 2d 557, 563 (E.D. Va. 2006)) (emphasis added). This requires more than conclusory assertions with "meager factual support." *Bouthner v. Cleveland Constr., Inc.,* 2012 WL 738578, at *4 ( D.Md. Mar. 5, 2012) (quoting *D'Anna,* 903 F. Supp. at 893)). Merely submitting conclusory declarations from the named Plaintiffs alone is not sufficient. *Brown v. White's Ferry, Inc.,* 2011 WL 5151394, at *2 (D. Md. Oct. 27, 2011) (plaintiffs' own conclusory declarations not sufficient for conditional certification); *accord* cases cited *infra* Section III(C). When, as here, "sufficient evidence in the record at the initial 'notice' stage makes it clear that notice is not appropriate, . . . a court can . . . deny certification outright." *Bouthner,* 2012 WL 738578, at *4 (quoting *Purdham,* 629 F. Supp. 2d at 547).

As discussed below, Plaintiffs' Motion should be denied because: (1) they have not shown that all Jamestown distributors are uniformly subject to an *unlawful* policy or plan; (2) their claims require highly-individualized factual inquiries that cannot be adjudicated collectively without individualized hearings distributor-by-distributor; and (3) they have not shown that they are similarly situated to each other—let alone some 230 other Jamestown distributors they seek to represent.

A.    Plaintiffs Have Not Established the Existence of a Common Unlawful Policy or Plan.

Plaintiffs' Motion must first be denied because they uniformly admit they and other Jamestown distributors are not, in fact, subject to any common policy, let alone an *unlawful policy*, that would somehow render them employees.  *See* testimony in Exhibit D and discussion *infra* Section II(D).[13]

Further, despite their contentions, mere treatment as independent contractor is not sufficient to justify conditional certification.  *Bouthner v. Cleveland Constr., Inc.*, 2012 WL 738578, at * 5 (D. Md. Mar. 5, 2012) (plaintiffs' argument that defendants employed a "common policy or scheme … [of] systematically misclassifying employees as independent contractors" is not sufficient to warrant conditional certification); *Slavinski v. Columbia Ass'n, Inc.*, 2011 WL 2119231, at *2 (D. Md. May 27, 2011) (denying conditional certification and holding that "plaintiff's assertion that merely alleging an employer potentially misclassified employees [as independent contractors] is sufficient to warrant conditional certification is an incorrect statement of the law"); *Bamgbose v. Delta-T Grp., Inc.*, 684 F. Supp. 2d 660, 669 (E.D. Pa. 2010) ("[e]valuation of whether [putative collective action members] are employees or independent contractors … would not be possible on a collective basis because it would require the Court to examine [their] distinct relationships with [defendant] and its various clients").[14]

Plaintiffs repeatedly discuss unidentified "sales contracts" with national accounts, which they contend "control every aspect of their jobs."  But this, too, fails.  They uniformly admit at

---

[13] *See Holt v. Rite Aid Corp.,* 333 F. Supp. 2d 1265, 1271 ("[T]his case is not a case where janitors are being classified as exempt. As such, similarly situated inquiry requires examination of day-to-day tasks and conditional certification [is] inappropriate.").

[14] **Similarly, that Plaintiffs held the same "job title" and were all classified as exempt is likewise insufficient**. *See* 29 C.F.R. § 541.2 ("A job title alone is insufficient to establish the exempt status of an employee."); *Grace v. Family Dollar Stores, Inc.,* 2007 WL 2669699, at *2 (W.D.N.C. Sept. 6, 2007) (mere allegation of uniform treatment as exempt insufficient to support conditional certification); *Palacios v. Boehringer Ingelheim Pharms., Inc.,* 2011 WL 6794438, at *6 (S.D. Fla. Apr. 19, 2011) ("as [d]efendant correctly points out, a defendant's policy and practice of classifying a group of employees as exempt is not a basis for proceeding collectively.").

deposition that they have never seen any such contracts and have no personal knowledge whatsoever of any negotiations between Flowers Foods, Flowers/Jamestown, and any such customers. *See, e.g.,* Ronchetti Dep. 83:1-16 (has no personal knowledge of any contracts or negotiations between Flowers Foods or Flowers/Jamestown and any customers); Rehberg Dep. 104:13-106:21 (same); Riley Dep. 78:6-23 (never saw any contracts between Flowers Foods, Flowers Jamestown or any of his customers and doesn't know who sets rack space or approves displays). What is more, Plaintiffs fail to acknowledge that *customer*-imposed control is irrelevant to whether they are independent contractors. *See, e.g., FedEx Home Delivery v. N.L.R.B.*, 563 F.3d 492, 501 (D.C. Cir. 2009) (citing *C.C. Eastern, Inc., v. NLRB,* 60 F.3d 855, 859 (D.C. Cir. 1995)) ("[C]onstraints imposed by customer demands and government regulations do not determine the employment relationship." ); *Scruggs v. Skylink Ltd.*, 2011 WL 6026152, at *3 (S.D. W.Va. Dec. 2, 2011) (requiring some compliance with certain specifications for a customer "is entirely consistent with the standard role of a contractor who is hired to perform highly technical duties").

Moreover, the remaining factors Plaintiffs cite do nothing further to support their Motion. Specifically, they assert that: (1) all Jamestown distributors sign a contract that outlines their "compensation and job performance expectations" and are required use a handheld computer, (2) "Flowers" can "terminate [their] contract[s]" if they do not meet the stated expectations, and (3) Flowers controls prices of products. Even if Plaintiffs had supported these assertions with factual evidence (they have not), these factors are also legally and factually inapposite. *See FedEx Home Delivery*, 563 F.3d at 496-97 (citing *North Am. Van Lines, Inc. v. NLRB*, 869 F.2d 596, 599 (D.C. Cir. 1989)) ("'[E]fforts to monitor, evaluate, and improve' a worker's performance were deemed compatible with independent contractor status."); *Freund v. Hi-Tech*

*Satellite, Inc.,* 185 F. App'x 782, 784 (11th Cir. 2006) (citing *Chao v. Mid-Atl. Installation Servs., Inc.*, 16 F. App'x 104, 107 (4th Cir. 2001)) (upholding independent-contractor status and finding "although the installers did not set the prices, the installers were 'no less in control of their net profits as a result of these variables than typical independent contractors.'").[15]

The remaining factors Plaintiffs cite are equally unsupported by any record evidence whatsoever[16] <u>and</u> are directly contradicted by their own deposition testimony. For example, they assert that "Defendants set the delivery schedule" and provide a "predetermined route," (Pls.' Brief 6, 15), but their testimony shows otherwise. Rehberg Dep. 77:6-21, 78:24-79:24 (individual distributors determine what hours they work—they don't receive any schedule from company); Ronchetti Dep. 40:24-41:26 (he determines sequence in which he services his customers by customer-service windows) and 42:18-43:1 (his decision to determine appropriate delivery sequence); Riley Dep. 41:2-11 (he and "the product" determine schedule—no manager tells him when to work). Likewise, they claim that "Defendants select the quantity and type of products that Distributors deliver," (Pls.' Brief 15), but testify to the contrary. Riley Dep. 128:12-129:24 and Ex. 5 (admitting he determines what products to order his customers and regularly makes adjustments to suggested order); Ronchetti Dep. 91:8-15, 107:4-109:5 (his decision to make adjustments to suggested order and admitting "probably all" distributors adjust their suggested orders based on sales history because the "suggested order does not work").[17]

---

[15] Plaintiffs also argue that all distributors are paid on a "piece rate" basis. Even if true (it is not), this, too, fails because it pre-supposes an employment relationship exists. It does not. Further, payment on a "piece rate" basis is not *per se* unlawful. *See* Section 14(c), FLSA (payment on piece rate basis).

[16] *See* Pls.' Brief 7-15, containing no citations to factual evidence, and ¶¶ 1-7, 9 of Pls.' Declarations, which do not extend beyond own individual circumstances.

[17] *Compare* "Defendants mandate that Distributors load their trucks in a certain way" (Pls.' Brief 15) *with* Rehberg Dep. 84:6-11 (admitting he is "pretty much allowed to load the truck however [he] feel[s]"); English Dep. 73:25-75:5 (same); and *compare* "Defendants reserve the right to—and regularly do—change orders placed by Distributors" (Pls.' Brief 6) *with* Ronchetti Dep. 97:1-19 (management in Concord has not made any changes to his orders in the past year).

B.     <u>Resolving Plaintiffs' Claims Requires Highly Individualized Inquiries That Cannot Be Adjudicated Collectively.</u>

Even though Plaintiffs' repeated admissions about the lack of any common unlawful policies provide more than sufficient grounds to deny their Motion, the substantial individualized inquiries involved in adjudicating their claims serves as yet another reason why collective action treatment is inappropriate.

           *1.*     *Plaintiffs' Claims Necessarily Implicate Individualized Practices.*

In the absence of any common unlawful policy, Plaintiffs' argument necessarily centers on their contention that *as a matter of fact*, rather than formal policy, they are performing non-exempt duties. Thus, the inquiry regarding whether Plaintiffs and other distributors are exempt and "similarly situated" turns on *individualized inquiries* about what *each putative class member* does on a daily basis and the extent to which the individualized facts and circumstances weigh in favor of—or against—independent-contractor status for each distributor, again, using the six-factor, economic-realities test outlined above.

Specifically, to determine whether each distributor is properly treated as an independent contractor, the Court would have to determine whether, to what extent, and over what time period *each individual*, given his *individual warehouse*, *individual sales manager*, *individualized accounts*, and other particularized circumstances:

- was subject to control over the manner, method and means of performance;

- took advantage of the various entrepreneurial opportunities available, such as incorporation, hiring a helper, buying or selling portions of territory, soliciting new accounts, and the like;

- realized the opportunity for profit or loss through his individualized sales efforts, accounts opening or closing in his defined territory, and the like;

- had a substantial investment in the business; and

- worked elsewhere, operated additional businesses, or sold non-competitive products, among others.

Assuming all such factors for each distributor did in fact weigh in favor of employee status (they do not), the Court would then need to determine whether each distributor was otherwise exempt from overtime pay under the motor-carrier or outside-sales exemptions. This would require the Court to assess whether, to what extent, and over what time period, each individual Plaintiff and opt-in:

**For the motor-carrier exemption**: [18]

- drove a vehicle with a Gross Vehicle Weight Rating (GVWR) of at least 10,001 pounds *or* whether his vehicle, with product, weighed at least 10,001 pounds—proof of which must be offered at least once every four months per individual[19];

- drove—or was subject to driving— across state lines;

- ordered products for customers that were produced out-of-state;

- ordered products that remained in the "practical continuity" of interstate commerce (*i.e.*, they did not remain in the warehouse for long periods of time after being ordered);

- used trays and packaging for products delivered that traveled in "interstate commerce;" and

- was subject to delivering products or using trays in interstate commerce.

---

[18] To establish applicability of the FLSA's "motor carrier exemption" (MCA) (29 U.S.C. § 213(b)(1)), Defendants must prove *inter alia* that "[the Distributor's] employment duties involved the safety of operation of motor vehicles weighing at least 10,001 pounds in interstate commerce." *Buckner v. United Parcel Serv., Inc.*, 2012 WL 1596726, at *4 (E.D.N.C. May 7, 2012). An individual who drives a wholly intrastate route can be nonetheless exempt under the MCA exemption if the goods they deliver remain in the "'practical continuity of movement' between the interstate segment and the overall interstate flow." *Walters v. Am. Coach Lines of Miami, Inc.,* 575 F.3d 1221, 1226 (11th Cir. 2009). Further, the MCA is applicable if the packaging and trays used flow in interstate commerce, even if the individual delivering them doesn't cross state lines. *Talton v. I.H. Caffey Distrib. Co., Inc.*, 124 F. App'x. 760, 764-66 (4th Cir. 2005) (per curiam).

[19] An individual is subject to the Secretary's jurisdiction under the MCA for a four-month period, beginning with the date the individual was called upon, *or could have been called upon*, to drive in interstate commerce. *See Badgett v. Rent-Way, Inc.,* 350 F. Supp. 2d 642, 657 (W.D. Pa. 2004) (quoting FOH § 24e01(b) (May 13,1982)).

19

**For the outside-sales exemption:**

- had a "primary duty" of "making sales" or obtaining orders using the nine sub-factors set forth in 29 C.F.R. § 541.504(b); *see Archer v. Freedmont Mortg. Corp.*, 2012 WL 5193828, at *3 (D. Md. Oct. 18, 2012) (citing same).

- consummated his own sales and performed other activities that were "incidental to and in conjunction with" his own sales; and

- spent the majority of time outside of the office.

By Plaintiffs' own admissions, these factors can—and <u>do</u>—vary from distributor to distributor and over time. *E.g.,* Riley Dep. 97:6-99:6 (discussing the 4 different vehicles he uses, at his discretion and on different days, to service distributorship), 124:7-17 (discussing how orders for Tasty products, which are produced out-of-state, vary from month to month); *accord* testimony discussed *supra* Section II(C) (noting differences in sales efforts between Plaintiffs). <u>As courts have found, each of these sets of highly-individualized factual inquiries— all of which are necessary to resolve independent-contractor and exempt status— is alone sufficient to deny conditional certification</u>:

- **Individualized inquiries in independent contractor analysis is inappropriate for collective action treatment:** *E.g., Bouthner*, 2012 WL 738578, at *7 ("to determine the economic reality of the employment relationship between the [d]efendants and the [plaintiff independent contractors], individualized questions would necessarily predominate …"); *Demauro v. Limo, Inc.*, 2011 WL 9191, at *4 (M.D. Fla. Jan. 3, 2011) (conditional certification denied where "each individual who may seek to join this case will be examined separately in order to determine whether such individual is an employee or an independent contractor," which is a "necessarily individualized assessment ['that'] eviscerates all notions of judicial economy that would otherwise be served by conditional class certification"); *In re Fed Ex Ground Package Sys., Inc. Emp. Practices Litig.*, 662 F. Supp. 2d 1069, 1083 (N.D. Ind. 2009) ("lack of substantial similarity among the putative class members" precluded conditional certification even where all putative class members were bound by the same independent contractor operating agreement).[20]

---

[20] *Accord, Andel v. Patterson Uti-Drilling, LLC,* 280 F.R.D. 287 (S.D. Tex. 15, 2012) (conditional certification denied because individualized inquiries involved in independent contractor analysis would "eliminate 'the economy of scale envisioned by the FLSA.'"); *Sherman v. Am. Eagle,* 2012 WL 248400 (E.D. Pa. Mar. 8, 2012) (individualized inquiries involved in independent contractor analysis rendered conditional cert inappropriate); *Pfaahler v. Consultants for Architects, Inc.*, 2000 WL 198888, at *2 (N.D. Ill. Feb. 8, 2000) (same).

- **Motor-carrier exemption:** *E.g., See Gregory v. FedEx Ground Package System, Inc.,* 2012 WL 2396873, at *13 (E.D. Va. May 9, 2012) ("[p]roving the [Motor Carrier Act] exemption will require [defendant] to put on evidence of the dates individual plaintiffs drove for [defendant] and the weights of the trucks they operated," thus warranting severing joint claims); *Williams v. Md. Office Relocators*, 485 F. Supp. 2d 616, 619 (D. Md. 2007) ("the question of whether a particular employee is a 'loader' [and thus falls within the Motor Carrier Act exemption] requires an individualized determination into the actual work performed by that employee") (quotations in original); *Bishop v. Petro-Chemical Transp., LLC,* 582 F. Supp. 2d 1290, 1303 (E.D. Cal. 2008) (denying conditional certification based on individualized inquires as to motor carrier exemption);

- **Outside-sales exemption:** *E.g., Evancho v. Sanofi-Aventis U.S. Inc.*, 2007 WL 4546100, at *4 (D.N.J. Dec. 19, 2007) (denying conditional certification due to individualized inquiries associated with the outside sales exemption); *Clausman v. Nortel Networks, Inc.*, 2003 WL 21314065, at *4 (S.D. Ind. May 1, 2003) (whether employees can be classified as an "outside salesman" would require individualized determination).

Because these individualized inquiries simply "defeat the point of a collective action" (*Family Dollar Stores, Inc.,* 2007 WL 2669699, at * 2-3), Plaintiffs' Motion must be denied.

2. *Courts Can—and Should—Consider These Required Individualized Inquiries, Even at the Notice Stage, As Matter of Sound Case Management.*

Plaintiffs attempt to downplay the significance of these inherently individualized inquiries by arguing that considering these inquiries is inappropriate at the notice stage. They are wrong. Courts in this Circuit have repeatedly acknowledged the propriety of examining the nature and extent of the individualized inquiries involved based on the evidence before them— and thus the manageability of adjudicating the claims collectively—as a matter of sound case management **before** determining whether notice is appropriate. *E.g., Bouthner,* 2012 WL 738578, at *4 ("As a matter of sound case management, a court should, before offering [to assist plaintiffs in locating additional plaintiffs], make a preliminary inquiry as to whether a manageable case exists…") (quotations omitted); *Syrja v. Westat, Inc.*, 756 F. Supp. 2d 682, 689 (D. Md. 2010) ("[u]ltimately, the significance of manageability concerns at the notice stage is,

like other aspects of the conditional certification analysis, a decision for the Court on the facts before it.")  This inquiry is necessary not only because "courts, as well as practicing attorneys, have a responsibility to avoid 'stirring up' of litigation through unwarranted solicitation," *D'Anna v. M/A–COM, Inc*., 903 F. Supp. 889, 894 (D. Md. 1995), but courts must also manage and resolve all claims that are certified for collective treatment.

When, as here, factual differences and individualized issues predominate, even among these few deponents, courts have easily concluded that conditional certification and notice are inappropriate. *E.g., Bouthner*, 2012 WL 738578, at *6 (denying collective action status as unmanageable given factual differences of plaintiffs because "individualized factual and legal issues" would predominate); *Pelczynski v. Orange Lake Country Club, Inc,* 284 F.R.D. 364, 369 (D.S.C. 2012) (denying conditional certification of timeshare salesmen's FLSA collective action due to manageability concerns, including the court's determination that the case would require individualized assessments of each salesman's work activities).  Further, the fairness and procedural considerations in play provide perhaps the most compelling reason to deny conditional certification. Indeed, it is unfair both to Defendants and to Plaintiffs to attempt to resolve such factually divergent claims collectively in one action.  *See id.* (fairness and procedural considerations relevant to conditional certification at first stage).  Here, Plaintiffs ask this Court to send notice to their broad class based on nothing more than pages of argument noticeably lacking in any citation to record factual evidence and to several conclusory assertions—all of which their deposition testimony confirms are not true or are not based on any personal knowledge whatsoever. Defendants have already had to spend significant time and expense in responding to this patently deficient Motion. Neither the Court nor Defendants should be saddled with the economic and administrative burden of continuing to adjudicate and defend

against a case that was filed without any competent factual basis for pursuing a collective or representative action. *D'Anna,* 903 F. Supp. at 893-94 ("[a]n employer should not be unduly burdened by a frivolous fishing expedition conducted by plaintiff at the employer's expense.")[21] For this reason, among the many others discussed above, Plaintiffs' Motion should be denied.

> C. <u>Plaintiffs' Motion Should Be Denied Because They Have Not Established That They Are Similarly Situated to Each Other—Let Alone Distributors At All Other Jamestown Warehouses</u>.

Finally, Plaintiffs' deposition testimony establishes that they are <u>not</u> similarly situated to each other—let alone to the distributors at the 24 other warehouses who they seek to represent. In fact, they do not even seek the <u>same relief</u> in this lawsuit. *See supra* Sections II(A), (C). Even if the Court were to consider only the face of Plaintiffs' Motion and their supporting declarations in adjudicating this Motion, the result can be no different. The only "evidence" Plaintiffs offer is their three cookie-cutter declarations, based exclusively on their own conclusory assertions—the majority of which do not even extend beyond their own personal circumstances—and pages of unsupported argument. Indeed, only 3 paragraphs of their entire 11-paragraph declarations even attempt to discuss alleged policies and procedures applicable to <u>other</u> Jamestown distributors. None offers any basis of personal knowledge to support the same. (*E.g.,* Decls. of Riley, Ronchetti & Rehberg ¶¶ 8, 10-11.)

Further, Plaintiffs' declarations fail to provide competent evidence of even the <u>most basic assumption</u> necessary to support their lawsuit: that other distributors *actually worked overtime and were unlawfully denied compensation*. Plaintiffs' conclusory statements in their declarations based on "understanding" and "belief" are insufficient to carry their burden. *See Bernard v.*

---

[21] What is more, despite their admitted solicitation efforts, Plaintiffs have only been able to find six individuals who wish to opt-in— **just 2% of the distributors in the Jamestown district**. (Rehberg Dep. 52:2-56:13.) This, too, supports denying Plaintiffs' Motion. *See Pelczynski.*, 284 F.R.D. at 368 (denying conditional certification and notice where there was no evidence that other individuals wanted to join the action: "[E]vidence that other similarly situated individuals desire to opt in to the litigation is … required.") (citing *Purdham*, 629 F. Supp. 2d at 548).

*Household Int'l,* 231 F. Supp. 2d 433, 435-36 (E.D. Va. 2002) (declarations stating "I believe that" and "it is my understanding that" were insufficient to support conditional certification); *Hanley v. Hand 'N Heart, LLC,* 2007 WL 2572193, at *4 (E.D. Va. Aug. 31, 2007) (denying court-facilitated notice where plaintiff's affidavit failed to set forth the basis of her claimed knowledge that other employees were also allegedly denied compensation for travel and wait time); *Parker v. Rowland Express, Inc.,* 492 F. Supp. 2d 1159, 1162 (D. Minn. 2007) (statements in plaintiffs' declarations that others did not receive overtime, which were, based on "information and belief," were not sufficient to support notice).

The unsupported conclusory assertions Plaintiffs' offer are insufficient, <u>as a matter of law</u>, to support their motion. *See Bouthner*, 2012 WL 738578, at *4 (allegations in complaint and three one-page declarations not sufficient to show a common policy of misclassifying employees as independent contractors); *Brown v. White's Ferry, Inc.,* 2011 WL 5151394, at *2 (D. Md. Oct. 27, 2011) (denying plaintiffs' motion when they only submitted their own conclusory declarations to support their motion); *Bernard,* 231 F. Supp. 2d at 435-36 (denying plaintiffs' request for notice where plaintiffs failed to provide evidence to support existence of company-wide policy resulting in FLSA violations); Order Denying Motion to Certify Class, *Holmes v. Quest Diagnostics,* No. 11-80567-KMW (S.D. Fla. Jun. 14, 2012), ECD No. 102 (denying conditional certification despite 23 declarations from opt-ins because the declarations were "conclusory" and "cookie cutter"); *Horne v. United Serv. Auto. Ass'n*, 279 F. Supp. 2d 1231, 1234-37 (M.D. Ala. 2003) (single affidavit that failed to provide particularized facts that policies that denied plaintiff overtime compensation were similarly applied to other employees insufficient).

D.    Even if the Court Were to Find that Plaintiffs Notice is Appropriate, It Should Be Limited to the Three Warehouses Where Plaintiffs Work.

If the Court concludes that Plaintiffs are entitled to some sort of notice, which Defendants deny and Plaintiffs' own evidence fails to support, conditional certification and the facilitation of notice must, *at a minimum*, be limited to only those distributors who operate out of the same three warehouses as Plaintiffs: Rock Hill, Concord, and Indian Trail.  District courts in this Circuit routinely limit the scope of notice where, as here, plaintiffs fail to offer evidence that individuals at **other facilities** were similarly affected by the same allegedly unlawful policy or plan attributed to the defendant.  *E.g., Mitchel v. Crosby Corp.*, 2012 WL 4005535, at \*\*1, 3-4 (D. Md. Sept. 10, 2012) (limiting conditional certification to employees who worked out of one facility; only plaintiffs offered no evidence of allegedly unlawful policies affecting underwriters at any facility other than their own); *accord McLaurin v. Prestage Foods,* 271 F.R.D. 465 (E.D.N.C. 2010) (narrowing scope of notice); *Faust v. Comcast Cable Commc'ns. Mgmt., LLC.*, 2011 WL 5244421, at \*4 (D. Md. Nov. 1, 2011) (limiting notice to call center where Plaintiffs and opt-in worked because they "failed to provide any *concrete evidence* demonstrating that CAEs in other call centers are similarly situated")*; Camper v. Home Quality Mgmt. Inc.*, 200 F.R.D. 516, 517, 519 (D. Md. 2000) (notice to the potential class was warranted for only the one facility where plaintiffs made factual showing of unlawful policy). Assuming this Court finds some notice is proper it should be similarly limited.

## IV.    CONCLUSION

For all of the reasons set forth above, conditional certification and notice of Plaintiffs' broad class is improper.  Plaintiffs' Motion for conditional certification and notice should be denied entirely with prejudice.

Dated this 4th day of January, 2013.

Respectfully submitted,

/s/ Margaret Santen Hanrahan
Kevin P. Hishta
GA Bar No. 357410
(Admitted *Pro Hac Vice*)
A. Craig Cleland
GA Bar No. 129825
(Admitted *Pro Hac Vice*)
Margaret Santen Hanrahan
GA Bar No. 578314
(Admitted *Pro Hac Vice*)
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
One Ninety One Peachtree Tower
191 Peachtree St. NE, Suite 4800
Atlanta, GA  30303
Telephone:  404.881.1300
Facsimile:  404.870.1732
kevin.hishta@ogletreedeakins.com
craig.cleland@ogletreedeakins.com
maggie.hanrahan@ogletreedeakins.com

Gregory P. McGuire, NC State Bar #14237
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
4208 Six Forks Road, Suite 1100
Raleigh, NC  27609
Telephone:  919.787.9700
Facsimile:  919.783.9412
Email:  gregory.mcguire@ogletreedeakins.com


*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I, hereby certify that I have this day electronically filed the foregoing **MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION AND JUDICIAL NOTICE** with the Clerk of Court using the CM/ECF system, which will send notification of the filing to the following person:

Ann Groninger
Copeley Johnson & Groninger, PLLC
225 East Worthington Avenue
Charlotte, NC 28203
ann@cjglawfirm.com

Shawn J. Wanta
Baillon Thome Jozwiak Miller & Wanta LLP
222 South Ninth Street
Suite 2955
Minneapolis, Minnesota 55402
sjwanta@baillonthome.com

Dated this the 4th day of January, 2013.

/s/ Margaret Santen Hanrahan
Kevin P. Hishta
GA Bar No. 357410
(Admitted *Pro Hac Vice*)
A. Craig Cleland
GA Bar No. 129825
(Admitted *Pro Hac Vice*)
Margaret Santen Hanrahan
GA Bar No. 578314
(Admitted *Pro Hac Vice*)
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
One Ninety One Peachtree Tower
191 Peachtree St. NE, Suite 4800
Atlanta, GA 30303
Telephone: 404.881.1300
Facsimile: 404.870.1732
kevin.hishta@ogletreedeakins.com
craig.cleland@ogletreedeakins.com
maggie.hanrahan@ogletreedeakins.com

Gregory P. McGuire, NC State Bar #14237
OGLETREE, DEAKINS, NASH, SMOAK & STEWART,

P.C.
4208 Six Forks Road, Suite 1100
Raleigh, NC  27609
Telephone:  919.787.9700
Facsimile:  919.783.9412
Email:  gregory.mcguire@ogletreedeakins.com

*Attorneys for Defendants*