IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SCOTT REHBERG, WILLARD ALLEN RILEY, and MARIO RONCHETTI, individually and on behalf of all similarly situated individuals,<br><br>            Plaintiffs,<br><br>-v-<br><br>FLOWERS FOODS, INC. and FLOWERS BAKING CO. OF JAMESTOWN, LLC,<br><br>            Defendants. | Court File No. 12-cv-00596-MOC-DSC |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I.      INTRODUCTION

Plaintiffs respectfully request this Court grant their Motion for Partial Summary Judgment ("Motion") dismissing Defendants, Flowers Foods, Inc. ("Flowers") and Flowers Baking Co. of Jamestown, LLC's ("Jamestown," collectively "Defendants") affirmative defenses brought pursuant to: (1) the outside sales exemption of the Fair Labor Standards Act ("FLSA"); and (2) the general release of claims Defendants forced Plaintiffs, FLSA Collective Group Members ("Members") and North Carolina Class Members ("Class Members") to sign.

The undisputed factual record clearly shows that Plaintiffs and Members do not meet the criteria for the outside salesman exemption under the FLSA because their primary duties are to deliver products, stock those products on the shelves, and reorder products according to quantities set between Defendants and their accounts, which is dictated by the available shelf space. Even while some Members occasionally ask for shelf space in stores, those activities are

trivial compared to their primary job duties of delivering bread and stocking shelves. Furthermore, Plaintiffs and Members have neither the need nor the authority to engage in activities designed to increase sales because Defendants employ robust sales and marketing teams to pitch products to accounts, present promotions, and propose pricing based upon market research and sophisticated computerized sales forecasting systems. Accordingly, Plaintiffs and Members are not outside salesman under the FLSA.

Likewise, Defendants' affirmative defense that some Class Members cannot recover because they signed general releases of claims during the class period also fails as a matter of law. The record indicates that the general release of claims Defendants obtained from select Plaintiffs, Members, and Class Members are void for public policy because the signors were not advised of the pendency of this litigation when the releases were presented to them; they were unaware of their rights in this litigation; and they were unaware of the consequences of signing a release.

Plaintiffs' Motion for Partial Summary Judgment should be granted in its entirety.

## II.    FACTUAL BACKGROUND

### A.    Defendants Exclusively Control All Sales & Marketing Activities to Solicit and Maintain Relationships with Customers.

Defendants exclusively control all marketing and sales activities with their customer accounts because that is what the market demands. Over the last 30 years, the commercial baking industry has changed substantially. In the 1980s, Defendants' customers were local, independent supermarkets and "mom and pop" shops, whereas today, the majority of Defendants sales are made to nationwide accounts like Wal-Mart, Family Dollar, and Burger King. (Dkt. No. 98-3, p. 105; 107-1, pp. 35-36.) As a result of this shift in the market, Defendant Flowers employs national account managers who are "the face of the company," representing Flowers with each

2

retailer or restaurant because the customer cannot logistically work individually with each

Flowers bakery. (Dkt. No. 107-1, p. 73.) Defendant Flowers provides these outlets with a single

national account manager because "that's what they demand, one point of contact." (Dkt. 102-3

at p. 6.) The national accounts managers initiate discussions with or respond to inquiries from

national accounts regarding the type of Flowers products they will sell. (Dkt. No. 98-3 at pp. 5–

15.) Along similar lines, Flowers also creates sales presentations to pitch new products, initiates

meetings with potential and existing customers, leads proposal meetings, brings samples of

products to customers, and offers suggested retail and wholesale pricing. (Dkt. No. 107-1, pp. 59,

61-62.) In addition, Flowers' national accounts team discusses planograms and shelf allocation

with the retailers and requests additional shelf space if Flowers feels it is "underspaced."

(Hampton Dep. 39-41.) A planogram is a diagram that illustrates how and where specific retail

products should be placed on retail shelves. (Ex. E.) Defendants are allotted a certain amount of

space for each product, and thus the amount of products that can be placed on store shelves is

fixed. (*Id.*) Planograms are accompanied by detailed "category schematics," which list the exact

number of aisle facings each product is allocated. (*Id.*) Flowers representatives also meet with

the national accounts to discuss the promotion of certain products, which all Members are

contractually required to honor. (Dkt Nos. 98-3 at pp. 54–61; 107-1, p. 4.) Finally, Flowers

employs separate bread and cake marketing teams and utilizes a consumer research company to

forecast consumer trends for retailers so Flowers and the retailer can make informed decisions on

product selection. (Dkt. Nos. 102-3 p. 7; 107-1, p. 72; 108.)

In an effort to increase sales at the local level, Jamestown employs sales managers and

directors of sales at each of its warehouses to develop Flowers' business. Jamestown sales

managers call on accounts, seek out new accounts, maintain good relationships with store

managers, and go out to stores to solicit more shelf space for promotions. (Dkt. No. 107-3, p. 3, 5.) In addition, they present customers with opportunities for new products. (Dkt. No. 107-3, p. 6.) Sales managers and directors of sales are typically involved in store "resets" to fight for "all of the regional space [they] can get." (Dkt. Nos. 107-3, pp. 10-11; 107-5.) Jamestown regularly runs reports on Members' route performance to identify opportunities to increase sales, but the company does not directly share the statistics with Members; rather, that information is used by Flowers sales management to increase sales in retail outlets. (Dkt. No. 107-3, p. 7.) Jamestown's directors of sales oversee 25-50 sales managers and mostly perform the same job duties as sales managers, including calling on customers. (Dkt. No. 107-3, p. 7.)

**B.** **Plaintiffs and Collective Group Members' Primary Job Duties Are to Stock Shelves, Rotate Product, and Comply with the Requirements Set Between Defendants and Representatives of Their Accounts.**

While Defendants handle the sophisticated business sales, development and management activities, Members are distributors who carry out the actual delivery and shelving of the products. Although their routes differ by size and customer mix, all Members share the same primary job responsibility of servicing Defendants' customers in accordance with "good industry practice." (Dkt. Nos. 107-1 p. 4; 107-3, p. 8.) Defendants define "good industry practice" as: properly ordering products; keeping shelves stocked with Flowers products; keeping store shelves in good condition in conformance with a planogram; properly rotating products on a regular basis; promptly removing all stale products; meeting customer service requirements; maintaining proper service and delivery to all outlets requesting service; and maintaining all equipment in a sanitary condition and in good, safe working order. (Dkt. Nos. 107-1, pp. 38, 40; 107-3, p. 8.) Jamestown's corporate testimony shows that "good industry practice" is a broad, catch-all term meaning, "in practice, whether the customer is satisfied with the service they're

4

receiving." (Dkt. No. 107-3, p. 8.) Generally, "it's always up to Flowers whether or not to adopt good industry practice." (Dkt. No. 107-3, p. 9.)

Given this significant oversight by Defendants, it's not surprising that Members follow the same daily and weekly routines. They begin their days by arriving at their respective warehouses to load product onto their trucks, which Jamestown employees have sorted, organized, and packed for each of the Distributors. (Dkt. No. 118-5, p. 3.) Members then proceed on their delivery route, as dictated by their Agreements. (Dkt. No. 107-1, pp. 16-17, 31.) They must service an account within the time frames dictated by the retailer or restaurant to Flowers. (Rehberg Dep. 79.) Members must deliver only the products that the outlets on their routes have requested or authorized through Flowers. (Dkt. No. 98-3, pp. 15-25.) When they arrive at their outlets, Members unload their vehicles and follow a predetermined planogram for stocking product—they do not have discretion in placing product on the shelves. (Dkt. Nos. 107-1, p. 37; 107-3, p. 7.) Members are also required to pull stale product and rotate product according to the standards set by Flowers. (Dkt. Nos. 107-1, p. 37; 107-3, p. 9.)

When a Member finishes stocking a particular location, he then places an order for product for the following week. (Dkt. No. 107-1, p. 32.) Defendants provide Distributors with "suggested orders" for each retailer and the number of products a Member actually orders depends on how much the product supply has depleted since the last time he placed an order (Ronchetti Dep. 61; Dkt. No. 107-1, p. 7.) Named Plaintiff Ronchetti testified that he orders a certain quantity of products based on what sells and "so [he] doesn't run out in [his] stores." (Ronchetti Dep. 61, 107.) This reality was echoed in the testimony by Defendants' representatives and national account managers. Defendants' corporate designee, Charles Rich, explained, the goal is to "keep the customer serviced," and that requires keeping the shelves full

5

of product. (Rich Dep. 110.) National account manager, Julie Young, testified that "the ordering piece of it is going to be based on the selloff in the store. The planogram is set." (Young Dep. 43.) And furthermore, "As long as [the shelf] contains the product that is set to the planogram, yes, [the distributor] is compliant." (*Id.*). Importantly, Jamestown sales managers and directors of sales retain ultimate control over order quantities and have the ability to adjust the orders Members place. (Dkt. Nos. 107-1, p. 32; 118-5, p. 7.) Indeed, Jamestown regularly exercises its authority to modify orders Members make. (Dkt. No. 111-2 pp. 2-5; Rehberg Dep. 122-23.)

Members must be back at their respective warehouses by 5:00 pm to return stale product back to Defendants, or else they will be penalized by not receiving credit for returned items. (Rehberg Dep. 77-78). Jamestown requires Members to separate stale product according to its standards and also dictates where in the warehouses Members must put the product. (Riley Dep. 58-59.) After they've serviced their routes for the day, Distributors might receive a "call-back" at any time from an account to deliver more products. (Dkt. No. 107-3, p. 24.) If they refuse, Jamestown will take over and arrange for the delivery by one of its employees and deduct $75.00 plus mileage costs from Distributors' weekly earnings. (*Id.*)

By Friday of every week, Members must provide Jamestown with a full settlement of all products that Jamestown provided to them in the preceding week. (Dkt. No. 107-1, p. 5.) Jamestown imposes warehouse and administrative fees on all Members, which are deducted from their weekly settlement checks. (Dkt. No. 107-1, p.43; Dkt. No. 107-3, 17.) Distributors can take time off from this weekly routine, but Jamestown must approve any vacation time, which is awarded based on seniority. (Rehberg Dep. 21; Dkt. No. 107-7.)

In addition to all of this control over Members' jobs, Jamestown also monitors Members' performance by conducting market checks and disciplines those Members who don't conform to

services standards or Jamestown's ten percent "stale cap."[1] (Dkt. Nos. 107-3, pp. 3; 107-7 pp. 5-10.) Any Member who has over ten percent stale for more than 12 weeks is placed on a "watch list." (Dkt. No. 107-7, pp. 9-10.) Jamestown meets with these Members and assists in remedying the stale percentage by conducting manager ride-alongs and providing other forms of performance help. (*Id.*).

### C. Members Do Not Realistically Have the Opportunity to Engage in Sales Activities Because Defendants Control All Sales Aspects and Members Do Not Have the Time Nor the Authority to Do So.

While Defendants argue that Members have sales opportunities, in actual practice, Members do not have the authority nor the time to engage in profit generating activities. Members' jobs of delivering products to numerous accounts everyday are demanding. For example, Plaintiff Rehberg typically arrived at the Jamestown warehouse between 6:00 am and 7:00 am every day that he picked-up fresh product for delivery and knows that other Members were there as early as 1:00 am. (Rehberg Dep. 76-77.) Members are forced to maintain extraordinary working hours in order to service all of the accounts on their routes and be back to the warehouse by 5:00 pm to provide Defendants with their stale products. (Rehberg Dep. 77.)

Based on the extensive time and effort demands of delivering, stocking, and rotating products, Members do not realistically have the opportunity to engage in sales efforts. When prompted to discuss what he does to develop additional business in his existing accounts, Class Representative Rehberg explained:

> I don't really have a whole lot of time for that. I feel like I'm maxed out as it is with all the private labels that I have and [Defendants] keep adding to us. I don't have time to go find extra accounts. They just put one on me last week that I didn't want.

---

[1] A "stale cap" is a metric Flowers uses to determine how efficiently and accurately Distributors place product orders.

…

I haven't added anything to my account – to my route the whole time …
I'm too maxed out.

(Rehberg Dep. 81-83.) Rehberg is similarly unaware of any efforts other distributors have taken to develop business. (Rehberg Dep. 83.) In practice, Members do not want to engage in sales activities because they are overworked and want to avoid taking on additional accounts for Defendants. For example, Ronchetti testified similarly to Rehberg—that he hasn't picked up any accounts for himself, but that "Flowers has – has basically just forced them upon me." (Ronchetti Dep. 69.)

Time notwithstanding, Members also don't have the authority to engage in sales efforts. For example, Members cannot propose new products or pricing to a retailer because retailers refuse to entertain product discussions with the hundreds of individual distributors who deliver products to their stores and restaurants. (Dkt. No. 107-1, pp. 60, 62.) Similarly, Members cannot negotiate with national accounts for more shelf space. (Dkt. No. 107-3, p. 7.) Nor can a Member reset product placement or in-store marketing on his own—it would "drive [accounts] crazy" and would be nearly impossible for a Member to do logistically, considering all of the other accounts he must service in a day. (Hampton Dep. 38-39.) Instead, Distributors are merely responsible for maintaining product placement until the next reset. (Dkt. No. 107-3, pp. 10-11.) Flowers does not consult with Members before making a proposal to a national account on products or pricing and therefore Members learn of new products or pricing when Flowers or Jamestown dictates it to them. (Hampton Dep. 57-58.) Corporate designee, Charles Rich, described Members' lack of authority best when he testified, "I doubt very seriously that a distributor would be able to go to a new chain account that's opening up in his territory and pick up business … they're not going to

do business with somebody that just shows up and knocks on their door one day." (Rich Dep. 117.)

### D. Defendants Have No Expectation or Requirement That Members Increase Sales or Devote Significant Time to Sales.

Finally, Members do not receive specialized sales training. (Rich Dep. 136.) They are not required nor expected to meet any sales goals or produce an annual growth rate and are not ranked according to their sales. (Rich Dep. 132, 136.) In fact, Defendants have no idea how much time Members actually spend soliciting orders, as evidenced by the testimony of Charles Rich:

> Q: Now, does Flowers Foods have any knowledge about the amount of time that distributors spend making sales or obtaining orders?
>
> A: No. No, there's really no – I mean, from a time perspective, you know, Flowers Foods is not aware – you know, there's no relationship there between Flowers Foods and the distributor. But even – even Flowers Jamestown would not have any knowledge of how many hours a distributor worked.
>
> …
>
> Q: But my question is specifically how many hours were spent making sales or placing orders. And your answer to that is you don't know?
>
> A: Yes.

(Rich Dep. 113.)

### E. Since Notice of the Present Litigation, Defendants Have Engaged in Coercive Conduct to Obtain General Releases from Members and Intimidate Them into Not Exercising Their Rights to Opt-In to The FLSA Collective Group.

In January 2011, Class Counsel notified Defendants of Plaintiffs' intent to bring a lawsuit for violations of the NCWHA and the FLSA. (Ex. A at ¶ 3.) Since that time, Defendants have solicited general releases of claims from Collective Group Members and putative Class Members. Arguably, the general release includes the FLSA and NCWHA claims at issue in this litigation and Defendants intend to raise this defense in dispositive motions and at trial. (Dkt.

9

Nos. 17—18.) Class Members have been forced to sign the general release of claims under a number of different circumstances, including when Defendants force Members and putative Class Members to reorganize their routes, and when Members and Class Members quit their jobs. Pursuant to their distributor agreements. All Members and Class Members are required to "execute … a general release of claims, in the event of any sale, conveyance or assignment, including any sale, conveyance or assignment to [Defendant Jamestown]." (Dkt. No. 107-1, p. 8). Thus, at the time of hire, Defendants bind distributors to later sign a general release of claims.

When a Class Member leaves his job—either voluntarily or involuntarily—Defendants' sales managers work to re-organize the route. Defendants will not pay a departing distributor the value he paid to do his jobs and operate the routes until the general release of claims is signed. (Exs. B and C.) In many circumstances, Defendants owe the Class Member tens of thousands of dollars, and thus the withholding of these funds creates serious economic hardship for Class Members. *Id*. If a Class Member ceases to operate Defendants' route without signing, Defendants will charge the distributor hundreds of dollars per day to operate the route. (Ex. B.) Defendants deduct these operation fees from the value owed to the Distributor until the general release is signed or no value remains. *Id*. As with the forced reorganization, many Class Members have been forced to sign the release of claims upon their departure from the companies to avoid losing the significant sums they previously paid out to do their jobs. *Id.*

The general release of claims provision signed by certain Members and Class Members contains substantially similar language, which provides in relevant part:

> Distributor … does hereby release and forever discharge [Jamestown], its related entities, past, present, and future … from any and all claims, action, rights, demands, or remedies, whether known or unknown, which Distributor ever had, or may claim to have had, from the beginning of time until as of the moment he/she/it signs this Agreement arising out of, or relating to, the

> Distributor agreement, including any and all tort and contract claims.

(Ex. A, attachment 1.) The present Action is not mentioned in the general release provision nor in other sections of the paperwork that Defendants forced Class Members to sign. *Id*. Instead, Defendants' communications to Class Members in the reorganization and employment separation process, such as Attachment 1, have multiple material omissions. First, they fail to inform Collective Group Members and Class Members about the filing of the class action on their behalf. Second, they fail to inform Collective Group Members and Class Members that the class action complaint seeks damages for unpaid wages and overtime. Third, they fail to inform Collective Group Members and Class Members that the class action complaint identifies Flowers Foods and Flowers Baking Company of Jamestown as Defendants. Fourth, they fail to inform Collective Group Members and Class Members that they are releasing all claims (past and present) against Defendants, including claims under the FLSA and the NCWHA. Accordingly, many Distributors have signed releases arguably waiving their rights in this Action without even knowing they may potentially be giving up their rights in pending litigation.

Finally, in addition to soliciting general releases, representatives of Defendants have also threatened to retaliate against Class Members for participating in this litigation by terminating their employment with Defendants. (Ex. C; Rehberg Dep. 53-54.) According to Named Plaintiff Rehberg, "They're all scared" to join the present litigation for fear of retaliation. (Rehberg Dep. 53.) Several of the Distributors who did not succumb to Defendants' intimidation and ultimately joined the FLSA Collective Group were later forced to sign a general release of claims for a route reorganization.

## III.    ARGUMENT

### A.    Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden to make this showing. *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986). At this stage, the "facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). In response to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* An otherwise properly supported motion for summary judgment will not be defeated by the mere existence of "*some* alleged factual dispute between the parties," because "the requirement is that there be no *genuine* issue of *material* fact." *Id.* (emphasis in original).

Plaintiffs' Motion must be granted because there are no genuine issues of material fact that must be decided by a trier of fact and Plaintiffs are entitled to judgment as a matter of law on Defendants' affirmative defenses based on the outside sales exemption, and the general releases signed by select Plaintiffs, Members, and Class Members.

### B.    The Fair Labor Standards Act Entitles Members to Overtime Pay

Section 7 of the FLSA entitles employees to overtime premium pay equaling one and one-half times their regular pay rate for hours worked over 40 per week. *See* 29 U.S.C. § 207(a)(1). Congress enacted the FLSA "to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers.'" *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981) (quoting 29 U.S.C. § 202(a)).   Any exemption from the FLSA must be "narrowly construed, giving due

regard to the plain meaning of statutory language and the intent of Congress." *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945). An **employer must prove** that the employee falls "**plainly and unmistakably**" within the terms of an FLSA exemption. *Id* (emphasis added). Here, Defendants cannot meet this high burden to show that Plaintiffs fall within the outside sales exemption.

    **C.**    **The Outside Sales Exemption to the FLSA**

The FLSA provides an exemption to overtime pay for employees "in the capacity of outside salesman." 29 U.S.C. § 213(a). Federal regulations adopted pursuant to the FLSA define an outside salesman as follows:

> (a) The term "employee employed in the capacity of outside salesman" in section 13(a)(1) of the Act shall mean any employee:
>
> > (1) Whose primary duty is:
> >
> > > (i) making sales within the meaning of section 3(k) of the Act, or
> > >
> > > (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
> >
> > (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.
>
> (b) The term "primary duty" is defined at § 541.700. In determining the primary duty of an outside sales employee, work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall be regarded as exempt outside sales work. Other work that furthers the employee's sales efforts also shall be regarded as exempt work including, for example, writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences.

29 C.F.R. § 541.500.

Federal regulations also address the specific circumstances of employees, like Members, who drive trucks to deliver a product. The regulations provide, "Drivers who deliver products and also sell such products may qualify as exempt outside sales employees only if the employee has a **primary duty of making sales**." 29 C.F.R. § 541.504(a) (emphasis added). An employee's primary duty "means the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). The following type of drivers generally do not qualify as exempt outside sales employees:

> …
>
> (2) A driver who often calls on established customers day after day or week after week, delivering a quantity of the employer's products at each call when the sale was not significantly affected by solicitations of the customer by the delivering driver or **the amount of the sale is determined by the volume of the customer's sales since the previous delivery.**

29 C.F.R. § 541.504(d) (emphasis added).

"In a FLSA overtime-wage case, the question of how an employee spends his or her workday is one of fact, while the question of whether his or her activities exclude him or her from the overtime-pay requirement is one of law." *Christopher v. SmithKline Beecham Corp.*, 635 F.3d 383, 390-91 (9th Cir. 2011) *aff'd*, 132 S.Ct. 2156 (2012). Here, it is undisputed that Members spend the majority of their days driving to Defendants' accounts, stocking products, rotating products, and placing orders for more products. Therefore, the only issue to resolve is whether or not these activities qualify as "sales," which is a question of law for the Court.

**D.    Members Are Not Subject To The Outside Sales Exemption Under the FLSA Because Their Primary Duties Are to Deliver Products and Stock Those Products on Shelves.**

By the time a Member arrives at a location on his route to stock the shelves of a retailer or restaurant with product, Defendants have already made the sale. Defendants have already formed the business relationships with the account, negotiated product mix and set pricing, and allocated

14

shelf space and developed detailed planograms for product placement. In accordance with these agreements established between Defendants and its accounts, Members are contractually required to deliver certain products, in certain quantities, and sell them at certain prices. Due to the fact that Defendants handle all discussions with the accounts regarding how much shelf space is allocated to a particular product and how that product fits into the store's planogram, the volume of product on a store's shelf or delivered to a restaurant is predetermined and fixed.

The primary job duties of a Member are to deliver Defendants' products, stock those products on shelves, and re-order more products. When a Member places an order for product, he makes a quantity determination based on how much product was purchased by consumers since the last time he ordered the product. In national accounts, Members have to follow strict planograms, which dictate exactly how much product can be placed on a shelf. (Ex. E.)  The goal for a Member is to avoid running out of product. Defendants agree that it is the Members' duties to keep the customer serviced by keeping the shelves stocked. (Rich Dep. 110.) A Member is "compliant" with his distributor agreement when he orders and stocks product according to the planogram set by the account and communicated to Defendants. (Young Dep. 43.) Accordingly, Members are not "selling" when they place orders, but are merely filling the product volumes in terms of shelf space, which were predetermined between Defendants and the accounts.

Plaintiffs and Collective Group Members precisely conform to the characteristics of a driver who does not meet the requirements for the outside sales exemption, as contemplated by federal regulations. *See* 29 C.F.R. § 541.504(d). Here, Members are servicing the same, established customers day after day and week after week. *Id.* The "sales" to these customers are not significantly affected by solicitations of the customer because Defendants have already negotiated what products Members will deliver, in what volume, and at what price *Id*.

15

Defendants control this aspect down to the number of products that are facing an aisle in a national account retailer.

Other courts around the country have declined to find the outside sales exemption applied to employees who performed activities similar to those performed by Members here. For example, in *Hodgson v. Klages Coal & Ice Co.*, the Sixth Circuit determined that the "routemen" collective group members were not conducting outside sales where their duties included: surveying the shelves allocated to products; determining how many cases would be needed to refill them; restocking the shelves; preparing invoices for the stock delivered; and receiving payment. *Hodgson*, 435 F.2d 377 (6th Cir. 1970). In reaching this conclusion, the court reasoned that: a sales manager handled initial discussions regarding product selection; store managers allocated shelf space for the products; there was no evidence that the routemen participated in or influenced the store's initial decision to buy products; and the routemen were delivering orders to customers to whom they did not make the initial sale in amounts which were exactly or approximately prearranged by customer or contractual arrangement. *Id.* at 383. The court also found that the fact that routemen solicited shelf space "from time to time" was not sufficient to make them outside salesmen. *Id.* at 383. In reaching the conclusion that the routemen's duties were limited, the court stated "it cannot be said on the evidence that the regular job of the routemen was to open up new accounts." *Id.* at 384.

The same applies here. It is undisputed that the regular job of Member distributors is to deliver Defendants' products to Defendants' accounts according to the agreements Defendants' established with those accounts. Indeed, that is how they are "compliant," with the requirements of their distributor agreements. Furthermore, Defendants have no expectations or requirements that Members grow their sales or pick-up new accounts because that is the work Defendants'

16

teams of national account managers, directors of sales, and sales managers are employed to do. Even the titles of Defendant Jamestown's employees—"directors of sales" and "sales managers"—demonstrate that it is they, not Members, who are making sales to accounts. Given this, it's not surprising that Defendants' didn't require members to have sales experience prior to becoming distributors and likewise have not required Members to participate in sales training. There is no reason for Defendants to train Members in sales when Defendants have corporate employees who conduct all promotional and business generating activities.

Finally, Plaintiffs testified they do not have time to solicit more sales. Their jobs as distributors for Defendants—delivering product and stocking shelves—are time consuming and require keeping extraordinary hours. Members are "maxed out" and acknowledge that they don't want extra accounts and are resentful that Defendants' "force" new accounts on them. Even if Members did have the time to solicit new accounts, a national retailer would not entertain a pitch from a deliveryman like Members, which Defendants readily acknowledged in their deposition testimony. Similarly, Members don't have the authority to add products, reset product placement or change pricing, making any alleged opportunity for increased sales illusory.

Accordingly, Members do not fall within the outside sales exemption to the FLSA and the Court should dismiss Defendants' affirmative defense relying on the same.

E.    **The General Release of Claims Signed by Select Collective Group Members are Void Because FLSA Rights Cannot Be Waived; While the Releases Signed by Select Class Members are Void Because They Violate Public Policy and Were Obtained Under the Threat of Economic Duress.**

1.    **The Releases Members and Class Members Signed Are Void for Public Policy.**

North Carolina recognizes the profound benefit to the general welfare of wage and hour legislation. In enacting the NCWHA, the legislature pronounced and codified the following:

> The public policy of this State is declared as follows: the wage levels of employees, hours of labor, payment of earned wages, and the well-being of minors are subjects of concern requiring legislation to promote the general welfare of the people of the State without jeopardizing the competitive position of North Carolina business and industry. The General Assembly declares that the general welfare of the State requires the enactment of this law under the police power of the State.

N.C.G.S. §95-25.1, subd. b.

Waivers of protective public policy are not allowed in North Carolina. *See Chem. Bank v. Belk*, 255 S.E.2d 421, 428 (N.C. Ct. App. 1979) (finding that the "benefits of a statute" regarding deficiency judgments in purchase money transactions could not be waived because of the "broad public purpose" implicated therein and because the statute was "enacted as an expression of public policy …"); *Bd of Managers of James Walker Memorial Hosp. of Wilmington*, 74 S.E.2d 749, 757 (N.C. 1953) ("A waiver is not … allowed to operate as to … transgress public policy …"). The language of the NCWHA explicitly contemplates the "general welfare" of the people of the state of North Carolina and the legislature made clear that the provisions of the NCWHA are the "public policy" of the state. Therefore, a Class Members' entitlement to: payment for all earned wages; overtime pay; protection from illegal wage deductions; accurate time records; lawful notice of an employer's policies and practices concerning compensation; and other practices, all pursuant to the NCWHA, cannot be waived because such a waiver would violate public policy. Accordingly, the releases Defendants forced Class Members to sign, allegedly waiving their rights in this litigation, should be voided.

This conclusion is consistent with the long established principle that the Fair Labor Standards Act ("FLSA") embodies public rights that may not be waived. *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697 (1945). Indeed, the policy supporting the FLSA, which led to the precedent of disfavoring waiver of the rights therein, is similar to the legislative purpose for

enacting the NCWHA. *Id*. at 704 ("where a private right is granted in the public interest to effectuate a legislative policy, waiver of a right so charged or colored with the public interest will not be allowed …"). As discussed above, "The principal congressional purpose in enacting the Fair Labor Standards Act of 1938 was to protect all covered worker from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.' " *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 739 (1981) (quoting 29 U.S.C. § 202(a)). While the language of the statutes are not identical, the purpose behind both the NCWHA and the FLSA is to promote the general welfare of the public under the respective purviews of the laws. These similarities further indicate that the Court should hold that the benefits of the NCWHA, like those of the FLSA, cannot be waived. *See Garcia v. Frog Island Seafood, Inc.*, 644 F.Supp.2d 696, 707 (E.D.N.C. 2009) (where there are similarities between the NCWHA and the FLSA, "North Carolina courts and state agencies look to the FLSA for guidance.").[2]

Other courts have utilized this reasoning to conclude that an employee's rights under a state wage and hour act, like his rights under the FLSA, cannot be waived and that releases signed to that effect are void. For example, in *Laadegard v. Hard Rock Concrete Cutters, Inc.*, the court voided releases signed by employee class members in a wage and hour class action. *Laadegard*, No. 00C5755, 2001 WL 1403007 (N.D. Ill. Nov. 9, 2001). In reaching this conclusion, the court reasoned that the state of Illinois has a rule that agreements "contrary to public policy" or which "have a tendency to injure the public welfare" are unenforceable. *Id*. at

---

[2] Plaintiffs maintain that there are certain circumstances when the FLSA does not serve as adequate guidance for interpreting the NCWHA, as is recognized by North Carolina case law and acknowledged by the North Carolina Administrative Code.

19

*3. The court went on to explain that the Illinois wage and hour statutes at issue embodied a public interest, as demonstrated by the statutes' similarities to the FLSA and case law proclaiming the policy of the NCWHA. *Id.* at *5. Accordingly, the court voided the releases. *Id.* at *7. Plaintiffs request the Court do the same here.

Further demonstrating that the public policy supporting the NCWHA is analogous to that of the FLSA is the fact that the North Carolina legislature enacted a similar anti-retaliation statute. The North Carolina Retaliatory Employment Discrimination Act (REDA), states in relevant part:

> No person shall discriminate or take any retaliatory action against an employee because the employee in good faith does or threatens to do any of the following:
> (1) File a claim or complaint, initiate any inquiry, investigation, inspection, proceeding or other action, or testify or provide information to any person with respect to any of the following:
> …
> b. Article 2A or Article 16 of this Chapter.
> …
> (2) Cause any of the activities listed in subdivision (1) of this subsection to be initiated on an employee's behalf.
> (3) Exercise any right on behalf of the employee or any other employee afforded by Article 2A or Article 16 of this Chapter, … .

N.C. Gen. Stat. § 95-241. Plaintiffs and the class allege a violation of the North Carolina Wage and Hour Act ("NCWHA"), which is Article 2A of Chapter 95. (Dkt. No. 1, pp. 15-16 (alleging violation of the NCWHA); Dkt. No. 129, Order granting Class Certification.) Because the class claims in this litigation are included under subdivision (1)(b) of REDA, Plaintiffs and all Class Members enjoy protection from retaliatory action under the statute, which includes Defendants' mandates that they give up their rights in this action by signing the releases. North Carolina courts have recognized that the state enacted REDA to prevent circumvention of the benefits granted to the public by the NCWHA . *See Whiting v. Wolfson Casing Corp.*, 173 N.C. App. 218, 222, (N.C. Ct. App. 2005) (observing that "[i]n enacting REDA and its predecessor statute

20

… the General Assembly intended to prevent employer retaliation from having a chilling effect upon an employee's exercise of his or her statutory rights … ."). Thus, North Carolina has demonstrated a strong interest in protecting the rights secured to employees under the NCWHA and Defendants should not be permitted to strip Plaintiffs and Class Members of the same.

Based on the foregoing public policy considerations, the Court should find that the general release of claims signed by North Carolina Class Members are void and dismiss Defendants' affirmative defense in reliance on the same. Similarly, the Court should dismiss Defendants' defense that select Members released their claims under the FLSA, as it is well established by the United States Supreme Court that these claims cannot be waived.

   F.   **The General Releases Are Void Because Defendants Obtained Them Through Threats of Economic Duress and Omitted Material Facts Regarding the Present Action**

In North Carolina, a release procured by fraud, misrepresentation, duress, or oppression is invalid. *See Pass v. McClaren Rubber Co.*, 150 S.E. 709, 711 (N.C. 1929); *Brown v. Lanier*, 299 S.E.2d 279, 281 (N.C. Ct. App. 1983). Duress occurs where one party "is induced to make a contract or perform or forego some act under circumstances which deprive him of the exercise of free will." *Radford v. Keith*, 584 S.E.2d 815, 817 (N.C. Ct. App. 2003). There must be a wrongful act or threat for duress. *Id.* "The act threatened is wrongful 'if made with the corrupt intent to coerce a transaction grossly unfair to the victim and not related to the subject of such proceedings." *Id.* (quoting *Link v. Link*, 179 S.E.2d 697, 705 (N.C. 1971). Duress can also arise from the "wrongful exertion of economic pressure." *In re Maco Homes, Inc.*, 96 F.3d 1439 (4th Cir. 1996). This so called "economic duress" occurs when one party's "wrongful action forces another to make a contractual promise or suffer irreparable injury …" *Id.*

Here, Defendants forced certain Class Members to execute the general releases under the threat of severe economic duress. Defendants explicitly instructed class members that they would

21

not receive back the money they paid to conduct their jobs as Distributors if they did not sign the general releases. For some Class Members, the total amounts Defendants owed them reached tens of thousands of dollars. Defendants further threatened resigning Class Members that the money owed to them would be reduced by hundreds of dollars for every day that the general releases went unsigned, as compensation to Defendants for running the routes previously serviced by Class Members. Class Members were left with the choice to either sign the release or face extreme financial hardship. More specifically, those Class Members who chose to end their employment with Defendants would face the loss of substantial sums of money they had paid to conduct their jobs for Flowers. Accordingly, Class Members were forced to sign the releases because of Defendants' wrongful threats and conduct, amounting to economic duress, the releases are void.

Finally, securing releases from putative Class Members without informing them that they are giving up participation in the class action is misleading, to say the least. *Friedman v. Intervet, Inc.*, 730 F.Supp.2d 758, 763 (N.D. Ohio 2010). Here, the evidence demonstrates that Defendants did not inform releasing Class Members of the existence of the Class Action, the details of the action, their rights in the action, or the consequences of signing the general release of claims. Nor do the general releases mention the same. The releases merely explain that the signor is releasing Defendants from "any and all claims." Without this important information, signing Class Members could not have voluntarily signed the releases because they were not aware of the repercussions of doing so. Because the releases contain numerous material omissions and are misleading, they are void.

Defendants obtained the general release of claims under the threat of severe economic duress and omitted material information about the present litigation in doing so. Thus, their

affirmative defense that select Class Members have waived their rights in the North Carolina Class Action should be dismissed.

IV.     **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court grant their Motion for Partial Summary Judgment dismissing Defendants' affirmative defenses pursuant to: (1) the outside sales exemption; and (2) the general release of claims signed by select collective and class members.

Dated: June 5, 2015                                     Respectfully submitted,


                                                        s/ Shawn J. Wanta                     .
                                                        Baillon Thome Jozwiak & Wanta LLP
                                                        Shawn J. Wanta, *pro hac vice*
                                                        100 South Fifth Street, Suite 1200
                                                        Minneapolis, MN 55402
                                                        Telephone: (612) 252-3570
                                                        Facsimile: (612) 252-3571

                                                        and

                                                        Copeley Johnson Groninger PLLC
                                                        Ann Groninger
                                                        225 East Worthington Avenue
                                                        Charlotte, NC 28203
                                                        Telephone: 704-200-2009
                                                        Facsimile: (888) 412-0421


                                                        *Class Counsel*

23

## CERTIFICATE OF SERVICE

I, Shawn J. Wanta, hereby certify that I have this day electronically filed the foregoing MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF system, which will send notification of the filing to the following persons:

Margaret Santen Hanrahan
Kevin P. Hishta
A. Craig Cleland
Ogletree, Deakins, Nash, Smoak & Stewart, P. C.
One Ninety One Peachtree Tower
191 Peachtree St. NE, Suite 4800
Atlanta, GA  30303
maggie.hanrahan@ogletreedeakins.com
kevin.hishta@ogletreedeakins.com
craig.cleland@ogletreedeakins.com

Benjamin R. Holland
Ogletree, Deakins, Nash, Smoak & Stewart, P. C.
201 South College Street, Suite 2300
Charlotte, NC 28244
ben.holland@ogletreedeakins.com

Dated this 5th day of June 2015.

s/ Shawn J. Wanta
Shawn J. Wanta, *pro hac vice*
BAILLON THOME JOZWIAK & WANTA LLP
100 South Fifth Street, Suite 1200
Minneapolis, MN 55402
Telephone: (612) 252-3570
Facsimile: (612) 252-3571

Ann Groninger
COPELEY JOHNSON GRONINGER PLLC
225 East Worthington Avenue
Charlotte, NC 28203
Telephone: 704-200-2009
Facsimile: (888) 412-0421

*Class Counsel*

24