# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

SCOTT REHBERG, WILLARD ALLEN RILEY, and
MARIO RONCHETTI, individually and behalf of all
similarly situated individuals,

       Plaintiffs,

v.

FLOWERS FOODS, INC. and FLOWERS BAKING
CO. OF JAMESTOWN, LLC,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 3:12-cv-00596-
MOC-DSC

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................1

II. BRIEF SUMMARY OF UNCONTROVERTED FACTS .......................................3

III. SUMMARY JUDGMENT ON ALL OR PART OF PLAINTIFFS' FLSA CLAIMS IS
    APPROPRIATE ....................................................................................................7

    A. Assuming, *Arguendo,* Plaintiffs Were Employees, Which is Denied, They Are
       Nonetheless Exempt Under the Motor Carrier Exemption ..................................8

       1. The Motor Carrier Act Exemption ..................................................................8

       2. The Historical Broad Scope of DOT Jurisdiction Over Safety-Affecting
          Positions ........................................................................................................8

       3. Plaintiffs Fall Under the Motor Carrier Exemption .....................................10

    B. Assuming, *Arguendo,* Plaintiffs Were Employees, They Are Exempt Under the
       Outside Sales Exemption .................................................................................21

       1. Plaintiffs Make Sales, As Defined by Section 3(k), Placing Them Squarely
          Within the Outside Sales Exemption. ..........................................................21

       2. The Undisputed Evidence Establishes that Sales Are Plaintiffs' Primary Duty..........25

       3. The DOL Outside Sales Primary Duty Factors Also Strongly Support the
          Exemption. ...................................................................................................28

       4. That Flowers May Engage National Accounts or Other Representatives Who
          Pave the Way for Plaintiffs' Own Sales Is Inapposite. ................................30

    C. Plaintiffs Cannot Establish a Willful Violation to Extend the Statute of
       Limitations to Three Years ...............................................................................32

    D. Defendants' Good Faith Precludes An Award of Liquidated Damages ...........35

IV. SUMMARY JUDGMENT ON SOME PLAINTIFFS' NCWHA CLAIMS IS
    APPROPRIATE ..................................................................................................38

    A. Certain North Carolina Plaintiffs Released Their NCWHA Claims ................38

    B. Plaintiffs' Are Not Entitled to Liquidated Damages Pursuant to Their Distributor
       Agreements ......................................................................................................39

V.  CONCLUSION...................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ackerman v. Coca-Cola Enterprises., Inc.,*
179 F.3d 1260 (10th Cir. 1999) ..................................................................22, 23

*Allen v. Coil Tubing Services, L.L.C.,*
846 F.Supp.2d 678 (E.D. Tex. 2012)..................................................................15

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)..................................................................................................7

*Avery v. Chariots For Hire,*
748 F.Supp.2d 492 (D. Md. 2010)................................................................14, 16

*Barnick v. Wyeth,*
522 F. Supp. 2d 1257 (C.D. Cal. 2007) ..............................................................22

*Bilyou v. Dutchess Beer Distribs., Inc.,*
300 F.3d 217 (2d Cir. 2002)..................................................................................11

*Bouchat v. Balt. Ravens Football Club, Inc.,*
346 F.3d 514 (4th Cir.2003) ..................................................................................7

*Brown v. Nipper Auto Parts & Supplies, Inc.,*
No. 7:08cv00521, 2009 WL 1437836..................................................................35

*Buckner v. UPS*
agreed. *See* 2012 WL 1596726, at *5 n. 3 (E.D. N.C. May 7, 2012), ....................16

*Burnley v. Short,*
730 F.2d 136 (4th Cir. 1984) ................................................................................36

*Chao v. Self Pride, Inc.,*
232 F. App'x 280 (4th Cir. 2007) ........................................................................33

*Chapman v. BOK Fin. Corp.,*
No. 12-CV-613-GFK-PJC, 2014 WL 3700870 ..................................................33

*Clements & Gerber v. Resource Consultants, Inc.,*
2006 U.S. Dist. LEXIS 36944 (D. Utah June 5, 2006)........................................31

*Collins v. Heritage Wine Cellers, Ltd.,*
589 F.3d 895 (7th Cir. 2009) ................................................................................18

*Cubias v. Casa Furniture & Bedding,*
    LLC, No. 06CV386, 2007 WL 150973 (E.D.Va. 2007)....................................34

*Dalton v. Sabo, Inc.,*
    No. 09-358*,* 2010 WL 1325613 (D. Or. Apr. 1, 2010) ..........................................17

*Department of Labor v. North Carolina Growers Ass'n,*
    377 F.3d 345 (4th Cir. 2004) ..............................................................................18

*Evans v. Techs. Applications & Serv. Co.,*
    80 F.3d 954 (4th Cir. 1996) ...................................................................................7

*Foxworthy v. Hiland Dairy,*
    997 F.2d 670 (10th Cir. 1993) .............................................................................11

*Garcia v. Frog Island Seafood, Inc.,*
    644 F. Supp. 2d 696 (E.D. N.C. 2009)................................................................32

*Gregory v. First Title of America, Inc.,*
    555 F.3d 1300 (11th Cir. 2009) ...........................................................................31

*Hantz v. Prospect Mortg. Co.,*
    11 F. Supp.3d 612, 621 (E.D. Va. 2014) ................................................29, 32, 35

*Herman v. Palo Group Foster Home, Inc.,*
    183 F.3d 468 (6th Cir. 1999) ..............................................................................33

*Hogdson v. Krispy Kreme Doughnut Co.,*
    346 F. Supp. 1102 (M.D.N.C. 1972) ..................................................................25

*Hurd v. NDL, Inc.,*
    No. CCB-11-1944, 2012 WL 642425 (D. Md. Feb. 27, 2012)............................33

*Jaramillo v. Garda,*
    2012 WL 4955932 ........................................................................................17, 18

*Jewel Tea Co. v. Williams,*
    118 F.2d 202 (10th Cir. 1941) .............................................................................29

*Levinson v. Spector Motor Serv.,*
    330 U.S. 649 (1940)...................................................................................8, 9, 18

*Lipnicki v. Meritage Homes Corp.,*
    No. 3:10-cv-605, 2014 WL 923524 (S.D. Tex. Feb. 13, 2014)............................34

*Luke v. Omega Consulting Group, LC,*
    670 S.E.2d 604 (N.C. Ct. 2009).........................................................................38

Case 3:12-cv-00596-MOC-DSC   Document 147   Filed 06/05/15   Page 4 of 49

*Marshall v. Brunner*,
   668 F.2d 748 (3d Cir. 1982) ................................................................37

*Martin v. Deiriggi*,
   985 F.2d 129 (4th Cir. 1992) ...............................................................33

*Mason v. ILS Tech., LLC*,
   No. 04-CV-139, 2007 WL 1101224 (W.D.N.C. Apr. 11, 2007) ................38

*Matsushita Electric Industries Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ...............................................................................7

*McGuiggan v. CPC Int'l, Inc.*,
   84 F.Supp. 2d (S.D.N.Y. 2000) ...........................................................12

*McLaughlin v. Richland Shoe Co.*,
   486 U.S. 128 (1988) .........................................................................32, 33

*McMaster v. Eastern Armored Servs., Inc.*,
   780 F.3d 167 (3rd Cir. 2015) ...............................................................20

*Meza v. Intelligent Mexican Mktg.*,
   720 F.3d (5th Cir. 2013) ..........................................................24, 25, 29

*Morris v. McComb*,
   332 U.S. 422 (1947) ................................................................................9

*Nelson v. Alabama Inst. For Deaf & Blind*,
   896 F. Supp. 1108 (N.D. Ala. 1995) .....................................................36

*Pamieri v. Nynex Long Distance Co.*,
   No. Civ. 04-128PS, 2005 WL 767170 (D. Me. Mar. 28, 2005) ..............34

*Reyes v. Goya Foods, Inc.*,
   549 F.App'x. 876, 877 (11th Cir. 2013) ...............................................24

*Richard v. Marriott Corp.*,
   549 F.2d 303, 305 (4th Cir. 1977) .......................................................37

*Rucker v. Hoffberger Moving Servs., LLC*,
   *No.* JFM-13-2716, 2013 U.S. Dist. LEXIS 182052 (D. Md. Dec. 31, 2013) .........17

*Saxton v. Young*,
   479 F. Supp. 2d 1243 (N.D. Ala. 2007) ...............................................34

*Schaefer-LaRose v. Eli Lily and Co.*,
   663 F. Supp. 2d 674 (S.D. Ind. 2009) ..................................................30

Case 3:12-cv-00596-MOC-DSC   Document 147   Filed 06/05/15   Page 5 of 49

*Shew v Southland Corp.*,
  370 F.2d 376 (5th Cir. 1996) ...........................................................................11, 12, 13

*Simontacchi v. Invensys, Inc.*,
  No. 05cv283, 2008 U.S. Dist. LEXIS 5413 (W.D.N.C. Jan. 11, 2008) ..............................38

*Stevenson v. The Great Am. Dream, Inc.*,
  No. 1:12-cv-03359-TWT, 2015 WL 2353094 (N.D. Ga. May 15, 2015) .......................36, 37

*Tumuly v. FedEx Ground Package Sys., Inc.*,
  No. C04-1425P, 2005 WL 1979104 (W.D. Wash. Aug. 16, 2005)......................................32

*United Labs., Inc. v. Kukendall*,
  437 S.E.2d 374 (N.C. 1993).................................................................................................39

*VF Jeanswear Ltd. P'ship v. Molina*,
  320 F. Supp.2d 412 (M.D.N.C. 2004) .................................................................................38

*Webb v. Athens Newspapers*,
  999 F. Supp. 1464 (M.D. Ga. 1998) ....................................................................................13

*Williams v. Maryland Office Relocators*,
  485 F. Supp. 2d 616 (D. Md. 2007).....................................................................................33

*Zachary v. ResCare Okla., Inc.*,
  471 F. Supp. 2d 1183 (N.D. Okla. 2006) ............................................................................36

**Statutes**

29 U.S.C. § 213(a)(1)..............................................................................................................20

29 U.S.C. § 213(b)(1) .................................................................................................................8

29 U.S.C. § 255(a) ..................................................................................................................32

29 U.S.C. § 260........................................................................................................................35

49 U.S.C. §13102 (14) .........................................................................................................8, 15

Fair Labor Standards Act ................................................................................................. *passim*

Section 3(k) of the FLSA ................................................................................................. *passim*

Interstate Motor Carriers, 1 Lab. Law Rep. (CCH) ¶25,275, pg. 38, 147 (dated
  Mar. 14, 2007)....................................................................................................................14

N.C. Gen. Stat. § 95-25 ...........................................................................................................39

N.C. Gen. Stat. § 95-25.22 ................................................................................................37, 38

Case 3:12-cv-00596-MOC-DSC   Document 147   Filed 06/05/15   Page 6 of 49

North Carolina Wage and Hour Act ("NCWHA") ...........................................................1, 38, 39

Pub. L. No. 110-244 Title III, §305 (2008) ...........................................................16

Pub. L. No. 110-244 Title III, §306(b) (2008) ...........................................................19

SAFETEA—LU Technical Corrections Act of 2008, Pub.L. 110-244, 122 Stat. 1572...........................................................15

§305(c), 122 Stat. 1572, 1620 ...........................................................15

Technical Corrections Act. ...........................................................18

**Other Authorities**

29 C.F.R. pt. 541 ...........................................................28, 29

29 C.F.R. §§ 504.504 and 505 ...........................................................23

29 C.F.R. § 541.500(a)(1) ...........................................................21

29 C.F.R. § 541.501(b) ...........................................................21

29 C.F.R. § 541.503(a) ...........................................................31

29 C.F.R. § 541.503(b) ...........................................................21, 30

29 C.F.R § 541.503(c) ...........................................................21

29 C.F.R. § 541.504 ...........................................................21

29 C.F.R. § 541.504(a) ...........................................................21

29 C.F.R. § 541.504(b) ...........................................................28

29 C.F.R. § 541.504(c)(1)-(4) ...........................................................22

29 C.F.R. § 541.504(c)(4) ...........................................................30

29 C.F.R. § 541.504(d)(3) ...........................................................22

29 C.F.R. § 541.505(d) ...........................................................23

29 C.F.R. § 541.700. Section 3(k) ...........................................................21

29 C.F.R. §782.2(b)(3)(2013) ...........................................................10

29 C.F.R. § 782.3(a) ...........................................................10

29 C.F.R. § 782.7 (b)(1) ...........................................................11

69 Fed. Reg. 22122-01, 22162, 22163 (Apr. 23, 2004) ....................................................28, 29

69 Fed. Reg. 22122, 22162-63 ...........................................................................................28

69 Fed. Reg. 22122, 22162-63 (Apr. 23, 2004) ...............................................................30

Black's Law Dictionary, p. 1200 (4th ed. 1999) ...............................................................21

Dep't of Labor Opinion Letter, 1999 WL 1002364 (Feb. 10, 1999) ...............................13

Dep't of Labor Opinion Letter FLSA 2005-2NA, 2005 WL 5419038 (Apr. 27,
      2005) ...........................................................................................................................13

DOL Opinion Letter FLSA 2006-3, 2006 WL 236429 (Jan. 13, 2006) ...........................9

Fed. R. Civ. P. 56(c) ...........................................................................................................7

COME NOW Defendants Flowers Foods, Inc. ("Flowers Foods") and Flowers Baking Co. of Jamestown, LLC ("Flowers/Jamestown") (collectively referred to as "Defendants") and file this Memorandum in Support of Their Motion for Summary Judgment.

## I.  INTRODUCTION

Plaintiffs are independent contractors who are seeking overtime under the Fair Labor Standards Act ("FLSA") and relief for unlawful deductions under the North Carolina Wage and Hour Act ("NCWHA").[1] Even assuming Plaintiffs qualify as employees (they do not), the undisputed evidence here establishes that they are otherwise exempt under the outside sales and/or Motor Carrier exemptions. Undoubtedly, Plaintiffs will attempt to dodge application of these exemptions by arguing that: (1) the Motor Carrier exemption doesn't apply because they use their personal vehicles occasionally, even though they admit this happens infrequently and most of the time when they are not even transporting property in interstate commerce; (2) their "primary duty" is delivery, not sales; and (3) Flowers' personnel—not them— are the ones actually making the sales. While, at first glance, these arguments may seem persuasive, a close review of the extensive record evidence, based mostly on Plaintiffs' admissions, and the plain letter and intent surrounding both exemptions establishes that these arguments must fail.

For one, Plaintiffs regularly and on a weekly basis deliver products that are only produced out-of-state and that remain in interstate commerce until their final delivery to customers in vehicles weighing over 10,001 pounds. This places them squarely within the Motor Carrier exemption. As discussed below, the statutory language itself and strong policy considerations surrounding the Motor Carrier exemption, not to mention district court decisions in this Circuit, make clear that infrequent use of personal vehicles does nothing to change this result,

_____

[1] Plaintiffs are comprised of the 21 named and opt-in Plaintiffs for the FLSA claims. The term "Plaintiffs" may also refer to the North Carolina plaintiffs asserting the NCWHA claim.

particularly when most of this time, Plaintiffs are not even transporting property in interstate commerce when using such vehicles.

While the Motor Carrier exemption serves as an independent basis upon which to grant summary judgment, Plaintiffs also satisfy the outside sales exemption. Plaintiffs have a primary duty of making sales[2] because they purchase products from Flowers/Jamestown, regularly sell them to their customers, and pass title to the products at that time. Under the plain language of Section 3(k) of the FLSA, which defines a "sale" as the "transfer of title to tangible property," there can be no question that Plaintiffs are making sales as a matter of law. Because of this, all other activities performed in conjunction with those sales, such as delivering and merchandising products, are also considered exempt. In case any question remains, Plaintiffs' repeated admissions that they regularly sell products to their customers; are compensated based on those sales, admitting "the more [they] sell, the more [they] make;" and engage in other activities to increase their sales, such as soliciting new accounts, recommending new products, and asking for displays "[a]nytime [they] have an opportunity," among others, solidify this conclusion.

Finally, even assuming Plaintiffs could identify some factual issues to avoid summary judgment on these exemptions (they cannot), the FLSA's two-year statute of limitations renders several Plaintiffs' claims untimely and limits the others' recovery to two years' worth of damages. Indeed, Plaintiffs can provide no evidence of a "willful" violation of the FLSA, which is necessary to trigger a three-year statute of limitations. For similar reasons, Plaintiffs' demands for liquidated damages fail because the evidence confirms Flowers acted in good faith in treating

---

[2] Plaintiffs perform the majority of their services outside of the warehouses. (SUMF ¶ 25).This fact is not seemingly contested.

2

Plaintiffs as exempt. The North Carolina Plaintiffs' claims fare no better. Based on this, and as discussed more fully below, summary judgment for Defendants[3] is required.

## II.   BRIEF SUMMARY OF UNCONTROVERTED FACTS[4]

Plaintiffs are independent contractor distributors with Flowers/Jamestown.[5] The contract under which Plaintiffs operate gives them exclusive rights to sell and distribute various branded products, many of which are only produced by out-of-state bakeries. (SUMF ¶¶ 11-12, 70, 97-98, 117-118, 136-137, 156-157, 230. *See also* Additional Plaintiff-Specific Facts, Section II of SUMF (hereinafter referred to as "Plaintiffs' Additional Facts")). Plaintiffs order and sell many of these out-of-state products to several different customers on a weekly basis. (*Id.* ¶¶ 12, 80, 98, 118, 137, 157, 187, 207. *See also* Plaintiffs' Additional Facts). These orders are then transmitted to the producing bakery, many of which are located out of state, which produces the products in response to these specific orders and then ships them back for ultimate delivery to end customers pursuant to the Direct Store Delivery ("DSD") system under which the subsidiaries operate.[6] (*Id.* ¶¶ 11, 12). Given the perishable nature of these goods and the nature of the DSD system, the producing bakeries expect that these products will be delivered to end customers for whom they were ordered shortly after they are shipped and delivered to the warehouses from which distributors operate. (*Id.* ¶¶ 13, 14). The products are not inventoried at the warehouse, with

_____

[3] Because the claims against Flowers Foods are solely premised on its joint employment status with Flowers/Jamestown, if claims against Flowers/Jamestown fail, they also necessarily fail against Flowers Foods.

[4] The Section contains a brief summary of pertinent facts. The comprehensive statement of facts is attached hereto as Defendants' Statement of Undisputed Material Facts In Support of Their Motion for Summary Judgment. This will be cross-referenced by paragraph number and referred to as "SUMF". While some examples of pertinent facts are discussed above, these examples are not exhaustive. Rather, all facts in the SUMF are relevant here and should be incorporated fully herein.

[5] While many Plaintiffs are current distributors, over 70 of them are former distributors who signed a release of claims when selling their distributorships back to the company. (*Id.* ¶ 67). Three of these joined this lawsuit well over two years after selling their distributorships back to the Company. (*Id.* ¶¶ 243, 366, 425). Approximately 203 others, when signing a Distributor Agreement with the Company, waived any right to liquidated damages. (*Id.* ¶ 68).

[6] The DSD system is a system whereby distributors typically deliver products directly to their customers as fresh product after the products are produced, as opposed to going through a customer's warehouse or broker. (*Id.* ¶ 3).

3

minimal exception, nor are the products altered or "processed" in any way in the future. (*Id.* ¶ 16). After the products arrive at their respective warehouses and are packed out behind their trucks and loaded, Plaintiffs sell and deliver the products to their customers, typically using large box trucks, Chevrolet step vans, or truck and trailer combinations. These vehicles typically have a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds. (*Id.* ¶¶ 16-18, 20). While Plaintiffs may use their personal vehicles to take product to accounts after hours, this happens only infrequently. And, much of the time when using these personal vehicles, they use them for "pull ups," which entails pulling existing product from the back room onto the shelves, and not to deliver products. (*See, e.g., id.* ¶¶ 19, 20, 101-102, 120-122, 161, 192-193. *See also* Plaintiffs' Additional Facts).

The distributorship model under which Plaintiffs operate was adopted to incentivize them to develop business and increase sales (*id.* ¶ 21), and their testimony establishes that they took full advantage of these opportunities, building significant equity through their efforts. (*Id.* ¶ 213 (Easley admits territory is worth over $100,000)); (*Id.* ¶ 87 (Rehberg admits he built close to $100,000 in equity)); (*Id.* ¶ 211 (Kirk admits his territory has increased in value 400% in part due to his hard work and effort in his accounts)); (*Id.* ¶ 164 (Glavey believes he can pocket over $200,000 when he sells his distributorship)). Under this model, Plaintiffs purchase products from Flowers/Jamestown at a specified discount percentage off a suggested wholesale price and sell them to their accounts for a higher price, making a profit margin. For example, if the suggested wholesale price of a loaf of bread is $1.00, and the specified discount percentage is 20%, the distributor purchases the load of bread from Flowers/Jamestown for $.80. If the distributor in turn sells the bread to a retail store for the suggested wholesale price of $1.00, the distributor

4

makes a profit of $.20 on the bread. (*Id.* ¶ 24). Plaintiffs are also contractually obligated to use their "best efforts" to increase their sales. (*Id.* ¶ 22).

Plaintiffs regularly sell the products they purchase from Jamestown to their customers and do several other things to try to increase their own sales, such as asking for displays, soliciting new accounts, recommending new products, changing product pricing from time to time, and the like. (*Id.* ¶¶ 24-30. *See also, e.g., id.* ¶¶ 73-75, 78, 114,126-131, 174 and Plaintiffs' Additional Facts). Keistler, for example, admits he asks for displays in his Target "[a]nytime [he has] the opportunity," has spoken with his accounts "several" times about product selection, and works with his Food Lion on shelf space allocation. (*Id.* ¶¶ 126-128). As Plaintiff Riley explained, "[y]ou realize, after being in the bread business 24 years . . . you . . . select where you could put your energy at to build sales for your territory." (*Id.* ¶ 110). Plaintiffs acknowledge their sales efforts were successful. Long, for example, acquired 25 new accounts. (*Id.* ¶ 349). Riley characterized himself as "the best" salesman. (*Id.* ¶ 108). And, these examples are far from exhaustive. (*See also generally* Additional Facts). And this success created immediate benefits for Plaintiffs because, as discussed above, their compensation is based on a profit margin. So, "the more [they] sell, the more money [they] make." (*Id.* ¶¶ 24, 107, 216, 352. *See also* Plaintiffs' Additional Facts).

Plaintiffs spend the majority of their time in the field calling on their accounts, with minimal company oversight, and are both contractually obligated to grow sales and expected to spend the majority of their time engaged in sales. (*Id.* ¶¶ 22-30). Plaintiffs service three types of accounts: cash accounts, charge accounts, and pay-by-scan accounts. (*Id.* ¶ 34). In cash accounts, Plaintiffs serve as the primary contact, accept payment from the account directly for products sold, can extend credit and set payment terms, and bear the risk of loss for non-payment. (*Id.* ¶¶ 36, 37). In

5

these accounts, Plaintiffs often have much more discretion over product selection, payment terms, pricing and the like. (*See, e.g., id.* ¶¶ 77-78, 176, 178). In charge accounts, Plaintiffs receive credit for their sales following sales transactions at their respective accounts. (*Id.* ¶¶ 38, 39). Plaintiffs admit that in certain authorized charge accounts, the accounts have very little interaction with Flowers. Glavey is a prime example. Gail's, his largest customer (and an authorized charge account), "looks to [him] for everything" and has very little interaction with Jamestown sales management. (*Id.* ¶ 151). Plaintiffs regularly order products for these customers based on their customers' needs, upcoming promotions, the weather, demographics of the area, and other factors by making changes to the suggested orders. (*See, e.g., id.* ¶¶ 31-33, 116, 155, 182-183. *See also* Plaintiffs' Additional Facts). As English noted, because the suggested orders "seldom [are] anywhere close to accurate" and do not "seem to have anything to do with reality," they regularly made such changes. (*Id.* ¶ 181).

To provide Plaintiffs with access to sales opportunities in the larger chain accounts, like Wal-Mart, Defendants employ several national accounts representatives. These individuals serve as the point of contact for the account at the corporate level to coordinate pricing, authorization, shelf space, and the like. (*Id.* ¶ 40). Plaintiffs, however, remain responsible for establishing the relationship with local store management at the accounts, who typically retains significant discretion to award additional displays, selling locations, and the like. (*Id.* ¶ 42). Indeed, in several national accounts, distributors have considerably more discretion over product authorization and can determine what products to sell off the authorized product list, and have opportunities to secure additional space and selling locations. (*Id.* ¶¶ 42-49. *See also* Plaintiffs' Additional Facts).

The distributor model under which Plaintiffs operate has been repeatedly upheld as one of independent contractor, as have other independent contractor models in the baking industry. (*Id.* ¶¶ 52, 62). Further, the IRS has historically treated the Flowers distributorship business model as one of common law independent contractor. (*Id.* ¶ 63). Alternatively, judicial decisions have confirmed that even if distributors are not independent contractors, which is denied here, they are nonetheless exempt under the FLSA. (*Id.* ¶¶ 57-61). Finally, Defendants take various steps to ensure the integrity of the model in practice is maintained, including management training on treatment consistent with an independent contractor relationship. (*Id.* ¶ 66).

## III. SUMMARY JUDGMENT ON ALL OR PART OF PLAINTIFFS' FLSA CLAIMS IS APPROPRIATE

Summary judgment is appropriate if the record demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact requiring determination by a fact finder. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The nonmoving party cannot meet this burden by resting upon mere allegations or denials. (*Id.*) Rather, the nonmoving party must come forward with "***specific facts*** showing that there is a genuine issue for trial." *Matsushita Electric Industries Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (emphasis added); *Bouchat v. Balt. Ravens Football Club, Inc.,* 346 F.3d 514, 522 (4th Cir.2003) (quoting former Fed. R. Civ. P. 56(e)). While a plaintiff may present circumstantial evidence, unsupported speculation cannot defeat a motion for summary judgment. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996).

As discussed below, the undisputed evidence here establishes that summary judgment of Plaintiffs' FLSA claims is appropriate because assuming, *arguendo,* that Plaintiffs are

7

employees: (A) they are exempt under the motor carrier exemption; (B) they are exempt under the outside sales exemption; (C) their claims are either barred or limited by the applicable two-year statute of limitations; and (D) they cannot recover liquidated damages.

## A. Assuming, *Arguendo,* Plaintiffs Were Employees, Which is Denied, They Are Nonetheless Exempt Under the Motor Carrier Exemption

### 1. The Motor Carrier Act Exemption

Generally, the overtime requirements of the FLSA do not apply to workers, including drivers, whose duties affect the safety of vehicles traveling in interstate commerce. The FLSA specifically exempts from overtime those employees over whom the U.S. Secretary of Transportation ("Secretary") has power to establish qualifications and maximum hours of service under the federal Motor Carrier Act (MCA). 29 U.S.C. § 213(b)(1).[7]

Under the MCA, the Secretary has authority over drivers who are employed by either a "motor carrier" or "motor private carrier" engaged in the transportation of property or passengers by motor vehicle in interstate commerce. A "motor carrier" is defined as "a person providing motor vehicle transportation for compensation." 49 U.S.C. §13102 (14). A "motor private carrier" is defined as:

> [A] person, other than a motor carrier, transporting property by motor vehicle when—(A) the transportation is as provided in 13501 . . . [interstate commerce]; (B) the person is the owner, lessee, or bailee of the property being transported; and (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

49 U.S.C. §13102 (15).

### 2. The Historical Broad Scope of DOT Jurisdiction Over Safety-Affecting Positions.

---

[7] As discussed below, for about 70 years the jurisdiction of the DOT and the jurisdiction of the DOL were mutually exclusive – if a worker was subject to DOT jurisdiction, the worker was not entitled to overtime. In 2008, Congress, for the first time, created a limited exception to this longstanding jurisdictional dichotomy. This exception is discussed further below. *See infra.*

The MCA exemption has been a part of the FLSA since its inception in 1938. *Levinson v. Spector Motor Serv.,* 330 U.S. 649, 657-62 (1940). As the Supreme Court explained therein, Congress had good reason for granting the Interstate Commerce Commission ("ICC"), the predecessor to the DOT, exclusive authority for setting maximum hours for safety-affecting employees instead of placing them within the 40-hour-a-week framework overseen by the Department of Labor (DOL). By 1935, the year the MCA was enacted, forty states had created differing programs of safety regulations for employees whose duties involved motor vehicles. After passage of the MCA, the ICC developed a universal safety program. (*Id.* at 658-62). When Congress passed the FLSA, it decided to preserve the ICC's authority to set maximum hours of service. (*Id.* at 661). As the *Levinson* Court noted:

> From a safety standpoint, a partial-duty driver who drives 30 hours continuously and then drives no more during that week creates a greater hazard than the man who drives 10 hours daily for 6 days a week. The hazard of continuous driving is not measured adequately by the total hours during which the driver is employed during the week, nor is it eliminated by a law which entitles him merely to an increased rate of pay for whatever time, above 40 hours per week…

*(Id.* at 680.)

As a result, it has long been the rule that even when an employee's duties are not exclusively those affecting the safety of vehicles in interstate commerce, the employee still comes within the MCA exemption so long as his safety-affecting role is more than *de minimus*.[8] This position has been incorporated by the DOL in its regulations describing the exemption:

---

[8] As the *Levinson* Court also noted, it is the character of the activities rather than the proportion of either the employee's time or activities that determines the Secretary's need for the power to establish requirements for qualifications and hours of service. *Levinson*, 330 U.S. at 674-75. The Supreme Court has held that drivers with only 4% of their trips involving interstate commerce were still exempt from the FLSA's overtime requirements because they directly affected the safe operation of motor vehicles in interstate commerce. *Morris v. McComb*, 332 U.S. 422, 431-36 (1947). Indeed, both the DOL and DOT have long taken the position that an individual subject to the Secretary's jurisdiction and exempt under the MCA for a four month period, beginning with the date the individual was called upon, or could have been called upon, to drive in interstate commerce. *See* DOL Opinion Letter FLSA 2006-3, 2006 WL 236429 (Jan. 13, 2006) (Attachment 1 to Ex. A, Hanrahan Declaration).

9

As a general rule, if the bona fide duties of the job performed by the employee are in fact such that he is (or, in the case of a member of a group of drivers, driver's helpers, loaders, or mechanics employed by a common carrier and engaged in safety-affecting occupations, that he is likely to be) called upon in the ordinary course of his work to perform, **either regularly or from time to time**, safety-affecting activities of the character described in paragraph (b)(2) of this section, **he comes within the exemption in all workweeks when he is employed at such job**. This general rule assumes that the activities involved in the continuing duties of the job in all such workweeks will include activities which have been determined to affect directly the safety of operation of motor vehicles on the public highways in transportation in interstate commerce. Where this is the case, **the rule applies regardless of the proportion of the employee's time or of his activities which is actually devoted to such safety-affecting work in the particular workweek, and the exemption will be applicable even in a workweek when the employee happens to perform no work directly affecting "safety of operation."**

29 C.F.R. § 782.2(b)(3)(2013)(emphasis added). Immediately thereafter, the DOL regulations specify that the preceding principles apply to drivers. 29 C.F.R. § 782.3(a).

Thus, for many years, it has been well established that as long as a driver regularly or from time to time transports goods in interstate commerce (*i.e.,* safety-affecting duties), the driver remains exempt from overtime *even if* he performs other non-safety-affecting duties. So, for example, a driver could regularly transport goods in interstate commerce and also regularly perform non-safety-affecting duties as a *helper*, supervisor, or a clerk, and the driver would still be exempt.

      3.   Plaintiffs Fall Under the Motor Carrier Exemption

          a.   *Flowers/Jamestown is a Motor Private Carrier*

Flowers/Jamestown is a registered DOT motor carrier. (SUMF ¶ 4). Flowers employees[9] (in addition to Plaintiffs) regularly transport baked goods in the stream of interstate commerce. Flowers is the owner or bailee of the property being transported, depending upon the

---

[9] Flowers/Jamestown employees order and deliver products made by out-of-state bakeries the same way. (SUMF ¶¶ 5-8).

circumstances, and such distribution is conducted to further Flowers/Jamestown's business. (SUMF ¶¶ 5-9). As such, this element of the MCA exemption is satisfied.

        b.   *Plaintiffs Regularly Distribute Goods in the Stream of Interstate Commerce*

Interstate commerce, for purposes of the MCA exemption, occurs with the actual transport of goods across state lines or with the intrastate transport of goods involved in a "practical continuity of movement" across state lines from the point of origin to the point of destination. *See Bilyou v. Dutchess Beer Distribs., Inc.,* 300 F.3d 217, 223 (2d Cir. 2002) (quoting *Walling v. Jacksonville Paper Co.,* 317 U.S. 564, 568 (1943)); *see also* 29 C.F.R. § 782.7 (b)(1) (interstate commerce element is satisfied where the "vehicles do not actually cross State lines but operate solely within a single State, if what is being transported is actually moving in interstate commerce.") Thus, out-of-state goods shipped to a warehouse, where they are transferred to a local driver for delivery to the end customer for whom such goods were originally intended, are involved in a "practical continuity of movement" if the pause at the warehouse is merely an "efficient opportunity to convert the means of delivery from one form of transportation to the other." *Foxworthy v. Hiland Dairy*, 997 F.2d 670, 673 (10th Cir. 1993). Whether the transportation is interstate or intrastate in nature depends on the "essential character of the shipment," which is dependent on the shipper's "fixed and persisting intent." *Foxworthy,* 997 F.2d at 672.

Analogous cases are illustrative. For example, in *Shew*, the Fifth Circuit Court of Appeals found that a delivery driver of Southland Corporation was exempt from overtime under the MCA exemption, even though he (like the Plaintiffs in the case at hand) drove a wholly intrastate route. Specifically, Southland received various products at its Dallas plant which it purchased from producers outside Texas and which were distributed to branch locations in Texas by transport truck drivers. The driver at issue delivered milk, butter, and other products, which were

11

manufactured by the out-of-state producers, from the Dallas plant to intrastate locations. The products the driver delivered were ordered by the branches every other day based on anticipated needs of the customers. These orders were consolidated by the Dallas office and an order was then placed with out-of-state producers. No processing or alteration of the out-of-state products was done at the Dallas plant. The Court reasoned that notwithstanding the driver's wholly intrastate route, there was a substantial movement of commodities in interstate commerce through the distribution of out-of-state products. Further, the driver distributed those out-of-state products within a short time frame of their arrival at the Dallas plant (within the same or next day) pursuant to pre-existing orders from the Southland branch. Thus, the court reasoned that because the driver delivered shipments that "originate[d] out of state and [were] part of a continuous movement in interstate commerce," he was exempt from overtime under the MCA exemption. *See Shew v Southland Corp.,* 370 F.2d at 376-380 (5th Cir. 1996).

The *McGuiggan* case, which also involved bakery distributors, is likewise illustrative. *See McGuiggan v. CPC Int'l, Inc.,* 84 F.Supp. 2d at 470, 470 (S.D.N.Y. 2000). Therein, the plaintiffs distributed and sold bakery products to retail accounts, which were all in New York. However, the products plaintiffs ordered for their accounts were produced at a baking plant in New Jersey. These products were subsequently shipped to distribution depots in New York, where plaintiffs picked them up for delivery to their retail accounts. *See id.* at 472. Finding the plaintiffs' overtime claims to be barred by the MCA exemption, the court reasoned (in pertinent part) that plaintiffs were engaged in interstate commerce because the goods they distributed were (1) ordered for specific customers, (2) produced by the out-of-state baking facility in response to those specific orders, and (3) delivered across state lines for subsequent delivery by the distributors within New York. The court found that the out-of-state shipper, had the requisite

"fixed and persisting intent" when it took orders in New Jersey for products that would be delivered in New York. The temporary placement of goods at the warehouse was simply not relevant. *See id.* at 483.[10]

The uncontradicted evidence here establishes that during the time period at issue (*i.e.,* September 12, 2009 to the present), Plaintiffs ordered products, including Blue Bird, Nature's Own, Cobblestone Mill, and Tastykake products that are only produced by out-of-state bakeries, for specific customers on an ongoing basis. (SUMF ¶¶ 11-12, 70, 97-98, 117-118, 136-137. *See also* Plaintiffs' Additional Facts). When Plaintiffs order such products through their handheld computers, these orders are subsequently placed with the out-of-state producing bakeries. The out-of-state producing bakeries bake the products in response to these specific orders and then ship such products to Flowers/Jamestown for distribution to the end customers of Plaintiffs through the DSD system. (SUMF ¶¶ 10-13). These out-of-state bakeries are aware that the products they produce in response to such orders are for end retail customers, and not simply a warehouse, given the structure of the DSD system and the perishable nature of the goods. (*Id.* ¶¶ 13, 14). Once the products arrive at Flowers/Jamestown's warehouse, Plaintiffs, as part of the intended DSD system of delivery, pick up and deliver the products to those customers. The products are not altered or processed during the temporary pause at any of the warehouses, nor do the products become general inventory from which they are subsequently sold or allocated. (SUMF ¶ 16).

---

[10] It is not necessary that the shipper know specifically which goods are earmarked for a particular customer, only that the goods will ultimately continue from the warehouse to a customer in a state different from that of the shipper. *See Shew, supra* (shipper had fixed and persisting intent beyond terminal storage point at time of shipment even though orders consolidated); Dep't of Labor Opinion Letter FLSA 2005-2NA, 2005 WL 5419038 (Apr. 27, 2005) (shipper had fixed and persisting intent even though goods not earmarked for a particular store where understood at the time of shipment that goods will ultimately continue from warehouse to retail customer); Dep't of Labor Opinion Letter, 1999 WL 1002364 (Feb. 10, 1999) (same) (opinion letters are attached as Attachment 1 to Hanrahan Decl.).

13

Finally, the perishable goods Plaintiffs deliver, and their limited shelf life, confirm that the goods did, in fact, remain in interstate commerce until reaching the end customer. This non-fungible nature of these goods make it clear the producing bakeries <u>do not</u> intend for the goods to remain in inventory, but continue in interstate commerce and reach the end customers as soon as possible. *See Webb v. Athens Newspapers*, 999 F. Supp. 1464, 1471-1472 (M.D. Ga. 1998) (the "strongest evidence" that the out-of-state newspaper supplements being delivered were intended to (and did) remain in interstate commerce until delivery to the end customers was that they were non-fungible in nature and lost their value if not delivered immediately).

<u>All of the above factors clearly establish that the goods are intended to and do remain in interstate commerce</u>. As such, Plaintiffs are engaged in interstate commerce.

   c. *Plaintiffs Are Exempt Under the MCA Despite Periodically Driving Their Personal Vehicles*

As previously noted, under the FLSA's MCA exemption "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service" is exempt from the requirement of overtime pay. Until 2005, the Secretary of Transportation's authority extended to all vehicles carrying goods or passengers in interstate commerce, regardless of weight. In 2005, however, Congress enacted the Safe, Accountable, Flexible, Efficient Transportation Equity Act; A Legacy for Users ("SAFETEA-LU"), which struck the phrase "motor vehicle" from the definition of "motor carrier" and inserted in its place the phrase "commercial motor vehicle." *Avery v. Chariots For Hire,* 748 F.Supp.2d 492, 497 (D. Md. 2010). Because a "commercial motor vehicle" is defined as one having a gross weight of at least 10,001 lbs., the SAFETEA-LU Act effectively limited the Secretary of Transportation's authority to cover only vehicles weighing more than 10,000 lbs. As a result, the FLSA's MCA

exemption was correspondingly narrowed to apply only to employees whose duties involved vehicles over 10,000 lbs.[11]

The SAFETEA-LU Act's restriction on the Secretary's authority, however, did not last long:

> On June 6, 2008, Congress passed the SAFETEA—LU Technical Corrections Act of 2008, Pub. L. 110-244, 122 Stat. 1572 ("TCA"). The TCA amended the SAFETEA—LU. . . . First, [t]he pre-SAFETEA-LU definitions of "motor carrier" and "motor private carrier" were restored by essentially striking the modifier "commercial" before the phrase "motor vehicle." See Id. §305(c), 122 Stat. 1572, 1620. This change accordingly expanded the reach of the DOT's authority to cover again all employers that operated "motor vehicles" of any weight.

*Allen v. Coil Tubing Services, L. L.C.,* 846 F.Supp.2d 678, 692 (E.D. Tex. 2012). Thus, as of June 6, 2008, the SAFETEA-LU Technical Corrections Act of 2008 ("TCA") restored the Secretary of Transportation's authority to cover again motor vehicles *of any weight.*

Second, in addition to restoring the Secretary's authority over vehicles of any weight, the TCA also amended the FLSA to carve out a limited exception for drivers who drive non-commercial vehicles (which is defined to include vehicles under 10,001 lbs.). Specifically, the TCA provides that Section 7 of the FLSA, which requires the payment of overtime, shall apply to certain "covered employee[s]." A "covered employee" is defined by the TCA as follows:

> (c) COVERED EMPLOYEE DEFINED.— In this section, the term "covered employee" means an individual—
>
> (1) who is employed by a motor carrier or motor private carrier (as such terms are defined by section 13102 of title 49, United States Code, as amended by section 305);
>
> (2) whose work, in whole or in part, is defined—
>
> (A)     as that of a driver, driver's helper, loader, or mechanic; and

---

[11] Based on the legislative history of SAFETEA-LU, it does not appear that the change in the MCA definition was intended to limit the scope of the FLSA's MCA exemption. Rather, this limitation on the scope of the FLSA's MCA exemption appears to have been an unintended consequence, rather than a purpose of SAFETEA-LU. FLSA Exemptions: Interstate Motor Carriers, 1 Lab. Law Rep. (CCH) ¶25,275, pg. 38, 147 (dated Mar. 14, 2007) (as of last filing dated May 14, 2015). (Attachment 1 to Hanrahan Decl.).

> (B)　　as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce, except vehicles—
>
> (i) designed or used to transport more than 8 passengers (including the driver) for compensation;
>
> .　.　.
>
> (3) who performs duties on motor vehicles weighing 10,000 pounds or less.

Pub. L. No. 110-244 Title III, §305 (2008).

Every district court within the Fourth Circuit to consider this exception in the mixed-fleet context—*i.e.,* where the employee uses both commercial and non-commercial vehicles—followed the well-established Supreme Court precedent and DOL regulations discussed above to hold that the MCA exemption still applies so long as an employee spends more than a *de minimus* amount of time driving a commercial motor vehicle in interstate commerce. As previously noted, all Plaintiffs spent more than a *de minimus* amount of time, in fact they spent the overwhelming majority of their time, driving motor vehicles with a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds. *See* pp. 3-4, *supra.*

First, in *Avery v. Chariots for Hire,* 748 F. Supp.2d 492 (D. Md. 2010), the plaintiff spent most of his time driving vehicles that carry more than eight passengers, but may also have spent some time driving non-commercial vehicles. *Avery,* 748 F.Supp.2d at 492. Nevertheless, the court held:

> Courts that have considered the issue of a mixed fleet are somewhat divided on the proper approach, but the prevailing view is that the motor vehicle exemption should apply so long as the time the employee spends operating commercial motor vehicles is more than *de minimus.*

16

(*Id.* at 500). The court in *Buckner v. UPS* agreed. *See* 2012 WL 1596726, at *5 n. 3 (E.D. N.C. May 7, 2012), *aff'd,* 489 F.App'x. 709 (4th Cir. 2012)(per *curium*)[12]. Specifically, the court stated:

> The court also notes that even though plaintiff himself may have operated vehicles weighing 10,000 pounds or less [*i.e.* a non-commercial vehicle] at certain times over the course of his employment, he nonetheless remains subject to the MCA exemption. *See, e.g. Avery v. Chariots for Hire,* 748 F.Supp.2d 492, 500 (D. Md.2010) (The "motor vehicle exemption should apply so long as the time an employee spends operating commercial motor vehicles *[i.e.,* vehicles weighing at least 10,001 pounds] is more than *de minimus*" because "[d]ividing jurisdiction over the same drivers, with the result that their employer would be regulated under the Motor Carrier Act when they were driving the big trucks and under the Fair Labor Standards Act when they were driving trucks that might weigh only a pound less, would require burdensome record-keeping, create confusion, and give rise to mistakes and disputes." (second alteration in original) (citation and internal quotation marks omitted)).

Finally, in *Rucker v. Hoffberger Moving Servs., LLC, No.* JFM-13-2716, 2013 U.S. Dist. LEXIS 182052 (D. Md. Dec. 31, 2013), following extensive briefing of the relevant history of the MCA and TCA, the court held that a driver was exempt because he spent more than a *de minimus* amount of time driving commercial vehicles (*i.e.,* vehicles greater than 10,000 pounds). And, several other district courts from beyond this Circuit are in accord. *See, e.g., Jaramillo v. Garda,* 2012 WL 4955932 at *5 (N.D. Ill. Oct. 17, 2012)(armored truck drivers who drive some vehicles that weigh less than 10,000 lbs., but drive vehicles greater than 10,000 lbs. more than 80% of the time are exempt under the MCA exemption); *Dalton v. Sabo, Inc.,* No. 09-358, 2010 WL 1325613 (D. Or. Apr. 1, 2010)(drivers who drove vehicles weighing more than 10,000 lbs. are exempt under the MCA even if they occasionally drove vehicles weighing less than 10,000 lbs.).

The courts taking the minority view have relied upon a position adopted by the Department of Labor in its Field Assistance Bulletin No. 2010-2, in which the DOL states that under the

---

[12] Copies of all unpublished cases are attached as Attachment 1 to Ex. A, Hanrahan Decl.

TCA, an employee will fall outside the FLSA's MCA exemption (and be entitled to overtime) in any workweek in which any portion of the employee's duties affect the safe operation of a vehicle weighing less than 10,000 lbs. in interstate commerce. For a number of reasons, however, this reasoning should not be followed, particularly given the undisputed material facts in this case. Indeed, this minority view corrodes the long-standing historical balance between DOT and DOL safety concerns and creates an administrative nightmare.

*Jaramillo* is instructive in this regard. There, the court refused to follow the DOL's guidance, finding that "the Bulletin . . . lack[s] clarity regarding the issue of employers with mixed vehicle fleets . . ." 2012 WL 4955932, at *4. Instead, the *Jaramillo* court followed the Seventh Circuit's reasoning in *Collins v. Heritage Wine Cellers, Ltd.,* 589 F.3d 895 (7th Cir. 2009) and held that it would "refuse[] to undergo a week-by-week analysis to determine what regulatory overtime scheme should apply to each individual plaintiff for each week of work." (*Jaramillo,* at *4). Similarly, the Fourth Circuit has also cautioned that because the DOL's informal guidance documents are "adopted without notice and comment rulemaking and without a formal adjudication" they "lack the force of law". *Department of Labor v. North Carolina Growers Ass'n,* 377 F.3d 345, 353 (4th Cir. 2004).

Rejecting the Bulletin is particularly appropriate because, as noted above, DOL regulations directly on point remain intact post-TCA. To hold otherwise leads to illogical results directly contrary to the overarching public policy safety considerations at the heart of the MCA. To adopt the Bulletin position and the minority view of the courts, post-TCA a driver could regularly drive a commercial vehicle in interstate commerce and be a helper performing non-safety tasks the rest of the time, and the driver would be MCA exempt. This result, given the safety policy at the heart of the MCA, is wholly consistent with *Levinson* and its progeny. However, if this driver,

18

instead of performing occasional helper duties, drove a vehicle 100% of the time (but occasionally in a smaller vehicle), the driver would be non-exempt. Because the same safety considerations remain, this result is totally illogical and contrary to *Levinson* and its progeny. If Congress had intended to so eviscerate the MCA exemption, it would have changed the expansive language of Section 213(b) itself, not simply buried a note in a Technical Corrections Act.

A close reading of the TCA further confirms this conclusion and that Plaintiffs' occasional use of personal vehicles does not take them out of the MCA exemption. First, this is clear from the text of the TCA itself. The TCA contains a safe harbor for employers who violated the FLSA "with respect to covered employees" for a 1-year period beginning on August 10, 2005. Pub. L. No. 110-244 Title III, §306(b) (2008). This safe harbor was necessary because, prior to August 10, 2005, the DOT's jurisdiction was not limited by the weight of vehicles but included *all* motor carriers in interstate commerce, which in turn meant that *none* of the drivers of such vehicles— even if the vehicles were less than 10,000 lbs.—were protected by the FLSA. After August 10, 2005, however, DOT lost jurisdiction over small vehicles (*i.e.,* those weighing 10,000 lbs. or less), such that drivers of those vehicles would now be entitled—for the first time—to FLSA protections. Because this change took many employers by surprise, Congress in 2008 provided this safe harbor, which is necessarily keyed to the distinction between the mutually exclusive jurisdictions of the DOT and DOL during the safe-harbor period (*i.e.* 2005-2006). After all, the safe-harbor provision protects employers who violated the FLSA "with respect to covered employees," but the only employees "with respect to" whom employers could have possibly violated the FLSA were those who fell outside of DOT jurisdiction at that time. Given the well-established precedent and DOL regulations discussed above, the only employees who fell outside

of DOT jurisdiction during that time (and were thus protected by the FLSA) were those who drove non-commercial vehicles <u>and</u> who either did not drive commercial vehicles or did so on a *de minimus* basis. And because the term "covered employee" must be read the same across the TCA, this historic distinction between DOT and DOL jurisdiction must inform reach of the TCA's carve-out to the Motor Carrier Act exemption. <u>It follows that where an employee operates both commercial and non-commercial vehicles, the TCA's carve-out applies only where drivers are not driving commercial vehicles on a regular basis, which is not the case here.</u>[13]

Second, and most compelling given the particular facts of this case, Plaintiffs do not meet the definition of "covered employee" for another reason. The definition of "covered employee" only encompasses those drivers operating smaller motor vehicles <u>engaged in the transportation of property in interstate commerce</u>. Plaintiffs' use of personal vehicles for pull ups falls outside this statutory definition because: (1) the vehicles do not carry any goods: pull ups merely entail moving goods that have already been delivered to the store to the store's shelves; and (2) because no goods in the stream of interstate commerce are being transported, the driving involved is wholly intrastate. And, as discussed above and further outlined in the Plaintiffs' Additional Facts section of the attached SUMF, to the extent Plaintiffs use their personal vehicles to deliver goods in the stream of interstate commerce, such use is *de minimus*. Thus, even if this court were to adopt the minority view (which it should not), Plaintiffs are still exempt under the MCA.[14]

---

[13]In other words, the most logical reading of the "in whole or in part" language of the TCA is that it only applies if a driver drives a vehicle of less than 10,001 lbs. exclusively or drives a vehicle less than 10,001 lbs. part of the time <u>and</u> any driving of a commercial vehicle is nonexistent or *de minimus*.

[14] Plaintiffs will undoubtedly contend that the Third Circuit's recent decision in *McMaster v. Eastern Armored Servs., Inc.,* 780 F.3d 167 (3rd Cir. 2015) should yield the opposite result. For several reasons, it should not. First and foremost, the facts of *McMaster* are starkly different. Plaintiff there drove smaller trucks 49% of the time and <u>solely</u> in interstate commerce. Second, the court concluded that the text of the TCA ("in whole or in part") necessarily required the result there. It does not, for the reasons discussed above. Third, the court failed to even discuss the historical broad jurisdiction of the DOT and the well-established precedent, judicial and otherwise, discussed above.

**B.** **Assuming, *Arguendo*, Plaintiffs Were Employees, They Are Exempt Under the Outside Sales Exemption**

   1. Plaintiffs Make Sales, As Defined by Section 3(k), Placing Them Squarely Within the Outside Sales Exemption.

The FLSA exempts outside sales employees from the reach of its overtime provisions. 29 U.S.C. § 213(a)(1). To qualify for this, an individual must: (1) have a primary duty of "making sales" within the meaning of Section 3(k) of the FLSA; and (2) be customarily and regularly engaged away from the employer's place or places of business. 29 C.F.R. § 541.500(a)(1). The Department of Labor Regulations clarify that an individual's primary duty is the "principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700. Section 3(k) of the FLSA specifies that "'sale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 C.F.R. § 541.501(b). "Sales within the meaning of section 3(k) . . . include the transfer of title to tangible property" and include any "sale or consignment for sale." 29 C.F.R. § 541.501(b). [15]

The regulations specifically recognize that driver salesmen, like Plaintiffs, may be considered exempt under the outside sales exemption. 29 C.F.R. § 541.504. For driver salesmen, any work performed "incidental to and in conjunction with the employee's own outside sales or solicitations," including "loading, driving, or delivering products" is also considered exempt outside sales work. 29 C.F.R. § 541.504(a); *see also* 29 C.F.R. § 541.500(b) (emphasis added) (work performed "incidental to and in conjunction with the employee's own outside sales . . . *shall be regarded as exempt outside sales work*.") Under the regulations, if the driver salesman

---

[15] The definition of "sales" in Section 3(k) comports with the definition in Black's Law Dictionary, which defines "[s]ale" as (in pertinent part) "[t]ransfer of property for consideration either in money or its equivalent." Black's Law Dictionary, p. 1200 (4th ed. 1999).

21

consummates his own sales,[16] then other promotional activities directed towards the consummation of the sale, such as placing point-of-sale materials, merchandising and rotating products, is also considered exempt outside sales work. *See* 29 C.F.R § 541.503(c).[17]

The regulations provide several, alternative examples of driver salesmen who may be considered exempt, including:

(1) Drivers who are the only sales contact with the customers, take orders for products and deliver the products to the customers, and are compensated based on the volume of products sold;

(2) Drivers who obtain or solicit orders for products from persons who have authority to commit the customer for purchases;

(3) Drivers who call on new potential customers along their route, while attempting to "convince them" to accept the "regular delivery of goods; **or**

(4) Drivers who call on "established customers" and persuade "regular customers" to accept the delivery of new or additional products, "*even though the initial sale or agreement for delivery was made by someone else*."

*See* 29 C.F.R. § 541.504(c)(1)-(4) (emphasis added).

The examples of driver salesmen *who are not* typically exempt as outside sales employees are also illustrative here. One such example is a driver who is "primarily engaged in making deliveries to customers and performing activities intended to promote sales by customers (including placing point-of-sale and other advertising materials, . . . arranging merchandise on the shelves, . . . rotating stock, and . . . otherwise servicing display cases), *unless such work is in furtherance of the driver's own sales efforts*." 29 C.F.R. § 541.504(d)(3). As this makes clear, the critical fact when determining applicability of the outside sales exemption is whether individuals

---

[16] Black's Law Dictionary (4th ed. 1999) defines consummate as "[t]o finish by completing what was intended; bring or accary to utmost point or degree; or carry or bring to completion." As this definition makes clear, consummating a sale must necessarily occur at the end of the sales process and occurs when title passes to the product and consideration is exchanged thereon.

[17] The examples of promotional versus exempt sales activities in 29 C.F.R. § 541.503(b) are likewise illustrative and illustrate the critical importance of who actually consummates the sale to this analysis. Specifically, 29 C.F.R. § 541.503(b) provides an example of a manufacturer's representative who performs "various types of promotional activities such as putting up displays and posters, removing damaged or spoiled stock . . . or rearranging merchandise," noting that such an individual "can be considered an exempt outside sales employee if the employee's primary duty is making sales" and that "[p]romotion activities *directed toward the consummation of employee's own sales* are exempt." (*Id.*)

22

actually consummate their own sales. *Barnick v. Wyeth,* 522 F. Supp. 2d 1257, 1263 (C.D. Cal. 2007) (*citing Nielsen v. Devry, Inc.,* 302 F. Supp. 2d 747, 759 (D. Mich. 2003) (in "borderline cases [involving the outside sales exemption], the test is whether the person is actually engaged in activities directed towards the consummation of his own sales, at least to the extent of obtaining a commitment to buy from the person to whom he is selling").

The decision in *Ackerman v. Coca-Cola Enterprises., Inc.,* is illustrative because it exemplifies the application of the outside sales regulations to driver-salesmen. 179 F.3d 1260 (10th Cir. 1999).[18] In *Ackerman,* plaintiffs were sales representatives and account managers who brought an action for overtime under the FLSA. Plaintiffs' primary responsibility was to sell Coca-Cola products to grocery stores, convenience stores, and mass merchandisers. Part of the plaintiffs' regular job duties involved merchandising products, which included delivering products, restocking shelves, rotating products, setting up displays, and other similar tasks. Plaintiffs argued that the merchandising work they performed (which exceeded the then-controlling 20% standard of the hours worked) was non-exempt in nature, rendering the outside sales exemption inapplicable to them. When discussing 29 C.F.R. §§ 504.504 and 505, the regulations applicable to promotion work and driver-salesmen, the Tenth Circuit noted:

> In both instances, a key inquiry is whether the employee in question *actually consummates the sale of his or her employer's products at a particular location.* If that employee consummates the sale but also performs a variety of other tasks intended to promote the company's products but not directly involving sales, those tasks may still be considered "incidental to and in conjunction with" those sales under the regulations.

*Ackerman*, 179 F.3d at 1265 (emphasis added). The court further reasoned that a driver "who takes orders or obtains commitments from customers for the products he delivers" is engaged in selling and his activities such as delivering the products, shelving them and performing other

_____

[18]While *Ackerman* was decided under the older regulations, it likewise remains persuasive and, based on the court's analysis, the result would not be different if decided under the new regulations.

23

promotion work are incidental exempt work. (*Id.* at 1265-66 (quoting 29 C.F.R. § 541.505(d))).

Under these facts, the court held that plaintiffs were outside salesmen. According to the court,

plaintiffs resembled the exempt driver salesmen described in 29 C.F.R. § 541.505(d) because

they took orders and consummated sales with their customers. As a result, all other duties, such

as merchandising product, were merely incidental to this primary sales duty and, therefore, also

constituted exempt work. When considering all such duties in total, *not simply the actual sales*, it

was clear that the plaintiffs' primary duty was sales. (*See Ackerman* at 1266).

The Eleventh Circuit's reasoning in *Reyes v. Goya Foods, Inc.* is likewise illustrative. 549 F.

App'x. 876, 877 (11th Cir. 2013) In *Reyes,* the Eleventh Circuit[19] affirmed the district court's

directed verdict to Goya on the application of the outside sales exemption to sales brokers. (*Id.)*

at 877-878. There, Reyes was a sales broker for Goya responsible for selling Goya's products to

customers. He claimed, however, that his primary duty was "merchandising," which he

characterized as restocking shelves, cleaning products and rotating merchandise, and that he was

not a salesman because he spent very little time *actually selling products* and had no authority to

negotiate price. (*Id.* at 877). The court disagreed, pointing to record evidence establishing that

sales brokers are expected to grow their sales, perform their work independently, set their own

schedules, and were paid a commission based on sales, among other things. (*Id.* at 878).

Importantly, the court noted that while the brokers did restock shelves, clean inventory and rotate

inventory, these duties were performed "in conjunction with and in furtherance of their own sales

efforts." (*Id.).* In light of this, "although Reyes may have personally spent little time promoting

Goya's products—his position as a sales broker . . . qualified him as an 'outside salesman' under

the FLSA." (*Id*.). The same reasoning applies here because while Plaintiffs, like Reyes, may

---

[19] *Reyes* is an unpublished decision but nonetheless carries significant persuasive authority here given its analogous facts.

have spent what they may characterize as a most of their time in delivering and merchandising the products, because they were the ones selling them, this work is also necessarily considered exempt.

Other cases involving route sales employees in similar circumstances have followed similar reasoning. *See, e.g., Meza v. Intelligent Mexican Mktg.,* 720 F.3d at 577, 577-87 (5th Cir. 2013) (route sales employee for food and beverage company was exempt outside sales employee, despite his contention that he spent very "little time" engaged in "sales" and spent most of his time delivering products rearranging them according to a pre-arranged set, because his responsibility was to sell products and he engaged in various tactics to do so);[20] *Hogdson v. Krispy Kreme Doughnut Co.,* 346 F. Supp. 1102 (M.D.N.C. 1972) (doughnut salesmen were exempt outside salesmen when they order products for customers based on customers' needs and other factors, call on customers and engaged in various activities to increase sales with existing customers, and received compensation commensurate with sales, among others).

     2.   The Undisputed Evidence Establishes that Sales Are Plaintiffs' Primary Duty.

The same result much be reached here. The undisputed evidence, in large part based on Plaintiffs' own admissions, establishes that Plaintiffs purchase products from Flowers/Jamestown, take title to those products, and thereafter regularly sell them to their accounts, including cash accounts, authorized charge accounts, and pay-by-scan accounts. (SUMF ¶¶ 22-30, 37-39. *See also* Plaintiffs' Additional Facts). Because Plaintiffs have and are passing title to the products when selling them to their accounts, and receive cash or credit from these sales, there can be no question that they are consummating sales within the plain meaning of Section 3(k). Plaintiffs regularly call on these accounts in the ordinary course of business with

---

[20] Specifically, in *Meza,* the court noted that plaintiff, like Plaintiffs here, regularly called on customers, took orders for products, and received compensation commensurate with the volume of products sold, among other things. (*See id.* at 577-78).

minimal oversight, if any; spend the majority of their time outside of the warehouse; and are both contractually obligated and expected to increase their sales on a regular basis. (*Id.*).

Perhaps the strongest evidence that Plaintiffs' primary duty is sales, however, is their own deposition testimony wherein they repeatedly admit that they are selling products to their customers. The record is also replete with admissions that Plaintiffs can and do solicit new accounts (*see, e.g.,* SUMF ¶¶ 131, 217, 272, 289, 329, 349), ask for and obtain displays from their accounts (*id.* ¶¶ 111, 126, 147, 287, 310, 350), discuss new products with accounts (*id.* ¶ 178), recommend changes to shelf space configurations or ask for more shelf space (*id.* ¶ 128-129), participate in sales contests (*id.* ¶ 250, 275), change the price of products sold (*id.* ¶¶ 78, 133, 148, 252), "research the competition" to give themselves an edge in the market (*id.* ¶ 108), recommend new or different products (SUMF ¶¶ 127, 128, 130, 206, 311), use promotional stickers (*id.* ¶ 91), entertain customers (*id.* ¶ 149), focus on selling branded products for higher profit (*id.* ¶¶ 146, 410), and provide excellent customer service (*id.* ¶ 173, 273). These examples are not exhaustive. (*See* Plaintiffs' Additional Facts).

While Plaintiffs will likely claim that all sales opportunities are minimal—if not eliminated—in the national accounts given the national accounts team, this, too, is completely contradicted by the record here. Keistler, for example, testified that he asks displays in Target "any time he has an opportunity" and has worked with Food Lion to get more shelf space and the shelf space allocation changed. (SUMF ¶ 126). Shillinglaw has recommended different shelf space allocation and been successful in working with his accounts to get the shelf space allocation changed. (*Id.* ¶ 447). Others provide similar testimony. (*See* Plaintiffs' Additional Facts). Moreover, the national accounts' 30(b)(6) testimony confirms the existence of these opportunities, including that in several accounts, Plaintiffs retain the discretion to determine what

26

products to sell to the accounts. In Family Dollar, for example, "the distributors can work with the store management to put in the 'best sellers' off a . . . product list . . . They've got flexibility to choose what sells best." (*Id.* ¶ 47). Variety Wholesalers is the same. (*Id.*). In Circle K, Pilot/Flying J, and The Pantry, distributors and the store manager can work together to determine what products go on the rack. Likewise, in BJs, distributors can work with local store management to get additional authorized items added to the shelf allocation. (*Id.* ¶ 48). In Wal-Mart, for example, distributors who have a "positive relationship with a store . . . and [when] the store manager can trust them to take care of Wal-Mart's business, they get extra opportunities to sell their products." (*Id.* ¶ 43). In Family Dollar, "[t]here's a lot that independent distributor[s] can do at the store level that can either reduce or increase the space," including getting "flex space," which is additional space set aside for the local store manager to award. (*Id.* ¶ 43). The same is true for Sam's. (*Id.*). In other accounts, Plaintiffs have much more discretion over and input into allocated shelf space. (*Id.* ¶¶ 42, 25). Plaintiffs also retain significant opportunities to get additional displays, shelf space, or extra selling locations through the local store management in various accounts. (*Id.* ¶¶ 42-45).

Moreover, the very distributorship model under which Plaintiffs operate is premised upon building sales, *i.e.,* that the conveyance of an ownership interest to distributors will instill entrepreneurial enthusiasm to make more sales and more money and build an equity interest by growing sales of branded products. (*Id.* ¶ 21). As Flowers' corporate designee confirmed, their most important responsibility is to increase sales in their accounts and they regularly expect distributors to be building sales in their accounts. (*Id.* ¶ 27). To incentivize these sales efforts, Jamestown runs several sales contests, in which Plaintiffs can and do participate. (*Id.* ¶ 30). What is more, as discussed above and outlined in Plaintiffs' Additional Facts in more detail, Plaintiffs

uniformly admit that they are contractually obligated to use their "best efforts" to increase sales and that they regularly engage in various activities to do so.

And, as discussed above and as the regulations make clear, when, as here, Plaintiffs consummate their own sales, all other activities performed incidental to and in conjunction with those sales—such as delivering products, and merchandising—are also considered exempt. This places Plaintiffs squarely within the four corners of the outside sales exemption.

   3.   The DOL Outside Sales Primary Duty Factors Also Strongly Support the
        Exemption.

A review and analysis of the factors the DOL notes should be considered when determining whether the driver's primary duty is making sales also supports the exemption here. These factors include, for example, the "presence or absence of customary or contractual arrangements concerning amount of products to be delivered . . ., sales training . . ., method of payment, and the proportion of earnings directly attributable to sales." 29 C.F.R. § 541.504(b). The undisputed evidence establishes that all of these factors are satisfied here.

First, the evidence establishes that there are no "contractual or customary arrangements concerning the amount of products to be delivered." Rather, Plaintiffs admit they regularly determine what products to order for their customers based on their accounts' needs—not just based on historical sales—by regularly making changes to the suggested orders. (SUMF ¶¶ 79, 96, 116, 155, 181, 237). That Plaintiffs place orders via the handheld computer and are provided with a suggested order, as opposed to obtaining orders from the customers directly, is inapposite. Indeed, the Preamble to Part 541 outlining the comments and changes in the 2004 regulations make clear that the "increasing computerization of sales and purchasing activities" will not defeat the exemption and that "[e]xempt status should not depend on whether it is the sales employee or the customer who types the order into a computer system and hits the return

28

button." 69 Fed. Reg. 22122-01, 22162, 22163 (Apr. 23, 2004). And, in the Preamble, the DOL noted that they "agree[] that technological changes in how orders are taken and processed should not preclude the exemption for employees *who in some sense make sales.*" 69 Fed. Reg. 22122, 22162-63.

Second, as prospective distributors, Plaintiffs received sales training on how to improve sales in their accounts. Finally, Plaintiffs' compensation is based, exclusively, on their sales of products to accounts. (SUMF ¶ 24). So, "the more they sell, the more they make." (*Id.* ¶¶ 107, 216, 352). As the preamble to the regulations makes clear, this compensation structure is a quintessential characteristic of an individual whose primary duty is sales. *See* Defining and Delimiting the Exemption for the Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122-01, at 22163 (codified as 29 C.F.R. pt. 541) (compensation commensurate with products sold is characteristic of an individual whose primary duty is making sales).

This method of compensation, coupled with the fact that Plaintiffs perform their duties on their own and, with minimal oversight, also establishes that they fall squarely within the category of individuals intended to be covered by the outside sales exemption. In *Jewel Tea,* which has been cited repeatedly by courts across the country when deciding outside sales exemption cases, the Tenth Circuit aptly explained the rationale behind this exemption:

> The reasons for excluding an outside salesman are fairly apparent. Such salesmen, to a great extent, work . . . individually. There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates. In lieu of overtime, he ordinarily receives commissions as extra compensation. He works away from his employer's place of business, is not subject to personal supervision by his employer, and his employer has no way of knowing the number of hours he works per day. To apply hourly standards primarily devised for an employee on a fixed hourly wage is incompatible with the individual character of the work of an outside salesperson.

*Jewel Tea Co. v. Williams,* 118 F.2d 202, 207-208 (10th Cir. 1941). *See also Meza v. Intelligent Mexican Mktg. Inc.,* 720 F.3d 577, 581 (5th Cir. 2013) (discussing *Jewel Tea* and ultimately finding that a routesales employee for a food and beverage company was exempt under the outside sales exemption); *Hantz v. Prospect Mortg. Co.,* 11 F. Supp.3d 612, 621 (E.D. Va. 2014) (citing *Jewel Tea* for rationale behind outside sales exemption and ultimately finding exemption was satisfied).This reasoning remains viable today and is equally applicable here. To hold otherwise would be both in violation of the plain wording of Section 3(k) and the regulations but also inconsistent with the spirit and intent behind the exemption as discussed above.

4. That Flowers May Engage National Accounts or Other Representatives Who Pave the Way for Plaintiffs' Own Sales Is Inapposite.

In an attempt to skirt application of the outside sales exemption, Plaintiffs will likely argue that they are not actually making sales, but that sales are instead made by the national accounts or sales management teams. The problem with this argument, however, is that no record evidence exists to support it. Rather, the evidence establishes that while the national accounts team establishes the initial contact with the accounts and is responsible for generally discussing price, product authorization and the like, they do not close the deal, nor do they secure commitments from the accounts to purchase any particular quantity of products. (SUMF ¶¶ 26, 40-42). This is critical. Clearly, and as confirmed by Flowers' extensive corporate designees, the role of both the national accounts and sales management teams is to pave the way for Plaintiffs' sales. (*Id.* ¶ 40). And, this is exactly the type of activity that the DOL *explicitly recognizes does not* constitute exempt outside sales work. *See* 29 C.F.R. § 541.503(b) ("[p]romotional activities designed to stimulate sales that will be made by someone else are not exempt outside sales work"); 69 Fed. Reg. 22122, 22162-63 (Apr. 23, 2004) (outside sales exemption does not apply to employees who were merely "engaged in paving the way for salesmen."). Indeed, the driver

30

salesmen regulations, and examples provided therein of those who can be considered exempt, also *specifically recognize* that the outside sales exemption can apply *even when the initial contact for an account is made by someone else.* 29 C.F.R. § 541.504(c)(4).

The critical distinction between "paving the way for sales" versus actual sales has also been regularly recognized in litigation. *See, e.g., Schaefer-LaRose v. Eli Lily and Co.,* 663 F. Supp. 2d 674, 686 (S.D. Ind. 2009) (finding outside sales exemption applied, noting that plaintiff did not merely "'grease the skids' in preparing the way for a second wave of Lily employees who would visit . . . and close the actual sales." Rather, she obtained their commitment and received salary increases for obtaining the same); *Gregory v. First Title of America, Inc.,* 555 F.3d 1300, 1309-10 (11th Cir. 2009) (finding outside sales exemption applied, in part, because the plaintiff did not "pave the way" for someone else's sales but rather consummated the sale herself, without any "intervening sales effort between her efforts and the consummation of the sale.") This same reasoning applies here.

Indeed, the regulations contain an entire section devoted to this category of individuals—or those who engage in promotional activities directed towards the consummation of *someone else's* sales—and note that such individuals cannot be considered exempt outside salesmen. 29 C.F.R. § 541.503(a) ("Promotional work that is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work. On the other hand, promotional work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work.") This establishes that the regulations clearly contemplate that businesses (like Flowers Foods and Flowers/Jamestown) will have individuals *other than* those consummating sales, who engage in activities directed towards increasing the visibility of the product generally, rather than directed towards getting a specific customer to buy a product from

31

them. The activities of the national accounts team and sales managers clearly fall within this category of nonexempt "promotional activity."

And, if there was any question, Plaintiffs' admissions that they regularly sell products to their accounts and engage in various sales activities *even in the national accounts* must put it to bed. Any argument to the contrary belies the obvious: if a sale (or contract for sale) for products to these accounts was, in fact, consummated by the national accounts team, further sales efforts by Plaintiffs would simply not be necessary. *See Clements & Gerber v. Resource Consultants, Inc.,* 2006 U.S. Dist. LEXIS 36944, at *20 (D. Utah June 5, 2006) ("continued recruiting would likely indicate no sale was consummated, otherwise further recruitment would not be necessary."). This conclusion is supported by the plain meaning of the term "consummate," which as noted above is defined as "to finish by completing what was intended." *(supra,* fn. 15). If the national accounts representatives consummated the sale, there would be no reason for distributors to call on them, solicit new accounts, recommend new products, and otherwise collect money or receive credit for the sales.

For all of the reasons discussed above, there is no question that Plaintiffs satisfy the outside sales exemption. Summary judgment for Defendants should be granted accordingly.

### C. Plaintiffs Cannot Establish a Willful Violation to Extend the Statute of Limitations to Three Years

An action for unpaid overtime under the FLSA must generally be commenced within two (2) years of the violation, unless Plaintiffs establish that Defendants acted in "willful violation" of the FLSA, extending the limitations period to three years. 29 U.S.C. § 255(a). *See also Garcia v. Frog Island Seafood, Inc.*, 644 F. Supp. 2d 696, 714 (E.D.N.C. 2009) (plaintiffs bear burden of showing defendants committed "willful violation"). As the Supreme Court has made clear, if a company makes a good faith attempt to comply with the FLSA, a willful violation cannot be

32

found. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). Rather, to establish the propriety of a three-year statute of limitations, Plaintiffs must prove that Defendants acted voluntarily, deliberately, and intentionally. *See id.* "If an employer acts unreasonably, but not recklessly, in determining its legal obligation," the conduct is not considered willful. (*Id.* at 135, n. 13). Consistent therewith, mere negligence is not sufficient to establish willfulness. *Hantz v. Prospect Mortgage, LLC,* 11 F. Supp.3d 612, 616-617 (E.D. Va. 2014).

Due to this demanding standard, a finding of willfulness and extension of typical two-year statutory period to three years "is not the norm." *Tumulty v. FedEx Ground Package Sys., Inc.*, No. C04-1425P, 2005 WL 1979104, at *7 (W.D. Wash. Aug. 16, 2005). As aptly stated by the Fourth Circuit, the Supreme Court "instruct[ed] us [in *Richland Shoe*] to look for an actually malignant – not merely – careless – mental state." *Chao v. Self Pride, Inc.*, 232 F. App'x 280, 287 (4th Cir. 2007). When an employer assumes, in good faith but incorrectly, that its conduct complied with the FLSA, willfulness cannot be found. (*Id.).* And, a mere allegation that plaintiffs may have been misclassified is certainly not enough to show willfulness. *Chapman v. BOK Fin. Corp.*, No. 12-CV-613-GFK-PJC, 2014 WL 3700870, at *4 (N.D. Okla. July 25, 2014) ("The evidence plaintiffs have presented – that [defendant] <u>may</u> have misclassified the plaintiffs – could support an ordinary FLSA violation only, <u>not</u> a willful violation.") (Emphasis added).

Consistent with the Supreme Court's teachings in *Richland Shoe,* courts typically only find willfulness in egregious circumstances, <u>unlike those presented here</u>, like when the company "ignored specific warnings that they were out of compliance with [the] FLSA, destroyed or withheld records to block investigations into their employment practices, or split employees' hours between two companies' books to conceal their overtime work." *Hurd v. NDL, Inc.*, No. CCB-11-1944, 2012 WL 642425, at *6 (D. Md. Feb. 27, 2012); *Williams v. Maryland Office*

*Relocators*, 485 F. Supp. 2d 616, 621 (D. Md. 2007) ("Proof of willfulness must be far stronger, such as evidence that the defendant had previously been investigated for FLSA violations, or evidence of a scheme by the employer to cover-up FLSA violations."); *Herman v. Palo Group Foster Home, Inc.*, 183 F.3d 468, 474 (6th Cir. 1999) (circumstances warranted a finding of willfulness where Company "had been investigated for violations twice in the past, paid unpaid overtime wages, received explanations of what was required to comply with the Act, and assured the DOL that [it] would comply in the future").[21]

Plaintiffs simply cannot point to any evidence here that Defendants committed a willful violation of the FLSA. Rather, the undisputed evidence establishes that Defendants had a good faith basis, in both law and fact, for believing its conduct <u>did not</u>—and does not— violate, the FLSA. Specifically, the evidence establishes that, when treating Plaintiffs as independent contractors or otherwise exempt, Defendants relied on several things, including: (1) judicial decisions upholding the model[22] as one of independent contractor or as otherwise exempt under the motor carrier or outside sales exemptions (SUMF ¶¶ 56-62, 64), (2) agency and judicial decisions upholding the independent contractor models of various others in the baking industry and industry practice (*Id.* ¶ 62), and (3) audits of the IRS confirming the propriety of common law independent contractor status (*Id.* ¶ 63). <u>Any one of these factors, standing alone, would be sufficient to avoid a willful violation.</u>[23]

---

[21] *See also Martin v. Deiriggi*, 985 F.2d 129, 136 (4th Cir. 1992)(upholding district court's finding of willfulness where there was credible evidence that the company "had destroyed some records and withheld others in order to impede the Department [of Labor]'s investigation"); *Cubias v. Casa Furniture & Bedding*, LLC, No. 06CV386, 2007 WL 150973 *3 (E.D.Va. 2007) (company's conduct was willful where it engaged in "a deliberate scheme to evade the FLSA's overtime requirements" by splitting employees' hours between two companies' books).

[22] These decisions involved other subsidiaries of Flowers that use the same distributor model.

[23] The Company's significant efforts, through training and otherwise, to uphold the integrity of the independent contractor model likewise strongly militate against a finding of willfulness here. *See, e.g., Saxton v. Young*, 479 F. Supp. 2d 1243, 1254 (N.D. Ala. 2007) (two year limitations period applies where records shows company took affirmative steps to comply with FLSA requirements).

34

With similar facts, courts routinely find willfulness is not established and a two—and not three—year statute of limitations governs. *See, e.g., Pamieri v. Nynex Long Distance Co.*, No. Civ. 04-128PS, 2005 WL 767170, at *10 (D. Me. Mar. 28, 2005) (plaintiff failed to establish company acted reckless or unreasonably, so as to extend statute of limitations, when company was aware of studies showing individuals in plaintiff's position to be "universally exempt" and believes plaintiff fit within the contours of the sales exemption); *Lipnicki v. Meritage Homes Corp.*, No. 3:10-cv-605, 2014 WL 923524, at *10-11 (S.D. Tex. Feb. 13, 2014) ("Because [defendant] relied on the FLSA letters and [a prior case in classifying plaintiffs as exempt], together with its knowledge of its salespeople's training and expected job duties, the Court concludes that it is entitled to judgment as a matter of law on the willfulness issue.")

Defendants are entitled to judgment as a matter of law on this issue accordingly, and Plaintiffs' claims should be limited to a two-year statutory period, with two—and not three—years of overtime potentially recoverable. Moreover, in light of this, the claims of any Plaintiff that fall outside of the two-year statutory period must be dismissed. It is well-established that an FLSA action is deemed commenced when the complaint is filed, if the plaintiff is a named party, or when the opt-in consent is filed. *Hantz,* 11 F. Supp.3d at 617. Here, Plaintiff Helms, Long and Gillelan all filed their opt-in consents, and thus commenced their claims against Defendants, well outside of the two-year statutory period and closer to three years after they ended their distributor relationship with Flowers/Jamestown. (SUMF ¶¶ 243, 366, 425). As such, their claims should be dismissed as a matter of law, and summary judgment for Defendants must be granted.

**D. Defendants' Good Faith Precludes An Award of Liquidated Damages**

Summary judgment for Defendants is also appropriate on the issue of liquidated damages under the FLSA. Under the FLSA, if "the employer shows . . . that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or

omission . . . was not a violation of the [FLSA] . . . the court may, in its sound discretion, award no liquidated damages." 29 U.S.C. § 260. To avoid the imposition of liquidated damages under the FLSA, "[t]he employer bears 'the plain and substantial burden of persuading the court by proof that his failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict.'" *Brown v. Nipper Auto Parts & Supplies, Inc.*, No. 7:08cv00521, 2009 WL 1437836, at *4 (W.D. Va. May 21, 2009 (citing *Burnley v. Short*, 730 F.2d 136, 140 (4th Cir. 1984)). Thus, the employer must demonstrate that it acted in good faith and that its actions were objectively reasonable. *See Burnley*, 730 F.2d at 141-42 (Winter, C.J., concurring and dissenting) (noting that Fourth Circuit precedent establishes such a two-prong test to excuse liability from liquidated damages).

Here, the undisputed facts establish that Defendants had an honest intention to ascertain and follow the FLSA and acted in good faith. Specifically, as discussed *infra*, when treating Plaintiffs as exempt (as independent contractors or, alternatively, exempt under the outside sales or motor carrier exemptions), Defendants relied on and/or acted in accordance with judicial and agency decisions upholding both the independent contractor model used by Flowers/Jamestown and others in the industry, as well as judicial decisions or orders upholding the application of or recognizing the validity of the exemptions to distributors in El Paso and Miami. Such actions are more than sufficient to establish that Defendants acted in good faith and had an honest intention to ascertain and follow the FLSA. *See Zachary v. ResCare Okla., Inc.*, 471 F. Supp. 2d 1183, 1193 (N.D. Okla. 2006) (internal analysis of judicial decisions sufficient to establish honest intention to ascertain and follow the dictates of the Fair Labor Standards Act); *Nelson v. Alabama Inst. For Deaf & Blind*, 896 F. Supp. 1108, 1115 (N.D. Ala. 1995). Indeed, courts have

relied on much less when finding defendants satisfied this prong. *See also Stevenson v. The Great Am. Dream, Inc.*, No. 1:12-cv-03359-TWT, 2015 WL 2353094, at *3 (N.D. Ga. May 15, 2015). (relying, in part, on defendant's reliance on industry practice in determining that defendant's belief its compensation structure was consistent with the FLSA was in good faith). *See also Burnley*, 730 F.2d at 140 (sustaining district court's denial of liquidated damages where employer relied on information about the FLSA in the monthly newsletter from the Virginia Motel Association).

Indeed, the very nature of the claim at issue here—independent contractor misclassification—weighs against liquidated damages. The *Stevenson* case is illustrative. *Stevenson v. The Great Am. Dream, Inc.*, No. 1:12-cv-03359-TWT, 2015 WL 2353094 (N.D. Ga. May 15, 2015). There, when deciding whether liquidated damages were appropriate in a similar misclassification case, the Court reasoned that "given the amorphous nature of the term 'employee,' the Court is reluctant to conclude that [defendant's] belief – that [plaintiff's] were not 'employees' under the FLSA – was objectively unreasonable." (*Id.* at *3). In light of this, the court ultimately granted defendant's motion for summary judgment on the issue of good faith and willfulness. (*Id.).* The facts of this case are even stronger because the independent contractor model under which Plaintiffs operate has, in fact, been upheld as one of independent contractor. (SUMF ¶¶ 62-63). Notably, Defendants' actions stand in sharp contrast to the actions of employers in cases where the courts have found an award of liquidated damages proper. *See e.g., Richard v. Marriott Corp.*, 549 F.2d 303, 305 (4th Cir. 1977) (awarding liquidated damages where employer had been made aware through an opinion letter issued by the Wage and Hour Administrator that its pay practices were illegal, and decided to take a chance), *cert denied*, 433 U.S. 915 (1977); *Marshall v. Brunner*, 668 F.2d 748, 753-54 (3d Cir. 1982) (award of liquidated

damages where employer deliberately circumvented FLSA requirements after Wage and Hour Division investigation).

In light of these facts, which Plaintiffs cannot controvert, summary judgment for Defendants on the issue of liquidated damages is appropriate and the Court should find they are not entitled to such damages as a matter of law. For the same reasons, liquidated damages should be denied, as a matter of law, under the NCWHA.[24]

## IV. SUMMARY JUDGMENT ON SOME PLAINTIFFS' NCWHA CLAIMS IS APPROPRIATE

Summary judgment for the North Carolina claims is also appropriate to the extent the North Carolina Plaintiffs: (1) signed a release of claims;[25] and (2) they contractually waived their right to liquidated damages under the Distributor Agreement.

### A. Certain North Carolina Plaintiffs Released Their NCWHA Claims

In North Carolina, "[w]hen a release is executed in exchange for valuable consideration, the release provides a complete defense to an action for damages." *VF Jeanswear Ltd. P'ship v. Molina,* 320 F. Supp.2d 412, 418-419 (M.D.N.C. 2004). The plain provisions of the release are also sufficient to bar any claims, including claims under the NCWHA, which can be effectively released as a matter of law. *Simontacchi v. Invensys, Inc.,* No. 05cv283, 2008 U.S. Dist. LEXIS 5413, at *45 (W.D.N.C. Jan. 11, 2008). Here, over 70 individuals in the North Carolina class signed releases of claims when they sold their distributorships back to the company. (SUMF ¶

---

[24] Section 95-25.22 of the North Carolina General Statutes provides that "if the employer shows to the satisfaction of the court that the act or omission constituting the violation was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this Article, the court may, in its discretion, award no liquidated damages or may award any amount of liquidated damages not exceeding the amount found due as provided in subsection (a) of this section." N.C. Gen. Stat. § 95-25.22. The determination of whether "good faith" is satisfied here is a matter of law for the court. *See Mason v. ILS Tech., LLC,* No. 04-CV-139, 2007 WL 1101224, at *6 (W.D.N.C. Apr. 11, 2007) (use of phrase "the court" in § 95-25.22(a1) indicates determination of good faith is for trial judge). Good faith is established "if 'the employer had reasonable grounds for believing that the act or omission was not a violation of this Article.'" *Luke v. Omega Consulting Group, LC,* 670 S.E.2d 604, 610 (N.C. Ct. 2009). This is clearly satisfied here.

[25] Defendants are not contending that the release bars any portion of Plaintiffs' FLSA claims.

38

67). These releases were supported by adequate consideration because the company repurchased these distributorships for significant monies and were not legally obligated to do so. The releases are also mutual. (*Id.*). In light of these facts, the NCWHA claims of the North Carolina Jamestown distributors who signed releases of claims must be dismissed.

**B. Plaintiffs' Are Not Entitled to Liquidated Damages Pursuant to Their Distributor Agreements**

Summary judgment is also appropriate to the extent Plaintiffs in the North Carolina class seek liquidated damages and explicitly waived their right to them.[26] *See United Labs., Inc. v. Kukendall*, 437 S.E.2d 374, 381 n.6 (N.C. 1993) ("Any right, whether statutory or constitutional, ordinarily may be waived by the party entitled to it.").

Specifically, 203 distributors in the North Carolina class signed distributor agreements containing the following limitation of damages provision:

> 20.12 **Damages**:  Neither party shall be liable to the other for, and each party expressly waives, any consequential, incidental, special, exemplary or punitive damages.

This is a clear and unambiguous statement of intent to waive certain remedies. These types of provisions have typically been upheld in North Carolina.[27] Specifically, in *United Labs*, the Supreme Court of North Carolina stated that it sees "no reason why a plaintiff . . . may not waive the right to recover treble damages and elect instead . . . to recover untrebled compensatory damages," even where the relevant statute "gives the plaintiff an absolute right to treble damages." *Id.* Such reasoning equally applies here, and the Court should find that the 183 individuals who signed the agreement waiving liquidated damages is not entitled to them as a matter of law, assuming their claims are not otherwise dismissed on other grounds.

---

[26] The NCWHA provides for a doubling of damages as "liquidated damages." N.C. Gen. Stat. § 95-25.

[27] Defendants acknowledge Plaintiffs cannot waive their right to liquidated damages under the FLSA absent court or DOL approval.

## V. __CONCLUSION__

For the reasons set forth above, Defendants respectfully request that the Court grant their

Motion for Summary Judgment.

Dated this 5th day of June, 2015.

Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.

/s/ Margaret Santen Hanrahan
Margaret Santen Hanrahan (GA Bar No. 578314)
(Admitted *Pro Hac Vice*)
Kevin P. Hishta (GA Bar No. 357410)
(Admitted *Pro Hac Vice*)
A. Craig Cleland (GA Bar No. 129825)
(Admitted *Pro Hac Vice*)
One Ninety One Peachtree Tower
191 Peachtree St. NE, Suite 4800
Atlanta, GA 30303
Telephone: 404.881.1300
Facsimile: 404.870.1732
kevin.hishta@ogletreedeakins.com
maggie.hanrahan@ogletreedeakins.com
craig.cleland@ogletreedeakins.com

Benjamin R. Holland (N.C. Bar No. 28580)
201 South College Street, Suite 2300
Charlotte, NC 28244
Telephone: 704.405.3135
Fax: 704.342.4379
E-Mail: ben.holland@ogletreedeakins.com
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed this **DEFENDANTS'**
**MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**
with the Clerk of Court using the CM/ECF system, which will send notification of the filing to
the following persons:

| | |
|---|---|
| Ann Groninger | Shawn J. Wanta |
| Copeley Johnson & Groninger, PLLC | Baillon Thome Jozwiak & Wanta LLP |
| 225 East Worthington Avenue | 100 South  Fifth Street, Suite 1200 |
| Charlotte, NC 28203 | Minneapolis, Minnesota 55402 |
| ann@cjglawfirm.com | sjwanta@baillonthome.com |

Dated this 5th day of June, 2015.

OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.

/s/ Margaret Santen Hanrahan
Margaret Santen Hanrahan
GA Bar No. 578314
(Admitted *Pro Hac Vice*)
 One Ninety One Peachtree Tower
 191 Peachtree St. NE, Suite 4800
 Atlanta, GA  30303
 Telephone:  404.881.1300
 Facsimile:  404.870.1732
 maggie.hanrahan@ogletreedeakins.com

Benjamin R. Holland
N.C. Bar No. 28580
201 South College Street, Suite 2300
Charlotte, NC 28244
Telephone: 704.405.3135
Fax: 704.342.4379
E-Mail: ben.holland@ogletreedeakins.com
*Attorneys for Defendants*