**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| SCOTT REHBERG, WILLARD ALLEN RILEY, and MARIO RONCHETTI, individually and behalf of all similarly situated individuals, <br><br> Plaintiffs, <br><br> v. <br><br> FLOWERS FOODS, INC. and FLOWERS BAKING CO. OF JAMESTOWN, LLC, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. 3:12-cv-00596-MOC-DSC |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR AN ORDER TO PROTECT THE CLASS AND FAIR CONDUCT OF THIS ACTION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(d) REGULATING COMMUNICATIONS WITH MEMBERS OF THE CLASS

COME NOW Defendants Flowers Foods, Inc. ("Flowers Foods") and Flowers Baking Co. of Jamestown, LLC ("Flowers/Jamestown") (collectively referred to as "Defendants"), by and through their undersigned counsel, and file this Response in Opposition to Plaintiffs' Motion for an Order to Protect the Class and Fair Conduct of This Action Pursuant to Federal Rule of Civil Procedure 23(d) Regulating Communications with Members of the Class.

## I. INTRODUCTION

Plaintiffs are independent distributors who, when initially signing their Distributor Agreements, explicitly agreed to sign a release of claims if and when they sell their distributorships or distribution rights. This practice, which is standard in the franchise context, has been well known to Plaintiffs' counsel for years. In fact, *for more than two years now,* Defendants' counsel has been communicating with Plaintiffs' counsel regarding release language for several named Plaintiffs and opt-in Plaintiffs—the only individuals who were considered "represented parties" at the time. What is more, Plaintiffs' counsel *specifically approved* the

releases and, in fact, *personally negotiated* some of the release language. Moreover, at no point did Plaintiffs' counsel ever even raise the issue of releases being presented to non-represented parties. Despite their approval of numerous releases and silence with respect to non-represented, putative class members, Plaintiffs' counsel now asks the Court to invalidate all releases signed by North Carolina distributors at any time since January 24, 2011, which is more than a year and a half before this lawsuit was even filed and four years before the class was ever certified. They also ask the Court to order Defendants to stop their standard business practice of presenting releases to departing distributors and for a curative notice to be sent to all 230+ in the class, whether they signed a release or not, to "remedy the harm" caused by these alleged improper communications. In support of this request, Plaintiffs offer only two bare-bones declarations, one of which is from a distributor who left the Company more than three years ago, and conclusory testimony from Rehberg that all class members were "scared" to join the litigation. Plaintiffs' "evidence" comes nowhere close to establishing the requisite "clear record" and "specific findings" of impropriety necessary to warrant the drastic relief they seek here—including whole-scale invalidation of over 70 releases, some or many of which the class members may not actually want to invalidate. For these and other reasons discussed below, the majority of relief Plaintiffs seek here, to the extent they have not waived their right to seek it (and they have), is improper, devoid of factual or legal support, and must be denied.

Alternatively, as discussed below, Defendants will agree to a notice to: (1) the nine class members who signed releases after the NC class was certified; and (2) distributors who are asked to sign a release moving forward, now that the class has been certified. Defendants will also agree to send a notice to those class members who have signed a release since the lawsuit was filed informing them of their right to petition the Court to seek invalidation of the release if they

contend they entered into it "unknowingly" or under duress, with appropriate evidence supporting the same to be presented in an appropriate evidentiary hearing.

## II. BACKGROUND

### A. Plaintiffs' Distributorships and Agreement to Sign a Release Upon Conveyances of Distribution Rights

Plaintiffs are comprised of current and former independent contractor distributors who entered into Distributor Agreements with Flowers/Jamestown under which they agreed to perform services as independent contractors. Before signing these agreements, distributors are given the opportunity to have the agreement reviewed by a lawyer or accountant. (Keistler Dep. 20:13-25; Ct. Doc. No. 113-2, pp. 4-5, 31). Because distributors are treated as traditional franchisees, at the inception of the relationship, distributors also receive a Franchise Disclosure Document ("FDD"), which provides specific disclosures required by law regarding the franchise opportunity, costs involved, and other factors. (Chuck Rich Dep. Vol. II: 270: 22 – 273:5.).[1]

Plaintiffs purchase distribution rights to sell and distribute products in a defined territory and can—and do—build equity in their distributorships. (Ct. Doc. No. 117-17, Ex. B, pp. 3-4; Ct. Doc. No.32-2, Ex. B, pp. 5-6; Ct. Doc. No. 117, p. 12). Plaintiffs can also buy and sell portions of their distribution rights or sell their distribution rights in their entirety. (*Id.*). Plaintiffs admit they can make between $34,000 and $50,000 or more from one partial territory sale alone. (Ct. Doc. No. 113-40, pp. 10-15, 21; Ct. Doc. No. 113-16, pp. 35, 53; Ct. Doc. No. 113-17, pp. 44-45). Distributors can either sell these distribution rights back to the Company or locate and sell to a third-party purchaser, as Plaintiff Rehberg and Easley have done. (Ct. Doc. No. 117, p. 12 and testimony cited therein).

---

[1] This testimony is attached hereto as Attachment 14 to the Declaration of Margaret Hanrahan.

The Distributor Agreement that Jamestown distributors sign contains a provision governing the transfer or sale of distribution rights. In the Agreement, as Plaintiffs acknowledge, distributors agree to "execute . . . a general release of claims, in the event of any sale, conveyance or assignment, including any sale, conveyance or assignment to [Flowers/Jamestown]." (Ct. Doc. No. 107-1, p. 8). Likewise, the Company is obligated to concurrently execute a general release of claims as to the distributor.

The Agreement also contains various contract termination provisions, including a provision entitled "Actions Following Termination." (_Id. p. 10). This provision provides for similar mutual releases:

> If this Agreement is terminated under either Section 16.2 (Non-Curable Breach) or 16.3 (Curable Breach), COMPANY within the limits of its ability to do so, will operate the business for the account of DISTRIBUTOR, deducting its reasonable expenses in connection with the operation thereof, and sell DISTRIBUTOR'S Distribution Rights to a qualified purchaser at the best price which can reasonably be obtained after proper notice and advertisement. Such sale shall be for the account of the terminated DISTRIBUTOR, and the proceeds of such sale, after deducting therefrom any monies owed by DISTRIBUTOR to COMPANY, the amount of any outstanding liens, any other known liabilities . . . and the reasonable costs incurred in effecting the sale, shall be turned over to DISTRIBUTOR in exchange for the release of DISTRIBUTOR'S Distribution Rights and interests under this Agreement, together with a general release of claims. COMPANY will concurrently execute a general release of claims as to DISTRIBUTOR, except for any claim for monies due and owing COMPANY.

Id.

From September 12, 2010 to the beginning of June 2015, over 70 individuals have sold their distributorships back to the Company or to a third party and signed these releases. (Ct. Doc. No. 148, SUMF ¶ 67). Nine individuals signed full releases after the class was certified on March 25, 2015. (Ct. Doc. No. 146-82, p. 3 & Att. 2, pp. 10-11). The Company, in turn, executed such releases as to claims against these distributors.

4

## B.   Pertinent Procedural Background

On January 24, 2011, Plaintiffs' counsel, who indicated he was representing Scott Rehberg, sent Defendants' counsel a letter threatening class-wide litigation asserting claims for unpaid wages and illegal wage deductions, among others. (Ct. Doc. No. 150-1, Ex. A). Plaintiffs, however, did not ultimately file their lawsuit until September 10, 2012. (Ct. Doc. No. 1). Plaintiffs base their claims on alleged misclassification as independent contractors.  (*Id.*).

Following some preliminary discovery, on March 22, 2013, the Court granted Plaintiffs' Motion for Conditional Certification, and notice was sent to members of the FLSA class. (Ct. Doc. No. 38). By the end of the opt-in period, and following the dismissal of various opt-ins' claims, 21 FLSA Plaintiffs remained.[2] Following the opt-in period, the parties engaged in substantial discovery. Plaintiffs ultimately moved for class certification on November 3, 2014, and, after extensive briefing, the Court granted class certification of their North Carolina claims on March 24, 2015. (Ct. Doc. No. 129). There are over 230 distributors in the North Carolina class. (Ct. Doc. No. 146-82, ¶ 5, p. 2). On June 16, 2015, after counsel for both parties negotiated and agreed upon the language for a draft class notice, the Court approved the class notice for the NCWHA claim. (Ct. Doc. No. 155). The parties are in the process of exchanging an updated class list for purposes of transmitting the class notice, and the notice has not been sent yet.[3]

---

[2] As discussed below, the only individuals considered "Plaintiffs" prior to the class certification decision were the named Plaintiffs and those who had opted in to the FLSA action.

[3] These releases were also discussed extensively in the class certification briefing and hearing, and Plaintiffs failed to raise the validity of the releases then.

5

**C. Plaintiffs' Counsel's Knowledge of Defendants' Release Practices and Substantial Involvement in Negotiating and Approving Multiple Releases**

Throughout this litigation, various Plaintiffs have sold their distribution rights—in whole or in part—receiving significant consideration in exchange for the same. (Ct. Doc. No. 111-2, § I(B), pp. 19-21; Ct. Doc. No. 111-4, ¶ 5). Prior to the class certification decision, for each FLSA Plaintiff, Defendants' counsel sent Plaintiffs' counsel a copy of the release in advance, informed them that the Company was going to present the release to the applicable Plaintiff for signature, and asked Plaintiffs' counsel to approve the same. (Declaration of Margaret Hanrahan, attached as Exhibit A, ¶¶ 3-14 & Atts. 1a-12b). This dialogue with Plaintiffs' counsel about these releases began in the Spring of 2013, *more than two years ago now*, when Defendants' counsel sent Plaintiffs' counsel a draft release for Mr. Shillinglaw, who had retained separate counsel at the time. (*Id.* ¶ 3 & Att. 1a-c). **In total, Plaintiffs' counsel has reviewed, revised and approved fifteen different release agreements for Plaintiffs, including Rehberg.** (*Id.* ¶¶ 3-14 & Atts. 1a-12b). Some Plaintiffs, like Riley, ultimately decided not to sign them. (*Id.* ¶ 10, Att. 8d).

Despite full knowledge of this practice, at no time did Plaintiffs' counsel challenge Defendants' general use of the releases or seek this Court's intervention regarding the same until Plaintiffs filed the instant Motion on June 8, 2015. What is more, during deposition, several Plaintiffs acknowledged that they entered into these releases voluntarily and received considerable monies in exchange for the same. Glavey, for example, admitted that he sold a portion of his territory to "reduce the number of stops" he had and that he pocketed close to $50,000 in connection with that sale. (Ct. Doc. No. 113-16, p. 35; Ct. Doc. No. 113-17, p. 44; Ct. Doc. No. 113-18, pp. 2-3. *See also* Ct. Doc. No. 113-16, p. 53; Ct. Doc. No. 113-17, pp. 44-45 [Glavey admitting that he voluntarily made the decision to sell parts of his territory on several occasions].). Named Plaintiff Rehberg openly admitted that he had the opportunity to discuss the

6

release with his lawyer. (Ct. Doc. No. 113-34, pp.30-33, 85-87 & Ex. 8). Several others also testified that they signed the releases voluntarily. *See, e.g.,* Helms Dep. 60: 3-13, Ex. 5; Lanham Dep. 92:3-93:5; Grant Dep. 59:24-61:14, Ex. 7 (same).

### D. Plaintiffs' Motion to Invalidate All Releases, Send a Curative Notice to Over 230 Class Members, and Force Defendants to Stop the Standard Business Practice

Despite full knowledge of this release requirement for over two years, if not more, Plaintiffs' counsel now asks the Court to order Defendants to: (1) stop their standard business practice of presenting releases to distributors, even though distributors agree to execute them under these circumstances when initially signing their distributor agreements; (2) prepare and send a supplemental notice to all 230+ class members, whether they were ever asked to sign a release or not, to "remedy the harm" caused by Defendants' "improper communications;" (3) provide a copy of the curative notice to Class Members and their counsel before any additional releases are executed; (4) identify any individuals who signed releases after filing the class action;[4] and (5) void all releases, including the ones Plaintiffs' counsel specifically approved, from January 24, 2011—more than a year and a half before the lawsuit was ever filed and more than four years before class certification—to the present. (Ct. Doc. No. 150, pp. 1-2).

In their Motion, Plaintiffs claim that the releases are misleading and coercive, that Defendants have "threatened to retaliate against Class Members' jobs for opting-in to the FLSA collective group,"[5] and that "this conduct led to the filing of [the instant Motion]." (Ct. Doc. No. 150, p. 4).[6] In support of this Motion, Plaintiffs offer only: (1) the release language itself; (2)

---

[4] The list of individuals who signed releases through the end of May 2015 has been provided and was attached to Ron Chandler's Declaration (Ct. Doc. No. 146-82). A few others have signed releases since that time. Defendants are willing to provide a list of those additional individuals to Plaintiffs.

[5] The opt-in period expired in 2013.

[6] As discussed above, Defendants do not object to sending certain supplemental notices. However, Plaintiffs have not—and cannot—establish that invaliding all releases, sending a notice to all 230+ North Carolina class members, including those that may not have ever signed a release, and ordering Defendants to stop presenting releases to distributors in the future is appropriate.

7

declarations from two of the over 230 class members, one of whom has not even worked for the company since 2012 (Ct. Doc. No. 150-3, Ex. B and 150-4, Ex. C), and a lone cite to Rehberg's deposition, who also has not been a distributor in several years, that "they're all scared to join the litigation." (Ct. Doc. No. 145-1, p. 17).

## III. DISCUSSION

When determining whether a limitation on communications with class members is required, the court "only should consider "the narrowest possible relief" "that limits speech as little as possible, consistent with the rights of the parties under the circumstances." *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 102 (1981). As Plaintiffs acknowledge, any order regulating communications with class members must "be based on a **clear record** and **specific findings** that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Id.* at 101 (emphasis added). Plaintiffs' Motion here comes nowhere close to meeting this burden. The relief they seek pursuant to Fed. R. Civ. Pro. 23(d) must be denied accordingly.

### A. Plaintiffs Have Waived Their Right to Challenge the Releases.

Preliminarily, the requested relief Plaintiffs seek now must fail because Plaintiffs, through their counsel's knowledge of and substantial participation in revising and approving the release language with numerous Plaintiffs, have waived their right to challenge it now. This is not a case where Plaintiffs' counsel has just learned that distributors are asked to sign releases when selling their distribution rights and are timely challenging this practice with the Court. Rather, Plaintiffs' counsel has known about this practice for well over two years now, if not well before, has never questioned it before now, and has, in fact, *actively participated* in reviewing, revising and negotiating language for fifteen different releases, including Rehberg. (Hanrahan Decl. ¶¶ 3-4 & Att. 1a-12b). Their attempts to challenge these releases now, at the twenty-fifth hour, must fail.

Indeed, in North Carolina, this type of conduct falls squarely within the waiver box. *McNally v. Allstate Ins. Co.,* 544 S.E.2d 807, 810 (N.C. Ct. App. 2001) (finding that when a party has clear knowledge of a right, benefit or practice and, with full knowledge of that the material facts "forebears the doing of something inconsistent with the existence of the right," waiver has occurred). *See also Guerry v. Am. Trust Co.,* 68 S.E.2d 272, 275 (N.C. 1951) ("Where a person with full knowledge of all the essential facts dispenses with the performance of something which he has the right to exact, he therefore waives his rights to later insist upon a performance."). The same principle must apply here.

**B.  Absent a Court Order Providing Otherwise, Which Did Not Exist, Defendants Were Free to Present Releases to Putative Class Members Prior to Class Certification.**

Even if the Court finds that Plaintiffs have not waived their right to challenge the releases now, Plaintiffs' requested relief also fails because it is based on the (incorrect) premise that, even absent a court order, Defendants are not permitted to communicate with putative class members regarding releases prior to class certification. This is wrong as a matter of law.

It is well-established that absent a court order to the contrary, defendants are permitted to contact putative class members regarding release agreements prior to class certification.  This is because, contrary to Plaintiffs' assertions, putative class members prior to certification are not considered "represented parties." *See McLaughlin on Class Actions 11:1* (11th ed.) (updated November 2014) ("The majority rule is that while named plaintiffs are client of counsel precertification, absent class members are not represented parties prior to class certification and the expiration of any opt-out period, and thus the ethical rules governing communications with represented parties nor the attorney-client privilege, are applicable precertification.").[7] *See also*

---

[7] *See also Fisher v. Flue-Cured Tobacco Coop. Stabilization Corp.,* No. 05CVS1938, 2005 WL 5191291 (N.C. Super May 5, 2005) (explaining that counsel may communicate with prospective class members "with whom a party

MODEL CODE OF PROF'L RESPONSIBILTY EC 7.3 (Am. Bar Ass'n 2015) and ABA Comm'n on Ethics & Prof'l Responsibility, Formal Op. 07-445 (2007) ("putative class members are not represented parties for purposes of the Model Rules").[8] In fact, in interpreting Rule 7.3, the ABA Standing Committee on Ethics & Professional Responsibility explained: "A client-lawyer relationship with a potential member of the class <u>does not begin until the class has been certified and the time for opting out</u> by a potential member of the class <u>has expired</u>." ABA Comm'n on Ethics & Prof'l Responsibility, Formal Op. 07-445. Courts in North Carolina routinely look to the ABA Rules for guidance when interpreting the NC ethical rules because the NC ethical rules are modeled after the ABA model rules. *Sea-Roy Corp. v. Sunbelt Equip. & Rentals, Inc.,* 172 F.R.D. 179, 183-84 (M.D.N.C. 1997) (explaining the NC Rules are "patterned after" the ABA's Model Rules and "the Court may look to … widely accepted national codes of conduct, such as the ABA Model Rules").

Indeed, even the cases cited by Plaintiffs recognize a company's right to present settlement offers directly to putative class members prior to certification. *See Jenifer v. Delaware Solid Waste Auth.,* No. CIV. A. 98-270MMS; CIV. A. 98-565MMS,1999 WL 117762, at *3 (D. Del. Feb. 25, 1999) ("[B]efore a class action is certified, it will ordinarily not be deemed inappropriate for a defendant to seek to settle individual claims."). *See also Kay Co., LLC v. Equitable Prod. Co.,* 246 F.R.D. 260, 263 (S.D.W.Va. 2007) ("Courts have recognized that, generally, a defendant may discuss settlement offers with putative class members prior to class

---

has an ongoing business relationship" and "the provisions of Rule 4.2 of the North Carolina Rules … do not prohibit such contact by Defendants' counsel."); *Slavinski v. Columbia Ass'n,* No. CCB-08-890, 2011 WL 1310256, at *3 (D. Md. Mar. 30, 2011) (because the employees had not opted-in yet, and there was no court order limiting contact, defense counsel was free to communicate with putative class members); *Brown v. Mustang Sally's Spirits & Grill, Inc.,* No. 12–CV–529S, 2012 WL 4764585, at *2 (W.D.N.Y. Oct. 5, 2012) ("There is nothing inherently improper about a party's communication with potential class members prior to certification."); *Vallone v. CNA Fin. Corp.,* No. 98C7108, 2002 WL 1726524, *1 (N.D. Ill. March 19, 2002) (attorney-client privilege did not attach between putative class counsel and putative class members).
[8] Rule 7.3 of both the NC Rules and the ABA Model Rules pertains to direct contact with prospective clients, including putative class members.

certification."); *Christensen v. Kiewit-Murdock Inv. Corp.,* 815 F.2d 206, 213 (2d Cir. 1987) ("[P]rior to class certification, defendants do not violate Rule 23(e) by negotiating settlements with potential members of a class."); *Jones v. Jeld-Wen, Inc*., 250 F.R.D. 554, 563 (S.D. Fla. 2008) ("[A] defendant has a right to communicate settlement offers directly to putative class members").

While Plaintiffs claim that Defendants are obligated to treat class members as represented parties even prior to class certification (Ct. Doc. No. 150, p. 10), none of the authority they cite actually supports this proposition. For one, Plaintiffs' reliance on Rule 4.2 of the North Carolina Rules of Professional Conduct[9] is misplaced because Rule 4.2 governs communications with persons represented by counsel. And, as discussed above, putative class members are not considered "represented" parties until class certification.[10] For the few releases executed after class certification, Defendants have agreed to provide a curative notice. *Resnick v. American Dental Ass'n*, which Plaintiffs also cite, does nothing more to support Plaintiffs' position and, in fact, actually supports Defendants' position here. 95 F.R.D. 372, 376-77 (N.D. Ill. 1982) ("[**O**]**nce there is certification**, the defendant cannot have ex parte communications with potential class members.") (emphasis added). Importantly, in a footnote in *Resnick*, the court specifically states that before certification, the same restrictions do not apply "*because the potential class members are not yet 'represented' by counsel." Id.* at 376 n.6 (emphasis added). *Accord Jenifer,* 1999 WL 117762, at *3.

---

[9] *See* N.C. R. Bar Ch. 1, R.4.2 (2015) ("During the representation of a client, a lawyer shall not communicate about the subject matter of the representation with a person the lawyer knows to be represented by another lawyer in the matter…").

[10] The Fourth Circuit's articulation of a "sharp line of demarcation between an individual action *seeking to become* a class action and an *actual* class action" further supports the distinction between precertification and post-certification communications with putative class members. *Shelton v. Pargo, Inc.*, 582 F. 2d 1298, 1304 (4th Cir. 1978) (emphasis added).

11

**C. There Is Nothing Inherently Coercive or Misleading About Defendants' Standard Business Practice of Presenting Releases to Distributors.**

Further, contrary to what Plaintiffs ask the court to believe, there is nothing inherently coercive, misleading or deceptive about asking individuals to sign general releases when parting ways with the company. In fact, it is a pretty standard practice, particularly in the franchise context when franchisees are often asked to agree, in the franchise agreement, that they will sign a release of claims upon transfer or termination of the franchise. Further underscoring the fact that there is nothing inherently coercive, misleading or deceptive about this practice is the fact that the releases are mutual.[11]

Defendants recognize that limitations on communications with putative class members may be proper when the company makes a series of misrepresentations, specifically initiated in response to the lawsuit, in an attempt to thwart participation. Indeed, in many cases where the court imposed the type of restrictions the Plaintiffs seek here, that was the case. *See, e.g., Hampton Hardware, Inc. v. Cotter & Co., Inc.,*156 F.R.D. 630, 631-632 (N.D. Tex. 1994) (after the lawsuit was filed, defendants sent three letters to individual putative class members informing them that: (1) the lawsuit will "cost you precious dollars and us time from our mission"; (2) "[b]y not participating in this suit, you will help save your Company expense in dollars and time"; and (3) "[b]y asking you to join the class, [plaintiff] is asking you to sue yourself."). <u>No such threats were made here</u>. Rather, when selling their distributorships back to the Company, Defendants simply asked Plaintiffs to do what they already contractually agreed to do—*i.e.,* sign a general release. In circumstances like this, courts routinely reject plaintiffs' efforts to invalidate the releases based on the same arguments Plaintiffs make here.

---

[11] This release on the Company's part is consideration in addition to the monies paid for the distributorship.

The *Wells* case, rendered by the Fourth Circuit (in an unpublished decision) under substantially similar circumstances, is illustrative. *Wells v. Entre Computer Ctrs., Inc.,* 915 F.2d 1566 (1990). In *Wells,* plaintiffs were franchisees who owned computer stores. *Id.* at *1. At the inception of their relationship with the franchisor, the *Wells* plaintiffs, like Plaintiffs here, signed an agreement that required them to execute a general release of claims upon transfer of the franchise. *Id.* The *Wells* plaintiffs subsequently filed a lawsuit accusing the franchisor of fraud and breach of contractual and statutory duties, among other claims. *Id.* at *1. Defendants moved for summary judgment on the grounds that the franchisees executed agreements releasing defendants from liability. *Id.* In response, the franchisees advanced the same arguments advanced by Plaintiffs here, including that: (1) the releases were invalid because they were general releases and did not cover every claim that each franchisee asserted; and (2) they signed the releases under duress because if they did not sign them, they would be forced to keep a failing business and would continue to lose money. *See id.* at *3-6. <u>The court rejected both arguments</u>, awarding summary judgment to defendant, and the Fourth Circuit affirmed.

With regard to the first argument, the Fourth Circuit found the general release language, which was the "all-encompassing boilerplate that lawyers have used for generations" was sufficient to effectuate a waiver of the specific claims at issue, even though such claims were not specifically listed in the release itself. *Id.* at *4. The Fourth Circuit also rejected plaintiffs' arguments of duress, noting that the choice of signing the release and transferring a failing business or keeping the business while continuing to lose money on the business provided no valid basis for voiding the releases. *See id.* at *5-6.[12] Importantly, however, the Fourth Circuit found that even accepting plaintiffs' portrayal of the "dire financial circumstances" as true, "the

_____

[12] The court applied Texas law when deciding these issues but noted that they thought "it ma[de] no difference which state's law we apply." *Id.* at *3.

13

franchisees had expressly agreed in the franchise agreements, at a time when they were under no financial distress whatsoever, that they would not transfer the business without [the franchisor]'s consent, and that [the franchisor] had the right to condition its consent on the execution of a general release." *Id.* at *6. In light of this, the franchisor made no "wrongful threat" that destroyed the franchisee's free will when signing the release. Rather, the franchisor "only required the franchisees to do what they already had agreed to do," which the Court found not at all improper. *Id.*[13]

The *Bayshore Ford Truck v. Ford Motor Co.* case is also illustrative. Civil Action No. 99-741(JLL) 2009 WL 3817930 (D.N.J. Nov. 16, 2009), *reversed in part on unrelated ground by* 540 F. App'x 113 (3d Cir. 2012). In *Bayshore*, plaintiffs were dealers of heavy trucks who entered into service agreements with Ford to supply Ford products. *Id.* at *1. Like here, when entering into the service agreements with Ford initially, the dealers were informed that if they resigned and sought termination benefits, they would be required to sign a release. *Id.* at *7. Several dealers did, ultimately, sign release agreements. *Id.* The dealers subsequently filed a class action against defendants and the class was certified. Defendants moved for summary judgment on the claims of those dealers who signed release agreements with the company when accepting termination benefits. The dealers challenged the company's releases, making virtually identical arguments to those lodged by Plaintiffs here, including that: (1) the general releases were ambiguous and were not intended to cover the claims at issue in the lawsuit, and (2) that the releases violated Rule 23 of the Federal Rules of Civil Procedure. *Id.* at *8. In support of their second argument, like Plaintiffs here, the *Bayshore* plaintiffs argued that "Ford improperly

---

[13] Importantly, the court also found that the franchisor's consent to transfer the center was adequate consideration for the release. *Id.* at *6. The court further noted that while not dispositive, the fact that the franchisee's own counsel drafted the releases "certainly militates against their theories of duress and unconscionability." *Id.* at *4 n.4. The same reasoning applies here—at least to those releases Plaintiffs' counsel specifically approved.

obtained the releases via unsupervised, unilateral communications with putative class members, in order to diminish the size of the class and undermine the purposes behind the class action rule." *Id.* at *10.  The *Bayshore* plaintiffs also argued, like Plaintiffs here, that the fact that Ford and the dealers were in an "ongoing business relationship" rendered this unilateral communication "both abusive of Rule 23 and coercive." *Id.*  The court, like the Fourth Circuit in *Wells,* rejected this argument, reasoning that plaintiffs' argument "ignore[s] that the subject of a release in exchange for termination benefits was agreed to well before the current dispute arose." *Id.* The court also distinguished *Kleiner*, a case Plaintiffs cite and rely on here, finding that unlike in *Kleiner,* the releases here were negotiated as part of the original Agreements and that "it will ordinarily not be deemed inappropriate for a defendant to seek to settle individual claims" before a class action is certified. *Id.*  In light of this, the court found the releases were enforceable, rejected plaintiffs' attempts to challenge them under Rule 23, and upheld summary judgment for defendants. *Id.*

The same reasoning must apply here.  Even accepting Plaintiffs' unsupported allegations of "duress" as true, this is inapposite because when signing the release, Plaintiffs were only doing what they had previously agreed to do—when initially signing the Distributor Agreement. As the Fourth Circuit concluded in *Wells,* this is the dispositive inquiry here—not the circumstances underlying the signing of the actual release.[14]

---

[14] Moreover, Plaintiffs have not—and cannot—establish that they were subject to "duress" when signing the agreements as a matter of law. "To demonstrate the existence of duress, [plaintiff] must proffer evidence that [defendant's] conduct was unlawful or wrong, that [plaintiff] was coerced into signing the agreement, and that [plaintiff's] consent to the agreement was involuntary because [defendant] prevented [plaintiff] from exercising his free will." *VF Jeanswear Ltd P'Ship v. Molina*, 320 F. Supp. 2d 412, 421 (M.D.N.C. 2004).  In North Carolina, "[e]conomic duress arises from the **illegitimate** use of economic power **outside** the bounds of a contract or the law." *In re Maco Homes, Inc.,* 96 F.3d 1439, at *4 (4th Cir. 1996) (unpublished opinion) (emphasis added). Plaintiffs can show no such illegitimate use of economic power here. The mere fact that plaintiffs faced a "difficult choice" between signing a release and obtaining benefits or not signing is simply not sufficient to establish the type of duress necessary to invalidate the agreements here. *Superior Performers, Inc. v. Meaike,* No. 1:13CV1149,2014 WL 1412434, at *13 (M.D.N.C. Apr. 11, 2014) ("[T]hough Plaintiff's conduct . . . may have threatened Defendants'

15

**D. Plaintiffs' Scant "Evidence" Is Insufficient to Justify the Drastic Relief They Seek.**

Further, the scant "evidence" Plaintiffs attach in support of their Motion is certainly not sufficient to create the requisite "clear record and specific findings" necessary under *Gulf Oil* to justify the drastic relief they seek. 452 U.S. 89, 101-102. *Accord Ralph Oldsmobile v. Gen. Motors Corp.,* No. 99Civ4567(AGS), 2001 WL 1035132, at *2 (S.D.N.Y. 2001).[15] Here, Plaintiffs offer only the release at issue, which is valid on its face as discussed below, and two declarations, one of which is from someone who left the Company more than three years ago and both of which are conclusory and bereft of much, if any, detail whatsoever. Plaintiffs' "evidence" of "retaliation," which is based mostly on hearsay, does nothing more to substantiate their request for relief because the two limited statements they present relate to alleged retaliation during the opt-in period *over two years ago*. (Ct. Doc. No. 145-01, p. 17). The proper remedy for this alleged retaliation, if it occurred (which is denied), would have been to petition the court for a curative notice and an extension of the opt-in period *back in 2013*. Plaintiffs cannot simply sit on this "evidence" for two years and then attempt to use it to support their request for Rule 23(d) relief involving different claims. Indeed, in *Zamboni*, one of the cases cited and relied upon by plaintiffs, this is the exact relief the court ordered (*i.e.* required defendant to send a curative notice and extended the opt-in period). *Zamboni v. Pepe W. 48th St. LLC,* No. 12Civ.3157(AJN)(JCF), 2013 WL 978935, at *3 (S.D.N.Y. Mar. 12, 2013).[16]

---

ability to conduct business and earn a living, that alone falls short of depriving Defendants of the exercise of free will, as is required for duress.")

[15] Defendants acknowledge that some courts have found a specific record of actual abuse is not required when there is an "inherently coercive relationship" between the parties. **Even in those circumstances, however, a clear record of threatened abuse is required**. *Ralph Oldsmobile,* at *3. And, courts are split on whether an employer-employee relationship (what Plaintiff alleges exist here, which is denied) fits this description. *See id.* at *3n2. No such clear record—or actual or threatened abuses—exists here.

[16] Importantly, in *Zamboni*, the court conducted an evidentiary hearing before awarding the requested relief given the parties' contradictory presentation of the facts. *See id.* at *1. As discussed below, if the court here is inclined to consider Plaintiffs' request to invalidate any releases, it should do the same and hear specific evidence from each individual on the issue.

Moreover, any concerns of retaliation surrounding the NCWHA claims and that class notice, which Plaintiffs have not even specifically raised, have been appropriately addressed in the class notice itself:

> "It is unlawful for Flowers to take any adverse action against you because of your participation in this lawsuit. If someone from Flowers makes any threat to or takes adverse action against you or other distributors because of your participation of this lawsuit, please call the attorneys listed in paragraph 23 of this notice."

(Ct. Doc. No. 143-1).

Plaintiffs' counsel agreed to this language, and this notice has been approved. (Ct. Doc. No. 155).

Even the cases upon which Plaintiffs rely establish that the drastic relief they seek here is not appropriate. *Ralph Oldsmobile*, a case cited extensively by Plaintiffs, is a prime example. *See* 2001 WL 1035132, at *1. In this case, plaintiffs, like Plaintiffs here, were franchisees who filed a class action against the franchisor and signed release agreements when the franchisor discontinued the product line. *Id.* Plaintiffs subsequently, however, asked the court to invalidate the releases and order the company to stop presenting them to franchisees in the future. *Id.* The court denied both requests, finding that a curative notice was "sufficient to cure any potential unknowing waivers." *Id.* at *6-7. As the court in *Ralph Oldsmobile* aptly noted:

> Plaintiff's proposed relief, forbidding GM from entering into the agreements that include the release, is inappropriate. First, it is not warranted by the potential abuses. Requiring that notice be provided is sufficient to cure any potential unknowing waivers. *There is no way to completely eliminate the potential for coercion in the relationship between GM and its dealers. Courts cannot simply interpose themselves in the business relationship between a franchisor and franchisee each time a franchisee files a putative class action against the franchisor.* Notifying the dealers in this action, should, however, provide a reasonable measure of protection. Second, prohibiting GM from entering into further agreements would infringe upon GM's freedom of speech and upon GM's ability to conduct its business.

17

*Id.* at *6 (emphasis added). Even in *Jenifer,* the court refused to ban the company from offering the releases to putative class members in the future. 1999 WL 117762, at *8. Rather, the court merely required defendants to send a notice, before any putative class member signs a release, regarding the pendency of this action and that, by signing the release, they would forgo their right to participate in the litigation. *Id.* at *7.

Here, as discussed above, Defendants agree to send: (1) a curative notice to those distributors who signed releases after the class was certified,[17] (2) a notice to any distributors who are asked to sign releases in the future informing them of this litigation and impact of signing the release; and, if the Court deems necessary, (3) a notice to individuals who signed release agreements from the time the lawsuit was filed to the date of class certification informing them of their right to challenge their releases with the Court directly by petitioning the Court with appropriate evidence. This is more than sufficient to address any concerns here.

The *Ralph Oldsmobile* court also refused to invalidate the waivers, noting "there is nothing in the record indicating, one way or the other, what most of the dealers who signed the releases did or did not know about this action." *Id.* at *7. <u>The same is true here</u>. The court also noted that whole-scale invalidation of all releases was inappropriate because even if a dealer knew nothing about the action when he or she signed the release, the dealer may nonetheless want to ratify the release even after learning about the action. *See id.* As such, the appropriate solution was to include in the notice to class members a statement informing them that the court would consider an application to void a release by any dealer who signed one prior to receiving notice. *Id.* This

---

[17] For the nine individuals who signed releases after the NC class was certified, Defendants will agree to a notice that will inform Plaintiffs: (1) about the status of the action and claims asserted therein, (2) that they are members of the class; (3) how they may obtain more information about the case or contact Plaintiffs' counsel, and (4) that by signing the release, they have waived their NC claims and right to monetary relief and if they want to invalidate the release and return the consideration provided thereunder, they should contact Plaintiffs' counsel.

18

way, the court could consider the issue "with knowledge of the applicable facts and law" and "any dealer who wishes to settle will be able to maintain its release." *Id.*

This same reasoning and type of approach should be employed here. As *Ralph Oldsmobile* and *Jenifer* establish, the court simply cannot, as Plaintiffs ask the Court to do here, order Defendants to stop presenting releases to all class members and/or invalidate over 70 releases based on nothing more than two conclusory declarations. This approach would fly in the face of the Supreme Court's requirement, established in *Gulf Oil,* that any such limitations on communications be based on a "clear record" and "specific findings." Moreover, Plaintiffs' request to invalidate all of the releases ignores that some of the class members who signed releases, even assuming they did so "unknowingly" at the time, which is denied, may not want to invalidate them now.

The approach adopted by *Ralph Oldsmobile,* which Defendants also advocate, of allowing individuals who signed releases to petition the Court, if they want to invalidate the releases, with appropriate evidence showing they did not enter into them voluntarily or somehow felt coerced to sign them, along with a subsequent evidentiary hearing, is the approach the Court should adopt here. It strikes the appropriate balance between the rights of the class members to make knowing waivers and the rights of defendants to run their businesses without undue restrictions on free speech. And, this approach is *particularly important* in this case because some of the Plaintiffs testified, under oath, that they entered into these releases voluntarily. *See, e.g.,* Helms Dep. 60: 3-13, Ex. 5; Lanham Dep. 92:3-93:5; Grant Dep. 59:24-61:14, Ex. 7. Indeed, named Plaintiff Rehberg even admitted that he had the opportunity to discuss the release with his lawyer. (Ct. Doc. No. 113-34, pp.30-33, 85-87 & Ex. 8).[18]

---

[18] In fact, requiring an evidentiary hearing before imposing limitations on communication is a mechanism courts routinely employ to ensure, as *Gulf Oil* requires, that any limitations on communications are drawn carefully. *Gulf*

19

**E.  Releases of Claims Under the NCWHA Are Enforceable in North Carolina and Do Not Contravene Public Policy.**

Further, contrary to Plaintiffs' assertions, North Carolina law does not prohibit private releases of NCWHA claims, nor are general releases impermissible. Specifically, under North Carolina law, a general release of all claims, like we have here, acts as a bar to any claim covered by the time period of the release. Specific causes of action do not need to be listed. As the Fourth Circuit has aptly noted, "[t]he very nature of a general release is that the parties desire to settle all matters forever. A general release . . . not only settles enumerated specific differences, but claims 'of every kind or character, known or unknown.'" *Zandford v. Prudential-Bache Sec., Inc.,* 112 F.3d 723, 727 (4th Cir. 1997) (quoting *Virginia Impression Prods. Corp. v. SCM Corp.*, 448 F.2d 262, 265 (4th Cir. 1971)); *Nelson v. Montgomery*, No. 3:12-CV-699-DCK, 2014 WL 1571208, at *6 (W.D.N.C. Apr. 17, 2014) (agreeing that plaintiff's specific claims, "whether known or unknown, were subject to a valid global release and under North Carolina law forever barred").[19]

Claims under the NCWHA are no exception, and courts have routinely recognized a parties' right to waive them via a private release.  *See, e.g., Simontacchi v. Invensys, Inc., No.*, No. 3:05CV283, 2008 WL 141905, at *15 (W.D.N.C. Jan. 11, 2008) (holding "the claims raised by [plaintiff] for breach of the covenant of good faith and under the Wage and Hour Act must be dismissed because he released all such claims"); *Wynne v. P.C. Greenville Ltd. P'ship*, 190

---

*Oil*, 452 U.S. 89, 102. *See also e.g., Hammond v. City of Junction City, Kansas*, 167 F. Supp. 2d 1271, 1274 (D. Kan. 2001) (holding a hearing on motion for protective order regarding ex parte communications with putative class member); *Franklin v. City of Alexandria*, No.1:07-cv-01011, 2010 WL 3199796, at *1-2 (W.D. La Aug. 12, 2010) (holding a hearing wherein the court entertained arguments from counsel for both parties and took testimonial and documentary evidence concerning the merits of the motion to seek an order prohibiting counsel from contacting potential class members).

[19] *See also VF Jeanswear Ltd. P'ship v. Molina*, 320 F.Supp.2d 412, 419 (M.D.N.C. 2004) ("[w]hen a release is executed in exchange for valuable consideration, the release provides a complete defense to an action for damages"). *Accord Fin. Servs. of Raleigh, Inc. v. Barefoot,* 163 N.C.App. 387, 392-93, 594 S.E.2d 37, 41 (2004) (*quoting Jenkins v. Fields,* 240 N.C. 776, 778, 83 S.E.2d 908, 910 (1954)).

F.R.D. 399, 400 (E.D.N.C. 1998) (recognizing the grant of summary judgment to employer where plaintiff executed a release of claims provision, releasing wage claims under the NCWHA among other claims); Order granting, in part, Motion to Dismiss, *Johnson v. Hendrick Automotive Grp.*, No. 3:10-cv-00109 (W.D.N.C. Sept. 10, 2010), ECF No. 25 (dismissing plaintiff's NCWHA claim, and other claims, because the plaintiff had "relinquished rights" to those claims when he previously signed the release and settlement documents).

As these cases established, Plaintiffs' argument that the releases they signed are void as a matter of North Carolina law is false. Tellingly, Plaintiffs have failed to present any legal precedent or other governing North Carolina authority that holds or even suggests that a release of NCWHA claims is void or otherwise unenforceable. Rather, Plaintiffs urge this Court to rely on Illinois law and the FLSA to establish *new* precedent in North Carolina disallowing releases of claims under the NCWHA under the theory that such a release contravenes public policy. (*See* Ct. Doc. No. 150, pp. 14-17). Neither controls here.

First, unlike the requirement that the court or the U.S. Department of Labor supervise settlements/releases of FLSA claims, the NCWHA has no such provision, nor has the NCWHA ever been interpreted by a court to require pre-approval before a release of state wage claims may be enforced.[20] Plaintiffs themselves note that the North Carolina Administrative Code and case law recognize that there are certain circumstances when the NCWHA does not follow the FLSA. This is a prime example of one such circumstance. (Ct. Doc. No. 150, p. 16). Similarly, North Carolina's legislature did, in fact, expressly require pre-approval of release agreements involving claims under the Workers' Compensation Act and could have done the same for claims under the NCWHA. But, it has not done so.

---

[20] Defendants agree that Plaintiffs' release of claims under the NCWHA does not affect their ability to proceed with their FLSA claims.

Further, allowing settlements and/or releases of claims under the NCWHA falls in line with North Carolina's strong public policy favoring the compromise of disputes without resort to litigation. *Smith Architectural Metals, LLC v. Am. Railing Sys., Inc.,* 207 N.C. App. 151, 155, 698 S.E.2d 752, 755 (2010) (noting North Carolina's "sound public policy encouraging the settlement of disputes"); *Menard By & Through Menard v. Johnson*, 105 N.C. App. 70, 73, 411 S.E.2d 825, 827 (1992) ("it is well settled that North Carolina public policy encourages prompt settlement of disputed claims"); *York v. Westall*, 143 N.C. 276, 55 S.E. 724, 725 (1906) ("The rule is established that an agreement to compromise and settle disputed matters is valid and binding. The law favors the avoidance or adjustment of litigation, and a compromise made in good faith for such a purpose will be sustained as not only based upon a sufficient consideration but upon the highest consideration of public policy as well."); *Wynne,* 190 F.R.D. at 401 (release of NCWHA claims did not violate public policy).

Here, it is undisputed that various Plaintiffs signed agreements wherein they agreed to release Defendants from "any and all claims, actions, rights demands, or remedies, whether known or unknown, from the beginning of time until as of the moment they signed the release agreement arising out of, or relating to, the Distributor Agreement" (Ct. Doc. No. 150-1) in exchange for the stated consideration. (Hanrahan Decl. ¶¶ 3-14 & Atts. 1a-12b). It is also undisputed that Plaintiffs accepted and never returned the consideration provided to them in exchange for their release agreements.  By doing so, they are estopped from challenging the releases now, unless they return the consideration provided, which they have not offered to do. *See Johnson v. Hendrick Auto. Grp.,* No. 3:10-CV-109-W, 2011 WL 1696987, at *5 (W.D.N.C. May 3, 2011) *order amended on reconsideration,* No. 3:10-CV-109-W, 2011 WL 6032706 (W.D.N.C. Dec. 5, 2011) *aff'd,* 471 F. Appx. 192 (4th Cir. 2012) ("Defendant correctly argues

that by retaining the consideration provided to him, Plaintiff legally ratified the release of all other claims…").

## IV. CONCLUSION

As the discussion above establishes, Plaintiffs have waived their right to seek the relief they seek here. Even assuming otherwise, their request for relief pursuant to Rule 23(d) must nonetheless be denied because it is unsupported in fact or law. The Court should deny Plaintiffs' Motion accordingly.

Dated this 25th day of June, 2015.

Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.

/s/ Margaret Santen Hanrahan
Margaret Santen Hanrahan (GA Bar No. 578314)
(Admitted *Pro Hac Vice*)
Kevin P. Hishta (GA Bar No. 357410)
(Admitted *Pro Hac Vice*)
A. Craig Cleland (GA Bar No. 129825)
(Admitted *Pro Hac Vice*)
One Ninety One Peachtree Tower
191 Peachtree St. NE, Suite 4800
Atlanta, GA  30303
Telephone:  404.881.1300
Facsimile:  404.870.1732
kevin.hishta@ogletreedeakins.com
maggie.hanrahan@ogletreedeakins.com
craig.cleland@ogletreedeakins.com

Benjamin R. Holland (N.C. Bar No. 28580)
201 South College Street, Suite 2300
Charlotte, NC 28244
Telephone: 704.405.3135
Fax: 704.342.4379
E-Mail: ben.holland@ogletreedeakins.com
*Attorneys for Defendants*

23

# CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of the filing to the following persons:

| | |
|---|---|
| Ann Groninger | Shawn J. Wanta |
| Copeley Johnson & Groninger, PLLC | Baillon Thome Jozwiak & Wanta LLP |
| 225 East Worthington Avenue | 100 South Fifth Street, Suite 1200 |
| Charlotte, NC 28203 | Minneapolis, MN 55402 |
| ann@cjglawfirm.com | sjwanta@baillonthome.com |

Dated this 25th day of June, 2015.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

/s/ Margaret Santen Hanrahan
Margaret Santen Hanrahan
GA Bar No. 578314
(Admitted *Pro Hac Vice*)
One Ninety One Peachtree Tower
191 Peachtree St. NE, Suite 4800
Atlanta, GA 30303
Telephone: 404.881.1300
Facsimile: 404.870.1732
maggie.hanrahan@ogletreedeakins.com

Benjamin R. Holland
N.C. Bar No. 28580
201 South College Street, Suite 2300
Charlotte, NC 28244
Telephone: 704.405.3135
Fax: 704.342.4379
E-Mail: ben.holland@ogletreedeakins.com
*Attorneys for Defendants*