UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:12-cv-00596-MOC-DSC

| | | |
|---|---|---|
| **SCOTT REHBERG, et al.,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| Vs. | ) | ORDER |
| | ) | |
| **FLOWERS BAKING COMPANY OF** | ) | |
| **JAMESTOWN, LLC and** | ) | |
| **FLOWERS FOODS, INC.,** | ) | |
| | ) | |
| Defendants. | ) | |

**THIS MATTER** is before the court on: 1) Plaintiff's Motion for Partial Summary Judgment (#144); 2) Defendants' Motion for Summary Judgment (#146); and 3) Defendants' Motion to Strike Portions of Declarations Submitted in Opposition to Defendants' Motion for Summary Judgment (#190). These matters being fully briefed and ripe for review, the court held oral arguments on November 9, 2015. Having considered the matter and the applicable law, the court enters the following findings, conclusions, and Order.

## FINDINGS AND CONCLUSIONS

### I.    BACKGROUND

#### A.  Factual Background

A summary of the facts relevant to the parties' motions currently before the court is as follows. Defendant Flowers Foods, Inc. ("Flowers"), headquartered in Thomasville, Georgia, is the parent holding company of numerous operating subsidiaries, including Defendant Flowers Baking Co. of Jamestown, LLC ("Jamestown"). See Chuck Rich. Dep. I:35:13-16 (#107–1 at

-1-

28); (#32-1 at ¶ 2). These subsidiaries produce and/or distribute packaged breads, buns, rolls and snack cakes. (Chuck Rich Dep. I:33:25-35:12; # 32-1, Ex. A, p. 2). Plaintiffs, a group of bakery product distributors ("Distributors") for Defendant Jamestown, purchase distribution rights to sell and distribute products to customers in a defined territory. Defendants uniformly classify all Distributors as independent contractors, pursuant to a "Distributor Agreement," which all Distributors have signed. (#117-17, Ex B, pp. 3-4; #32-2, Ex. B, pp. 5-6; #107–1). Jamestown is the entity that enters into Distributor Agreements with Distributors (# 107–1, p. 3) and enforces the terms therein, while Flowers establishes the policies and procedures that Jamestown and its Distributors must employ.

The distributor position at issue in this case entails picking up Flowers bakery products from one of 24 Jamestown-owned warehouses in North Carolina, South Carolina, Virginia, and West Virginia, and delivering them to customers in a defined geographic territory. See (Paul Holshouser Aff. (# 32–2) at ¶ 3). The orders are first delivered to Defendants' Jamestown, N.C. baking factory and then shipped to the respective warehouses, where they are picked up for distribution and sale by Distributors to customers. Id. ¶ 9. Each warehouse is managed by a Sales Manager responsible for oversight of the territories within their respective branch. Id. ¶ 3. Distributors purchase or are otherwise granted distribution rights to certain product brands within a defined geographic territory. Id. ¶ 8.

Distributors' job duties include delivering Flowers products to customers, restocking shelves with fresh product, removing stale product, and—to an extent disputed by the parties—making sales of Flowers products to account customers. Distributors share the same primary job responsibility of servicing Defendants' customers in accordance with "good industry practice" as

described in their Distributor Agreements. (##107-1, p. 4; 107-3, p. 8). Defendants define "good industry practice" as: properly ordering products; keeping shelves stocked with Flowers products; keeping store shelves in good condition in conformance with a planogram; properly rotating products on a regular basis; promptly removing all stale products; meeting customer service requirements; maintaining proper service and delivery to all outlets requesting service; and maintaining all equipment in a sanitary condition and in good, safe working order. (##107-1, pp. 38, 40; 107-3, p. 8).

Plaintiffs state that they begin their workdays by arriving at their respective warehouses to load product onto their trucks, which Jamestown employees have sorted, organized, and packed for Distributors. (# 118-5, p. 3). They then proceed on their delivery route, as defined by the territory set forth in their Distributor Agreements. See, e.g., (#107-1, pp. 16-17, 30-32). They state that they are required to deliver products to retailers within certain timeframes every service day; must stock products according to predetermined planograms; and can only deliver, order, and stock the products that a retailer has approved with Defendants. See Pl. Resp. SUMF (#181) (citing (Woods Decl. ¶¶ 2,3; Solomon Decl. ¶¶ 3-5; Shillinglaw Decl. ¶¶ 2, 3, 6; Ronchetti Decl. ¶¶ 2, 4-5)). According to Defendants, the Distributors determine the type of product and quantity to be delivered to a particular customer, see, e.g., Riley Dep. (#32-5, pp. 69-71), and that quantity can be adjusted based upon the customers' needs, historical sales, and other variables such as weather and holidays. See id. at. 73-74; Ronchetti Dep. at 91:8-15 105: 17-109:5 (#32-6, p. 55; 66-68); Rehberg Dep. 119:5-120:16 (#32-3 at p. 76-77). According to Plaintiffs, however, Jamestown sales managers and directors of sales retain ultimate control over order quantities, have the ability to adjust the orders Distributors place, and frequently make such

changes. (##107-1, p. 32; 118-5, p. 7) (#111-2 , pp. 2-5; Rehberg Dep. 122-23).

Plaintiffs state that they must be back at their respective warehouses by 5:00 p.m. each workday to return stale product to Defendants, or else they will be penalized by not receiving credit for returned items. (Rehberg Dep. 77-78). Plaintiffs also state that after servicing their routes for the day, they might receive a "call-back" at any time from an account to deliver more products. (#107-3, p. 24). If they refuse, Jamestown will take over and arrange for the delivery by one of its employees and deduct $75.00 plus mileage costs from Distributors' weekly earnings. Id. By Friday of every week, Distributors must provide Jamestown with a full settlement of all products that Jamestown provided to them in the preceding week. (# 107-1, p. 5). Jamestown imposes warehouse and administrative fees on all Distributors, which are deducted from their weekly settlement checks. (# 107-1, p.43; # 107-3, 17). Defendants state that Plaintiffs are compensated based on their sales of products to accounts. See Def. SUMF (#148 at ¶ 24). Plaintiffs, however, state that they are paid bi-weekly and that their checks are based on a number of different transactions. See Pl. Resp. Def SUMF (#181 at ¶ 24).

It is undisputed that most Distributors currently lease Isuzu box trucks owned by Defendants to service their distributorships. See Def. SUMF (#148) at ¶ 6; Pl. Resp. SUMF (#181) at ¶ 6; Transcript of Oral Arguments (Tr. at 26:19-27:8). It is also undisputed that on normal delivery days (Monday, Tuesday, Thursday, Friday, and Saturday), Distributors drive Isuzu box or similar larger trucks, or a truck and trailer combination, because of the amount of product Distributors deliver to their customers each day. See Def. SUMF (#148) at ¶ 17; Pl. Resp. SUMF (#181) at ¶ 7. Defendants state that these trucks have a gross vehicle weight rating ("GVWR") or actual weight, when loaded, of 10,001 pounds or more; Plaintiffs do not dispute that, depending on

their loads, they drive trucks with a GVWR exceeding 10,000 pounds on some—but not all—days of their workweek. See Def. SUMF (#148) at ¶ 18; Pl. Resp. SUMF (#181) at ¶ 18. The parties agree that Distributors also use their personal vehicles to perform their job duties, though Defendants claim that they only do so when conducting "pull-ups"—pulling existing stock previously delivered to an account from the back room of an account and putting it on the shelf (and thus not putting any product in a Distributor's vehicle). Plaintiffs dispute Defendants' characterization of Distributors' personal vehicle use as occasional and only to conduct pull-ups, citing testimony for some Distributors that they also use these vehicles to transport products from the warehouses to retailers and restaurants. See Def. SUMF (#148) at ¶ 19; Pl. Resp. SUMF (#181) at ¶ 19.

Also relevant to the parties' motions now before the court is the nature of contractual releases that certain Distributors signed releasing either one or both Defendants from liability. As the terms of the releases varied somewhat over the relevant time frame in this case, the class members are each affected differently. Pursuant to their Distributor Agreements, all Distributors are required to "execute . . . a general release of claims, in the event of any sale, conveyance or assignment, including any sale, conveyance or assignment to [Defendant Jamestown]." (#107-1, p. 8). Thus, at the time of hire, Defendants bind Distributors to sign a general release of claims as to Jamestown in the future. Id. The general release of claims provision signed by certain Distributors contains substantially similar language, which provides in relevant part:

> Distributor … does hereby release and forever discharge [Jamestown], its related entities, past, present, and future … from any and all claims, action, rights, demands, or remedies, whether known or unknown, which Distributor ever had, or may claim to have had, from the beginning of time until as of the moment he/she/it signs this Agreement arising out of, or relating to, the Distributor agreement, including any and all tort and contract claims.

(#145-1).

It is undisputed that between September 12, 2010 and May 28, 2015, approximately seventy-one (71) Distributors sold their distributorships and executed a full release of claims. <u>See</u> Def. SUMF (#148) at ¶ 67; Pl. Resp. SUMF (#181) at ¶ 67. Defendants state, and Plaintiffs do not dispute, that while Jamestown chose to repurchase these distributorships back from these former Distributors, it was not obligated to. <u>Id.</u> Plaintiffs note that Flowers secured the release despite that the fact that the Distributor Agreements did not require them to release Flowers, but only Jamestown. <u>Id.</u> The court notes that Defendants have amended their Response (#182, p. 13) to explain that Distributor Agreements in place prior to April 5, 2013 did not contain a provision requiring Distributors to release claims against Flowers Foods. However, since April 5, 2013, the Distributor Agreements have included a contractual requirement to release "all affiliated companies," such as Flowers Foods, upon any sale or conveyance. (#117-17, Ex. B, Att. 4); (#186, p.30, n. 22).

Additionally, it is undisputed that since 2002, the Distributor Agreements signed by Jamestown Distributors have contained a limitation of damages clause, providing that "[n]either party shall be liable to the other for, and each party expressly waives, any consequential, incidental, special, exemplary or punitive damages." <u>See</u> Def. SUMF (#148) at ¶ 68; Pl. Resp. SUMF (#181) at ¶ 68; (#117-17, Ex. B, pp. 3-4). Two-hundred and three (203) Jamestown Distributors in North Carolina signed agreements with this clause. <u>Id.</u> Defendants concede that eight (8) Jamestown Distributors in the North Carolina class who signed releases executed Distributorship Agreements prior to August 2002, which did not contain a provision requiring the Distributors to sign a release of claims upon any conveyance or sale of the Distributorship.

See (Def. Notice of Correction (#197 at ¶ 7)).

**B. Procedural Background**

Plaintiffs filed suit on September 11, 2012, alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., and the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. §§ 95-25.1, et seq. Plaintiffs allege they are misclassified by Defendants as independent contractors, as opposed to employees, and are therefore entitled to certain benefits under the FLSA and the NCWHA, namely, time-and-a-half pay for hours worked in excess of forty (40) per week.

By the Complaint, Plaintiffs allege: 1) violation of the FLSA for failure to pay overtime; and 2) violation of the NCWHA for: a) failing to pay earned wages for all hours worked, b) failing to pay overtime, c) making unlawful deductions from wages; d) failing to make, keep, and preserve accurate time records sufficient to determine wages and hours; e) failing to provide lawful notice to Distributors of its policies and practices, or any change in its policies and practices, concerning compensation. See (#1) at p. 14-16. The court granted conditional certification on March 22, 2013 of Plaintiffs' FLSA claims for the following class:

> all individuals who have or had a distributor agreement with Flowers Baking Co. of Jamestown at any time from September 12, 2009 to the date of this Order and who sign and timely file a consent to join this action pursuant to 29 U.S.C. § 216(b).

(##38, 41). On March 24, 2015, the court granted class certification of Plaintiffs' NCWHA claims pursuant to Fed. R. Civ. P. 23. (#129). The class for Plaintiff's NCWHA claims is defined as:

> all persons who, at any time from September 12, 2009, continuing through entry of judgment in this case, worked as Distributors in the State of North Carolina for Flowers Foods, Inc. or Flowers Baking Co. of Jamestown, LLC and who were classified as independent contractors.

Id. By its March 24, 2015 Order, the court also denied Defendants' Motion to Decertify the

FLSA class and allowed the collective action to proceed. Defendants filed a petition  pursuant to

Fed. R. Civ. P. 23(f) to appeal the certification order, which was denied by the Fourth Circuit on

May 21, 2015. (##130, 140).

On July 13, 2015, the court entered an Order on Plaintiff's "Motion for an Order to

Protect the Class," addressing Plaintiffs' concern that Defendants were seeking releases from

class members without explaining to them to pendency of this litigation or the potential

consequences of releasing claims. See (#164). Particularly, Plaintiffs were concerned that

Defendants would use such releases as a defense to its NCWHA claims on summary judgment

(which they have indeed done). The court ordered Defendants to distribute curative notice to the

nine class members who signed releases after the North Carolina class was certified and to any

Distributors who were asked to sign a release from that point forward, as well as class members

who signed a release after the lawsuit was filed. Id. at p. 8. In that Order, the court specifically

declined to invalidate all general releases signed since January 24, 2011, as Plaintiffs urged, and

noted that to the extent Plaintiffs sought such relief, they could renew such motion if Defendants

sought to enforce such waivers by moving for summary judgment. Id.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). Once this initial burden is met, the burden shifts to the nonmoving party, which "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Instead, that party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 252. When, as here, the court reviews cross-motions for summary judgment, "each motion must be considered individually, and the facts relevant to each must be viewed in the light most favorable to the non-movant." Mellen v. Bunting, 327 F.3d 355, 363 (4th Cir. 2003) (citing Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003)).

## III.    ISSUES ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

By their Motion for Partial Summary Judgment (#144), Plaintiffs argue that they are entitled to summary judgment on Defendants' asserted affirmative defenses under the "outside sales exemption" of the FLSA, and on the issue regarding the general release of claims signed by some North Carolina class members. Defendants have also moved for summary judgment on these two issues. (#146).

As previously noted by this court's Orders, at issue in this case is whether Plaintiffs were improperly classified as independent contractors, and whether they are in fact "employees" subject to the standards articulated in the FLSA. See, e.g. (#129). Defendants have conceded for the purposes of summary judgment that issues of fact remain on this issue, thus making summary judgment inappropriate. See Summary Judgment Hearing Transcript ("Tr.") at 1. Defendant has assumed, arguendo, for the purpose of summary judgment, that Plaintiffs are employees within the meaning of the FLSA. See, e.g., Def. Mem. Sup. Summ. Jud (#147) at p. 9. For the purposes of these cross-motions, the court therefore assumes the same without deciding the issue.

### A.  FLSA Outside Sales Exemption

The FLSA requires employers to pay overtime compensation for an employee's work in excess of 40 hours per week. 29 U.S.C. § 207. The overtime provisions of the FLSA do not apply to any employee "employed in the capacity of outside salesman," as covered by the "Outside Sales Exemption" outlined in 29 U.S.C. § 213(a)(1). The Fifth Circuit has explained that the

> logic of the exemption is that…[a] salesman, to a great extent, works individually. There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates….An outside salesman's extra compensation comes in the form of commissions, not overtime, and because most of the salesman's work is performed away from the employer's place of business, the employer often has no way of knowing how many hours an

outside salesman works.

Meza v. Intelligent Mexican Mktg., Inc., 720 F.3d 577, 581 (5th Cir. 2013) (internal citation and quotation marks omitted). While Congress did not expressly define "outside salesman," in the statute, the Department of Labor has promulgated regulations relevant to the exemption. See 29 U.S.C. § 213(a)(1). An outside salesperson is defined by regulation as an employee:

(1) Whose primary duty is:
   (i) making sales within the meaning of section 3(k) of the Act, or
   (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration  will be paid by the client or customer; and
(2) Who is customarily and regularly engaged away from the employer's place or places of business in  performing such primary duty.

C.F.R. § 541.500(a) (emphasis added).

For purposes of the "primary duty" prong, the FLSA defines "sale" or "sell" to include "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k). Regulations on the Outside Sales Exemption provide that "[s]ales within the meaning of section 3(k) of the Act include the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property." 29 C.F.R. § 541.501(b). As for "primary duty," the regulations provide that the term "means the principal, main, major or most important duty that  the employee performs." Id. § 541.700(a). Additionally, regulations provide:

[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

Id.[1] Finally, "[i]n determining the primary duty of an outside sales employee, work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall be regarded as exempt outside sales work. Other work that furthers the employee's sales efforts also shall be regarded as exempt work…." Id. § 541.500(b).

On the second prong, regulations provide that "'customarily and regularly' means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks." Id. § 541.701. Regarding whether an outside sales employee is customarily and regularly engaged "away from the employer's place or places of business," the regulations provide that "[t]he outside sales employee is an employee who makes sales at the customer's place of business..." Id. § 541.502.

As applicable to this case, the Outside Sales Exemption has specific regulatory requirements for "Drivers who sell," which provide an overview as to how to determine whether a deliveryman who also makes sales qualifies as exempt. See id. § 541.504. The regulations provide:

_____

2 29 C.F.R. § 541.700 further provides:

    (b)   The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

    Id.

a) **Drivers who deliver products and also sell such products may qualify as exempt outside sales employees only if the employee has a primary duty of making sales.** In determining the primary duty of drivers who sell, work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including loading, driving or delivering products, shall be regarded as exempt outside sales work.

b) Several factors should be considered in determining if a driver has a primary duty of making sales, including, but not limited to: a comparison of the driver's duties with those of other employees engaged as truck drivers and as salespersons; possession of a selling or solicitor's license when such license is required by law or ordinances; presence or absence of customary or contractual arrangements concerning amounts of products to be delivered; description of the employee's occupation in collective bargaining agreements; the employer's specifications as to qualifications for hiring; sales training; attendance at sales conferences; method of payment; and proportion of earnings directly attributable to sales.

c) **Drivers who <u>may qualify</u> as exempt outside sales employees include**:

  **(1) A driver who provides the only sales contact between the employer and the customers visited, who calls on customers and takes orders for products, who delivers products from stock in the employee's vehicle or procures and delivers the product to the customer on a later trip, and who receives compensation commensurate with the volume of products sold.**

  **(2) A driver who obtains or solicits orders for the employer's products from persons who have authority to commit the customer for purchases.**

  (3) A driver who calls on new prospects for customers along the employee's route and attempts to convince them of the desirability of accepting regular delivery of goods.

  **(4) A driver who calls on established customers along the route and persuades regular customers to accept delivery of increased amounts of goods or of new products, even though the initial sale or agreement for delivery was made by someone else.**

d) **Drivers who generally would <u>not qualify</u> as exempt outside sales employees include:**

  (1) A route driver whose primary duty is to transport products sold by the employer through vending machines and to keep such machines stocked, in good operating condition, and in good locations.

  **(2) A driver who often calls on established customers day after day or week after week, delivering a quantity of the employer's products at each call when the sale was not significantly affected by solicitations of the customer by the delivering driver or the amount of the sale is**

**determined by the volume of the customer's sales since the previous delivery.**

**(3) A driver primarily engaged in making deliveries to customers and performing activities intended to promote sales by customers (including placing point-of-sale and other advertising materials, price stamping commodities, arranging merchandise on shelves, in coolers or in cabinets, rotating stock according to date, and cleaning and otherwise servicing display cases), unless such work is in furtherance of the driver's own sales efforts.**

Id. § 541.504 (emphasis added). Thus, the regulations the provide examples of drivers who generally would and would not meet the requirements for exemption. Each side contends that the given examples support their arguments as to whether the exemption applies.

Defendants bear the burden of establishing, by clear and convincing evidence, that the outside sales exemption applies in this case. See Shockley v. City of Newport News, 997 F.2d 18, 21 (4th Cir. 1993); Hantz v. Prospect Mortgage, LLC, 11 F. Supp. 3d 612, 619 (E.D. Va. 2014). As the Fourth Circuit has noted, "[t]he congressional purpose in passing the FLSA was to protect all covered workers from substandard wages and oppressive working hours. Pursuant to that goal, coverage under the FLSA is construed liberally to apply to the furthest reaches consistent with congressional direction." U.S. Dep't of Labor v. N. Carolina Growers Ass'n, 377 F.3d 345, 350 (4th Cir. 2004) (internal citations and quotations omitted). Thus, as the Supreme Court has repeatedly emphasized, "[i]t is well settled that exemptions from the [FLSA] are to be narrowly construed." Mitchell v. Kentucky Fin. Co., 359 U.S. 290, 295 (1959) (citing A. H. Phillips, Inc. v. Walling, 324 U.S. 490, 493 (1945)).

The question before the court is whether any genuine issues of material fact preclude a determination as matter of law as to whether Plaintiffs fall within the Outside Sales Exemption. While Defendants go to great lengths to argue why the Plaintiffs' activities constitute "sales,"

Plaintiffs do not appear to dispute that they sometimes make sales as part of their job responsibilities. As Defendants note, the Distributor Agreement specifically requires Plaintiffs to "use his/her best efforts to develop and maximize the sale of COMPANY'S products…with good industry practice." See (#117-17, p. 11 (¶5.1). Defendants also note that the distributorship model that it employs is designed to build sales and grow equity. While Defendants set forth several "Undisputed Material Facts" showing that Plaintiffs make sales as part of their job, see (#148) at ¶21-51, there is scant evidence as to such sales being their primary duty, which is a requirement for the exemption to apply. As the "strongest evidence" that Plaintiffs' primary duty is making sales, Defendants note that several Plaintiffs admitted in deposition that they sold products, solicited new accounts, recommended changes to shelf space configurations, participated in sales contests, and other activities related to sales. See Def. Resp. (#147) at p. 34. However, such evidence misses the mark, as it does not tend to show, much less prove by clear and convincing evidence, that sales were "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a).

Plaintiffs argue that they do not meet the criteria for the exemption because their primary duties are to deliver products, stock those products on the shelves, and reorder products according to quantities set between Defendants and their accounts, which is dictated by the available shelf space. They argue that while some Plaintiffs occasionally ask for shelf space in stores, those activities are trivial compared to their primary job duties of delivering bread and stocking shelves. Plaintiffs also argue that they have neither the need nor the authority to engage in activities designed to increase sales because Defendants employ robust sales and marketing teams to pitch products to accounts, present promotions, and propose pricing based upon market

research and sophisticated computerized sales forecasting systems. Plaintiffs argue that any sales made to their customers are incidental to their other responsibilities and do not qualify as a "primary duty." Plaintiffs have set forth evidence showing that many Plaintiffs testified that they had little to no ability to make sales, and that sales to customers were largely controlled by Flowers' sales and marketing team. See Pl. Repl. (#187) at p. 4-6 (citing deposition testimony of 21 Plaintiffs showing that they had limited sales responsibilities and that Defendants maintained control over most sales issues).

In addition to the parties' arguments, the court has also considered the applicable factors outlined in 29 C.F.R. § 541.504(b) and finds that the record either does not contain sufficient information on the factors, the factors are inapplicable, or that they do not conclusively determine one way or another whether sales are a primary duty of the distributors. For example, Defendants explicitly state that Plaintiffs are not required to attend any formal sales training as distributors, but that they go through some training regarding ways to increase their sales. See Def. SUMF (#148 at ¶ 51). However, this minimal amount of sales training does not negate the significant sales done by the national sales team. See Def. SUMF (#148 at ¶ 40-46); Pl. Resp. Def SUMF (#181 at ¶ 40). Additionally, regarding the factor on the proportion of earnings directly attributable to sales, Defendants state that Plaintiffs are compensated based on their sales of products to accounts. See Def. SUMF (#148 at ¶ 24). Plaintiffs, however, state that they are paid bi-weekly and that their checks are based on a number of different transactions. See Pl. Resp. Def SUMF (#181 at ¶ 24). Finally, as to the customary or contractual arrangements concerning amounts of products to be delivered, Defendants state that Plaintiffs regularly determine what products to order for their customers based on their accounts' needs—not just

based on historical sales—by regularly making changes to the suggested orders. See Def. SUMF (#148 at ¶¶ 79, 96, 116, 155, 181, 237). However, Plaintiffs point to evidence showing that the national sales team initiates discussions with accounts and largely determines what products they will sell, how they will be priced, how they will be arranged in the stores, and how certain products will be promoted. See Pl. Resp. SUMF (#181 at ¶¶26-29; 42).

Based on the relevant evidence, the court finds that summary judgment is not appropriate to either party on the issue of the Outside Sales Exemption. Defendants have not presented sufficient evidence to make the requisite showing that sales are a "primary duty" of the Distributors. In turn, Plaintiffs have a raised a genuine issue of material fact as to this issue, noting that Defendants maintain their own separate sales and marketing teams and that many Distributors testified that they do not make sales. In light of the requirement that FLSA exemptions be "narrowly construed," Defendants' Motion for Summary Judgment on this issue will be denied. See Drummond v. Herr Foods Inc., No. CIV.A. 13-5991, 2014 WL 5343642, at *6 (E.D. Pa. Oct. 21, 2014) (denying employer's motion for summary judgment on the Outside Sales Exemption and noting, "[w]ithout question, Herr's route salespersons sold product. But Herr's sales procedures arguably included constraints for certain accounts, including contractual space limitations, and those constraints may lead a jury to conclude that the heavy lifting with respect to sales was left to other team members, not route salespersons."); Killion v. KeHE Distributors, LLC, 761 F.3d 574, 585 (6th Cir. 2014) (finding that the district court erred in granting summary judgment to employer on the outside sales exemption where, assuming that employees made sales, there was evidence on the record calling into doubt whether sales were a primary duty, including evidence showing, inter alia, that the vast majority of the plaintiffs' time

was spent stocking and cleaning shelves and that their compensation was primarily based on stocking shelves.). Conversely, as to Plaintiff's Motion for Summary Judgment on this issue, Defendants note that sales are explicitly set out in the Distributor Agreement as a required component of the Distributor's duties, and that some Distributors seem to make sales a significant portion of their duties. These circumstances create an issue of material fact as to whether sales to customers constitutes a "primary duty" of Plaintiffs. Accordingly, the court will deny the parties' cross-motions for summary judgment on the Outside Sales Exemption.

### B. General Releases

Both parties ask the court to make a ruling as a matter of law as to the validity of the releases signed by several North Carolina Class Members. As noted above, many class members have signed a general release of claims as to one or both Defendants at some point in the course of their working relationship. While Defendants do not argue that the release bars any portion of Plaintiffs' FLSA claims, see Def. Mot. Sum. Jud. (#147 at p. 46, n. 25), they do argue that such releases bar the NCWHA claims. Here, over 70 individuals in the North Carolina class signed releases of claims when they sold their distributorships back to the company. (SUMF ¶ 67; Pl. Resp. to SUMF ¶ 67). Defendants argue that these releases were supported by adequate consideration because the company repurchased the distributorships for significant monies and were not legally obligated to do so, and because the releases were mutual. Id. When confronted with the issue of whether Defendants must inform the class members of the pendency of this litigation in Plaintiffs' previous "Motion to Protect the Class," the court ordered a curative notice be sent to North Carolina class members who had signed and would be signing releases in the future. (#164 at p. 5). The court declined to invalidate the releases that had been signed since the date Defendants received notice of the instant litigation "without prejudice, subject to further

consideration if Defendants seek to enforce such waivers by moving to dismiss, for summary judgment, or such other relief." Id. at p. 8). Clearly, Defendants seek such judicial remedy here.

This court has previously noted that courts look to the FLSA for guidance when interpreting the NCWHA. See (#129 at p. 12) (citing Miller v. Colorcraft Printing Co., No. 3:03–CV–51–T, 2003 WL 22717592, at *3 (W.D.N.C. Oct. 16, 2013); Sullivan v. Knight's Med. Corp., No. 5:12–CV–592–FL, 2013 WL 4524897, at *5 (E.D.N.C. Aug. 27, 2013); and Garcia v. Frog Island Seafood, Inc., 644 F.Supp.2d 696, 707 (E.D.N.C. 2009)). As the North Carolina Court of Appeals explained in Laborers' Int'l Union of North Am., AFLCIO v. Case Farms, Inc., 488 S.E.2d 632 (N.C. Ct.App.1997), "[t]he [NCWHA] is modeled after the Fair Labor Standards Act." Id. at 634. Additionally, the North Carolina Administrative Code provides:

> Where the legislature has adopted the language or terminology of the Fair Labor Standards Act (F.L.S.A.) for the purpose of facilitating and simplifying compliance by employers with both the federal and state labor laws, or has incorporated a federal act by reference, the Department of Labor will look to the judicial and administrative interpretations and rulings established under the federal law as a guide for interpreting the North Carolina law. Such federal interpretations will therefore be considered persuasive and will carry great weight as a guide to the meaning of the North Carolina provisions and will be controlling for enforcement purposes. However, where there are intentional differences in the language of the North Carolina statutes, or where the laws of this State or the authority granted to the Commissioner of Labor of North Carolina require a different interpretation, the federal decisions will not be binding on the Department.

13 N.C. Admin. Code 12.0103.

As Plaintiffs note, generally, employees may not waive their rights under the FLSA. The FLSA was enacted to protect workers from substandard wages and oppressive working hours. Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 706 (1945); Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 739 (1981). Because of the significant inequalities in bargaining power between employers and employees, the statute's provisions are mandatory and generally not

subject to bargaining, waiver, or modification by contract or settlement. See Brooklyn Sav.

Bank, 324 U.S. at 706; Lynn's Food Stores, Inc. v. United States, 679 F.2d 1350, 1355 (11th Cir.

1982). As applied to this case, Plaintiffs argue that while the language of the statutes are not

identical, the purpose behind both the NCWHA and the FLSA is to promote the general welfare

of the public under the respective purviews of the laws. Plaintiffs argue that the court should

therefore find that the releases are contrary to the public policy of both the FLSA and NCWHA.

In its Order addressing Plaintiff's Motion to Protect the Class (#164), the court discussed

case law wherein two district courts in North Carolina found that releases of NCHWA claims

were valid:

> Though waivers which "transgress public policy" are not permitted, Bd. of
> Managers of James Walker Mem'l Hosp. of Wilmington v. City of Wilmington, 74
> S .E.2d 749, 757 (N.C.1953), this court and other North Carolina district courts
> have consistently allowed parties to waive claims under the NCWHA via private
> release. See Simontacchi v. Invensys, Inc., 2008 WL 141905, at *15
> (W.D.N.C.2008) (holding "the claims raised by [plaintiff] for breach of the
> covenant of good faith and under the Wage and Hour Act must be dismissed
> because he released all such claims"); Wynne v. P.C. Greenville Ltd. P'ship, 190
> F.R.D. 399, 400 (E.D.N.C.1998) (the court granted summary judgment to employer
> where plaintiff executed a release of wage claims under the NCWHA); VF
> Jeanswear Ltd. P'ship v. Molina, 320 F.Supp.2d 412, 419 (M.D.N.C.2004) (holding
> that "[w]hen a release is executed in exchange for valuable consideration, the
> release provides a complete defense ...").

See (#164) at p. 8. Despite noting such case law, the court expressly declined to make a ruling on

the precise issue of validity of releases of NCWHA claims in that Order. Additionally, upon

closer consideration of these cases, it does not appear that any party therein raised the issue of

such releases violating public policy. As such, the court finds that these previously-cited

decisions are not entirely persuasive to the extent that they do not address the precise issue now

before the court.

Plaintiffs argue that the general release of claims Defendants obtained from select Plaintiffs are void for public policy, asking the court to find that because FLSA claims cannot be waived, NCWHA claims also cannot be waived. In support of their argument, Plaintiffs note that the overarching goals of the two laws are similar in that they seek to protect workers' rights to wages and reasonable working hours. As stated in the NCWHA's section on legislative purpose:

> The public policy of this State is declared as follows: The wage levels of employees, hours of labor, payment of earned wages, and the well-being of minors are subjects of concern requiring legislation to promote the general welfare of the people of the State without jeopardizing the competitive position of North Carolina business and industry. The General Assembly declares that the general welfare of the State requires the enactment of this law under the police power of the State.

N.C. Gen. Stat. § 95-25.1. The policy statement of the FLSA proclaims:

> (a) The Congress finds that the existence, in industries engaged in commerce[2] or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce….
> (b) It is declared to be the policy of this chapter…to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power.

29 U.S.C.A. § 202. The Supreme Court has noted that "[t]he principal congressional purpose in enacting the Fair Labor Standards Act of 1938 was to protect all covered workers from substandard wages and oppressive working hours, [and] 'labor conditions [that are] detrimental

---

2 "Congress enacted the FLSA under its commerce power, having found that the existence of such 'detrimental' labor conditions would endanger national health and efficiency and consequently would interfere with the free movement of goods in interstate commerce." Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 751 (1981).

to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'" Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 739 (1981) (citing 29 U.S.C. § 202(a)). A reading of these two statements in conjunction makes clear that, as noted above, the NCWHA is modeled after the FLSA. Laborers' Int'l Union of N. Am., AFL-CIO v. Case Farms, Inc., 488 S.E.2d 632, 634 (N.C. Ct. App. 1997).

As the NCWHA clearly proclaims the "public policy" of North Carolina, Plaintiffs argue that, like the FLSA, public policy concerns prohibit employers from requiring Plaintiffs to release their claims for overtime and other wage claims. See Chem. Bank v. Belk, 255 S.E.2d 421, 428 (N.C. Ct. App. 1979) ("As to waiver of benefits conferred by statutes designed to protect public interests, the law is well settled. Ordinarily, effect will not be given to an attempted waiver of a protective public policy by an individual."). Plaintiffs fail to cite any case law discussing whether NCWHA claims can be released in light of public policy concerns. However, significant independent research by the court has not uncovered any cases on this precise issue. Plaintiffs do cite a case in the Northern District of Illinois that expressly addressed the issue of whether a release of claims presented to class members, which included explicit waivers of rights under the FLSA and that state's wage and hour law, was valid. See Ladegaard v. Hard Rock Concrete Cutters, Inc., No. 00 C 5755, 2001 WL 1403007, at *1, 7 (N.D. Ill. Nov. 9, 2001) (finding that the releases under the Illinois Minimum Wage Law ("IMWL") and Illinois Wage Payment and Collection Act ("IWPCA") as well as the FLSA were void as a matter of law, and granting plaintiffs' motion to void the releases). Specifically, after analyzing the language and intent of the statutes at issue, the Ladegaard court found:

> based on the similar purposes of the FLSA and IMWL (and IMWL and IWPCA) the judicial recognition that these statutes involve public rights, the long history of

United States Supreme Court interpretation of the FLSA prohibiting release of such claims, and the Illinois common law rule that laws enacted to serve a public concern cannot be abrogated by mere private agreement, of which the legislature is presumed to be aware, the court concludes that it would be against the public policy of the IMWL and IWPCA to permit the parties to release their claims thereunder, unless expressly allowed by these statutes. However, the express language of the IMWL and IWPCA, set forth *supra,* if not explicit, is at least implicitly consistent with the public policy prohibiting private releases.

Ladegaard v. Hard Rock Concrete Cutters, Inc., No. 00 C 5755, 2001 WL 1403007, at *6 (N.D. Ill. Nov. 9, 2001) (internal citation omitted). The court finds the logic of that case well-reasoned and, as more thoroughly explained below, finds that the same logic applies to the NCWHA.

The court also notes that the NCWHA provides regarding "wages in dispute":

a) If the amount of wages is in dispute, the employer shall pay the wages, or that part of the wages, which the employer concedes to be due without condition, within the time set by this Article. The employee retains all remedies that the employee might otherwise be entitled to regarding any balance of wages claimed by the employee, including those remedies provided under this Article.
(b) **Acceptance of a partial payment of wages under this section by an employee does not constitute a release of the balance of the claim. Further, any release of the claim required by an employer as a condition of partial payment is void.**

N.C. Gen. Stat. Ann. § 95-25.7A. Thus, though the legislature did not explicitly provide that waivers of the NCWHA were impermissible as some states have, see, e.g., 1 Employment Law § 4:12 (5th ed.) ("Generally, employees may not waive their rights under state wage payment statutes" (citing Haw. Rev. Stat. § 388-8; N.H. Rev. Stat. Ann. § 275:50; N.J. Stat. Ann. 34:11-4.7; W.Va. Code § 21-5-10)), it clearly provided that a release of claims entered in exchange for less than what an employee is owed is unenforceable.

Having considered the applicable legal authority, the court finds that the stated purpose of the NCWHA, which aims to address the "wage levels of employees, hours of labor, [and] payment of earned wages" for the general welfare of the people, N.C. Gen. Stat. Ann. § 95-25.1,

as well as the provisions therein requiring: 1) that the "employer shall pay every employee all wages," id. at § 95-25.6; 2) that "[e]very employer shall pay each employee who works longer than 40 hours in any workweek at a rate of not less than time and one half of the regular rate of pay of the employee for those hours in excess of 40 per week," id. at § 95-25.4; and 3) for other requirements mandating timely and adequate payment of workers, all clearly indicate that employers should not be permitted to contract around proper payment of their employees. Additionally, the court finds that the policy mandates of the NCWHA, the regulations of the North Carolina Department of Labor stating that "judicial and administrative interpretations and rulings established under the federal law [shall serve] as a guide for interpreting the North Carolina law," 13 N.C. Admin. Code 12.0103, the well-established precedent in the state and federal courts of North Carolina that the FLSA guides interpretation of the NCWHA, see, e.g., Miller v. Colorcraft Printing Co., No. 3:03–CV–51–T, 2003 WL 22717592, at *3 (W.D.N.C. Oct.16, 2013), and the principle that waivers which "transgress public policy" are not permitted, Bd. of Managers of James Walker Mem'l Hosp. of Wilmington v. City of Wilmington, 74 S.E.2d 749, 757 (N.C.1953), together indicate that employers in this state should not be able to require their employees to waive wage and hour claims through general releases, either under federal or state law. Therefore, to the extent that Defendants seek to dismiss Plaintiffs' wage and hour claims under the NCWHA based on the releases executed, the court will deny Defendants' Motion for Summary Judgment. Furthermore, the court finds that the releases signed by the North Carolina class members in this action do not bar their claims under the NCWHA, and will therefore grant Plaintiff's Motion for Partial Summary Judgment on this issue and allow the NCWHA class claims to proceed alongside the FLSA claims.

Because the court finds that the general releases are invalid as to Plaintiffs' NCWHA claims, it need not engage in a lengthy analysis of Plaintiff's argument as to whether the releases are invalid due to being signed under alleged threats of economic duress.

## IV.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants argue that even if Plaintiffs are considered employees, and not independent contractors, their FLSA claims cannot proceed because of two applicable exemptions in the FLSA—the Outside Sales Exemption (analyzed <u>supra</u>) and the Motor Carrier Act exemption. They also argue that summary judgment is appropriate because Plaintiffs: 1) cannot establish a willful violation of the FLSA sufficient to support a three-year statute of limitations; (2) cannot recover liquidated damages under either the FLSA or NCWHA; and (3) certain Plaintiffs released their claims of liquidated damages.

### A.    FLSA Motor Carrier Act Exemptions

Defendants argue that assuming Plaintiffs are employees under the FLSA, they are exempt under the Motor Carrier Act ("MCA"), codified in 29 U.S.C. § 213(b)(1). As noted above, FLSA exemptions are to be narrowly construed, <u>Mitchell v. Kentucky Fin. Co.</u>, 359 U.S. 290, 295 (1959), and the burden is on the employer to show that any exemption applies. <u>See</u> <u>Sanchez v. Truse Trucking, Inc.</u>, 74 F. Supp. 3d 716, 727 (M.D.N.C. 2014) (citing <u>Arnold v. Ben Kanowsky, Inc.</u>, 361 U.S. 388, 392, 394 n. 11 (1960)). Also as noted above, the FLSA provides that employers must pay hourly employees 150% of their typical wages on hours they work overtime. <u>See</u> 29 U.S.C. § 207. However, the MCA Exemption is one exception to this general rule requiring overtime pay. The MCA Exemption applies to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours

of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213(b)(1). That

section—49 U.S.C. § 31502(b)(1)—provides the Secretary of Transportation with the authority

to prescribe requirements for:

1) qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier; and
2) qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation.

49 U.S.C. § 31502(b). A "motor carrier" is "a person providing motor vehicle transportation for

compensation." Id. §§ 31501(2), 13102(14). A "motor private carrier" is defined as:

a person, other than a motor carrier, transporting property by motor vehicle when—
(A) the transportation is as provided in section 13501 of this title[3];
(B) the person is the owner, lessee, or bailee of the property being transported; and
(C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

49 U.S.C.A. § 13102(15). "The purpose of the motor carrier exemption is to avoid subjecting

employers to overlapping regulatory regimes." Fox v. Commonwealth Worldwide Chauffeured

Transp. of NY, LLC, 865 F. Supp. 2d 257, 264 (E.D.N.Y. 2012) (citing Levinson v. Spector

Motor Serv., 330 U.S. 649, 661 (1947)). "If the Secretary of Transportation is authorized under

the [MCA] to set maximum work hours for an employee, then the FLSA's overtime provisions

---

3 As applicable in this case, 49 U.S.C.A. § 13501 defines the jurisdiction of the Secretary to include:

transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier--
    (1) between a place in--
        (A) a State and a place in another State;
        (B) a State and another place in the same State through another State
…
    (2) in a reservation under the exclusive jurisdiction of the United States or on a public highway.

Id. Thus, jurisdiction is "limited, in pertinent part, to transportation in interstate commerce." Buckner v. United Parcel Serv., Inc., No. 5:09-CV-411-BR, 2012 WL 1596726, at *4 (E.D.N.C. May 7, 2012) aff'd, 489 F. App'x 709 (4th Cir. 2012) (citing Tews v. Renzenberger, Inc., 592 F.Supp.2d 1331, 1343 (D.Kan. 2009)).

do not apply to that employee." Id. "Thus, the effect of the interplay between the FLSA and the MCA … is to exempt from the FLSA's mandatory overtime coverage employees of motor private carriers transporting property in interstate commerce on public highways when the activities of the employees affect safety of operation." Veney v. John W. Clarke, Inc., 28 F. Supp. 3d 435, 441 (D. Md. 2014) (citing Troutt v. Stavola Bros., Inc., 107 F.3d 1104, 1106 (4th Cir. 1997)).

Two considerations arise in determining whether the MCA Exemption applies: the class of the employer and the class of work the employees perform. 29 C.F.R. § 782.2(a). "Specifically, the MCA exemption applies if the employer is a carrier subject to the DOT's jurisdiction and the employee is a member of a class of employees that 'engage[s] in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the [MCA]." See Resch v. Krapf's Coaches, Inc., 785 F.3d 869, 872 (3d Cir. 2015) (citing 29 C.F.R. § 782.2(a)). "The question of how [Plaintiffs spent their time working for Defendants] is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law...." Veney, 28 F. Supp. 3d at 442 (citing Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986)).

Defendants argue that Plaintiffs are motor private carriers under the MCA. Defendant Flowers/Jamestown is a registered motor carrier with the Federal Motor Carrier Safety Administration. (SUMF ¶ 4). Plaintiffs do not appear to dispute that Defendant is subject to DOT jurisdiction. They do dispute, however, that they engage in interstate commerce. They also argue that even if they do participate in interstate commerce and therefore fall within the MCA

Exemption, they are excepted from that exemption by the Technical Corrections Act of 2008.

For the reasons explained herein, the court finds that even assuming Plaintiffs engage in

interstate commerce, summary judgment is not appropriate on the issue of the MCA Exemption

because there are genuine issues of material fact as to whether Plaintiffs fall within the exception

created by the Technical Corrections Act.

Congress enacted the Technical Corrections Act ("TCA") in 2008, which amended the

scope of the MCA Exemption by providing that overtime compensation would be available to

"covered employee[s]" despite the provisions of the MCA Exemption. See SAFETEA—LU

Technical Corrections Act of 2008, PL 110–244, June 6, 2008, 122 Stat. 1572. Specifically,

section 306(a) of the TCA provides that "Section 7 of the [FLSA] ... shall apply to a covered

employee notwithstanding section 13(b)(1) of that Act [the MCA exemption]." See id. at §

306(a). Section 306(c) of the TCA defines the term "covered employee," in relevant part, as an

individual—

> (1) who is employed by a motor carrier or motor private carrier …;
> (2) whose work, **in whole or in part**, is defined—
>    (A) as that of a **driver**…; **and**
>    (B) as affecting the safety of operation of **motor vehicles weighing 10,000 pounds
>    or less** in transportation on public highways in interstate or foreign commerce…; **and**
> (3) **who performs duties on motor vehicles weighing 10,000 pounds or less.**

Id. (emphasis added).

While "[n]either the language of the FLSA nor the motor carrier exemption indicates how

to categorize individuals who operate both commercial motor vehicles and non-commercial

motor vehicles," Avery v. Chariots For Hire, 748 F. Supp. 2d 492, 499 (D. Md. 2010), courts

interpreting the TCA in such context have reached different conclusions about the scope of its

coverage. See Smith v. Schwan's Home Serv., Inc., No. 2:13-CV-00231-JAW, 2014 WL

6679129, at *29 (D. Me. Nov. 25, 2014) (collecting cases and explaining, "[f]ederal courts have taken an inconsistent approach in answering the question of whether the MCA Exemption applies to an employee who drives both exempt and non-exempt vehicles."). Defendants note that every district court within the Fourth Circuit to consider the exception in the "mixed-fleet context"—i.e. where an employee uses both commercial and non-commercial vehicles—has held that the MCA Exemption still applies so long as the employee spends more than a "de minimis" amount of time driving a commercial vehicle in interstate commerce. See Avery v. Chariots For Hire, 748 F. Supp. 2d 492, 500 (D. Md. 2010) ("[c]ourts that have considered the issue of a mixed fleet are somewhat divided on the proper approach, but the prevailing view is that the motor vehicle exemption should apply so long as the time an employee spends operating commercial motor vehicles is more than de minimis.") (collecting cases); Rucker v. Hoffberger Moving Services, LLC, No. JFM-13-2716 (D. Md. Dec. 31, 2013) (citing Avery with approval and finding employee exempt under the FLSA because he spent more than a de minimis amount of time driving commercial vehicles); Buckner v. United Parcel Serv., Inc., No. 5:09-CV-411-BR, 2012 WL 1596726, at *5, n. 3 (E.D.N.C. May 7, 2012) aff'd, 489 F. App'x 709 (4th Cir. 2012) (unpublished) (citing Avery).

Plaintiffs note that several other courts, including the only published decision from a Court of Appeals squarely addressing the issue (discussed infra), have applied a more expansive reading of FLSA coverage in light of the TCA, and encourage the court to apply that standard here. See, e.g., Hernandez v. Alpine Logistics, LLC, No. 08-CV-6254T, 2011 WL 3800031, at *4 (W.D.N.Y. Aug. 29, 2011); Rojas v. Garda CL Se., Inc., No. 13-23173-CIV, 2015 WL 5084135, at *5 (S.D. Fla. Aug. 28, 2015); Aikins v. Warrior Energy Servs. Corp., No. 6:13-CV-

54, 2015 WL 1221255, at *5 (S.D. Tex. Mar. 17, 2015); <u>Heng Guo Jin v. Han Sung Sikpoom</u>

<u>Trading Corp.</u>, No. 13-CV-6789 CBA LB, 2015 WL 5567073, at *7 (E.D.N.Y. Sept. 21, 2015)

("The majority of courts have held that, under the [TCA], a driver is covered by the FLSA's

overtime-wage provisions when he spends part of a week driving a small vehicle and part driving

a large vehicle.")

> Most notably, the Third Circuit recently examined the issue and explained:

> the relevant language of the [TCA] is that, as of June 6, 2008, "Section 7 of the [FLSA] ... shall apply to a covered employee notwithstanding section 13(b)(1) of that Act." Corrections Act § 306(a). This is a plain statement that a 'covered employee' is to receive overtime even where section 13(b)(1)—the [MCA] Exemption—would ordinarily create an exemption.…Statutory construction points to one conclusion: 'covered employees' are entitled to overtime.

<u>McMaster v. E. Armored Servs., Inc.</u>, 780 F.3d 167, 170 (3d Cir. 2015). Relevant to Defendants'

arguments here about the history of the MCA and FLSA, the Third Circuit noted, "our own

jurisprudence has historically seen the [MCA] Exemption as establishing a strict separation

between the Secretary of Transportation's jurisdiction and the ambit of the [FLSA] overtime

guarantee…Neither history nor policy, however, can overcome an express change to the

statutory scheme." <u>Id.</u> at 171-72 (internal citations omitted) (expressly disagreeing with <u>Avery</u>,

748 F. Supp.2d 492). In <u>McMaster</u>, the plaintiff was a driver and guard of commercial armed

vehicles, and approximately half of her trips were in vehicles weighing less than 10,000 pounds.

<u>Id.</u> at 169-70. The Third Circuit explicitly declined to define "in part" as used in the TCA, noting

that "[w]hatever 'in part' means, it is certainly satisfied by [plaintiff], who spent 49% of her days

on vehicles less than 10,000 pounds." <u>See</u> <u>id.</u> at 169-70, n.4.

> Several district court cases outside this circuit are in accord with with <u>McMaster</u>,

including <u>Aikins v. Warrior Energy Servs. Corp.</u>, No. 6:13-CV-54, 2015 WL 1221255 (S.D. Tex.

Mar. 17, 2015), upon which Plaintiffs rely heavily. In <u>Aikins</u>, the United States District Court for the Southern District of Texas noted that "[t]he TCA both restored-and therefore widened-the scope of the Secretary of Transportation's regulatory jurisdiction ...<u>and</u> simultaneously narrowed the scope of the MCA exemption. It accomplished the latter by broadening the FLSA overtime requirement to covered employees notwithstanding the MCA exemption." <u>Id.</u> (citations omitted). The <u>Aikins</u> court expressly considered the "de minimis" standard in <u>Avery</u>, but rejected it, noting that "many decisions…instead read section 306 [of the TCA] to afford overtime coverage to employees, notwithstanding the MCA, as long as they perform 'some meaningful work' on vehicles weighing 10,000 pounds or less." <u>Aikins</u>, 2015 WL 1221255, at *4 (citing <u>Lucas v. NOYPI, Inc.</u>, 2012 WL 4754729, at *9 (S.D. Tex. Oct.3, 2012); <u>Allen v. Coil Tubing Servs., L.L.C.</u>, 846 F. Supp. 2d 678, 705 (S.D. Tex. 2012) <u>aff'd</u>, 755 F.3d 279 (5th Cir. 2014)). The <u>Aikins</u> court noted that <u>Avery</u> and similar cases "appear to be outliers, applying pre-TCA law." <u>Id.</u> The court went on to "[follow] the majority of courts (including the only court of appeals) to have addressed the issue, and decline[d] to adopt a reading of the TCA that any significant use of vehicles weighing more than 10,000 pounds excludes an employee from FLSA coverage." <u>Id.</u> at *5. In doing so, the court found that "[b]ecause the TCA extends FLSA coverage to motor carrier employees whose work, even 'in part,' 'affect[s] the safety of operation of motor vehicles weighing 10,000 pounds or less,' the law does not exclude a motor carrier employee from FLSA coverage merely because his or her work also involves operating heavier vehicles." <u>Id.</u> Other district courts have recently followed such logic, one explaining:

> The meaning of this statutory text is plain. Even though a driver is subject to DOT's general maximum-hours regulations, the FLSA's overtime-wage provisions apply to that driver if he spends all or part of his time driving a small vehicle. The mandatory 'shall' leaves courts no discretion. Nothing in the structure or the legislative history

of the [TCA] suggests an interpretation contrary to the plain meaning of the text of sections 306(a) and 306(c). In sum, under the [TCA], drivers who transport goods in both small and large vehicles are subject to the FLSA's overtime provisions.

Heng Guo Jin v. Han Sung Sikpoom Trading Corp., No. 13-CV-6789 CBA LB, 2015 WL 5567073, at *6 (E.D.N.Y. Sept. 21, 2015). The Aikins court also discussed the "minimum threshold of the type or amount of work that employees must perform on vehicles weighing 10,000 pounds or less before the TCA affords them FLSA overtime coverage," id. at *6, but declined to resolve the issue decisively. The court noted, however, that because there were factual issues in dispute under the "some meaningful work" standard, which "seems to require no more than that covered employees' work on vehicles weighing 10,000 pounds or less be more than de minimis," summary judgment was inappropriate.

Finally, the court has considered Defendants' argument that the use of the term "covered employee" in the TCA, taken in tandem with the historical interplay of the jurisdiction of the Departments of Labor and Transportation under the MCA, compels the conclusion that the MCA Exemption still applies here notwithstanding the TCA. Defendant argues that Plaintiff asks the court to read two separate definitions into "covered employee" in the TCA[4], but the court does not agree that Plaintiff is requesting such a reading. The TCA clearly defines "covered

---

4 Defendants argue that "covered employee" in the TCA's "safe harbor provision" cannot square with Plaintiff's argument that the TCA applies to the "mixed-fleet" context. The "safe harbor" provision of the TCA provides:

b) LIABILITY LIMITATION FOLLOWING SAFETEA–LU.
    (1) LIMITATION ON LIABILITY.—An employer shall not be liable for a violation of section 7 of the Fair Labor Standards Act of 1938 (29 U.S.C. 207) with respect to a covered employee if—
    (A) the violation occurred in the 1–year period beginning on August 10, 2005; and
    (B) as of the date of the violation, the employer did not have actual knowledge that the employer was subject to the requirements of such section with respect to the covered employee.

SAFETEA—LU Technical Corrections Act of 2008, PL 110–244, June 6, 2008, 122 Stat. 1572.

employee" in subsection (c) to include a person whose work, "in whole or in part," involves driving vehicles weighing 10,000 pounds or less. The court disagrees with Defendant's assertion that "the most logical reading of the 'in whole or in part' language of the TCA is that it only applies if a driver drives a vehicle of less than 10,001 [pounds] exclusively or drives a vehicle less than 10,001 [pounds] part of the time and any driving of a commercial vehicle is nonexistent or de minimis." See Def. Mem. Mot. Sum. J. (#147 at p. 28, n. 13).

In sum, the court has carefully considered the applicable legal authority and notes that there is no binding decision from the Fourth Circuit on this precise issue.[5] While several district courts in this circuit have found that an employee is exempt from the overtime requirements of the FLSA so long as he spends more than a de minimis amount of time operating commercial motor vehicles, the court finds that the recently published decision from the Third Circuit and its progeny more closely align with the express language of the TCA and is otherwise highly persuasive. Principles of statutory construction indicate that Congress intended to carve out an exception for certain employees of motor carriers—i.e. those who, at least "in part," drive vehicles weighing 10,000 pounds or less. See Ignacio v. United States, 674 F.3d 252, 254 (4th Cir. 2012) ("The starting point for any issue of statutory interpretation ... is the language of the statute itself. In that regard, we must first determine whether the language at issue has a plain and

---

5 The court acknowledges that the Fourth Circuit has upheld, by an unpublished decision, a decision from the Eastern District of North Carolina wherein the court adopted, in a footnote, the de minimis rule urged by Defendants here. See Buckner v. United Parcel Serv., Inc., No. 5:09-CV-411-BR, 2012 WL 1596726, at *5, n.3 (E.D.N.C. May 7, 2012) aff'd, 489 F. App'x 709 (4th Cir. 2012) (unpublished) (citing Avery and finding, "The court also notes that even though plaintiff himself may have operated vehicles weighing 10,000 pounds or less at certain times over the course of his employment, he nonetheless remains subject to the MCA exemption."). Nonetheless, the court notes that such unpublished decision, which contained no substantive discussion of the legal issues presented here, is not binding precedent on this court. Additionally, the court finds that the well-reasoned opinion of the Third Circuit explicitly took into account the legal stance adopted by Buckner, and found it not entirely in line with the express statutory intent of the TCA for the reasons explained therein.

unambiguous meaning with regard to the particular dispute ... and our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent.") (internal citations and quotation marks omitted). Additionally, as noted by several other district courts addressing this issue, the Department of Labor's Wage and Hour Division has administered two documents that support the court's reading of the TCA. See U.S. Dep't of Labor, Wage & Hour Div., Field Assistance Bulletin No.2010–2 (available at http://www.dol.gov/whd/FieldBulletins/) at *2–3 (interpreting Corrections Act to apply FLSA overtime-wage protections to drivers during workweeks in which they "in part" operate small vehicles even if they also operate large vehicles); U.S. Dep't of Labor, Wage & Hour Div., Fact Sheet # 19, (available at http://www.dol.gov/whd/fact-sheets-index.htm) at *2 (2009) (same); Heng Guo Jin v. Han Sung Sikpoom Trading Corp., No. 13-CV-6789 CBA LB, 2015 WL 5567073, at *7 (E.D.N.Y. Sept. 21, 2015); Hernandez v. Alpine Logistics, LLC, No. 08-CV-6254T, 2011 WL 3800031, at *5 (W.D.N.Y. Aug. 29, 2011). Though not binding, such interpretations are entitled to at least some deference from the court.[6] The court thus finds unpersuasive Defendants' argument that the TCA is inapplicable based on the fact that Plaintiffs spend more than a de minimis amount of time driving commercial vehicles.

Here, all Plaintiffs admit to using commercial delivery trucks to some extent. See Pl. Resp. SUMF (#181) at ¶18, p. 6 ("Plaintiffs do not dispute that, depending on their loads, they

---

[6] Guidance documents issued without the safeguard of notice and comment rulemaking are not entitled to Chevron deference. See Christensen v. Harris Cnty., 529 U.S. 576, 587 (2000); Precon Dev. Corp. v. U.S. Army Corps of Engineers, 633 F.3d 278, 295, n. 10 (4th Cir. 2011). Such interpretations, however, are "entitled to respect" to the extent they have the "power to persuade." Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944). "[A]n agency's interpretation may merit some deference whatever its form, given the specialized experience and broader investigations and information available to the agency and given the value of uniformity in its administrative and judicial understandings of what a national law requires." United States v. Mead Corp., 533 U.S. 218, 234 (2001) (internal citation and quotation marks omitted).

drive trucks with a GVWR exceeding 10,000 pounds on some—but not all—days of their

workweek."). However, there is no dispute that Plaintiffs also sometimes use their personal

vehicles (weighing less than 10,000 pounds) within the course of their duties. There is some

dispute as to the context in which they use such vehicles, as well as the extent of use—

Defendants argue that they only use them for "pull-ups," and Plaintiffs argue that they use them

more regularly to conduct deliveries. See (Pl. Resp. (#179) at p. 14-15 (citing ##113-34 at 68-

69)). Plaintiffs argue that they often use personal vehicles weighing less than 10,000 pounds,

instead of commercial trucks, at least twice a week. See Pl. Resp. SUMF (#181) at ¶¶ 83-84,

121-22, 210, 239, 259 (identifying at least five Plaintiffs who testified to using personal vehicles

at least twice a week to deliver Flowers products). The court determines that because Plaintiffs

work as motor carrier employees who at least "in part" "affect the safety of operation of motor

vehicles weighing 10,000 pounds or less," they are not exempted from the FLSA through the

MCA Exemption simply because their work also involves operating heavier vehicles. However,

because the parties dispute the extent to which plaintiffs use such vehicles, the court finds that

summary judgment is inappropriate. See Aikins v. Warrior Energy Servs. Corp., No. 6:13-CV-

54, 2015 WL 1221255, at *8 (S.D. Tex. Mar. 17, 2015)[7]; Rojas v. Garda CL Se., Inc., No. 13-

23173-CIV, 2015 WL 5084135, at *5 (S.D. Fla. Aug. 28, 2015); Heng Guo Jin v. Han Sung

---

7 The Aikins court held:

> The summary judgment evidence focuses on whether, how often, and under what circumstances
> Plaintiffs operated Ford F–250 pickup trucks. This is critical, because, as discussed in more detail
> below, Plaintiffs' eligibility for FLSA overtime pay depends on their use of 'motor vehicles
> weighing 10,000 pounds or less.' … It is not disputed that [employer's] Ford F–250s, operated
> without an attached trailer, fall at or below the threshold weight of 10,000 pounds.…The parties
> paint very different pictures concerning Plaintiffs' use of the pickup trucks. At this stage in which
> all inferences must be drawn in favor of Plaintiffs, that is enough to defeat summary judgment.

Aikins v. Warrior Energy Servs. Corp., No. 6:13-CV-54, 2015 WL 1221255, at *8 (S.D. Tex. Mar. 17, 2015).

Sikpoom Trading Corp., No. 13-CV-6789 CBA LB, 2015 WL 5567073, at *6 (E.D.N.Y. Sept. 21, 2015) ("Since there are triable issues of fact as to whether [plaintiff] drove a small vehicle in each and every workweek after the [TCA] went into effect, summary judgment is inappropriate."). The court will therefore deny Defendants' Motion for Summary Judgment on the MCA Exemption issue.

### B. Alleged Willful Violation of FLSA—Statute of Limitations

Defendants argue that Plaintiffs have failed to show that Defendants willfully violated the FLSA, which is required for the 3-year statute of limitations to apply. The FLSA contains a two-year statute of limitations on actions to enforce its provisions, but allows that "a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). "[A]n action under the FLSA is considered 'commenced' when the complaint is filed if the plaintiff is specifically named as a party, otherwise the date the plaintiff joined the collective action applies." Hantz v. Prospect Mortgage, LLC, 11 F. Supp. 3d 612, 617 (E.D. Va. 2014) (citing LaFleur v. Dollar Tree Stores, Inc., No. 2:12–cv–00363, 2012 WL 4739534, at *1 (E.D.Va. Oct. 12, 2012). See also 29 U.S.C. § 256. Defendants argue that all Plaintiffs who left their distributor positions prior to September 12, 2010 (two years before the Complaint was filed) must be dismissed. Defendants have identified three Plaintiffs (Helms, Long, and Gillelan) who filed their opt-in consents, and thus commenced their claims against Defendants, well outside of the two-year statutory period after they ended their distributor relationship with Flowers/Jamestown. (SUMF ¶¶ 243, 366, 425).

Plaintiffs bear the burden of proving a willful FLSA violation. See Hantz v. Prospect Mortgage, LLC, 11 F. Supp. 3d 612, 617 (E.D. Va. 2014) (citing Desmond v. PNGI Charles

Town Gaming, L.L.C., 630 F.3d 351, 358 (4th Cir. 2011)); Garcia v. Frog Island Seafood, Inc., 644 F. Supp. 2d 696, 714 (E.D.N.C. 2009). "Only those employers who 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]' have willfully violated the statute." Desmond, 630 F.3d at 358 (quoting McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988)). Negligence is insufficient to show willfulness. Id. Similarly, the Supreme Court noted in McLaughlin that an employer's violation of the FLSA is not willful if it is the result of a "completely good-faith but incorrect assumption that a pay plan complied with the FLSA in all respects." McLaughlin, 486 U.S. at 135. In sum, "if an employer acts unreasonably, but not recklessly, in determining its legal obligation," it is not acting "willfully." Id. at n. 13. Although willfulness is ultimately a question of fact, Plaintiff must present sufficient evidence of willfulness to survive summary judgment. Id.

Plaintiffs argue that this case presents egregious circumstances demonstrating willfulness. First, they argue that Defendants violated their discovery obligations and hid the existence of Mr. Woodward, former Flowers CFO. (#142 at p. 4). Second, Plaintiffs argue that when they learned of the existence of Mr. Woodward, Defendants tried to block efforts to take his deposition. (#158). Third, Flowers' Vice President Chuck Rich testified that the IRS made the determination that Flowers' Distributors were independent contractors, (#146-44 at pp. 26–31), but did not disclose that the IRS had actually informed Flowers that it was going to rule against Flowers' request for a letter ruling. (Woodward Dep. 70–73.) Plaintiff argues that these facts establish willfulness, but the court notes that they seem to relate more to discovery disputes than attempts to cover up known FLSA violations, as occurred in the cases that Plaintiffs cite in support. See Williams v. Maryland Office Relocators, 485 F. Supp. 2d 616, 621 (D. Md. 2007) (noting proof

of willfulness includes evidence of a scheme by defendants to cover up FLSA violations); <u>Martin v. Deiriggi</u>, 985 F. 2d 129, 136 (finding most damaging evidence was that defendants had destroyed some records and withheld others in order to impede investigation).

The court also notes that several district courts have declined to enter summary judgment on the willfulness issue until an FLSA violation has been conclusively established. <u>See, e.g.</u>, <u>Regan v. City of Charleston, S.C.</u>, No. 2:13-CV-3046-PMD, 2015 WL 5331627, at *14 (D.S.C. Sept. 14, 2015) ("because the City's liability is still an open question, the Court declines to reach and decide the City's alternative arguments related to its § 260 affirmative defense and the three-year statute of limitations.") (collecting cases). The court finds significant logic in such approach, and will therefore deny Defendants' motion on this issue without prejudice. The court finds that while Plaintiffs have not pointed to any overwhelmingly convincing evidence of willful violations of the FLSA at this time, it would be inappropriate to grant summary judgment where an FLSA violation has not even been affirmatively shown.

### C. Alleged Failure to Show that Recovery Of Liquidated Damages Is Appropriate

Defendants also argue that Plaintiffs' claims for liquidated damages must be denied under both the FLSA and NCWHA. 29 U.S.C. § 260 gives the court discretion to limit or deny liquidated damages where the employer is found to have acted in good faith and had reasonable grounds to believe his act or omission did not violate the FLSA. <u>See</u> 29 U.S.C. § 260 ("if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA] the court may, in its sound discretion, award no liquidated damages"). The NCWHA has a nearly identical provision, which authorizes the court to

discretionarily deny or limit liquidated damages for violation of the NCWHA where an employer "shows to the satisfaction of the court that the act or omission constituting the violation was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation" of the NCWHA. N.C. Gen. Stat. § 95–25.22(a1).

Here, Defendants seek a ruling that it acted in good faith, as a matter of law, with regard to its pay practices so as to preclude Plaintiffs from recovering liquidated damages for any alleged FLSA and NCWHA violations. Defendants argue that they acted in good faith and had an honest intention to ascertain and follow the FLSA for most of the same reasons cited in their arguments that they did not willfully violate the FLSA. The Fourth Circuit has interpreted "the exemption entailed by § 260 to place a plain and substantial burden upon the employer to persuade the court that the failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict." Mayhew v. Wells, 125 F.3d 216, 220 (4th Cir. 1997) (internal quotations and citation omitted). Furthermore,

> This defense requires the employer to prove an honest intention to ascertain and follow the law. An employer may not take an ostrichlike approach to the FLSA by simply remaining blissfully ignorant of FLSA requirements. It is not enough, though, that the employer honestly believes it is in compliance with the law; that belief must also be objectively reasonable.

Martinez-Hernandez v. Butterball, LLC, No. 5:07-CV-174-H 2, 2011 WL 4591073, at *3 (E.D.N.C. Sept. 30, 2011) (internal quotations and citations omitted).

As noted above, where no FLSA violation has been conclusively established, consideration of whether an employer acted in good faith in making such violation is premature. See Regan, 2015 WL 5331627, at *14 (denying employer's motion for partial summary judgment on the

issue of liquidated damages under the FLSA as premature); <u>Kelley v. TaxPrep1, Inc.</u>, No. 5:13-CV-451-OC-22PRL, 2015 WL 4488401, at *3 (M.D. Fla. July 22, 2015) ("because no FLSA violation has been established (or otherwise conceded), consideration of the issue of liquidated damages, and thus the associated affirmative defense of good faith, is premature."); <u>Martinez-Hernandez</u>, 2011 WL 4591073, at *4 (finding "summary judgment is not appropriate as to either Butterball's good faith reliance defense or its good faith defense to liquidated damages under 29 U.S.C. § 260 and N.C. Gen.Stat. § 95–25.22(a1)….there exist genuine issues of material fact concerning Butterball's intentions, the reasonableness of the steps taken by Butterball to ascertain its compliance or non-compliance with the FLSA and NCWHA, and whether Butterball's belief of compliance was objectively reasonable in light of …[applicable] legal developments."). Therefore, the court will deny Defendants' Motion without prejudice on this issue.

### D.    Waiver of Liquidated Damages Claims Pursuant to Distributor Agreements

In addition to the arguments presented in response to Plaintiff's Motion for Summary Judgment on the issue, Defendants argue that summary judgment is appropriate to the extent that Plaintiffs in the North Carolina class seek liquidated damages because approximately two hundred (200) Distributors signed Distributor Agreements containing the following limitation of damages provision:

> 20.12 Damages: Neither party shall be liable to the other for, and each party expressly waives, any consequential, incidental, special, exemplary or punitive damages.

(#117-17 at p. 4); Def. SUMF at ¶ 68. Defendants argue that this is a clear and unambiguous statement of intent to waive certain remedies, and contend that these types of provisions have typically been upheld in North Carolina. Defendants cite <u>United Labs., Inc. v. Kuykendall</u>, 335

N.C. 183 (1993), which noted that "[a]ny right, whether statutory or constitutional, ordinarily may be waived by the party entitled to it. We see no reason why a plaintiff in an unfair practices claim may not waive the right to recover treble damages and elect instead, for reasons satisfactory to the plaintiff, to recover untrebled compensatory damages." Id. at 194, n. 6. However, that case was not brought under the NCWHA, but rather, under the North Carolina Unfair and Deceptive Trade Practices Act. Thus, there would have been no reason for the court to be concerned about the policy considerations present in waiving wage and hour claims that the court has here.

Defendants admit that this provision in the Distributor Agreement cannot limit Plaintiffs' FLSA claims, absent approval from a court or the Department of Labor. See Def. Mem. Sup. Mot. Sum. J. (#147, p. 47, n. 27); Taylor v. Progress Energy, Inc., 493 F.3d 454, 460 (4th Cir. 2007) ("under the FLSA, a labor standards law, there is a judicial prohibition against the unsupervised waiver or settlement of claims.") (citing D.A. Schulte, Inc. v. Gangi, 328 U.S. 108, 114–16 (1946)).

Having carefully considered the issue, the court finds that its above reasoning regarding the inability of an employee to waive state wage and hour claims also applies to the issue of liquidated damages waivers. The court agrees with Plaintiffs that such releases violate public policy and the intent of the NCWHA. Just as the FLSA prohibits unsupervised settlement or waiver of claims, the court here finds that the NCWHA prohibits such waivers. The court will therefore deny Defendants' motion on this issue and invalidate the waiver in the same way that it would a waiver of a right to liquidated damages pursuant to an FLSA claim.

# V. DEFENDANTS' MOTION TO STRIKE PORTIONS OF DECLARATIONS

Defendants argue that portions of the Declarations submitted by Plaintiffs Danny Barnes, Paul English, Chris Helms, Kenneth Kirk, Willard Allen Riley, Mario Ronchetti, Bobby Shillinglaw, and Charles Solomon, filed in conjunction with Plaintiffs' opposition to Defendants' Motion for Summary Judgment (#179) and Response to Defendants' Statement of Undisputed Material Facts (#181), should be stricken because "Plaintiffs rely on self-serving Declarations submitted by Plaintiffs, despite each of these Plaintiffs having been deposed during discovery on the same topics." (#190).[8]

On a motion for summary judgment, a movant may demonstrate "that a genuine issue of material fact exists by referencing matters in the record, including depositions and affidavits." In re Family Dollar FLSA Litig., 637 F.3d 508, 512 (4th Cir. 2011) (citing Fed.R.Civ.P. 56(c)). A movant many not, however, "create a dispute about a fact that is contained in deposition testimony by referring to a subsequent affidavit of the deponent contradicting the deponent's prior testimony, for 'it is well established that a genuine issue of fact is not created where the only issue of fact is to determine which of the two conflicting versions of a party's testimony is

---

[8] Specifically, Defendants moved to strike the following paragraphs of Plaintiffs' Declarations:

1. Danny Barnes Declaration - ¶ 2
2. Chris Helms Declaration - ¶¶ 7, 9
3. Kenneth Kirk Declaration - ¶ 5, 10
4. Willard Allen Riley Declaration - ¶ 5, 6, 14
5. Mario Ronchetti Declaration - ¶ 8
6. Bobby Shillinglaw Declaration - ¶ 4
7. Charles Solomon Declaration - ¶¶ 4, 5

While Defendants stated in their motion (#190) that they sought to strike ¶ 15 of Paul English's Declaration, they made no argument as to that paragraph in their supporting memorandum (#191) or in their reply (#194). As the burden is on Defendants to explain to the court why any statements should be stricken, the court will deny the motion as to Mr. English's statement.

correct." Id. (citing Erwin v. United States, 591 F.3d 313, 325 n. 7 (4th Cir. 2010)). Indeed, the Fourth Circuit has repeatedly noted that:

> If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

Id. at 513 (4th Cir. 2011) (citing Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984)). Accordingly, courts are to disregard assertions in affidavits that are inconsistent with prior testimony when deciding whether to grant summary judgment. See Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 976 (4th Cir.1990). However, for this rule to apply, there must be a "bona fide inconsistency" between the earlier and later testimony. See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 n. 7 (4th Cir. 2001).

Defendants argue that portions of the above-named Plaintiffs' affidavits are inconsistent with prior testimony. They ask the court to strike any portion of any declaration that directly conflicts with prior deposition testimony, or, in the alternative, re-open discovery for the limited purpose of deposing Plaintiffs on the new, allegedly conflicting testimony provided in their declarations. Plaintiffs counter that Defendants mostly use selective editing to argue that the affidavits conflict with the deposition testimony and that they do not cite to any of the allegedly offending statements in their Response to Defendant's Motion for Summary Judgment. Upon review, while Plaintiffs do not appear to directly cite such testimony in the motion itself, they do cite some portions in response to Defendants' Statement of Undisputed Material Facts, which they then cite to by motion. Plaintiffs also correctly note that most of the offending statements are irrelevant to Defendants' summary judgment arguments—and relate more to whether Plaintiffs are independent contractors or employees (an argument that Defendants have conceded

employee status for the purposes of summary judgment). While the court is not surprised that both parties have attempted to characterize the deposition testimony in a manner that supports each of their arguments, it is the testimony itself that the court is concerned with, not the post-hoc classifications of counsel. Nonetheless, the court has carefully considered the declarations and deposition testimony, see (#191) (containing complete excerpts and citations to depositions in the record), and finds as follows regarding the Motion to Strike:

1. *Mario Ronchetti Declaration - ¶ 8*

The Motion to Strike Mr. Ronchetti's statement at ¶ 8, "I regularly use my personal vehicle to do pull ups, just like most every other bread man in the industry, because it is cheaper on fuel and easier and faster than using the company vehicle." is **DENIED** because the court finds there is no bona fide inconsistency between his testimony regarding the amount of time he typically used a personal vehicle to conduct pull-ups.

2. *Kenneth Kirk Declaration - ¶ 5, 10*

The Motion to Strike Mr. Kirk's statement in ¶ 5- "I do not deliver to Goodwill," is **GRANTED**, as such statement directly contradicts earlier statements that he delivered to Goodwill. See (#113-29, at p. 22-23; 26). Plaintiffs argue that Mr. Kirk delivered to Goodwill at the time of his May 2014 deposition, but had stopped delivering to Goodwill at the time of his September 2015 declaration. While the court has no reason to doubt such explanation from counsel, it is not indicated in the declaration, and the court cannot let the bona fide inconsistency as to this fact stand.

The motion to Strike Mr. Kirk's statement in ¶ 10—"I do not suggest any sales or different products to customer during pull ups. I only restock shelves when I deliver and do pull ups." is

**GRANTED** insomuch as Mr. Kirk clearly stated in his deposition that he does speak to customers and "try to offer [his] product" while conducting pull-ups. <u>See</u> (#113-29, at p. 66-67).

 3. *Danny Barnes Declaration - ¶ 2*

The Motion to Strike Mr. Barnes' statement in ¶ 2—"I did not have control over the amount of products I could order for national chain accounts. I could not change anything in the computer." is **DENIED** because the court finds no bona fide inconsistency between Mr. Barnes' statement that he could not control sales on his <u>national</u> accounts and his deposition testimony.

 4. *Chris Helms Declaration - ¶¶ 7, 9*

Mr. Helms' statement in ¶ 7, "I ordered the products I was told to order by Flowers managers. I could not make different decisions about products…" contradicts his prior statement in his deposition that while a manager from Flowers/Jamestown would typically tell him what to order, he would sometimes order products on his own when he had not spoken with a manager. <u>See</u> (#146-24) at p. 3-6. As the deposition testimony in its entirety clearly speaks for itself, and Mr. Helms' later statement does create a bona fide inconsistency, Defendants' motion to strike ¶ 7 is **GRANTED.**

Mr. Helms' statement in ¶ 9, "I regularly used my small personal vehicle, a Dodge Durango, to transport Flowers bread and cake products. I used my personal vehicle at least two days a week and sometimes more if a customer needed products outside of the normal delivery window," does not completely contradict his prior deposition that he used a Nissan Altima to conduct pull-ups. <u>See</u> (#146-24, p. 111). To the extent that Defendants wish to introduce evidence that Mr. Helms used two different cars to conduct pull-ups at trial, and to introduce evidence of the respective vehicle weight, it may do so. However, the court finds no bona fide

inconsistency in these statements, as it is entirely plausible that Mr. Helms used two different personal vehicles in the course of his distributorship. The Motion to Strike ¶ 9 is **DENIED**.

5. *Willard Allen Riley Declaration - ¶ 6, 14*

Defendants' Motion to Strike Mr. Riley's statement at ¶ 6, "Flowers controls things like displays, end caps…" is **DENIED** as no bona fide inconsistency exists between the statement and the prior deposition testimony. Indeed, the deposition excerpt cited by Defendants indicates that Mr. Riley had to get consent from someone at the warehouse to obtain a display.

Defendants' Motion to Strike Mr. Riley's statement at ¶ 14, "I have to do pull ups every afternoon because of the delivery schedule that the accounts have set and because of the bread space that Flowers provides me in my accounts. I have no control over that." (Riley Decl. ¶ 14) is **GRANTED** insomuch as the statement creates a bona fide discrepancy with prior deposition testimony. In his deposition testimony, Mr. Riley explained that depending on his supervising manager at the time, he had more flexibility to do pull ups at different times of day, and could choose to do pull ups in the morning or not at all depending on various factors. See (#113-36, pp. 62-63; #113-37, p. 8).

6. *Bobby Shillinglaw Declaration - ¶ 4*

Defendants' Motion to Strike Mr. Shillinglaw's statement at ¶ 4 "I could not get displays or shelf space whenever I wanted" is **GRANTED** insomuch as it creates a bona fide discrepancy between his prior deposition testimony stating: "it depends on what the display was, whether I would try to get a display or not. But I could basically get one whenever I wanted because I had a good relationship with the people down there." (#113-48, pp. 44-45).

*7. Charles Solomon Declaration - ¶¶ 4, 5*

Defendants' Motion to Strike Mr. Solomon's statement at ¶ 4, "I never made the decision of how many hours to work" is **GRANTED** because it creates a bona fide discrepancy between his prior deposition testimony, which explained in more detail the way his work hours were determined depending on a variety of factors. See (#113-49, pp. 42-43). Upon being asked at his deposition if Flowers/Jamestown dictates how many hours he must work in day, Plaintiff Solomon stated "no." Id

Defendants' Motion to Strike Mr. Solomon's statement at ¶ 5, "There was constant oversight from Flowers management. Nearly every aspect was micromanaged by Flowers management. I have hardly any freedom to run the route the way it should have been." is **DENIED** as there is no bona fide inconsistency between that statement and the deposition testimony, see (#146-59, pp. 7-9; #113-49, p. 42), which related to uniforms, order placement, and hours worked.

In light of the above rulings, the court reminds Defendants that inconsistent statements remain excellent fodder for cross-examination at trial. While the court is well aware of the rules governing inconsistent testimony in litigation, it is also cognizant of the nature of deposition testimony and the ability of skilled litigators to spin it in support of their legal arguments. To the extent that the motions to strike herein are denied, they shall be denied without prejudice as to reassertion at trial should Defendants feel compelled to introduce such evidence.

## VI.  CONCLUSION

For the reasons explained herein, the court will grant in part and deny in part Plaintiffs' Motion for Summary Judgment as explained herein, deny Defendants' Motion for Summary Judgment as explained herein, and grant in part and deny without prejudice in part Defendants' Motion to Strike. The court therefore enters the following Order.

## ORDER

**IT IS, THEREFORE, ORDERED** that:

1. Plaintiff's Motion for Partial Summary Judgment (#144) is **DENIED in part** as to the FLSA Outside Sales Exemption issue and **GRANTED in part** as to the release of NCWHA claims;

2. Defendants' Motion for Summary Judgment (#146) is **DENIED**, and the motion is **DENIED without prejudice** as to the issues of willful FLSA violations and liquidated damages; and

3. Defendants' Motion to Strike Portions of Declarations Submitted in Opposition to Defendants' Motion for Summary Judgment (#190) is **GRANTED in part and DENIED without prejudice in part** as explained herein.

Signed: February 12, 2016



Max O. Cogburn Jr.
United States District Judge