IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SCOTT REHBERG, WILLARD ALLEN RILEY, and MARIO RONCHETTI, individually and on behalf of all similarly situated individuals, | Court File No. 3:12-cv-00596-MOC-DSC |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR CLARIFICATION OF THE CLASS CERTIFICATION ORDER AND SCOPE OF AVAILABLE DAMAGES** |
| v. | |
| FLOWERS FOODS, INC. and FLOWERS BAKING CO. OF JAMESTOWN, LLC, | |
| Defendants. | |

## I.        Introduction

Seemingly acknowledging their liability to Distributors for unpaid overtime premium pay and reimbursement for illegal wage deductions, Defendants ask this Court to skip past trial and make a determination of available damages. The damages model in this case is simple and well-established. Distributors are owed damages under two different statutory claims: the Fair Labor Standards Act (FLSA) and the North Carolina Wage and Hour Act (NCWHA). FLSA overtime damages are calculated by dividing the regular rate of pay in half and multiplying that amount by the number of hours worked over 40 in a given week. NCWHA damages are calculated by adding the wages Defendants deducted from Distributors' weekly pay checks.[1] Defendants do not dispute these methods. Rather, Defendants ask the Court to reclassify Distributors' income as "profits" and allow them to take a credit for, or offset, Distributors' damages using the purported "profits." Defendants identify two sources of profits: (1) commission earned by Distributors and (2) the sale of some or all of their route to other Distributors. The law is clear that Defendants

---

[1] Both statutes provide for liquidated damages, interest, and attorneys' fees and costs.

may not take credit for either source of income. Defendants' request to recast this income as "profits" and use it to offset their damages must be denied.

## II. Facts

Defendants Flowers Foods, Inc. and Flowers Baking Co. of Jamestown, LLC employ Plaintiff-Distributors to deliver their bakery products to grocery stores, restaurants, institutions, and other retail outlets. Defendants pay Distributors a commission calculated as the difference between the price a retailer pays for the product and the price at which Flowers provides the products to the distributor. (Dkt. 107-1 at p. 35.) Flowers pays the commission to Distributors on a weekly basis and reports earnings on a weekly settlement statement. (Ex. 1, Rehberg Dep. 2, 75:4–19; Ex. 2, Ronchetti Dep. 1, 21:2–9; Dkt. 113-37 at p. 13, 16.) Flowers deducts certain job-related expenses such as warehouse fees and administrative fees out of Distributors' weekly settlement statements. (Ex. 1, Rehberg Dep. 2, 157:24–159:2; Ex. 3, Ronchetti Dep. 2, 166:23–168:8.) The net difference between the commissions earned and deductions made by Flowers and federal employment taxes, is the Distributors' weekly take home pay.

Flowers classifies Distributors as statutory employees for tax-reporting purposes and as independent contractors for all other purposes. (Dkt. No. 146-44 at p. 28.) In 1985 or 1986, Flowers requested a private letter ruling from the IRS approving the independent contractor classification. (*Id*.) Flowers' former Chief Financial Officer, Jimmy Woodward, met with IRS officials in 1986 or 1987; the participants of the meeting discussed the fact that the IRS was going to "rule unfavorably" on Flowers' request for letter ruling. (*Id*. at 68–74.) The IRS verbally communicated that they did not think that there was sufficient investment in facilities by the distributor because the company finances the purchase of the route and there is no down

payment.[2] (Woodward Dep., Dkt. 180, p. 73.) In response to the IRS's indication that it was going to rule adversely on Flowers' request for letter ruling, the company immediately withdrew the request for letter ruling and unilaterally classified its distributors as statutory employees for FICA withholding purposes. Flowers continued to treat distributors as independent contractors for all other purposes. (*Id.* at 73–74; *see also id.* at 87–88.) The relevant effect of the statutory employee classification is that Flowers must report Distributors' wages to the IRS, and withhold federal income taxes from Distributors' weekly settlement reports. (Dkt. 180 at p. 20.)

Former CFO Woodard, testified that as the tax manager, he was extensively involved in the process of calculating Distributors taxable wages. (*Id.*) Mr. Woodward testified that Defendants use their weekly settlement process to "make some estimate of the FICA and collect it and then remit it just like you would for any employer/employee relationship." (*Id.*) Defendants also hire accountants to assist Distributors in their record keeping so that they could submit a statement of their commissions and expenses to Defendants. (*Id.*; Ex. 4, Rich Dep. Vol. I, 198:18–200:3.) Defendants' calculations of payroll taxes owed to the United States have been the subject of IRS audits over the years. (Dkt. 180 at p. 21.) In one such audit Defendants entered into a settlement agreement with the IRS regarding the company's underreporting income earned by Distributors. (*Id.* at pp. 44–45, 56.) It is this weekly income—the same income that Flowers reports to the IRS as wages—that Flowers now recasts as "profits" and asks this Court to deduct from Distributors' damages.

When a Distributor stops working for Flowers—whether voluntarily or involuntarily—the Distributor transfers his route to a third party individual. Flowers calls this process a route

---

[2] Having an insufficient investment in facilities and equipment by the worker is a factor signifying "employee" rather than "independent contractor" status under the economic realities test. *Wirtz v. Welfare Finance Corp.*, 263 F.Supp.229, 236 (N.D. W. Va. 1967).

"sale." (Ex. 5, Holshouser Dep. Vol. I, 79:6–23.) A route "sale" may also occur when the geography of a Distributor's route changes, which, too, may be voluntarily or involuntary. (Ex. 6, Holshouser Dep. Vol. II, 289:12–22; Dkt. 113-34 at pp. 65–66.) In either event, a transaction takes place between the Distributor and a third party (who may be another Distributor) in which the third party transfers money to the Distributor in exchange for the ability to work the route. (Dkt. 113-34 at pp. 3–4.) In such a transaction, Flowers takes a 5% "transaction fee" and the remainder of the money is paid by the third party directly to the Distributor. (*See id.*) There is no evidence that Flowers records the transaction on its gross receipts. Despite the fact that the transaction is funded by a third party and not by Flowers, Flowers asks this Court to give Flowers credit for the amount of this payment to offset the damages it is required to pay as the result of Flowers' violations of the Fair Labor Standards Act and the North Carolina Wage and Hour Act.

## III. Argument

### A. The Class Certification Order Does Not Require Clarification Because Plaintiffs Do Not Dispute Defendants' Characterization of It

Plaintiffs agree that the Court's class certification order is limited to claims for unlawful deductions under the North Carolina Wage and Hour Act ("NCWHA") for warehouse and administration fees. No clarification of the class certification order is required.[3]

---

[3] It is undisputed that Flowers takes deductions from the Distributors' wages for a number of other business expenses that Plaintiffs believe are unauthorized in violation of the NCWHA. Plaintiffs acknowledge, however, that based on the record in existence at class certification, the Court certified the NCWHA claim to encompass only the administrative and warehouse fees. Plaintiffs, recognize, therefore, that deductions at trial will be limited to these categories.

**B.  Income Earned by Plaintiffs from the Sale of Products Are Their Regular Wages Under the FLSA, Not "Profits"**

The FLSA requires employers to pay employees for all hours worked. The Act further provides, "no employer shall employ any of his employees … for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the *regular rate* at which he is employed." 29 U.S.C. § 207(a)(1) (emphasis added). In order to determine the amount of overtime damages owed, it is necessary to first define the "regular rate of pay" of an employee. This "regular rate" under the Act is a "rate per hour." 29 C.F.R. § 778.109. Although the Act does not require employers to compensate employees on an hourly basis, the regular rate must be computed on an hourly basis in order to determine the amount of overtime owed. *Id.* Once the "regular rate" is determined, overtime damages are calculated by dividing the regular rate in half and multiplying that amount by the number of hours worked over 40 in a given week. This is the way FLSA damages calculations have been done since at least 1944. *See Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424, 65 S. Ct. 1242, 1245, 89 L. Ed. 1705 (1945) ("As we have previously noted, the regular rate refers to the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed. … In the case of piece work wages, this regular rate coincides with the hourly rate actually received for all hours worked during the particular workweek, such rate being the quotient of the amount received during the week divided by the number of hours worked.") (internal citations omitted). This well-established computation model must be applied here.

Here, Defendants compensate Distributors on a commission basis. Distributors receive products from Defendants at a specified "discount" (generally 20 percent) and then sell the product to customers at the non-discounted wholesale price. (*See* Dkt. 145-1 at pp. 19–21. *See*

*also, e.g.* Ex. 1, Rehberg Dep. 2 Ex. 3 (exemplar weekly settlement reports showing wages earned by Plaintiff Rehberg for one week in the lower right hand corner).) For example, if retailer pays $1.00 for a product, the Distributor receives the product from Flowers for $0.80 and sells it to the retailer for $1.00, resulting in a $0.20 commission. Distributors are paid by Defendants each week via a settlement sheet generated by Defendants' SAP computer system. (Ex. 7, Frye Dep., 37:9–16; Dkt. 145-1 at p. 19.) The settlement sheet includes the discounted value of product received by the Distributor from Defendants, the non-discounted wholesale value of product "sold" by the Distributor to retailers,[4] and various other charges and credits. The "balance," (if positive) is deposited in the Distributor's bank account.

The regulations implementing the FLSA specifically state that commission payments "are payments for hours worked and must be included in the regular rate. This is true regardless of whether the commission is the sole source of the employees' compensation or is paid in addition to a guaranteed salary … or on some other basis … ." 29 C.F.R. § 778.117. Accordingly, to calculate a Distributor's "regular" hourly rate, the balance on the weekly settlement sheet[5] would be divided by the number of hours a Distributor worked in a given week.

Defendants, without any support, appear to argue that these weekly earnings are not wages at all, but are rather exclusively "profits" earned by the Distributor that Defendants are able to be offset against the damages owed to Plaintiffs. Defendants ask this court to reclassify

---

[4] The only product sales not reflected on the weekly settlement sheet are sales made to "cash accounts," which, as the name implies, are customers who pay Distributors in cash. The vast majority of accounts, however, are charge accounts, representing customers who pay with credit. These payments are processed through the subsidiary and reflected on the settlement sheet. Defendants apparently do not distinguish between these two types of accounts, but rather allege that every cent earned by a Distributor through the "sale" of product under Defendants' compensation scheme is a "profit."

[5] Plaintiffs contend that this balance should exclude charges for illegal deductions.

Plaintiffs' commission earnings to "profit" and then ask that the same money be used to offset Plaintiffs' wage damages based upon the reclassification. This is the sort of manipulation of facts that the United States Supreme Court has sternly rejected: "The regular rate by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments. It is not an arbitrary label chosen by the parties; it is an actual fact. Once the parties have decided upon the amount of wages and the mode of payment the determination of the regular rate becomes a matter of mathematical computation, the result of which is unaffected by any designation of a contrary 'regular rate' in the wage contracts." *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 424–25. The regular rate of pay Defendants paid to Plaintiffs is based upon the commission Defendants paid to Plaintiffs for performing their jobs, regardless of what Defendants want to call it.

Defendants' effort to reclassify their payments to Plaintiffs is purely litigation-driven. Indeed, Defendants have been classifying the payments they make to Distributors as wages for decades and representing as much to the IRS on their annual tax submissions, and Defendants actually pay payroll taxes on those wages. (*See* Ex. 4, Rich Dep. Vol. I, 198:18–199:12; Dkt. 118-5 at p. 8 ("it's in the distributor's best interests financially that he be a statutory employee because he's paying half of his FICA tax and the bakery's matching the other half as opposed to being a—having to pay both portions.").) Due to Defendants' classification of distributors as statutory employees for tax purposes, Defendants are required to calculate and report Distributors' income to the IRS. (Dkt. 180 at p. 20.)

Former CFO Woodward testified that Defendants use their weekly settlement process to calculate Distributors' income for IRS wage-reporting purposes. (*Id*.) This is because Flowers' Distributor wage calculations have been the subject of IRS audits over the years. (Dkt. 180 at

7

p. 21.) And at least one audit resulted in a settlement agreement with the IRS requiring the company to pay taxes on Distributor income that it underreported. (*Id*. at pp. 44–45, 56.) Since then, Flowers has hired and used outside accountants to assist Distributors in tracking their out-of-pocket expenses so that the reporting would be more accurate. (Ex. 4, Rich Dep. Vol. I, 198:19–200:3.) For decades, Flowers and Distributors have understood that the company uses commissions reflected on weekly settlement reports to calculate wages reported to the IRS. To call the wages Defendants paid to Plaintiffs anything else for the first time at this late stage of litigation does not reflect reality.

Even if Defendants could simply ignore their contrary representations to the IRS, their re-characterization of Plaintiffs' earnings to manipulate a reduction in their liability is unsupportable. First, the FLSA itself lays out payments that are and are not included in the regular rate of pay and defines three types of payments which may be used by employers to meet their overtime obligations. 29 U.S.C. § 207(h)(2). Defendants did not even cite to these governing provisions, let alone attempt to argue that these alleged "profits" fit within the statutory exceptions. Moreover, even if there were some exception that applied to these earnings (there is not), it is wholly unclear how Defendants intend to *define* the underlying regular rate of pay. Defendants make no attempt whatsoever to propose a method of calculating overtime damages. As a result, Defendants' argument that Plaintiffs' alleged "profits" from the sale of products can be offset against their damages must be rejected. These earnings cannot be characterized as anything other than commissions, and as such, they must be included in the Distributors' regular rate of pay.

**C.     Defendants May Not Offset Their Liability Based on Plaintiffs' Alleged "Profits" from the Sale of Distributorships**

Defendants seek to offset from their overtime liability under the FLSA and their liability for illegal deductions under the NCWHA, amounts Defendants characterize as "profits" received by Plaintiffs. The alleged "profit" arising from Distributors' "sales" of product should not be offset because such amounts constitute Plaintiffs' wages, as argued above. Defendants argue in a similar fashion that Plaintiffs receive a "profit" when, with Defendants' consent, they transfer the distributorship to another party in an arrangement facilitated by Defendants. Defendants' ubiquitous use of the word "profit" in the context of Plaintiffs' compensation brings to mind the quote from *The Princess Bride* (1987): "You keep using that word. I do not think it means what you think it means."

Defendants seem to argue that any amount a Plaintiff receives when he assigns his distributorship to a third party is a "profit," without any consideration or calculation of the fixed costs and numerous business expenses the Plaintiff has borne in operating the route under Defendants' employment scheme, such as the cost of the vehicle used to transport the Defendants' products. One cannot calculate a "profit" without consideration of expenses; hence Defendants' use of the word "profit" in this context is misleading and inaccurate.[6] Nevertheless, the law is also clear that any "profits" from the sale of distributorships, regardless of how "profit" is defined, may not be used to offset damages under either the FLSA or the NCWHA.

---

[6] As demonstrated herein, no offsets are allowed under either the FLSA or the NCWHA for the alleged "profits" argued by Defendants. Even if there were an offset, any alleged "profit" would need to first be reduced by all of the business expenses incurred by Distributors in performing their work for Flowers.

###### 1. The FLSA Does Not Permit These Offsets

The FLSA allows employees to sue for "their unpaid minimum wages, or their unpaid overtime compensation." 29 U.S.C. § 216(b). Defendants here, in disregard of the statutory provisions of the FLSA and Fourth Circuit precedent, attempt to evade their obligations under the FLSA by arguing that the so-called "profits" Plaintiffs receive from any whole or partial sale of their distributorships should reduce the amount of damages they may recover under the FLSA. Two critical facts should be noted about these alleged "profits." First, these were not payments made to Plaintiffs as compensation for hours worked.[7]  Second, these were not payments made to Plaintiffs by Defendants; rather, they were made by third parties. As explained below, both of these undisputed facts absolutely preclude these payments from being used by Defendants to offset their obligations under the FLSA. Defendants' arguments to the contrary not only ignore the statutory language and implementing regulations that define and limit offsets, but are wholly contrary to the consistently-expressed principle in the Fourth Circuit that payments and benefits made to employees from sources *other than the employer* may not be used to reduce an employer's liability to an employee for unpaid wages.

###### a) None of the Statutorily-Permitted Offsets Apply Here

As discussed above, the FLSA defines certain types of payments that may be used by employers to meet their overtime obligations under the FLSA. 29 U.S.C. § 207(e)(5), (6), (7) and (h)(2). Defendants have not cited these provisions nor argued that any apply to the alleged profits here, and a review of the provisions confirms that none apply. Rather, each address "extra compensation provided by a premium rate" paid to the employee by the employer for extra hours

---

[7] If the money Plaintiffs receive from third parties for the "sale" of their routes is, in fact, wages paid for hours worked, then that amount must be included in the regular rate of pay calculation and Defendants must pay overtime premium wages based upon that amount.

or days worked. None of the provisions apply to payments made to employees by third parties that bear no relation to their hours worked. Accordingly, Defendants have no support in the FLSA or it is implementing regulations to support their offset argument. *See* 29 C.F.R. § 778.216 (stating that with regard to "payments [that] are not made as compensation for the employee's hours worked in any workweek, no part of such payments can be credited toward overtime compensation due under the Act."); 29 C.F.R. § 778.201 ("No other types of remuneration for employment may be so credited.").

### b) The Fourth Circuit Does Not Allow Offsets for Payments Made by Third Parties

Apparently unbeknownst to the Defendants, the Fourth Circuit has considered the issue of offsets numerous times in the employment context. Most recently, the court decided in *McFeeley v. Jackson Street Entertainment*, No. 15-1583, 2016 WL 3191896, ____ F.3d ____, (4th Cir. June 8, 2016), that an employer was not entitled to use "tip credits" or "service charges" to offset its minimum wage liability. *McFeeley* involved an employment status misclassification claim against an exotic dance club. The plaintiffs, who were dancers at the club, had been paid in two ways—through tips and performance fees. *Id.* at *7. Performance fees were set by the club, but paid directly to the dancers. *Id.* at *8.

The court looked to specific provisions of the FLSA to determine whether there was an applicable set-off. It first concluded that the employer could not claim the tips as a "tip credit" under 29 U.S.C. § 203(m). *Id.* at *7. The court then characterized the performance fee as a "service charge" which is defined in the FLSA as a "compulsory charge for service … imposed on a customer by an employer's establishment." 29 C.F.R. § 531.55(a). To count a service charge as an offset, the charge "must have been included in the establishment's gross receipts and it must have been distributed by the employer to its employees." *McFeeley*, 2016 WL

3191896, at *7 (emphasis added) (citing 29 C.F.R. § 531.55(b); *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 929 (S.D.N.Y. 2013)). The Fourth Circuit held that "since none of [the service charges] ever went to the clubs' proprietors, defendants … could not have distributed any part of those service charges to the dancers. … As a result, the 'service charge' offset is unavailable to defendants." *Id.* at *7.

This principle in *McFeeley* is also consistent with a line of cases in the Fourth Circuit that do not allow employers to offset their liability when employees receive payments or benefits from sources other than the employer. For example, in *Fariss v. Lynchburg Foundry*, 769 F.2d 958 (4th Cir. 1985), the plaintiff alleged he was owed damages under the ADEA for the loss of a life insurance policy. Although the court allowed the employer to offset its damages by the lump sum pension the plaintiff received from his employer upon his termination, the Court stated:

> A payment made entirely by the employer directly to the employee is not a "collateral benefit" within the meaning of *NLRB v. Gullett Gin Co.*, 340 U.S. 361, 364 (1951) (holding unemployment compensation benefits collateral and exempt from offset in labor case). Collateral benefits are those received from a source distinct from the employer; they are not offset because they do not discharge an obligation of the employer, but serve an independent social policy.

*Fariss*, 769 F.2d at 966, n.10. The Fourth Circuit has often repeated the principle that payments and benefits received from a source *other than the employer* cannot be offset against damages owed to the employee. *See Hylind v. Xerox Corp.*, 381 F. App'x 819, 824–25 (4th Cir. 2012) (holding district court erred in offsetting disability payments from back pay award); *Sloas v. CSX Transp., Inc.*, 616 F.3d 380, 389 (4th Cir. 2010) ("compensation from a collateral source should be disregarded in assessing … damages.").

The underlying principle expressed in *all* of these cases is equally applicable here—when the employer does not (1) include the payments in its gross receipts and (2) distribute the

payments or profits to the employees, it cannot offset those payments against its obligations under the FLSA. Here, the profit allegedly received by Plaintiffs is from partial or total sales of their distributorships. By Defendants' own admission, these sales are *made to third parties*. *See* Br. at 4 ("Plaintiff Rehberg sold his distributorship to an outside buyer at an ultimate take-home profit of more than $67,000."). Defendants do not allege that they make the actual payments to Plaintiffs. Nor have Defendants alleged that they counted these payments made to Plaintiffs in their gross receipts, or even that they recorded them in any way. *Cf. McFeeley*, 2016 WL 3191896, at *8. While Flowers occasionally acts as a middleman in the transaction, and receives a 5% kickback for its participation, it is undisputed that any payment in consideration for a route comes from a third party, not from Flowers. Accordingly, based on the principles expressed by the Fourth Circuit, Defendants should not be allowed to offset these supposed profits against the damages they owe to Plaintiffs for unpaid overtime because Flowers is not the source of the payments.

### c) Defendants' Cases Are Inapplicable

The FLSA cases cited by Defendants do not support their theory that amounts received as "profits" should offset amounts due for overtime under the FLSA. Virtually every case cited by Defendants involves a situation where an employer shifted payment for the overtime hours worked in subsequent pay periods. *See* Br. at 8–9. As such, they merely follow the offset rule espoused in cases such as *Singer v. City of Waco, Tex.*, 324 F.3d 813, 826 (5th Cir. 2003), which allow an employer to set-off wage overpayments in some work periods against shortfalls in others. *See also Martin v. PepsiAmericas, Inc.*, 628 F.3d 738, 742 (5th Cir. 2010) ("We continue to look with disfavor on set-offs [under the FLSA] unless the money being set-off can be considered wages that the **employer pre-paid to the employee**." (emphasis added)).

Thus, in *Lupien v. City of Marlborough*, 387 F.3d 83 (1st Cir. 2004) and *Roman v. Maietta Constr., Inc.*, 147 F.3d 71 (1st Cir. 1998), the court permitted a set-off where "in any given week, any hours in excess of forty worked by the employee would be 'held' as 'compensatory time' and be paid out at the regular rate or taken by the employee as paid time off in subsequent weeks when the employee worked fewer than forty hours." *Lupien*, 387 F.3d at 88 (characterizing *Roman*). *See also D'Camera v. District of Columbia*, 722 F. Supp. 799, 803–04 (D.D.C. 1989) (same); *Bray v. Dog Star Ranch*, No. 1:08-cv-1005, 2010 WL 889908, at *15 (E.D. Mich. 2010) ("during certain pay periods, Defendants paid Plaintiffs as though they worked forty hours a week even though Plaintiffs worked less than the hours for which they were paid. Defendants are entitled to a credit for those overpayments."); *McCoy v. N. Slope Borough*, No. 3:13-cv-00064, 2013 WL 4510780, *19 (D. Alaska Aug. 26, 2013) (FLSA set-off permitted where "Plaintiffs generally worked only two out of every four weeks throughout the year, but were paid for 75 hours every two weeks."); *Albanese v. Bergen County, N.J.*, 991 F. Supp. 410, 414 (D.N.J. 1997) (in FLSA action for off-the-clock time K-9 officers spent taking care of police dogs, court set-off a negotiated "yearly stipend to compensate plaintiffs for the additional work they performed as K-9 handlers.").

Every one of these cases involves a ***direct link*** between the proposed offset paid and the hours worked by the employee. This is in stark contrast to the alleged distributorship "profit" amounts Defendants seek to offset here. These amounts are completely unknown to a Distributor prior to his leaving the route or portion of the route, are calculated only at the end of service and bear absolutely no relation to any hours actually worked by a Distributor. As a result, the cases Defendants cite in support of their set-off theory are inapplicable to these facts.

The lone decision Defendants cite that does not involve an employer shifting overpayments in one pay period to underpayments in another is the out-of-circuit district court decision, *Allen v. Entergy Operations, Inc.*, No. 11-1571, 2016 WL 633779 (E.D. La. Feb. 17, 2016). That FLSA case permitted a set-off of payments made to employees under an "incentive bonus program." But *Allen* did not involve the misclassification of employees as independent contractors; it involved the misclassification of non-exempt employees as exempt employees under the FLSA. Thus the numerous issues relating to independent contractor misclassification were not involved, such as the willful shifting of employer business expenses onto its employees. Moreover, it is obvious that the incentive bonuses were paid to the employees *by the employer*. *Id.* at *9. In such a case, when the *employer* has made payments it would not otherwise have made, it could be permissible to allow the employer to offset those payments against the damages owed. Here, however, these route "sales" were made to third parties, not to Flowers. Accordingly, it makes no sense to allow Flowers to use payments made by third parties to offset their obligations under the FLSA.

Ultimately, Defendants' argument is based solely on principles of equity. As is evident from the above discussion, however, equity only arises in the cases cited by Defendants because the **employers** made payments to the employees, and the courts found it would be inequitable to require the employers to pay the employees twice for the same work. *See, e.g.*, *Allen*, 2016 WL 633779, at *9. This is simply not the case here because Defendants did not make these payments or provide these "profits" to Plaintiffs. Rather, Plaintiffs were paid by third parties; the payments bear absolutely no relation to hours worked; and Defendants' characterization of Plaintiffs' compensation entirely ignores the business expenses they shifted to Plaintiffs (to Plaintiffs'

detriment and Defendants' benefit. Defendants thus have no equitable interest that should allow them to escape their overtime obligations under the FLSA.

### 2. There Is No Basis For Offsetting Alleged "Profits" From Illegal Deductions Under the NCWHA

Defendants also ask the Court to offset the supposed "profits" received by class members against the amounts Defendants illegally deducted from their wages under the North Carolina Wage and Hour Act, N.C.G.S. § 95-25.8. There is no authority for this position. Instead, Defendants simply assert that "[t]his Court has recognized in earlier decisions in this case that [the] NCWHA mirrors the FLSA." Br. at 7. This mischaracterizes both the law and this Court's rulings.

North Carolina General Statutes § 95-25.8 requires an employer to obtain specific written authorizations from an employee before making any wage deductions. "The statute offers employers two options of written authorizations to deduct wages." *Whitehead v. Sparrow Enterprise, Inc.*, 605 S.E.2d 234, 238 (N.C. App. 2004). Written signed authorizations may be for a "'known' sum of money … or a blanket authorization … for an unknown amount of money." *Id.* If an employer does not obtain authorizations for the deductions made from their employees' pay, the employer is "as a matter of law, … liable for violating N.C.G.S. § 95-25.8." *Gaxiola v. Williams Seafood of Arapahoe, Inc.*, 776 F. Supp. 2d 117, 131-32 (E.D.N.C. 2011). [8]

While courts do look to the FLSA for guidance in interpreting the NCWHA, this doctrine applies only to those provisions of the NCWHA which actually mirror the FLSA. *See Whitehead*, 605 S.E.2d at 237 ("judicial and administrative interpretations and rulings established under

---

[8] Under N.C.G.S. § 95-25.22, an employee may recover all "unpaid amounts due under G.S. § 95-25.6 through 95-25.12," including "liquidated damages in an amount equal to the amount found to be due as provided in subsection (a)."

federal law may serve as a guide for interpreting North Carolina laws when our legislature has adopted provisions of the FLSA."); *Garcia v. Frog Island Seafood, Inc.*, 644 F. Supp. 2d 696, 707 (E.D.N.C. 2009) (N.C. Dept. of Labor will look to federal law "where the legislature has adopted the language or terminology of the FLSA for the purpose of facilitating and simplifying compliance by employers with both the federal and state labor laws," quoting 13 N.C.A.C. § 12.0103).[9]

Here, there is no provision of the FLSA comparable to § 95-25.8 of the NCWHA. The FLSA does not mandate prior written authorization for deductions from wages. Thus, this is not a situation where the North Carolina legislature "has adopted provisions of the FLSA" in state law. *See Whitehead*, 605 S.E.2d at 237-38 (identifying § 95-25.8 as a provision not covered by the FLSA); *Morales v. Showell Farms, Inc.*, 910 F. Supp. 244, 248 (M.D.N.C. 1995) (recognizing that claims under § 95-25.8 are "state provisions without direct analogues in the FLSA.") As a result, interpretations and rulings involving claims brought under the FLSA have no direct relevance to wage deduction claims brought under § 95-25.8 of the NCWHA.

The NCWHA provides that "any employer who violates the provisions of [N.C.G.S. § 95-25.8] shall be liable to the employee or employees affected [for] … their unpaid amounts due under [N.C.G.S. § 95-25.8], … plus interest at the legal rate set forth in G.S. 24-1." No statutory provisions allow these specific damage amounts to be "offset" as Defendants attempt to argue, nor do Defendants cite any such provisions. In essence, Defendants seek an exception to

---

[9] In concluding that "employers in this state should not be able to require their employees to waive wage and hour claims through general releases," SJ Order at 24, the Court observed that the "overarching goals of [the FLSA and NCWHA] are similar," citing 29 U.S.C. § 202 and N.C.G.S. § 95-25.1. SJ Order at 21. It then examined several specific provisions of the NCWHA which "all clearly indicate that employers should not be permitted to contract around proper payment of their employees." *Id.* at 24.

the liability provisions of the NCWHA. But North Carolina courts have long held that courts may not rewrite statutory schemes: "[T]he statute makes no exception. We have no power to add to or subtract from the language of the statute." *Ferguson v. Riddle*, 62 S.E.2d 525, 528 (N.C. 1950); *Worrell v. N. Carolina Dept. of State Treas., Ret. Sys. Div.*, 427 S.E.2d 871, 872 (N.C. 1993) ("We are bound by the plain words of the statute."); *Union Acad. v. Union County Pub. Schools*, No. COA11-1300, 2012 WL 5857373, at *5 (N.C. App. 2012) ("To add in such a consideration—in the guise of equitable relief—would amount to judicial amendment of the statute.").

As indicated above, Defendants rely exclusively upon interpretations of the overtime provisions of the FLSA, which have no application to § 95-25.8. But even <u>assuming</u> <u>arguendo</u> that the doctrine of overtime set-offs under the FLSA could even apply to claims made under § 95-25.8, Defendants have completely misconstrued the FLSA set-off doctrine, and as argued in Section III.B. *supra*, the FLSA neither requires nor permits set-offs of what Defendants mischaracterize as "profit" from any amounts illegally deducted by and employer under the NCWHA. Further, since Defendants have based their entire argument on decisions interpreting set-offs under the FLSA, if the Court concludes that the FLSA does not require or permit a set-off of the alleged "profits" from FLSA damages, then the same ruling should apply to all damages assessed under the NCWHA.

### D. Defendants' "Compensatory Damages" Cases Do Not Apply to the FLSA or NCWHA

Lastly, citing a potpourri of federal cases, Defendants urge the Court to offset these amorphous "profits" pursuant to "basic compensatory damages principles." *See* Br. at 10. None of these cases involve damage claims under the FLSA, or any other employment statute for that matter, and there are good reasons for Defendants' lack of applicable authority.

Two of Defendants' cases arise out of common law claims—a breach of contract case applying principles of the common law of contracts, and state law claim for breach of fiduciary duty. *See John Morrell & Co. v. Local Union 304A*, 913 F.2d 544, 551 (8th Cir. 1990) ("We must apply these principles of contract law in the context of the labor law principles implicated here"); *S&K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 847 (2d Cir. 1987) ("a New York claim for inducing … a breach of fiduciary duty.") Courts are wholly responsible for determining the measure of damages in claims under the common law, and Plaintiffs have not pled either a breach of contract claim or any state common law claim.[10]

Defendants' remaining cases arise under the federal antitrust laws or federal laws regulating the sale of securities or commodities.[11] But these cases do not support Defendants' argument that a court must offset asserted "profits" accruing to an employee in assessing damages under the FLSA or state wage deduction statutes, specifically N.C.G.S. § 95-25.8.

*Kottaras v. Whole Foods Market, Inc.*, 281 F.R.D. 16 (D.D.C. 2012), involves the issue of class certification of claims under the Sherman and Clayton Acts. The court concluded that an essential element of an antitrust claim – adverse impact or antitrust injury—could not be demonstrated by common proof because price decreases arising from the alleged merger had to

---

[10]   After spending their entire brief arguing that federal FLSA decisions permit them to set-off certain amounts, Defendants cannot now argue that they are entitled to additional remedies under state common law damage principles. Federal preemption doctrine quickly disposes of this argument because "the FLSA provides exclusive remedies for the enforcement of its own provisions." *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 194 (4th Cir. 2007); *Rogers v. City of Richmond, Va.*, 851 F. Supp. 2d 983, 990 (E.D. Va. 2012) (same). If the FLSA does not permit the set-offs Defendants seek, then they surely cannot obtain them by appealing to state common law.

[11]   *Abrahamson v. Fleschner*, 568 F.2d 862 (2d Cir. 1977) involved claims under 10(b) of the Securities Exchange Act of 1934 and the Investment Advisors Act of 1940. *Minpeco, S.A. v. Conticommodity Services, Inc.*, 676 F. Supp. 486 (S.D.N.Y. 1987) apparently arose under the Commodities Exchange Act ("CEA") 7 U.S.C. § 13.

19

be considered along with price increases in order to determine if antitrust injury occurred. *See id.* at 25 ("since [price] benefits must be offset against losses, it is clear that widespread injury to the class simply cannot be proven through common evidence.")

There is a critical distinction between the damages recoverable under the FLSA and § 95-25.8 and under the various federal laws involved in the antitrust and securities cases Defendants cite. The damages available under the FLSA and § 95-25.8 have been specifically described in the statutes themselves. *See* 29 U.S.C. § 216(b) (employees may sue for "their unpaid overtime compensation"); § 95-25.22(a) (employer "shall be liable to the employee in the amount of … unpaid amounts due [under § 95-25.8]"). In contrast, Congress enacted unspecific, general damages liability provisions under both the antitrust laws[12] and Section 28(a) of the 1934 Securities Act,[13] with the intent that the federal courts would be responsible for determining the measurement of damages under these federal statutes. Accordingly, there is no need to examine any "benefits" plaintiffs obtained in order to prove any element of a violation of either the FLSA or § 95-25.8 of the NCWHA. Liability is shown by failure to pay overtime and by deducting amounts from wages without appropriate written authorization and the amount of damages owed is specifically set out in these statutes, *Kottaras* is thus inapposite.[14]

---

[12]   The Clayton Act established a private right of action under the federal antitrust laws and simply provides that a Plaintiff "shall recover threefold the damages by him sustained." 15 U.S.C. § 15(a).

[13]   Section 28(a) provides that "no person … shall recover … a total amount in excess of his actual damages." 15 U.S.C. § 78bb(a). Section 10(b) and Rule 10b-5 failed to provide a measure of damages, which were held by the Supreme Court to be "actual damages" in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972). Section 25(a)(3) of the CEA provides that those violating the Act "shall be liable for actual damages proximately caused by such violation."

[14]   It is important to observe that Defendants' supposed "illegal activity" offset expressly has no application in *per se* antitrust cases. *See In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) (finding class certification proper in price-fixing case and holding "antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset."); *In re*

Further, the very cases Defendants cite involving damage offsets in federal securities and commodities actions make clear that the "benefit" offset principle they seek should have no application under the FLSA. The court in *Minpeco* recognized that any asserted offsets under the federal securities laws were governed by *Randall v. B.J. Loftsgaarden*, 478 U.S. 647, 106 S. Ct. 3143 (1986).[15] In *Randall*, the Court made clear that it had "never interpreted [the 'actual damages' limitation of § 28(a) of the 1934 Act] as imposing a rigid requirement that every recovery on an express or implied right of action under the 1934 Act must be limited to the net economic harm suffered by the plaintiff." *Id.* at 663, 3152-53. "Congress intended to deter fraud and manipulative practices in the securities markets … [t]his deterrent purpose is ill served by a too rigid insistence on limiting plaintiffs to recovery of their 'net economic loss'. The effect of allowing a tax benefit offset would often be substantially to insulate those who commit securities frauds from any appreciable liability to defrauded investors … [which] would seriously impair the deterrent value of private rights of action." *Id.* at 664, 3153. As a result, the court in *Minpeco* recognized that "there is no rigid requirement that a plaintiff must always be limited to its net economic injury where such a limitation would be inequitable or contrary to deterrent goals." 676 F. Supp. at 490.

Here, Congress has precisely specified the measure of damages under the FLSA, and statutorily set forth a number of permissible set offs, none of which apply to these asserted "profits." The "basic compensation damages principles" to which Defendants appeal and which

---

*Delta/AirTran Baggage Fee Antitrust Litig.*, ____ F. Supp 3d ____, No. 1:09-md-2089-TCB, 2016 WL 3770957, at *7 (N.D. Ga. July 12, 2016) ("courts have refused to allow defendants accused of such antitrust violations to assert claims that their unlawful conduct in some way benefitted the Plaintiffs … And in a price fixing conspiracy, the amount of damages is established by the amount of the overcharge.")

[15] The court in Minpeco was clearly of the opinion that decisions interpreting the federal securities laws applied to actions under the CEA.

federal courts have to some degree imported into the more general damages schemes of the federal antitrust and securities laws therefore have no application. But even if they did, *Randall* makes clear that an offset for "profits" would be inappropriate here.

Defendants' employment scheme resulted in employees being denied their overtime wages under the FLSA, and resulted in wage deductions that were clearly illegal under the NCWHA. This scheme permitted Defendants to shift their costs of doing business onto their employees, saving them substantial sums of money. Permitting Defendants to now offset any amounts Plaintiffs received from third party transferees of their routes would impair the deterrent value of employment actions and would likely "substantially … insulate those who [violate employment laws] from any appreciable liability to defrauded [employees]," *Randall*, 478 U.S. at 664, 3153. Under Defendants' theory, if a new mark can be convinced to fall for their scheme and pay a Plaintiff some amount for his route, then Defendants' liability under the FLSA or NCWHA is thereby substantially lessened or eliminated entirely.[16]  This cannot be the law, and this Court should hold that such purported "profit" offsets are not available under either the FLSA or NCWHA.

Finally, the one North Carolina case Defendants cite in support of a set-off, *Lake Mary Ltd. P'ship v. Johnston*, 551 S.E.2d 546 (N.C. App. 2001) is inapposite. *Lake Mary* involved the set-off of counterclaims and competing judgments to obtain a "net recovery." 551 S.E.2d at 557 ("the rule permits a court to set off judgments by way of claim and counterclaim."). The case does not deal with a set-off of liability, and Defendants cannot characterize their requested set-off as a counterclaim because "generally speaking, courts have been hesitant to permit an

---

[16]   For example, Defendants assert that they should be able to offset Plaintiff Rehberg's FLSA and NCWHA damages by $67,000, his supposed "profit" from transferring his route.

employer to file counterclaims in FLSA suits for money the employer claims the employee owes it." *Martin*, 628 F.3d at 740. Defendants' appeal to "the inherent equitable jurisdiction of the court," Br. at 9, n.4, rings hollow when one considers that they are seeking a set-off or "credit" for amounts that they never paid to Plaintiffs. Defendants' arguments under North Carolina common law are thus wholly without merit.[17]

**IV. Conclusion**

Defendants' brief cannot withstand scrutiny. In seeking these "offsets" to the statutory damages in this case, Defendants have ignored not only binding Fourth Circuit precedent and the statutory and regulatory universe in which this motion exists, but their own characterizations and representations to the IRS regarding the nature of these alleged profits. Indeed, it becomes difficult to see this motion as anything other than Defendants' last-ditch attempt to position themselves for trial and disadvantage Plaintiffs. Without a single leg to stand on, Defendants' motion must fail. Accordingly, Plaintiffs respectfully request that the Court deny Defendants' motion and schedule this case for trial.

---

[17] Defendants also argue that set-off is available for quantum meruit damages. *See* Br. at 11. Because Plaintiffs have not pled a claim under the North Carolina common law doctrine of quantum meruit and the Court has not certified any such claim, this is not a live issue in this litigation.

Dated:  August 5, 2016

Respectfully submitted,

/s/Shawn J. Wanta

Shawn J. Wanta, *pro hac vice*
Christopher D. Jozwiak, *pro hac vice*
BAILLON THOME JOZWIAK & WANTA LLP
100 South Fifth Street, Suite 1200
Minneapolis, MN 55402
Telephone: (612) 252-3570
Fax: (612) 252-3571
sjwanta@baillonthome.com
cjozwiak@baillonthome.com

Susan E. Ellingstad, *pro hac vice*
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Fax: (612) 339-0981
seellingstad@locklaw.com

Ann Groninger
COPELEY JOHNSON & GRONINGER PLLC
225 East Worthington Avenue
Charlotte, NC 28203
Telephone: (704) 200-2009
Fax: (888) 412-0421
ann@cjglawfirm.com

Charles E. Schaffer, *pro hac vice*
LEVIN FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone: (215) 592-1500
Fax: (215) 592-4663
cschaffer@lfsblaw.com

Gordon Rudd, *pro hac vice*
David Cialkowski, *pro hac vice*
ZIMMERMAN REED PLLP
111 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Gordon.Rudd@zimmreed.com
David.Cialkowski@Zimmreed.com

*Attorneys for Named Plaintiff*

**CERTIFICATE OF SERVICE**

I, Shawn J. Wanta, hereby certify that I have this day electronically filed the foregoing PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR CLARIFICATION OF THE CLASS CERTIFICATION ORDER AND SCOPE OF AVAILABLE DAMAGES with the Clerk of Court using the CM/ECF system, which will send notification of the filing to the following persons:

Kevin P. Hishta
A. Craig Cleland
Margaret Santen Hanrahan
Ogletree, Deakins, Nash, Smoak & Stewart, P. C.
One Ninety One Peachtree Tower
191 Peachtree St. NE, Suite 4800
Atlanta, GA 30303
maggie.hanrahan@ogletreedeakins.com
kevin.hishta@ogletreedeakins.com
craig.cleland@ogletreedeakins.com

Benjamin R. Holland
Lia A. Lesner
Ogletree, Deakins, Nash, Smoak & Stewart, P. C.
201 South College Street, Suite 2300
Charlotte, NC 28244
lia.lesner@ogletreedeakins.com
ben.holland@ogletreedeakins.com

Michael Oliver Eckard
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
211 King Street, Suite 200
Charleston, SC 29401
michael.eckard@ogletreedeakins.com

s/ Shawn J. Wanta